Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2                  MIAMI DIVISION
3            CASE NO:   14-CV-22991-KMW
4     ROBERT M. LAWRENCE,
5
             Plaintiff,
6
7     vs.
8     BAYVIEW LOAN SERVICING, LLC,
9
             Defendant.
10
      _____/
11
12
13                    One Southeast Third Avenue
                      Miami, Florida 33131
14                    Thursday, September 17, 2015
                      10:00 a.m. - 3:45 p.m.
15
16
17
                 DEPOSITION OF ROBERT LAWRENCE
18
19
20        Taken on behalf of the Defendant before Joy
21    Reich, Court Reporter and Notary Public in and
22    for the State of Florida at Large, pursuant to
23    Notice of Taking Deposition in the above cause.
24
25

CERTIFIED TRANSCRIPT

Page 2

```
 1
 2  APPEARANCES:
 3
 4  For the Plaintiff:
 5      YECHEZKEL RODAL, ESQ.
        LOAN LAWYERS, LLC
 6      2150 S. Andrews Avenue
        Second Floor
 7      Fort Lauderdale, Florida 33316
        E-mail: chezky@floridaloanlawyers.com
 8
 9  For the Defendant:
10      BRENDAN HERBERT, ESQ.
        WILLIAM MCCAUGHAN, ESQ.
11      AKERMAN, LLP
        One Southeast Third Avenue
12      25th Floor
        Miami, Florida 33131
13      E-mail: william.heller@akerman.com
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          I N D E X
 2  WITNESS        DIRECT    CROSS
 3  ROBERT LAWRENCE
 4  Mr. Herbert        4
    Mr. McCaughan        130
 5  Mr. Rodal          126
 6
            EXHIBITS
 7
    DEFENDANT'S              PAGE
 8
    Exhibit A   Financial Statement    23
 9
    Exhibit B   Letter dated November 1, '09 26
10
    Exhibit C   Letter dated March 25, 2012  50
11
    Exhibit D   Letter dated May 25, 2012   54
12
    Exhibit E   Letter dated June 30, 2012   62
13
    Exhibit F   Letter dated November 8, 201270
14
    Exhibit G   Letter dated April 1, 2013   75
15
    Exhibit H   Letter dated October 1, 2013 76
16
    Exhibit I   Letter dated October 26, 201383
17
    Exhibit J   Letter dated
18      November 21, 2013        91
19  Exhibit K   Letter dated January 3, 2014 93
20  Exhibit L   Letter dated January 13, 201496
21  Exhibit M   Letter dated April 28, 2014  107
22  Exhibit N   Letter containing Mortgage
        Interest Statement    113
23
    Exhibit O   Letter dated January 24, 2014120
24
    Exhibit P   Letter mailed
25      January 27, 2014        123
```

Page 4

```
 1  Thereupon:
 2          ROBERT LAWRENCE,
 3  was called as a witness and, having been duly
 4  sworn, and responded "Yes, ma'am," was examined
 5  and testified as follows:
 6          DIRECT EXAMINATION
 7  BY MR. HERBERT:
 8      Q.   Good morning, Mr. Lawrence.  My name
 9  is Brendan Herbert.  I'm an attorney here at
10  Akerman.  I represent the defendant, Bayview
11  Loan Servicing, in the lawsuit that you have
12  filed against it that's currently pending in the
13  Southern District of Florida, Case Number
14  14-CV-22991-KMW.
15      Do you understand that you're here
16  today to give your deposition for that case?
17      A.   Yes.
18      Q.   Have you ever given your deposition
19  before?
20      A.   No.
21      Q.   So before we get started, I know
22  you've spoken with your attorney about what
23  today is, and the reason that we're here today,
24  but there's some ground rules that I'd like to
25  establish before we go any further.  Every
```

Page 5

```
 1  question that I ask and every answer that you
 2  give is going to be taken down by the court
 3  reporter today.
 4      I'd asked that if you do answer yes or
 5  no, rather than nodding or shaking your head,
 6  you actually respond by saying yes or no so it's
 7  easier for Madam Court Reporter to take that
 8  down.  The questions that I ask you, if you do
 9  give me a answer, it will be presumed that you
10  heard and understood the question that I asked.
11      If I ask you a question and you don't
12  understand it, please just tell me and I'll do
13  my best to try to rephrase or to try to simplify
14  the question that I ask you.
15      During the deposition your attorney
16  might object to a question that I ask.  Allow
17  him to make his objection and unless he tells
18  you to not answer the question, you can go ahead
19  and proceed to answer the question that I asked.
20      If I do ask you a question, even if
21  you know where I'm going with the question,
22  please let me actually finish it before you give
23  your response.  I don't want you to guess.  Yes,
24  no or I don't know is a completely acceptable
25  answer.  However, you are under oath and you are
```

2 (Pages 2 - 5)

1 expected to testify truthfully today.
2        If at any point you need a break,
3 please let me know, I'll be happy to accommodate
4 you.  I would just ask that if we're in the
5 middle of a question, you finish giving your
6 answer to the question.  Then you actually ask
7 for the break.  There's water and coffee over
8 there if you'd like some.
9        We've just gone over some instructions
10    and ground rules for the deposition; do you
11    understand them?
12    A.   Yes.
13    Q.   Are you currently under any
14 medications that would affect your ability to
15 hear the questions that I ask you today?
16    A.   No.
17    Q.   Are you currently on any medications
18 that would affect your ability to testify
19 truthfully to the questions that I ask you
20 today?
21    A.   No.
22    Q.   Have you had an alcoholic beverage
23 within the last eight hours?
24    A.   No.
25    Q.   Do you presently have any physical or

1 mental condition that would affect your ability
2 to hear the questions that I ask you today?
3    A.   No.
4    Q.   Do you currently have any physical or
5 medical condition that would affect your
6 ability to testify truthfully today?
7    A.   No.
8    Q.   Are you married?
9    A.   No.
10    Q.   Have you ever been married?
11    A.   No.
12    Q.   For the record, can you please spell
13 your full name?
14    A.   Robert, R-O-B-E-R-T, Montieth,
15 M-O-N-T-I-E-T-H, Lawrence, L-A-W-R-E-N-C-E.
16    Q.   Where do you live?
17    A.   891 South Dyer Circle, Incline
18 Village, Nevada 89451.
19    Q.   You own that property, correct?
20    A.   Yes.
21    Q.   Do you own any other properties?
22    A.   Yes.
23    Q.   Where are those properties?
24    A.   Jacksonville, Florida.
25    Q.   What's the address?

1    A.   11181 Castleman Circle.
2    Q.   How long have you owned that property?
3    A.   Ten years, approximately.
4    Q.   That's a vacation home?
5    A.   A rental.
6    Q.   How long have you owned the property
7 at Incline Village?
8    A.   Estimate, 15 years.
9    Q.   You're employed?
10    A.   I'm on disability with United
11 Airlines.
12    Q.   When did you stop working with United?
13    A.   Approximately two and a half years
14 ago.
15    Q.   What was your job title with United?
16    A.   I'm a pilot.
17    Q.   How long were you a pilot with United?
18    A.   I have been a pilot with United for 18
19 years, approximately.
20    Q.   Who did you work for before United?
21    A.   The military.
22    Q.   What branch?
23    A.   The Navy.
24    Q.   How long were you in the Navy?
25    A.   Approximately ten years.

1    Q.   You were a pilot in the Navy?
2    A.   Correct.
3    Q.   Are you presently involved in any
4 other lawsuits?
5    A.   No.
6    Q.   Have you ever been a party to a
7 lawsuit before this one?
8    A.   Rephrase the question.
9    Q.   Have you ever sued anybody before?
10    A.   Me, personally?
11    Q.   Yes.
12    A.   No.
13    Q.   Have you ever been sued?
14    A.   No.
15    Q.   This lawsuit has to do with calls that
16 were purportedly made to your cell phone, right?
17    A.   Yes.
18    Q.   What's your cell phone number?
19    A.   Redacted-3295.
20    Q.   That's a cellular telephone?
21    A.   Correct.
22    Q.   How long has that been your cellular
23 telephone number?
24    A.   20 years.
25    Q.   That's been your cell phone number for

3 (Pages 6 - 9)

Page 10

1  20 years?
2     A.   It's my first cell phone number.  It's
3  my only cell phone number.  20 years is
4  approximate.  A very long time.
5     Q.   Have you ever had any other cellular
6  telephone numbers?
7     A.   No.
8     Q.   Have you ever owned any other cellular
9  telephone numbers?
10    A.   Sometimes traveling overseas, I would
11 just get a telephone number to call home.  I
12 don't have those.
13    Q.   When you say "telephone number to call
14 home," do you mean a calling card?
15    A.   Right.  You would just do that.  It
16 was cheaper to call home when you're overseas.
17    Q.   What do you use your cell phone for?
18    MR. RODAL:  Objection.  Form.
19 BY MR. HERBERT:
20    Q.   Let me rephrase it.  Do you have a
21 home phone number?
22    A.   No.
23    Q.   So you have no land line at the
24 Incline Village, Nevada property, right?
25    A.   At this time, correct.

Page 11

1     Q.   When's the last time you did?
2     A.   Good question.  I would estimate three
3  years ago.
4     Q.   Why did you get rid of the land line?
5     A.   I would receive calls -- not required.
6  The land line was not required.  I could live
7  without a land line.
8     Q.   So then your cell phone now is your
9  primary telephone, correct?
10    A.   Yes.
11    Q.   Do you have an office?
12    A.   No.
13    Q.   Have you ever owned a work or office
14 number, telephone number?
15    A.   No.
16    Q.   When I asked you just a few minutes
17 ago, whether when you stopped working for
18 United, I think you said, "I've been working for
19 United for, 18 years;" was it?
20    A.   August 1997.
21    Q.   Is it your position or is it your
22 testimony that you're still employed by United?
23    A.   Yes.
24    Q.   How much communication do you have
25 with United now?

Page 12

1     A.   Very little.
2     MR. RODAL:  Objection.
3  BY MR. HERBERT:
4     Q.   How much communication have you had
5  with United over the last two and a half years
6  that you've been on disability?
7     MR. RODAL:  Objection.  Form.
8     Q.   You can answer the question.
9     MR. RODAL:  Just for the record, I'm
10 gonna say "form."  Unless I instruct you not
11 to, I'm not gonna say anything to you --
12 unless I tell you not to, then go ahead and
13 answer the question.
14    THE WITNESS:  State the question.
15 BY MR. HERBERT:
16    Q.   You've testified that you've been on
17 disability for two and a half years, right?
18    A.   Approximately.
19    Q.   How often do you speak with United or
20 have you spoken with United over those two and a
21 half years?
22    MR. RODAL:  Objection.  Form.
23    A.   I would say every six months.
24    Q.   When you speak with them, do you speak
25 with them over the telephone or is it in writing

Page 13

1  going back and forth?
2     MR. RODAL:  Form.
3     A.   Telephone primarily.  They do send
4  letters, so telephone and writing.
5     Q.   Why have you spoken with then every
6  six months over the last two and a half years on
7  your cellular telephone?
8     MR. RODAL:  I object to this line of
9  questioning.
10 BY MR. HERBERT:
11    Q.   You can answer.
12    A.   It would have to do with the
13 disability payments.
14    Q.   Are you on permanent disability?
15    A.   Yes.
16    Q.   What did you do to prepare for today's
17 deposition?
18    MR. RODAL:  Objection.  Calls for
19 attorney/client privilege.
20 BY MR. HERBERT:
21    Q.   Right.  I don't want you to tell me
22 anything you spoke to your attorney about, but
23 other than that, what did you do to prepare for
24 today's deposition?
25    A.   Very little.  I have some notes,

4 (Pages 10 - 13)

1 reviewed the notes that I've put together over
2 the years.
3    Q.   Are those your personal notes?
4    A.   Yes.
5    Q.   How many notes have you put together
6 over the years?
7    A.   Rephrase.
8    Q.   How many pages of notes have you put
9 together over the years?
10       MR. RODAL:  Objection.
11    A.   75 pages.
12    Q.   What do those notes include?
13    A.   Rephrase the question.
14    Q.   There's 75 pages of notes that you've
15 taken that you just said that you reviewed --
16    A.   Correct.
17    Q.   -- in anticipation of today's
18 deposition, right?  What's in those notes?
19    A.   Open-ended question.  What -- I don't
20 understand the question.
21    Q.   What is on those 75 pages of notes
22 that you reviewed in anticipation of today's
23 deposition?
24    A.   Notes regarding Bayview.
25    Q.   Have you produced those notes in this

1 case?
2    A.   Yes.
3       MR. HERBERT:  Have they all been
4    produced in this case?
5       MR. MCCAUGHAN:  I'd have to go back
6    and look.  There's some compilations of what
7    they've given us.  I don't know how many
8    pages.
9       MR. RODAL:  Clarify what you mean by
10    "notes."
11 BY MR. HERBERT:
12    Q.   Mr. Lawrence just testified that, over
13 the years you've put together approximately 75
14 pages of notes regarding -- that you reviewed in
15 anticipation of today's deposition, correct?
16    A.   Approximately 75 pages, about one-inch
17 thick in a binder; that's correct.
18    Q.   Are they handwritten or typed?
19    A.   Both.
20    Q.   Are they all notes that you have
21 taken?
22    A.   Yes.
23    Q.   I want you to tell me what's on those
24 75 pages of notes that you reviewed before
25 today's deposition.

1    A.   They're notes regarding Bayview.
2    Q.   What about Bayview?
3    A.   About my interaction with Bayview.
4    Q.   What about your interaction with
5 Bayview?
6    A.   I don't understand the question.
7 There's multiple interactions with Bayview.
8 Please ask me what you want me to explain?
9    Q.   Well, tell me about each interaction
10 with Bayview that you just referenced that's in
11 the 75 pages of notes you reviewed.
12       Do you have the notes here with you
13 today?  You can reference them, if you'd like.
14       MR. RODAL:  No.
15    A.   They're in the car.
16       MR. HERBERT:  Have you seen this
17    binder?  Off the record.
18       (Discussion off the Record)
19 BY MR. HERBERT:
20    Q.   So besides reviewing your binder that
21 you have regarding this case, did you do
22 anything else besides speaking to your attorney
23 today to prepare for the deposition?
24    A.   No.
25       MR. RODAL:  Just to clarify, off the

1    record, I had discussion, Mr. Lawrence
2    clarified that when he said "notes" he was
3    referring to the many documents that have
4    been provided that were like Bayview letters
5    to and from Bayview that had some of his
6    handwritten notes.  So we're not talking
7    about separate notes -- separate as far as,
8    we're concerned you produced all this to
9    defendant.
10 BY MR. HERBERT:
11    Q.   So just to clarify, the binder that
12 you just referenced that contains all of your
13 notes, every page in that binder has been
14 produced in this case, correct?
15    A.   As far as I know, yes.  I did not
16 produce them, so I can't guaranty that, but I
17 produced them.
18    Q.   Have you spoken with anybody else
19 besides your attorney with regard to this
20 deposition?
21    A.   No.
22    Q.   Have you spoken with anybody else
23 besides your attorney regarding the allegations
24 in this lawsuit?
25    A.   Yes.

5 (Pages 14 - 17)

Page 18

1   Q.   Who?
2   A.   The Nevada Attorney General.
3   Q.   When did you speak with the Nevada
4 Attorney General?
5   A.   Two years ago, approximately.
6   Q.   Do you remember that individual's
7 name?
8   A.   No.
9   Q.   Was that over the telephone?
10   A.   Writing.
11   Q.   Who else have you spoken with
12 regarding the allegations of this lawsuit?
13   A.   The Florida Attorney General.
14   Q.   Was that also in writing?
15   A.   Yes.
16   Q.   Who else have you spoken with?
17   A.   The Florida Department of Financial
18 Services.
19   Q.   Also in writing?
20   A.   Yes.
21   Q.   Who else?
22   A.   The Florida -- there's another agency,
23 Division of Financial Services.  There's two
24 Divisions of Financial Services.
25   Q.   Also in writing?

Page 19

1   A.   Yes.
2   Q.   Who else?
3   A.   The Nevada equivalent of the
4 Department of Financial Services.
5   Q.   Do you remember what that department
6 or what that equivalent was titled?
7   A.   No.  I have it and I can get that to
8 you.
9   Q.   Who else?
10   A.   There is also a second Nevada
11 Department of Financial Services.  I think they
12 call it, Business and Industry, Department of
13 Business and Industry.
14   Q.   Also in writing?
15   A.   Yes.
16   Q.   Who else have you spoken to?
17   A.   Senator Harry Reid.
18   Q.   Was that also in writing?
19   A.   Yes.
20   Q.   Who else?
21   A.   Senator Elizabeth Warren.
22   Q.   Also in writing?
23   A.   Yes.
24   Q.   Who else?
25   A.   The Consumer Financial Protection

Page 20

1 Board.
2   Q.   Also in writing?
3   A.   Yes.
4   Q.   Who else?
5   A.   To the best of my knowledge, that is
6 the list.
7   Q.   Have you discussed this lawsuit with
8 any members of your family?
9   A.   No.
10   Q.   Have you discussed this lawsuit with
11 any of your friends or personal acquaintances?
12   A.   No.  My girlfriend.
13   Q.   What's your girlfriend's name?
14   A.   Leona Tilden.
15   Q.   Does she live with you?
16   A.   No.
17   Q.   What's her address?
18   A.   I'll have to get back to you.  I don't
19 know.
20   Q.   Where does she live?
21   A.   In San Francisco, the Bay Area.
22      MR. HERBERT:  So you're gonna get that
23   information for us?  After the depo or should
24   we just take a break so we can get it now?
25      MR. RODAL:  We'll get it to you later,

Page 21

1   I guess.
2      MR. HERBERT:  That's fine.
3 BY MR. HERBERT:
4   Q.   What's your date of birth?
5   A.   5 October, 1963.
6   Q.   What's your highest level of
7 education -- tell me about your educational
8 background.
9   A.   Bachelor of Science.
10   Q.   From?
11   A.   California Polytechnic State
12 University.
13   Q.   Do you have any graduate degrees?
14   A.   No.
15   Q.   Do you currently hold any professional
16 licenses?
17   A.   Yes.
18   Q.   In what?
19   A.   I'm a registered professional
20 engineer.
21   Q.   Is your license from the State of
22 California or Nevada?
23   A.   California.
24   Q.   Any other licenses?
25   A.   Flying, obviously, pilot's license.

6 (Pages 18 - 21)

Page 22

1  Q.  Who is that issued by?
2  A.  The FAA.
3  Q.  That license is current?
4  A.  Yes.
5  Q.  Do you know who Saxon Mortgage Company
6  is?
7  A.  What do you mean?
8  Q.  Have you ever heard of Saxon Mortgage?
9  A.  Yes.
10  Q.  Who are they to your knowledge?
11  A.  A loan servicing company.
12  Q.  Do you recall Saxon at a time when
13  Saxon was the loan servicer of the loan that is
14  the subject of this lawsuit?
15  A.  Yes.
16  Q.  Did you ever speak with anybody from
17  Saxon over the phone?
18  A.  I don't recall.
19  Q.  Do you remember applying for a loan
20  modification with Saxon?
21  A.  Yes.
22  Q.  Why did you do apply for a loan
23  modification with Saxon?
24  A.  United Airlines, my employer, went
25  bankrupt.  The pilots took two pay cuts, the

Page 23

1  pilot retirement age was increased from 60 to
2  65.  All of those things combined reduced my
3  monthly income.
4  Q.  So did you apply for a modification
5  because you could no longer afford your monthly
6  mortgage payments?
7  A.  Yes.
8  Q.  When you applied for a modification,
9  had you fallen behind in making those payments?
10  A.  Saxon requested that I do not make two
11  payments and that would enable them to modify
12  the loan.  I did as told by Saxon.
13  Q.  Do you remember who from Saxon told
14  you to stop making payments?
15  A.  No.
16  Q.  Was that over the phone or in writing?
17  A.  Over the phone.
18  Q.  So you submitted a loan modification
19  package, right?
20  A.  Correct.
21  Q.  I'm going show you a document that is
22  Bates-stamped Bayview 4000151.
23     (Defendant's A, Financial
24  Statement, was marked for Identification.)
25  BY MR. HERBERT:

Page 24

1  Q.  I'm handing you a document I've marked
2  as Exhibit A. Have you ever seen this document?
3  A.  Yes.
4  Q.  Is that your handwriting on the
5  document?
6  A.  Yes.
7  Q.  Did you fill this document out?
8  A.  Yes.
9  Q.  Is that your signature at the bottom
10  of the page?
11  A.  Yes.
12  Q.  If you look at the top, left-hand box,
13  it asks for loan number, your name, property
14  address, et cetera, correct?
15  A.  Yes.
16  Q.  You see the box where it says, "cell
17  phone number"?
18  A.  Yes.
19  Q.  I know it's redacted, but the last
20  four digits here that are not redacted are 3295,
21  correct?
22  A.  Yes.
23  Q.  So you provided your cell phone to
24  Saxon, right, on this document?
25     MR. RODAL:  Objection.

Page 25

1  A.  It appears so.
2  Q.  To clarify, the number that you
3  provided here on this document that's been
4  marked as Exhibit A, is the cell phone that is
5  the subject of this lawsuit, right?
6  A.  Those are the last four numbers of my
7  current cell phone.
8  Q.  Those were the last four numbers of
9  your cell phone at the time you filed this
10  complaint, correct?
11  A.  Yes.
12  Q.  What is Alpen Glow Plastic Surgery?
13  A.  I have no idea what that is.
14  Q.  All right.  I'm going to show you a
15  document --
16  A.  What did I just -- what is Alpen Glow
17  Plastic Surgery?
18  Q.  I don't know.  It's at the top of the
19  document, so it looks like that's where the fax
20  was sent in, so I didn't know what that was.
21     MR. RODAL:  You're gonna keep the
22  ones with the blue -- you're gonna keep?
23     MR. HERBERT:  I'm marking a document
24  that has been previously Bates-stamped as
25  Bayview 001353, as Defendant's Exhibit B.

7 (Pages 22 - 25)

1         (Defendant's B, Letter dated
2    November 1, '09, was marked for
3    Identification.)
4    BY MR. HERBERT:
5         Q.   Have you ever seen this document?
6         A.   Not in a very long time.  I can't
7    recall this document, but that is my writing.
8         Q.   Would you agree with me that this
9    letter was in reference to the loan that Saxon
10   serviced with respect to your Nevada property?
11        A.   It appears so.
12        Q.   It's your testimony that this does
13   appear to be your handwriting, correct?
14        A.   Yes.
15        Q.   Do you remember writing this letter?
16        A.   No.
17        Q.   You said that it had been a while
18   since you've seen this letter, but you have seen
19   this letter before, right?
20        A.   I recognize the writing.
21        Q.   So at bottom of the letter, it's the
22   signature of Bob Lawrence; right, that's your
23   signature?
24        A.   Yes.
25        Q.   Right underneath it, there's a

1    redacted area, there are four numbers that end
2    in 3295, correct?
3         A.   Yes.
4         Q.   Which would be the last four numbers
5    of your cell phone, correct?
6         A.   Yes.
7         Q.   Look at this letter, does it refresh
8    your recollection as to why you wrote this
9    letter to Saxon?
10        A.   It appears related to the loan
11   modification.
12        Q.   Can you expound upon that?
13        A.   No.
14        Q.   What about the loan modification; why
15   were you trying to contact Saxon regarding the
16   loan modification at this point, on
17   November 1, 2009?
18        MR. RODAL:  Objection.
19        A.   I don't know.
20        Q.   Take a look at the letter and see if
21   it refreshes your recollection.
22        A.   It relates to the loan modification.
23        Q.   Let's go through the letter.  It says,
24   "I have not received the new modified
25   statement," right?

1         A.   Yes.
2         Q.   That's what it says.  So would you
3    agree with me that you were writing this letter
4    to Saxon because you had not received a new
5    modified statement?
6         MR. RODAL:  Objection.
7         A.   It appears so.
8         Q.   Do you remember if that was a cause
9    for concern to you?
10        A.   No.
11        Q.   You don't remember?  Okay.  Why would
12   you put your phone number at the bottom of the
13   page?
14        A.   In case somebody of knowledge would
15   want to clarify whatever issue in the letter.
16        Q.   When you say "somebody of knowledge,"
17   what do you mean?
18        A.   Somebody relating to this information
19   would need any further information, I would
20   assume in this letter.
21        Q.   You listed your number in case
22   somebody wanted to get in touch with you, right?
23        A.   In case somebody of knowledge had any
24   question over what I wrote in this letter.
25        Q.   Explain to me what you mean "of

1    knowledge" though?
2         A.   As it relates to this letter.
3         Q.   Again, when you say "of knowledge,"
4    explain to me what you mean by that?  What
5    constitutes a person of knowledge?
6         A.   Somebody who has knowledge of a loan
7    modification.
8         Q.   Somebody from Saxon?
9         A.   Somebody who has information relating
10   to the loan modification at Saxon.
11        Q.   So you put this number on the bottom
12   of the page in case they wanted to get in touch
13   with you, right?
14        A.   In case somebody with knowledge of the
15   loan modification at Saxon required more
16   information.
17        Q.   What would your understanding be of
18   somebody -- when you say "somebody with
19   knowledge of the loan modification situation,"
20   what does that mean?
21        MR. RODAL:  Objection.
22   BY MR. HERBERT:
23        Q.   What do you mean by that?
24        A.   If somebody in this case, required
25   information relative to the loan modification.

8 (Pages 26 - 29)

Page 30

1    Q.    Do you remember whether you wrote any
2  other letters to Saxon when they were servicing
3  your loan about the modification?
4    A.    No.
5    Q.    Do you remember whether you wrote any
6  letters at all to Saxon when they were servicing
7  your loan besides this one?
8    A.    I have given -- this is the letter.  I
9  don't recall very much with Saxon to be honest
10  with you.
11    Q.    So is that, "no, you do not recall"?
12    A.    No.  I don't recall this letter.
13    Q.    Do you remember a time in which
14  Bayview assumed servicing of your loan from
15  Saxon?
16    A.    Restate the question.
17    Q.    Do you remember when Bayview started
18  servicing your loan?
19    A.    I don't remember it.
20    Q.    You would agree with me, there was a
21  point in time where Bayview began servicing your
22  loan, right?
23    A.    Yes.
24    Q.    Do you remember how you first found
25  out they were servicing your loan?

Page 31

1    A.    They sent me a letter.
2    Q.    Do you remember what the letter said?
3    A.    In general terms that they were going
4  to service my loan.
5    Q.    Do you remember what year that
6  occurred in?
7    A.    2011, approximately.
8    Q.    Do you remember the first time you
9  spoke to somebody over the telephone from
10  Bayview?
11    A.    I do not.
12    Q.    Do you remember ever speaking to
13  somebody from Bayview?
14    A.    Yes.
15    Q.    Who did you speak to?
16    A.    I don't recall.  The first phone call
17  with Bayview?
18    Q.    Any phone call with Bayview; do you
19  remember the names of anybody you spoke with at
20  Bayview?
21    A.    Yes.
22    Q.    Tell me their names.
23    A.    I remember Mitchell Beck, supervisor.
24    Q.    Do you remember when you spoke to
25  Mr. Beck?

Page 32

1    A.    Approximately January of 2014.
2    Q.    Did you call him or did he call you?
3    A.    I called them and Mitchell Beck was
4  the second person, and I don't recall the
5  representative that I called first.  He was the
6  one who was supposed to fix the problem.
7    Q.    Did you call him from your cell phone?
8    A.    Yes.
9    Q.    The cell phone that's the subject of
10  this lawsuit?
11    A.    Yes.
12    Q.    Do you know, ballpark, how many times
13  between 2011 and 2015 you used your cell phone
14  to call Bayview?
15    A.    No.
16    Q.    It was more than five?
17    A.    Yes.
18    Q.    More than ten?
19    A.    I would say, yes.
20    Q.    Do you remember if it was more than
21  20?
22    A.    What period of time?
23    Q.    Between 2011 and 2015, to the present,
24  how many times do you think given your rough
25  estimate, that you have used your cell phone to

Page 33

1  call Bayview?
2        MR. RODAL:  Objection.
3    A.    I would estimate, very roughly, 50.
4    Q.    Did you ever call Bayview, to the best
5  of your recollection, from a number other than
6  your cell phone?
7    A.    No.
8    Q.    Besides Mr. Beck, who else did you
9  speak to at Bayview when you called Bayview?
10    A.    Dina, a supervisor, Dina.
11    Q.    In the notes that you reviewed to
12  prepare for today's deposition, are the names of
13  any of the individuals with whom you spoke at
14  Bayview written down or listed on those notes?
15    A.    Yes.
16        MR. HERBERT:  Off the record.
17        (Discussion off the Record)
18        MR. HERBERT:  Is there anything that
19  is objectionable with respect to the --
20        MR. RODAL:  I mean, there's some stuff
21  that is work product, where it was, like,
22  summary and stuff that we're taking into
23  litigation.
24        But -- so in clarifying what
25  documents, first of all, he did not review

9 (Pages 30 - 33)

Page 34

1  this. He did not review this last night in
2  anticipation -- I understood your question,
3  are these the only documents you reviewed?
4      He didn't review these last night. He
5  met with me. He didn't review any documents
6  other than I gave him, you know, the
7  discovery responses, the complaint. We went
8  over production. We went over, you know,
9  attorney/client privilege.
10     We went over the interrogatories, the
11  initial disclosures. So he did not review
12  this. When he answered, have you reviewed in
13  anticipation of litigation? So this was not
14  reviewed last night.
15     You know, I don't really want to have
16  a senseless discovery dispute, because this
17  was all given over, other than this summary,
18  which summarizes everything. You know, I
19  don't know if it's worth it, a discovery
20  dispute, put on principle, you could have
21  made it duces tecum. This is all produced.
22  All these things are tabbed here.
23     MR. HERBERT: I mean --
24     THE WITNESS: Clarification, I thought
25  you asked me in preparation for the case.

Page 35

1  Last night I really didn't review anything.
2  I just kind of looked at the interrogatories
3  or whatever.
4  BY MR. HERBERT:
5      Q.   Let me ask you this, when's the last
6  time you reviewed the documents that are in that
7  binder?
8      A.   Not for a long time. A long time
9  would be, maybe, two weeks or something -- I
10  haven't really looked, you know, cause I just
11  haven't looked at that stuff.
12     Q.   When was the first time you found out
13  that your deposition was gonna be taken today?
14     A.   About a month ago. Are we on the
15  record?
16     Q.   Yes. When were the notes that are in
17  that bender created?
18     A.   A year ago.
19     Q.   Before or after this lawsuit was
20  filed?
21     A.   Before.
22     Q.   What's in that binder?
23     A.   All --
24     MR. RODAL: Objection.
25  BY MR. HERBERT:

Page 36

1      Q.   Pending the objection, we'll discuss
2  that -- but you can answer.
3      A.   All of my information about Bayview,
4  that only relates to Bayview.
5      Q.   What kind of information that relates
6  to Bayview?
7      A.   Everything that I documented relative
8  to Bayview only.
9      Q.   Everything that you documented with
10  respect to your communications and calls with
11  Bayview?
12     A.   Communications, calls, yes.
13     MR. HERBERT: So then, listen, I think
14  that -- and this is not a question for you.
15  This is a question for your attorney or a
16  discussion with your attorney. Arguably,
17  those are subject to being turned over as an
18  initial disclosure, in my opinion, just
19  because there were -- there were disclosure
20  notes regarding this -- regarding what
21  happened with respect to the facts leading up
22  to your client filing the case.
23     MR. RODAL: They were disclosed in the
24  initial disclosure. We're not required to
25  provide the actual documents.

Page 37

1      MR. HERBERT: Then, if you want, we
2  can go through each and every request for
3  production that was propounded upon
4  Mr. Lawrence to see of the documents that are
5  in that binder, that were not produced,
6  should have been produced in response to it,
7  I think.
8      MR. RODAL: You know what I'm gonna
9  do? Without waiving the objection of
10  relevance and work product, I'm gonna give
11  you everything that was produced. I'm doing
12  this to save us both the time and effort and
13  discovery dispute, without waiving the
14  objection to speed this up a little.
15     MR. HERBERT: Why don't we do this,
16  I'll take a look at what's in here, okay?
17  Rather than making a copy of everything and
18  marking it as one composite exhibit.
19     MR. RODAL: I believe everything
20  here -- I don't even know if I gave you the
21  summaries. I may have given you the
22  summaries.
23     The only thing that you may not have
24  is the summary, which I don't think is in
25  response to any production, that would be

10 (Pages 34 - 37)

Page 38

1  work product.  Other than that, everything
2  else --
3        MR. HERBERT:  Let me take a quick
4  look.
5        MR. RODAL:  (Handing).  I gave you the
6  documents in chronological order.
7        MR. HERBERT:  Off the record.
8        (Discussion off the Record)
9        MR. HERBERT:  I've asked to look at
10 the documents that have just been provided to
11 us without Mr. Rodal waiving objection to the
12 production of those documents, I've asked
13 whether or not we can step into the room next
14 door to review the documents, and when I say
15 "we," I mean counsel for Bayview.
16       Mr. Lawrence is objecting.  He does
17 not want the folder that has been provided to
18 us to leave his sight.  So therefore I'm
19 going to ask that Mr. Lawrence, to the extent
20 that he does not want this original folder to
21 leave his sight, Mr. Lawrence can go to the
22 document services department here at the firm
23 with us, while we make a copy of the contents
24 of this folder.  Would you like to come with
25 us?

Page 39

1        MR. RODAL:  Yes.  And all these
2  documents have been produced already.
3        MR. HERBERT:  Let's go make a copy.
4        [Recess taken.]
5  BY MR. HERBERT:
6     Q.   All right.  So, Mr. Lawrence, you have
7  your notes in front of you.  You've been so kind
8  and your counsel's been so kind as to allow us
9  to make a copy of the notes that you previously
10 referenced.  They're in front of you now.
11       We last left off when I asking about
12 the names of people at Bayview that you had
13 spoken with, right?
14       And you told me about Mitchell Beck
15 and then you told me about a woman named Dina.
16 Looking through, you've had an opportunity to
17 look through your notes; do you remember that
18 woman's name?
19    A.   It's Norma Darias (phonetic).
20    Q.   She's an employee of Bayview, correct?
21    A.   I assume so.
22    Q.   Did you call her or did she call you?
23    A.   I called her -- I called a
24 representative and was transferred to a manager.
25 The manager in this case was Norma Darias.

Page 40

1     Q.   Do you remember what you spoke to
2  Ms. Darias about?
3     A.   The accounting problem.
4     Q.   When you reference the accounting
5  problem, what do you mean?
6     A.   The insurance problem, the property
7  insurance problem, was satisfied by Bayview in
8  December of 2013.  Bayview at that point, was to
9  correct the accounting of the force-placed
10 insurance that they then disclosed was proper.
11       The accounting of the force-placed
12 insurance premium was what I was discussing with
13 Norma Darias.
14    Q.   Do you remember besides speaking with
15 Norma Darias or Mitchell Beck, if you ever spoke
16 anybody directly on a call that you initiated
17 from your cell phone?
18    A.   I did with Norma Darias -- is that
19 what you're saying?
20    Q.   Besides Ms. Darias and Mr. Beck --
21    A.   So now we're going to somebody else.
22    Q.   We'll go to somebody else?
23    A.   Yes.
24    Q.   Who was that person?
25    A.   Terry.

Page 41

1     Q.   Do you know Terry's last name?
2     A.   No.
3     Q.   That was a call you made to Bayview?
4     A.   Yes.
5     Q.   Do you remember what you spoke to
6  Terry about?
7     A.   The accounting problem.
8     Q.   When you say the "accounting problem,"
9  you mean the insurance issue that you just told
10 me about?
11    A.   I mean the insurance issue that we
12 just discussed.
13    Q.   You previously testified -- and
14 correct me, if I'm wrong -- that in the
15 vicinity, given it's a rough estimate, I
16 understand about 50 times where you called
17 Bayview using your cellular phone, right?
18    A.   Approximately, 50 phone calls.
19    Q.   How many of those calls that you
20 placed to Bayview were regarding the insurance
21 issue that you just described?
22    A.   I don't know.
23    Q.   Do you remember any occasions where
24 you called Bayview about something other than to
25 the insurance issue on your property?

Page 42

1    A.    This wasn't the insurance issue.  This
2  was the accounting issue.
3    Q.    Explain to me the difference between
4  the insurance issue and the accounting issue.
5    A.    The insurance issue is up until
6  December of 2013.  At that point, the insurance
7  issue was solved.  After the insurance, it
8  became an accounting issue.
9    Q.    Tell me about the accounting issue.
10    A.    I just did.
11    Q.    Can you tell me again, please?
12    A.    Bayview acknowledged proper property
13  insurance in December of 2013.  At that point,
14  the force-placed insurance premium was to be
15  accounted for.
16    Q.    When you say "accounted for," what do
17  you mean?
18    A.    Reimburse.  At that point forward, I
19  was looking for the accounting of that
20  force-placed insurance premium to be resolved.
21  That is an accounting issue.  That occurred
22  after December 24, 2013, when I spoke with
23  Cynthia.
24    Q.    So you just referenced an insurance
25  issue and an accounting issue?

Page 43

1    A.    Correct.
2    Q.    Tell me what the insurance issue was.
3    A.    It was force-placed insurance policy.
4    Q.    Could you explain?
5    A.    Ask me a question.
6    Q.    When you refer to an insurance
7  issue --
8    A.    Yes.
9    Q.    -- which you've been referring to,
10  right?  What was the insurance issue?
11    A.    Bayview, for lack of a better word,
12  "said" that I did not have proper property
13  insurance.  I did have proper property insurance
14  that was the insurance issue.
15    Q.    So as you sit here today, of those
16  roughly 50 calls that you made on your cell
17  phone to Bayview directly, you don't know how
18  many of those are related to the insurance
19  issue, as you refer to it, and how many were
20  related to the accounting issue, as you refer to
21  it; is that true?
22    A.    Now that we understand the two
23  different issues, I would approximately say
24  two-thirds of those calls were related to the
25  insurance issue and one-third of those calls

Page 44

1  were related to the accounting issue.
2    Q.    Do you remember the names of any of
3  the other individuals that you spoke with when
4  you called Bayview directly using your cellular
5  telephone?
6    A.    Cynthia.
7    Q.    Cynthia what?
8    A.    I don't know.
9    Q.    When did you speak with Cynthia?
10    A.    December 24, 2013.  Let me confirm
11  that.  Cynthia, yes, sir.
12    Q.    What happened during that call; what
13  did you talk about on that call, sir?
14    A.    Force-placed insurance.  I had given
15  documentation for 21 months of insurance
16  multiple times.  Every document that USAA had
17  provided directly.  At this point, Christmas
18  Eve, I received an acceleration notice for the
19  cost of that premium.  And at this point with
20  nothing left to do, I said, "I'm going to have
21  to sue you."
22    Q.    So did you tell Cynthia during that
23  call you were going to sue Bayview?
24    A.    First time I've ever used that term,
25  yes.

Page 45

1    Q.    You were frustrated, right?  At that
2  point, you must have been very frustrated?
3    A.    I was very -- I was ready to solve the
4  problem with Bayview.
5    Q.    Do you remember any other individuals
6  with whom you spoke from Bayview at time that
7  you --
8    A.    I didn't finish my conversation.
9    Q.    I'm sorry.  Go ahead.
10    A.    So I, for the first time in the my
11  life, threatened a complaint, at this point,
12  Cynthia immediately acknowledged that she had
13  the proof of insurance without any additional
14  information, Cynthia showed proof of insurance.
15  No additional information was provided to
16  Cynthia, and Cynthia had proof of insurance.
17         The only thing that was different in
18  my communication with Bayview is that I
19  threatened legal action.  Unfortunately, I
20  didn't want to threaten legal action.  No
21  additional proof was given to Bayview and
22  Cynthia found the insurance.  Next question.
23    Q.    With all due respect, this is my
24  deposition, and I'll be controlling the
25  deposition, and I'll be asking the questions, so

12 (Pages 42 - 45)

1 you don't tell me when to ask the next question,
2 respectfully.
3    A.   No disrespect intended.
4    Q.   Who else from Bayview besides
5 Ms. Darias, Cynthia and Mitchell Beck, did you
6 speak with during a call in which you contacted
7 Bayview using your cellular telephone?
8    A.   Andrea.
9    Q.   When did you speak with Andrea?
10   A.   January 23, 2014, sir.
11   Q.   What did you speak to Andrea about?
12   A.   The accounting problem.
13   Q.   How long did you speak to Andrea for;
14 do you remember?
15   A.   No.
16   Q.   What was the context of that call;
17 what about the accounting problem did you speak
18 to her about?
19   A.   The numbers of the accounting.
20   Q.   Was that issue resolved by the end of
21 the call with Andrea or no?
22   A.   Andrea understood the problem.  Andrea
23 promised to fix the problem.  Andrea did not fix
24 the problem.
25   Q.   How did you end the call with Andrea,

1 do you remember?
2    A.   The phone call was terminated.
3    Q.   By who?
4    A.   I don't know.
5    Q.   Did you say goodbye to each other or
6 did you hang up on each other?
7    A.   No.  It was broken.  Somebody
8 disconnected the phone call.
9    Q.   Did you try calling Andrea back?
10   A.   Yes, I could not -- I don't know for
11 sure.  What I did is, I put the conversation
12 notes that I had with Andrea together, and I
13 gave those notes to Mitchell Beck.
14   Q.   Do you know whether or not Andrea
15 tried calling you back once you got
16 disconnected?
17   A.   I don't know that information.
18   Q.   Would you agree with me that if you
19 were in the middle of a conversation with Andrea
20 and your phone got disconnected, that it would
21 be reasonable for her to call you back?
22   A.   Yes.
23   Q.   Who else did you speak with on a call
24 you placed to Bayview using your cellular
25 telephone?

1       MR. RODAL:  Objection.
2 BY MR. HERBERT:
3    Q.   You can answer.
4    A.   Johnny.
5    Q.   When did you speak with Johnny?
6    A.   May 29, 2013.
7    Q.   Do you know or recall how long you
8 spoke to Johnny?
9    A.   I estimate 30 minutes.
10   Q.   Was that regarding the accounting
11 issue or the insurance issue?
12   A.   The insurance issue.
13   Q.   What did you talk about on that call?
14   A.   It was a three-way conversation and I
15 had my USAA insurance representative on that
16 conversation and it was my attempt to solve the
17 insurance problem once and for all.
18   Q.   Did you initiate that call?
19   A.   Yes.
20   Q.   So, how did that call end?
21   A.   It ended with me asking Johnny if he
22 had everything that he possibly desired relative
23 to insurance?
24   Q.   Do you remember what Johnny said?
25   A.   Yes.

1    Q.   What did he say?
2    A.   Yes.
3    Q.   Yes, he had everything?
4    A.   Yes.
5    Q.   Did he say that they would be back in
6 touch with you?
7    A.   No.
8    Q.   What did he say then before the call
9 ended?
10   A.   Yes.
11   Q.   Just "yes" --
12   A.   Correct.  I asked if the purpose was
13 to have the insurance representative give the
14 information directly to the insurance department
15 at Bayview where Johnny worked.
16       At the end of the conversation, I just
17 asked Johnny if he had everything that Bayview
18 needed to show that the property was properly
19 insured?  Johnny, to the best of my knowledge,
20 said, yes -- but I don't know if it was yes, sir
21 or yes, I don't know the exact words.
22   Q.   Who else did you speak to?
23       MR. RODAL:  Did you use the
24 interrogatory responses that list each and
25 every call; would that be easier?

13 (Pages 46 - 49)

1      MR. HERBERT: I don't. Mark
2  Exhibit C.
3      (Defendant's C, Letter dated
4  March 25, 2012, was marked for
5  Identification.)
6    A.   To the best of my knowledge, those are
7  calls I have notes on.
8    Q.   So I've marked a document that has
9  been Bates-stamped Lawrence_docs 015. I'm
10 marking it a Defendant's Exhibit C. I'd like
11 you to take a look at this document and tell me
12 if you've ever seen it.
13   A.   I don't recall this letter, but this
14 is my writing.
15   Q.   Is that your signature at the bottom
16 of the page?
17   A.   Yes.
18   Q.   You wrote this to Bayview regarding
19 the insurance issue, correct?
20   A.   Yes.
21   Q.   On last sentence or last line of the
22 body of this, document you'd agree with me that
23 it says, "questions/requests" and then it
24 provides a telephone number, correct?
25   A.   Yes.

1    Q.   That is the cellular telephone number
2  that is the subject of this lawsuit, correct?
3    A.   Yes.
4    Q.   Why did you write Bayview this letter?
5    A.   To solve the insurance problem.
6    Q.   So at the end of the letter, it says,
7  "questions/requests;" why did you write that?
8    A.   I assume if -- I don't know what went
9  with this letter, if there was any information
10 with this letter, but if they required
11 additional information than what I provided, the
12 question or requests would be relative to that
13 for the insurance.
14   Q.   So you're telling them that -- correct
15 me if I'm wrong -- you're telling them that if
16 they have questions or requests that they can
17 call at that number, correct?
18   A.   I'm telling whoever receives this
19 letter, somebody with information or knowledge,
20 to call me or contact me relative to the
21 insurance.
22   Q.   So just to clarify, you're saying that
23 you wanted the person that received it,
24 physically received the letter to contact you or
25 somebody from Bayview with knowledge of the

1  information in the letter to contact you?
2    A.   This is an insurance issue. Somebody
3  from the insurance department to contact me to
4  with additional -- I'm trying to solve the
5  insurance problem, so my thought was, if they
6  needed any additional insurance documents?
7    Q.   Do you agree with me that this letter
8  does not say that "I want somebody specifically
9  from the insurance department to call me,"
10 right?
11   A.   I would say it's implied in the
12 letter.
13   Q.   But it doesn't actually say that,
14 right?
15   A.   It does not say that.
16   Q.   After you sent this letter, did
17 anybody from Bayview contact you?
18   A.   No.
19   Q.   Nobody from Bayview contacted you
20 regarding the insurance issue?
21   A.   This letter, I believe not.
22   Q.   As you sit here today, I don't want
23 you to guess, do you know or do you not know
24 whether somebody from Bayview contacted you
25 regarding the insurance issue?

1    A.   What does "contact" mean? Phone
2  contact or mail contact?
3    Q.   Either.
4    A.   Not phone, no phone contact. I
5  believe there were letter -- there was a letter
6  response at some point regarding the insurance.
7    Q.   Then looking at Exhibit C, it just
8  says at the top, it says "ATTN: Bayview,"
9  right?
10   A.   Yes.
11   Q.   Does that mean "Attention: Bayview"?
12   A.   "Attention Bayview, insurance
13 department."
14   Q.   Does it say "Bayview insurance
15 department"?
16   A.   That's implied in the letter.
17   Q.   But you'd agree with me, it just says
18 "Attention Bayview," right?
19   A.   Yes.
20   Q.   Do you know the address to which you
21 sent this letter?
22   A.   No.
23   Q.   When you were sending letters into
24 Bayview was there one address that you were
25 sending it to or were you sending it to

Page 54

1 different addresses?
2   A.   Generally, multiple addresses which
3 were received from the statement.  I would send
4 them to both addresses.
5   Q.   Which addresses were those?
6   A.   I don't know.  It was the addresses
7 that were on the statements.  So I made sure it
8 was my goal to ensure the proper department
9 received the information.
10   Q.   Did you ever send any letters directly
11 to Bayview Loan Servicing Insurance Department?
12   A.   No.  That was not on the statement.
13   Q.   So you just sent them to Bayview Loan
14 Servicing?
15   A.   There is more than one address, and I
16 sent the letters to more than one address.  I
17 don't have that address with me.
18       (Defendant's D, Letter dated
19 May 25, 2012, was marked for
20 Identification.)
21 BY MR. HERBERT:
22   Q.   All right.  I've marked a document
23 that's been Bates-stamped as Bayview 000759 as
24 Exhibit D. I'd like you to look at this document
25 and tell me if you recognize it.

Page 55

1   A.   Yes.
2   Q.   Did you draft this letter?
3   A.   Yes.
4   Q.   It's not signed, but did you send it?
5   A.   I assume so.
6   Q.   Do you have any reason to believe you
7 didn't send this letter?
8   A.   No.
9   Q.   This letter is dated May 25, 2012,
10 correct?
11   A.   Yes.
12   Q.   Who did you send this letter to?
13   A.   This letter, if I didn't sign it, I
14 don't know, was this a text or was it a letter?
15 I don't recall what format this was.  There was
16 one text.  I have sent a written response --
17 this is, I sent an e-mail to Bayview, it appears
18 in the letter.  I've sent a written response to
19 the above address and an e-mail.
20       So in this case, this was not only
21 sent to that -- so it's implied in the letter
22 here.  I sent it to this Post Office and I sent
23 it to that e-mail, it directly says in the
24 letter.
25   Q.   When you say, "Post Office" you mean

Page 56

1 "Post Office Box" in Troy, Michigan?
2   A.   I don't remember the letter.  I'm just
3 reading the letter and it says, "I have sent a
4 written response to the above address and an
5 e-mail to Bayview team at pflc.com, I assume, so
6 in the letter itself, I describe what I'm doing
7 with this letter.
8   Q.   Who at Bayview did you send the letter
9 to?
10   A.   I don't understand the question.
11   Q.   I says here, at the top of the
12 letter -- you'd agree with me, it says, "Bayview
13 Loan Servicing, Post Office Box 5933, Troy,
14 Michigan, correct?
15   A.   Yes.
16   Q.   Do you have any reason to believe that
17 you did not physically mail that letter to
18 Bayview Loan Servicing at Post Office Box 5933?
19   A.   Yes.  That's what I would have done,
20 is mail it to that address.
21   Q.   Do you know what Post Office Box 5933
22 was?
23   A.   I assume at this point, it's a mail
24 collection facility.  And I additionally assume
25 that somebody there has adequate knowledge to

Page 57

1 put the letter to the proper individual in this
2 case, insurance.
3   Q.   Halfway down the letter -- tell me if
4 I read it incorrectly -- it says, "please feel
5 free to contact me at (Redacted)-3295; do you see
6 that?
7   A.   Yes.
8   Q.   That's your cell phone number that's
9 the subject of this lawsuit?
10   A.   Yes.
11   Q.   Why did you put that sentence in this
12 letter?
13   A.   I wanted somebody of knowledge to
14 contact me.
15   Q.   Again, you keep saying, "somebody of
16 knowledge," where do you get that from?
17   A.   My goal was to solve an insurance
18 problem.  So my goal was to have this letter
19 delivered to somebody at the insurance
20 department and solve the insurance problem.  If
21 this letter had the insurance statement, the
22 insurance documents, the -- I provided the
23 actual policy, my desire was to have those
24 documents go to, in this case, the insurance
25 department at Bayview.

15 (Pages 54 - 57)

Page 58

1    Q.   Did you ever send a letter
2  specifically, any letter, specifically to
3  Bayview Loan Servicing, care of the insurance
4  department?
5    A.   No.
6    Q.   Why not?
7    A.   I assume that Bayview is capable of
8  receiving a letter and distributing the letter
9  to the appropriate department.
10    Q.   Why would the loan servicing
11  department not be the appropriate department to
12  receive the letter?
13    A.   This is Bayview Loan Servicing.
14    Q.   Right.  So you sent a letter to
15  Bayview Loan Servicing, correct?
16    A.   Yes.
17    Q.   Did anybody contact you on your cell
18  phone after you sent this May 25, 2012 letter?
19    A.   No.
20    Q.   I want to restate that, did Bayview
21  contact you after you sent in this May 25, 2012
22  letter?
23       MR. RODAL:  Objection.
24  BY MR. HERBERT:
25    Q.   You can answer.

Page 59

1    A.   Again, I don't believe so.
2    Q.   Did you send any letters into Bayview
3  that specifically said "I want to receive a
4  phone call from somebody in the insurance
5  department"?
6    A.   No. Can we go off the record for a
7  minute?
8    Q.   Unless it's to take a break or unless
9  it's to speak to your attorney?
10    A.   Just to you.
11    Q.   Then, no.
12       This letter here that's been marked as
13  Defendant' D, the end of it is threatening
14  efiling a complaint with state and federal
15  regulators, right?
16    A.   I don't -- which paragraph?
17    Q.   You wrote the letter.  Tell me what
18  the last few paragraphs of this letter --
19    A.   I appealed to the state and federal
20  regulators.
21    Q.   Before that, it says, "in rough form,
22  the critical complaint will be as follows:"  So
23  tell me who you were threatening here?
24    A.   I was nonthreatening.  I was just
25  going to notify the state and federal regulators

Page 60

1  which I subsequently have done.
2    Q.   You don't believe that that's a
3  threat?
4    A.   I'm just stating a fact.
5    Q.   Let me ask you this, let's relate it
6  differently.  If, when you were still flying, if
7  somebody had alleged to you that they were going
8  to file a complaint with the FAA about you, do
9  you think that would be threatening?
10       MR. RODAL:  Objection.
11  BY MR. HERBERT:
12    Q.   You can answer.
13    A.   I was just -- my goal was to solve an
14  insurance problem and I was going to appeal to a
15  regulator to help solve the insurance problem.
16    Q.   So if somebody told you that they were
17  going file a complaint against you with the FAA,
18  you would not take that as threatening?
19       MR. RODAL:  Objection.
20  BY MR. HERBERT:
21    Q.   You can answer.
22    A.   Yes.
23    Q.   You would feel that that was
24  threatening, right?
25    A.   I would try and solve whatever issue

Page 61

1  that they had for me that applied to the FAA.  I
2  wouldn't feel threatened, because I would solve
3  the problem.  I'm not threatened, it would give
4  me an incentive to solve the problem.  I don't
5  see that as a threat.  It would be a goal to
6  solve the problem.  I don't see that as
7  threatening to me.
8    Q.   One of the last full sentences, "if
9  this matter is unresolved in 30 days, I will
10  file a complaint."
11    A.   Again, to try and solve the issue.
12    Q.   You don't feel that that is
13  threatening?
14    A.   This is a complaint.  This isn't a
15  legal complaint.  This was a complaint to a
16  federal regulator.  Again, notification.
17       MR. HERBERT:  I'm going to mark this
18     document.  This was a document that was in
19     the notes.
20       MR. RODAL:  The date?
21       MR. HERBERT:  June 30, 2012.
22       MR. RODAL:  Do you have that index I
23     sent you?
24       MR. MCCAUGHAN:  I don't.  I'm not
25     saying that you didn't.  I'm just saying in

16 (Pages 58 - 61)

Page 62

1   my exhibits of the letters in this group for
2   the cell phone numbers, I don't have it.
3       MR. RODAL: I sent over an index with
4   all the letters by date.
5       MR. HERBERT: I'm just going to mark
6   this.
7       (Defendant's E, Letter dated
8   June 30, 2012, was marked for
9   Identification.)
10  BY MR. HERBERT:
11      Q.   I have marked a document that is not
12  date-stamped which may or may not have been
13  produced, we're looking into that, as Exhibit E.
14  It's a letter dated June 30, 2012.
15          Have you seen this document?
16      A.   I wrote this document.
17      Q.   Did you send it to Bayview?
18      A.   Yes.
19      Q.   Who at Bayview did you send it to?
20      A.   There were multiple, I think two
21  addresses on the back of the statements I
22  received from Bayview.  In general, I would send
23  the letter to the addresses on the statement,
24  multiple addresses.
25      Q.   Now, at the bottom of the document

Page 63

1   that's been marked as Defendant's E, your cell
2   phone is there, right?
3       A.   Yes.
4       Q.   You wrote it there?
5       A.   Yes.
6       Q.   Why did you write that document; why
7   did you send that letter to Bayview?
8       A.   I was trying to solve an insurance
9   problem.
10      Q.   Why did you leave your number at the
11  bottom of it?
12      A.   I requested, if anybody at the
13  insurance department or somebody of knowledge at
14  Bayview needed to contact me with additional
15  requests or information.
16      Q.   Does that letter specifically request
17  somebody from Bayview's insurance department to
18  contact you?
19      A.   It's implied in the letter.
20      Q.   Where?
21      A.   It says "insurance documents by USAA.
22  Here's current USAA documents, here's the
23  paperwork of USAA insurances.  It has a USAA
24  insurance policy number.  It's implied in this
25  document that -- if anything, the documents, I

Page 64

1   assume were sent with this letter -- anybody in
2   the insurance department to contact me.
3       Q.   You sent that to Bayview Loan
4   Servicing, correct?
5       A.   I sent this letter to the addresses
6   that were given in the statement provided to me
7   from Bayview, multiple addresses.
8       Q.   Did you ever ask, during any of your
9   conversations, either telephonically or in
10  writing, for the specific address or P.O. Box
11  for the insurance department at Bayview?
12          MR. RODAL: Object to form.
13      A.   I assume that Bayview was capable of
14  distributing the information within their
15  company.  No, I did not feel that that was
16  required.
17      Q.   Did you know if there is a specific
18  P.O. Box or address for a department within
19  Bayview that handles insurance disputes?
20      A.   I do not know that.  The only thing I
21  know Johnny at Bayview insurance department and
22  he identified himself as Employee A01.
23      Q.   Did you ask for Johnny's e-mail?
24      A.   I did not.  I let the insurance
25  company directly send the information to Johnny.

Page 65

1       Q.   During the roughly 30-minute call you
2   had with USAA, yourself and Johnny, do you know
3   whether USAA ever requested a specific address
4   or e-mail address from Johnny at which they
5   could send that information?
6       A.   I believe it was a fax.  They did
7   communicate as to how they were to receive the
8   information.  I don't recall if it was a fax or
9   an e-mail.  My sense is that it was a fax.
10      Q.   Did you ever fax anything specifically
11  to Johnny?
12      A.   No.
13      Q.   Did you ever ask for a fax number for
14  the insurance department within Bayview?
15          MR. RODAL: Objection.
16  BY MR. HERBERT:
17      Q.   You can answer the question.
18      A.   Repeat the question.
19      Q.   Did you ever ask for a fax number for
20  the insurance department at Bayview?
21          MR. RODAL: Same.
22  BY MR. HERBERT:
23      Q.   You can answer the question.
24      A.   I assumed Johnny and the USAA
25  representatives were fully capable of

17 (Pages 62 - 65)

1 communicating whatever Johnny required as proof
2 of insurance amongst themselves. I didn't feel
3 it necessary for me to additionally fax
4 information to Johnny when I have USAA
5 representative with all knowledge of the
6 insurance documents. I didn't feel that was
7 necessary.
8    Q.   So your answer is "no"?
9    A.   Yes, my answer is "no."
10   Q.   During that call you found out that
11 there was in fact a fax number at which Bayview
12 within the insurance department could be
13 contacted, right?
14   A.   I realized that Bayview had an
15 insurance department.
16   Q.   You realized during that call, at the
17 latest, that they had a fax number as well?
18   A.   I'm not certain that the documents
19 were faxed. I assume there were communication
20 methods and that USAA communicated properly. I
21 assume there's a fax number at the Bayview,
22 insurance department -- the Bayview, insurance
23 department.
24   Q.   If you assumed that there was fax
25 number for the Bayview insurance department, why

1 didn't you request it?
2    A.   Because I had a USAA representative
3 providing the documents to them directly. I
4 figured that was -- 100 percent, I figured that
5 would solve the problem, to have a USAA
6 representative fax the documents directly to
7 Bayview Loan Servicing.
8    Q.   Did it solve the problem?
9    A.   It did not.
10   Q.   You kept sending an e-mail or letters
11 to Bayview after that three-way conversation
12 between you, Johnny and USAA, right?
13        MR. RODAL: Objection.
14   A.   Yes.
15   Q.   You kept sending them to Bayview Loan
16 Servicing, correct?
17   A.   To the address that I had, which was
18 provided by the statement.
19   Q.   But you did not send any
20 correspondence after that to, specifically, to
21 the insurance department at Bayview?
22   A.   I felt as though Bayview adequately
23 could distribute the information within their
24 own company.
25   Q.   So the answer is "no"?

1    A.   The answer is "no."
2    Q.   You've been telling me that you
3 thought that Bayview would be capable of
4 distributing correspondence to the appropriate
5 departments internally once they received them,
6 right?
7    A.   I feel Bayview should be perfectly
8 capable of distributing documents to the
9 appropriate department within their company.
10   Q.   Do you feel Bayview is, in fact,
11 capable of that, knowing what you know now?
12   A.   I don't know.
13   Q.   You have no position on that?
14   A.   I don't know if it was intentional, I
15 don't know. I don't know.
16   Q.   This process really has frustrated
17 you, right?
18   A.   I have better things to do with my
19 time than prove insurance to Bayview Loan
20 Servicing.
21   Q.   Is that yes or no?
22   A.   No.
23   Q.   You weren't frustrated with the
24 process?
25   A.   I have better things to do than to

1 provide insurance documents to Bayview --
2 frustrating -- it's work. It's just work. It's
3 unnecessary work. You might -- you could apply
4 multiple adjectives to it. It's work.
5    Q.   Do you feel that the process of trying
6 to resolve the insurance or the accounting
7 issues affected you in any way other than it
8 just being annoying?
9        MR. RODAL: Objection.
10   A.   No. It takes, it's a lot of work and
11 it mentally, it rides on you. It's -- what
12 was -- state the question, please?
13   Q.   Besides it just being annoying, did
14 the process -- or annoying you, did the process
15 of trying to resolve the insurance or accounting
16 issues take any other toll on you?
17   A.   I would say, yes.
18   Q.   How?
19   A.   Maybe just the insurance process
20 mentally, trying to come up with multiple ways
21 to show that I insured the property properly was
22 little bit overwhelming. I didn't understand
23 why it was so difficult. Maybe a little bit --
24 frustrating, you know, I don't know if it's the
25 correct word, but it's an adjective that is

Page 70

1  similar -- may be properly applied here.  I
2  don't know the correct adjective.  Does that
3  answer your question?  I am trying to answer
4  your question.
5      Q.   I appreciate that.  I'm trying to --
6  we'll move on.  We might com back to it.  Let's
7  mark Exhibit F for identification.
8          (Defendant's F, Letter dated
9  November 8, 2012, was marked for
10  Identification.)
11  BY MR. HERBERT:
12     Q.   So I'm gonna show you a document
13  that's been previously Bates-stamped as Bayview
14  000760.  Have you ever seen this document?
15     A.   This is my writing.  I don't recall
16  this document, but it is my writing.
17     Q.   Is that your signature at the bottom?
18     A.   It's not my signature, but it's
19  just --
20     Q.   It's your writing?
21     A.   It's my writing, yes.
22     Q.   Then the number next to your name, is
23  the cell phone number that is at issue in this
24  lawsuit, right?
25     A.   Yes.

Page 71

1      Q.   I'd like you to read starting with
2  "again"?
3      A.   "I've enclosed a USAA billing
4  statement showing the correct billing for my
5  homeowner's insurance.  The actual policy has
6  already been sent to Bayview.  However, if you
7  need it again, please ask."
8      Q.   Then the next sentence.
9      A.   "I am beginning to see a systemic
10  problem with Bayview."
11     Q.   Why were you leaving your cell phone
12  number on this letter?
13     A.   For somebody with knowledge from
14  Bayview to, however, possibly they could need
15  additional information to get a hold of me with
16  whatever request they might deem reasonable.
17     Q.   Do you know whetherer the insurance
18  department within Bayview was the only
19  department who could have helped you resolve
20  your issue?
21         MR. RODAL:  Objection.
22  BY MR. HERBERT:
23     Q.   You can answer.
24     A.   Say again.
25     Q.   You have an issue with your insurance

Page 72

1  at this point, right?
2      A.   I didn't have an insurance issue.
3  Bayview had an insurance issue.
4      Q.   There was a dispute with respect
5  insurance at this time in November of 2012,
6  correct?
7      A.   No.
8      Q.   There was no dispute?
9      A.   "It was a dispute with proof of
10  insurance to Bayview.  My property has always
11  been insured."
12     Q.   There was a dispute between you and
13  Bayview as to whether or not there was insurance
14  coverage on your property in November of 2012;
15  was there not, sir?
16     A.   Yes.
17     Q.   You sent in a lot of letters to
18  Bayview; did you not?
19     A.   Yes.
20     Q.   This is one of the letters that you
21  sent in; was it not?
22     A.   Yes.
23     Q.   This letter listed your phone number;
24  did it not?
25     A.   Yes.

Page 73

1      Q.   You've consistently said that you list
2  your phone number because you want somebody to
3  contact you with knowledge of the topics that
4  are raised -- the disputes that are raised in
5  your letters to Bayview; did you not?
6      A.   Topic, singular, insurance, yes.
7      Q.   In topic, let's see if we agree, the
8  topic is whether or not you should have been
9  charged by Bayview for lender-placed insurance
10  at that time, correct?
11     A.   Whether the property was properly
12  insured, which it was.
13     Q.   My question for you is, do you know
14  whether the insurance department within Bayview
15  is the only department that could have resolved
16  this issue for you?
17         MR. RODAL:  Objection.
18     A.   I assumed the insurance department was
19  capable of solving this insurance problem.  I
20  don't know if a manager -- I don't know.  I
21  assume Bayview has the capability to get this
22  letter to the insurance department, if that's
23  appropriate, the C.E.O. of the company, if
24  that's appropriate.  But I assumed that they
25  know how to handle this -- my goal here is to

19 (Pages 70 - 73)

Page 74

1 solve the insurance problem.
2    Q.   So when you just said to the insurance
3 company or to the C.E.O., what it really comes
4 down to is, you just wanted somebody to contact
5 you that could help you, right?
6    A.   I wanted somebody to solve the
7 insurance problem.
8    Q.   Did to matter to you who at Bayview
9 could have helped you solve the insurance
10 problem?
11    A.   Whoever Bayview wants to solve the
12 insurance problem is fine with me.
13    Q.   The last sentence here says, "I'm
14 beginning to see a systematic problem with
15 Bayview."  What did you mean by that?
16    A.   That only references the need to write
17 multiple letters to Bayview.
18    Q.   Can you explain?
19    A.   It shouldn't take more than one letter
20 to solve proof of insurance.
21    Q.   Let me ask you this, obviously, in
22 November 2012 your insurance issue problem had
23 not been resolved yet, right; you'd agree with
24 me?
25    A.   Yes.

Page 75

1    Q.   The conversation you had with Johnny
2 in USAA was I believe, May 2012, right; does
3 that sound right?
4    A.   May 29th of 2013 -- no, it's May of
5 2013.
6        (Defendant's G, Letter dated
7 April 1, 2013, was marked for
8 Identification.)
9        MR. HERBERT:  Off the record.
10        (Discussion off the Record)
11 BY MR. HERBERT:
12    Q.   I've marked a document that's
13 previously Bates-Labeled as Bayview 000761 as
14 Defendant's G. Have you ever seen this document,
15 Mr. Lawrence?
16    A.   I remember this letter, yes.
17    Q.   Do you remember who you sent it to?
18    A.   I sent it to the addresses on the
19 Bayview Loan Servicing statement and this is
20 probably one of those addresses.
21    Q.   So we've seen two different addresses
22 now.  We've seen one in Michigan and one in
23 Coral Gables, Florida?
24    A.   I just noticed that and I assume that
25 those are on the back of the statement, but I

Page 76

1 would send a letter to both of them.
2    Q.   Do you recall whether you sent any
3 correspondence to Bayview to an address other
4 than the Coral Gables or the Michigan address?
5    A.   Only the addresses that were on the
6 statement.
7    Q.   Down in the second-to-last paragraph,
8 it says, "I will send two copies of this letter,
9 one copy will be enclosed with the mortgage
10 payment coupon to a Chicago address;" do you
11 know which address that is?
12    A.   I assume it's on the statement.  I
13 was -- my attempt was to get the letter to the
14 appropriate department within Bayview.
15    Q.   At the end of this letter it says,
16 "please do the right thing.  Please resolve this
17 matter correctly.  I desire a good
18 relationship," because you wanted this fixed,
19 right?
20    A.   Yes.
21    Q.   Let me ask you this, a lot of the
22 letters have this letterhead on it, the wings,
23 right; is that your standard letterhead?
24    A.   Yes.
25        (Defendant's No. H, Letter dated

Page 77

1 October 1, 2013, was marked for
2 Identification.)
3 BY MR. HERBERT:
4    Q.   I'm gonna show you a document that's
5 been previously Bates-stamped as Bayview 000707.
6 Have you seen this document?
7    A.   I don't recall this document, but this
8 is from me.
9    Q.   Is that your signature at the bottom
10 of the page?
11    A.   Yes.
12    Q.   Now, this was dated October 1, 2013,
13 right?
14    A.   Yes.
15    Q.   It would have been after the
16 conversations you had with USAA and Johnny?
17    A.   Yes.
18    Q.   If you look down to the paragraph
19 starting with the word, "however"?
20    A.   Yes.
21    Q.   The last half-sentence says, "I am
22 uncertain as to whether this lack of
23 communication is deliberate or simply
24 disorganization; do you see that?
25    A.   Yes.

20 (Pages 74 - 77)

1    Q.   What does that mean?
2    A.   It's what we discussed about 15
3 minutes ago.  I forget what your question was
4 previously.  This alludes to that.  I don't know
5 if the act was deliberate or otherwise within
6 Bayview.  My sense was this should not be this
7 difficult.  That's what that means.
8    Q.   So just to be clear, so you mean the
9 failure to resolve the problem that you had, you
10 didn't know whether that was a lack of
11 communication or disorganization internally
12 within Bayview?
13       MR. RODAL:  Objection.
14   A.   I don't know why it is -- or was that
15 difficult to prove insurance to Bayview.  I
16 don't know obviously because I don't work for
17 Bayview, if the cause is internally or
18 intentional internally.  I don't know why it's
19 so hard to solve a proof of insurance problem.
20   Q.   As you sit here today, do you think it
21 was due to disorganization or was it
22 intentional?
23   A.   I don't know.
24   Q.   Do you have an opinion one way or the
25 other?

1    A.   I don't know.
2    Q.   You don't have an opinion one way or
3 the other?
4    A.   We can speculate on everything but
5 there are no facts.  I can honestly say that if
6 you were to take a class in probabilities, if
7 something was missed once or twice, there's a
8 high degree of probability that it was a
9 mistake.
10       If something happens nine, ten, 11 or
11 12, the probability of a mistake decreases and
12 the opposite increases.  That's what I can say.
13   Q.   Then applying that reasoning to your
14 situation, are you saying that you think that
15 the failure to resolve this problem with respect
16 to your insurance was intentional?
17       MR. RODAL:  Objection.
18   A.   The probability starts to move in that
19 direction, yes.
20   Q.   Now, this letter asks to "please
21 provide a basis for this escrow account not
22 having a zero balance," right?
23   A.   Yes.
24   Q.   Do you know the name of the department
25 or departments in Bayview who could provide that

1 basis?
2       MR. RODAL:  Objection.
3    A.   No.
4    Q.   In this letter, you provided your cell
5 phone number, correct?
6    A.   Yes.  Yes.
7    Q.   Why did you provide your cell phone
8 number?
9    A.   For somebody with knowledge within
10 Bayview Loan Servicing, to solve this problem.
11   Q.   To provide a basis for the escrow
12 account not having a zero balance, right?
13   A.   Yes.
14   Q.   Would it matter to you who within
15 Bayview assisted you in resolving this problem?
16   A.   My goal is to have -- to be honest, I
17 never had an escrow account.  This escrow
18 account was generated by Bayview.  It's not my
19 escrow account.  The account has no escrow.  I
20 assumed that they could properly within the
21 company solve this problem.
22   Q.   So you didn't care who solved it, you
23 just wanted it solved, right?
24   A.   I assume in this case, the accounting
25 department would solve this problem.

1    Q.   Why do you assume that?
2    A.   Because it's an accounting problem.
3    Q.   Do you know if there's an accounting
4 department within Bayview?
5       MR. RODAL:  Objection.
6    A.   I assume there's an accounting
7 department within Bayview.
8    Q.   What do you assume the accounting
9 department within Bayview does?
10   A.   Accounting.
11   Q.   What kind of accounting?
12   A.   I don't know different types of
13 accounting.
14   Q.   Run the accounting internally for
15 Bayview or from a corporate standpoint or
16 accounting of individual borrower complaints for
17 loans that Bayview services?
18   A.   I don't know the difference.
19   Q.   When you sent this letter and you
20 expected to get a response from the accounting
21 department at Bayview?
22   A.   I expected them to provide a basis for
23 this escrow account not being zero.  The billing
24 statements were late so all they had to do is
25 show it on the next billing statement, would

Page 82

1 have been adequate.  The accounting department
2 fix the accounting statement with no contact
3 whatsoever would have been perfectly adequate.
4     Q.   Do you know whether the accounting
5 department at Bayview has the ability to do
6 that?
7     A.   I don't know.
8     Q.   You didn't ask specifically in this
9 letter for the accounting department at Bayview
10 to contact you; did you?
11     A.   It's implied in this letter.
12     Q.   Where?
13     A.   To provide a basis for an account not
14 having a zero balance.  That would be an
15 accounting problem.
16     Q.   You're making the assumption that the
17 accounting department is the only department
18 within Bayview that can actually do that, right?
19     A.   I assumed when the letter arrives to
20 Bayview, that Bayview has the capability to
21 distribute the information to the appropriate
22 department to solve the appropriate problem.
23     Q.   If you were wrong and the accounting
24 department, as you have described it, is not the
25 proper department to provide you the information

Page 83

1 you requested, that wouldn't matter to you,
2 right?  It would only matter to you that a
3 department that could fix this contacted you?
4     A.   Or solve the problem.  I just wanted
5 the problem solved.
6         (Defendant's I, October 26, 2013,
7 was marked for Identification.)
8 BY MR. HERBERT:
9     Q.   I'm going to show you a document
10 previously marked as Bates-stamp Bayview 000768.
11 I marked it as Defendant's I.  Have you seen this
12 document?
13     A.   I don't recall this document.
14 However, I did do this document, and I do
15 remember the name Dina Rodriguez.
16     Q.   Do you remember who Dina Rodriguez is?
17     A.   I don't.  I assume she's a manager or
18 somebody in the insurance department.
19     Q.   Your phone number is at the top of
20 this letter, right?
21     A.   Yes.
22     Q.   Why did you send this letter directly
23 to Dina Rodriguez?
24     A.   Because she had written me a letter
25 and that was one response that I did receive for

Page 84

1 the insurance, I believe, was from Dina
2 Rodriguez.  So I had a name within Bayview and,
3 again, it goes back to our previous concept, I'm
4 just trying to get information to the
5 appropriate person to solve the insurance
6 problem.
7     Q.   So you wanted a response -- you wanted
8 to engage in communication with Dina, right,
9 here?
10     A.   I wanted Dina to solve the insurance
11 problem.
12     Q.   So you sent the letter to Dina, right?
13     A.   In response to a letter from Dina.
14     Q.   Because you wanted Dina to fix this
15 problem for you?
16     A.   To solve the insurance problem.
17     Q.   Let me ask you this, you wanted a
18 response from the insurance department on all
19 the other letters that you sent in.  Why didn't
20 you address those letters like you did to Dina
21 here, and say, "Bayview, insurance department"?
22         MR. RODAL:  Objection.
23     A.   I assume Dina was the person at the
24 insurance department at Bayview.
25     Q.   Why did you assume that?

Page 85

1     A.   Because I have a letter from Dina.
2     Q.   Does that letter say that Dina was
3 from the insurance department at Bayview?
4     A.   I don't recall.
5     Q.   Is it in your notes?
6     A.   I don't recall.  I don't have it.  To
7 the best of my knowledge, I received a letter
8 from her, and that's why I responded to her.
9 For some reason, I cannot find that document.
10     Q.   Were you relieved once you had
11 somebody who you believed was helping you within
12 Bayview?
13         MR. RODAL:  Objection.
14     A.   I thought that possibly Dina was the
15 appropriate person to solve the problem within
16 Bayview.
17     Q.   So you started writing her,
18 specifically?
19     A.   I think I wrote one letter.  I don't
20 know if I wrote more than one to Dina.  What
21 would happen -- it's a typical pattern in that
22 one person would respond and then they would
23 disappear.  Then no communication.  Another
24 person would respond and then disappear.  I
25 don't recall whether Dina -- I don't believe I

22 (Pages 82 - 85)

Page 86

1 received anything back from Dina, so there's
2 no -- the communication was terminated.
3    Q.   When you say "one person would respond
4 and then would disappear," what departments did
5 those people that responded work in within
6 Bayview?
7    A.   I assume the insurance department.
8    Q.   Do you know that for sure?
9    A.   I assumed.  I assumed they have the
10 ability to, you know, if they're gonna contact
11 me about insurance, they're from the insurance
12 department.
13    Q.   So, similarly, did you also assume
14 that if you needed to resolve a problem with
15 insurance you should contact the insurance
16 department within Bayview?
17    A.   I did that.
18    Q.   When?
19    A.   With Johnny.
20    Q.   In May of 2013, right?
21    A.   Yes.
22    Q.   How did you get in touch with Johnny?
23    A.   I was transferred.
24    Q.   Did you call Bayview and specifically
25 request to speak to somebody in the insurance

Page 87

1 department?
2    A.   No.  Somebody transferred me within
3 Bayview, somebody with knowledge.  So somebody
4 within Bayview to the best of my recollection.
5    Q.   When you say "with knowledge" what do
6 you mean?
7    A.   They knew -- an insurance problem and
8 they switched me to the appropriate department
9 within Bayview to solve insurance problems.
10    Q.   On the occasions that you called
11 Bayview directly, did you ever ask for somebody
12 specifically within the insurance department?
13    A.   I would notify them of my problem and
14 they would switch me to an individual and I
15 assume they were responsible for insurance.
16    Q.   When did you first come to the opinion
17 that the insurance department was the
18 appropriate department to resolve your problem
19 for you?
20    A.   I don't understand the question.
21    Q.   So when did you first determine that
22 the insurance department was the proper
23 department to resolve your insurance issue --
24 dispute?
25    A.   I just assumed -- I think all along I

Page 88

1 assumed that the insurance department was the
2 appropriate department.  I just assumed that
3 writing to those addresses would get to the
4 proper insurance department to solve the
5 problem.
6    Q.   So this letter that you sent to Dina,
7 you included your number in that letter; would
8 you -- by including your number in that letter,
9 were you asking Dina to call you back?
10    A.   If she had knowledge, which it
11 appeared she did, not in this letter but the
12 previous correspondence, it would be adequate
13 for her to contact me.
14    Q.   Do you remember what Dina's position
15 within Bayview was?
16    A.   I have no idea.
17    Q.   Do you know if she's a manager?
18    A.   I have no idea.
19    Q.   What if somebody had called you back
20 from Bayview who worked with Dina who could have
21 helped resolve your issues as well, would you
22 have taken issue with that?
23    A.   If somebody with knowledge within
24 Bayview would have contacted me and that was the
25 intent of my number, I would have happily solved

Page 89

1 my insurance problem.
2    Q.   So if somebody called you from Bayview
3 that could have helped you with this issue, you
4 would have been okay with that?
5    A.   I would have -- at this point,
6 requested the information be written, but verbal
7 communication to prepare for a written response
8 would have been adequate, yes.
9    Q.   Can you clarify that?
10    A.   All I'm trying to say is at this
11 point, I would want something in writing, not
12 verbal, so if she did contact me --
13    Q.   You would want something in writing
14 meaning what?
15    A.   Not a verbal acknowledgment of
16 insurance, so something documented.
17    Q.   But if she had called in response to
18 this letter dated October 26, 2013, you would
19 have been fine with that, right?
20    A.   Yes.
21    Q.   Actually, if anybody had called you
22 from Bayview who could have helped you resolve
23 this issue after this October 26, 2013 letter,
24 you would have been happy with that?
25    A.   Somebody with knowledge from Bayview

23 (Pages 86 - 89)

Page 90

1 who could solve the insurance problem, yes.
2    Q.    I've got to ask you, when you keep
3 saying "with knowledge," just to clarify, are
4 you saying somebody that has knowledge or
5 information that could assist in resolving this
6 problem for you?
7    A.    Yes.
8    Q.    Is that all you mean?
9    A.    I don't understand "all."
10    Q.    You keep saying "with knowledge" and
11 you might not know this but "with knowledge" can
12 be a legal term --
13    A.    I didn't know that.
14    Q.    So you just mean somebody that knows
15 what they're talking about?
16    A.    Somebody with knowledge.
17    Q.    Somebody with knowledge of the dispute
18 between you and Bayview?
19    A.    Somebody with knowledge from the
20 insurance department in this case to solve the
21 insurance problem.
22    Q.    But, again, you'd agree with me that
23 you don't know that the insurance department is
24 the only department that could have resolved
25 this for you, right?

Page 91

1    A.    I don't know.  I assume, you know,
2 somebody from accounting isn't going to solve an
3 insurance problem would be my guess.
4    Q.    So if somebody from accounting had
5 called you and said, "listen, Mr. Lawrence, we
6 can resolve this for you," you would have been
7 okay with that, right?
8        MR. RODAL:  Objection.
9    A.    I would have assumed they had the
10 ability to solve the problem, yes, if they could
11 solve the problem, yes.
12        (Defendant's J, Letter dated
13 November 21, 2013, was marked for
14 Identification.)
15 BY MR. HERBERT:
16    Q.    All right.  So I'm going to show you a
17 document that we're marking as J, Defendant's J,
18 which has been previously Bates-stamped as
19 Bayview 000811.  I'd like you to look at this
20 document.  Do you recognize this document?
21    A.    I recognize Dina's name.  This is
22 after that previous document.  This is in
23 November and that is my signature.
24    Q.    So here you sent it to just generally
25 Bayview, right?

Page 92

1    A.    In looking at this, I assume that now
2 Dina has disappeared, sort of like what we
3 discussed before.  When I say "whomever" in this
4 case, it means somebody in the insurance
5 department again.
6        My sense is -- I don't recall in
7 sequence what the purpose of this letter is, but
8 my sense is that now Dina has failed to respond
9 to the previous letter and now I'm back to
10 square one again with a letter to Bayview trying
11 to get to the insurance department again.
12 That's the intent of that header.
13    Q.    But it doesn't say -- whomever it may
14 concern at the insurance department, right?
15    A.    That's implied.
16    Q.    The letter -- it's actually sent, just
17 to Bayview, not even Bayview Loan Servicing, LLC
18 just to Bayview, right?
19    A.    It's -- in this case, I probably
20 didn't have enough time or there was, you know,
21 that's just sloppiness on my part.
22    Q.    Now, at the top of this letter, it
23 lists a 775 number?
24    A.    That was my old home phone number.
25    Q.    That was your land line?

Page 93

1    A.    Yes.
2    Q.    When did you get rid of the land line?
3    A.    To be honest, I think -- I didn't know
4 I had it that long.  I don't know the
5 correlation between the two.  I can't remember.
6 2013 seems later than when I got rid of that.
7 That might be a mistake.  I don't know the
8 answer to that question.
9    Q.    Now, the second to last paragraph
10 says, "Bayview's resistance to resolve this
11 matter has added considerable stress to my
12 life"?
13    A.    Yes.
14    Q.    So, previously, I asked you, you said
15 you weren't even frustrated?
16    A.    Then we came back and discussed that.
17 You know, again, I don't know how to apply
18 adjectives to, you know, the requirement to
19 write so many letters.  That's what that is
20 trying to imply.
21        MR. HERBERT:  I'm gonna mark
22 Exhibit K.
23        (Defendant's K, Letter dated
24 January 3, 2014, was marked for
25 Identification.)

24 (Pages 90 - 93)

Page 94

1  BY MR. HERBERT:
2      Q.   This document has been previously
3  Bates-stamped Bayview 000772.  Do you recognize
4  this letter?
5      A.   I don't recognize the letter.  I
6  recognize Mitchell Beck.
7      Q.   Your cell phone number is at the top
8  of this document, right?
9      A.   Yes.
10     Q.   Why did you send this specifically to
11 Mitchell Beck?
12     A.   After the conversation with Cynthia on
13 December 24th of 2013, it solved the insurance
14 problem.  On January -- I called to solve the
15 accounting problem and I was transferred to
16 Mitchell Beck from a Bayview representative.
17     Q.   Do you know which department Mitchell
18 worked in?
19     A.   I don't have a clue.
20     Q.   You sent this letter directly to
21 Mitchell, correct?
22     A.   Yes.
23     Q.   Why did you include your cell phone
24 number on this letter?
25     A.   Because he was the person with

Page 95

1  knowledge who could solve the accounting
2  problem.  We had a conversation, Mitchell Beck
3  and I, I don't know when the conversation took
4  place, but it was about a one-hour conversation
5  then -- it was on Friday, the Friday before --
6  this 3rd of January.  This was a followup to
7  that conversation on Friday.  So in my mind, he
8  was the person of knowledge and I'm trying to
9  solve this problem of the accounting with
10 Mitchell Beck.
11     Q.   So is it your position that you
12 provided your cell phone here in case Mitchell
13 needed to call you back?
14     A.   Additional information, yes.
15     Q.   What if somebody else who could have
16 assisted you with your credit reporting disputes
17 here had called you back?
18     A.   As long as they had a position of
19 knowledge and they could solve the problem, that
20 would be acceptable.
21     Q.   Also says here, the solution
22 difficulties have now caused some major
23 inconveniences and embarrassments; what did you
24 mean by that?
25     A.   Credit reporting.

Page 96

1      Q.   Anything else?
2      A.   That was alluding to the credit
3  reporting problem.
4          MR. HERBERT:  We'll break for lunch.
5          [Recess taken.]
6          (Defendant's L, Letter dated
7  January 13, 2014, was marked for
8  Identification.)
9  BY MR. HERBERT:
10     Q.   So there's a document that's been
11 previously Bates-stamped Bayview 000774.  I'm
12 going to show that to you right now.  Can you
13 tell me if you recognize that document?
14     A.   Yes.  This is to Mitchell Beck.
15     Q.   At the top of this document, your cell
16 phone's listed, right?
17     A.   Yes.
18     Q.   Why did you send this letter directly
19 to Mitchell Beck?
20     A.   Mitchell Beck was the person of
21 knowledge that was supposed to fix the
22 accounting problem after the December 24,
23 insurance problem was solved.
24     Q.   When you sent Mr. Beck this letter,
25 why did you include your cell phone on it?

Page 97

1      A.   He was the person of knowledge.
2      Q.   Let me ask you this, when you say
3  "person of knowledge," did your attorney tell
4  you to use that terminology?
5      A.   No.
6      Q.   Did you do any research that would
7  lead you to use that specific terminology?
8      A.   No.
9      Q.   That's just your own personal
10 terminology, "person with knowledge"?
11     A.   Person with knowledge.
12     Q.   So am I correct in assuming that if
13 Mr. Beck had called you on your cell phone
14 number at this point, you would have been fine
15 with that?
16     A.   Yes.
17     Q.   Because you wanted to resolve the
18 issues that are outlined in this letter?
19     A.   Yes.
20     Q.   What about if somebody else from
21 Bayview who could have helped resolve these
22 issues had contacted you --
23         MR. RODAL:  Objection.
24     Q.   -- would you have been okay with that?
25     A.   A person of knowledge, yes.  Somebody

25 (Pages 94 - 97)

Page 98

1 who could solve the problem, yes.
2    Q.   Do you know who that person would have
3 been?
4    A.   No.
5        MR. RODAL:  Objection.
6 BY MR. HERBERT:
7    Q.   Do you know what department at Bayview
8 that person would have worked in?
9        MR. RODAL:  Objection.
10    A.   I don't.  I would assume -- I don't
11 know.  The answer's "no."
12    Q.   Do you know the names of all of
13 different departments within Bayview?
14    A.   No.
15    Q.   Have you researched to determine the
16 names of departments within Bayview Loan
17 Servicing?
18    A.   No.
19        MR. RODAL:  Objection.
20 BY MR. HERBERT:
21    Q.   So when you wrote these letters to
22 Bayview asking for assistance, you really didn't
23 know the specific department that could help
24 you, right?
25    A.   I assume insurance would be in the

Page 99

1 insurance department.  I assume accounting would
2 be in the accounting department.  I assume that
3 Bayview distributes the paperwork to somebody
4 who works in the appropriate department.
5    Q.   That's not my question.  My question
6 is, you didn't know, when you were writing to
7 Bayview the name of the specific department you
8 could address each one of your concerns; did
9 you?
10    A.   No.
11    Q.   So when you were writing all these
12 letters to Bayview, you were writing to Bayview
13 in general asking for somebody to help you
14 resolve these problems, correct?
15    A.   No.  No.  Somebody with knowledge.
16 You know, somebody, if it's an insurance
17 problem, the insurance person.  You know, an
18 accounting problem, the accounting person, not,
19 you know, not a general person.  Maybe I'm
20 answering your question.
21    Q.   It don't think you're answering my
22 question.  My question is, when you were writing
23 these letters, you really didn't know who at
24 Bayview could help you, right?
25    A.   I assumed, the appropriate

Page 100

1 departments.
2    Q.   But you didn't know specifically the
3 names of those departments?
4    A.   I don't know the names of the
5 departments.
6    Q.   You didn't know the names of those
7 departments when you were writing these letters
8 into Bayview, right?
9        MR. RODAL:  Objection.
10    A.   No.  I assumed it was the appropriate
11 department.
12    Q.   So you assumed that when you would
13 write to Bayview Loan Servicing, LLC, that was
14 the proper entity to help you, right?
15    A.   Yes.  I didn't send them to
16 McDonald's.
17    Q.   When you were sending those letters to
18 Bayview, you were asking Bayview to help you
19 resolve the issues that you were outlining in
20 each one of these letters that we've discussed
21 today?
22    A.   I assumed Bayview, the company, would
23 distribute the information to the appropriate
24 department, be it insurance or accounting to
25 solve that problem.

Page 101

1    Q.   You were asking Bayview to help you,
2 correct?
3    A.   Yes.
4    Q.   It didn't matter to you who at Bayview
5 responded to you as long as they could help you
6 resolve those issues outlined in your letters,
7 correct?
8    A.   As long as it was a person of
9 knowledge, yes.  You know -- and frustrating was
10 the right word.  The more I think about it, you
11 were right.  This was frustrating.  I wanted the
12 person who could solve insurance to solve the
13 insurance problem, that's all I was asking of
14 Bayview.
15        I wanted the accounting person to
16 solve the accounting problem.  I don't know the
17 departments.  I didn't research Bayview to see
18 the appropriate corporate structure to find the
19 proper address.  I assumed that -- and I was
20 even careful to make sure I covered all the
21 addresses, because I want to make sure that the
22 bill-paying person, if he just takes the payment
23 and throws everything else in the garbage.  I
24 was really careful to get it to Bayview to where
25 they would distribute it.  That was my intent.

26 (Pages 98 - 101)

Page 102

1   Q.   You said you were using the addresses
2 that were on your billing statements, correct?
3   A.   Right. Right. That's why I sent it
4 to multiple addresses.
5   Q.   You sent it to two different
6 addresses, correct?
7   A.   Whatever was on there. I think it was
8 two or three. I can't remember, but I tried to
9 cover the addresses that were on there, because
10 I thought that was appropriate.
11   Q.   All of your letters were to Bayview
12 Loan Servicing or just Bayview, as we see in
13 some of the letters, correct?
14   A.   Bayview and Bayview Loan Servicing.
15 Generally, I would try and, you know, cover
16 Bayview Loan Servicing. I assumed the two were
17 the same.
18   Q.   You didn't direct any of these letters
19 to specific departments, correct?
20   A.   Like I said, I should have looked up
21 perhaps, the company layout of Bayview and
22 specifically found the appropriate departments.
23 I didn't know really where to find that.
24   Q.   So your answer is, no, you did not
25 send them to a specific department?

Page 103

1   A.   No, I did not. I sent them to the
2 addresses on the statement. I thought that was
3 appropriate.
4   Q.   You were trusting Bayview to select
5 the appropriate people within Bayview to respond
6 to you to try to help you, correct?
7   A.   Correct.
8   Q.   Out of curiosity, when did you first
9 learn about the TCPA?
10       MR. RODAL: Objection.
11   A.   I did some research when I received
12 all of those phone calls early on. Oh, just
13 when they transferred the note and that -- I
14 still don't really understand all of the
15 information, but that's when I did some research
16 mainly with the FCC and the FTC, and I still
17 don't know the differences, significant
18 difference between the two.
19       I think at that point, I kind of knew
20 what TCPA -- I just knew what acronyms were, but
21 I really didn't know what it meant. So I had
22 very little knowledge back to probably -- no
23 knowledge, depending on the scale of the TCPA
24 during this entire --
25   Q.   Did you set Bayview up to file a TCPA

Page 104

1 claim against them?
2       MR. RODAL: Objection.
3   A.   No.
4   Q.   How did you find your lawyer?
5   A.   I did --
6       MR. RODAL: Objection.
7   A.   -- research on the internet. What I
8 did is, I back-searched "Bayview." I wanted
9 somebody who had information -- that had
10 information on Bayview so there was an
11 understanding of that company of Bayview Loan
12 Servicing.
13   Q.   Were you looking for a lawyer
14 specifically to file a TCPA claim against
15 Bayview?
16   A.   No.
17   Q.   Why were you looking for a lawyer?
18   A.   Because, like I said -- actually, I
19 did not say. I could solve the problem with
20 Bayview. I did everything possible, humanly
21 possible.
22       Frustrating is the right word. I hate
23 to use adjectives, but I honestly could not
24 solve the problem with Bayview. They didn't
25 want to solve the problem. I did not want to

Page 105

1 file a suit. I did everything humanly possible
2 not to file a suit.
3   Q.   With respect to calls that you got
4 from Bayview, was there a time when you told
5 Bayview to stop contacting you on your cell
6 phone?
7   A.   Yes.
8   Q.   How many times did you do that?
9   A.   I don't know.
10   Q.   More than five?
11   A.   I don't know. Basically, when I would
12 receive a phone call from Bayview, I would
13 explain to the person who called me that "I
14 wasn't late." I would explain that I paid the
15 payments. I would explain that I've always paid
16 the payments. It was remarkable most of the
17 representatives were in agreement with me or,
18 you know, they're "I'm sorry," your know, or one
19 way or the other, that was the conversation.
20       So I'm trying to explain and do my
21 best with the representative. Then I would
22 specifically after that, I would request, "Don't
23 call me." You know, I would say either, "don't
24 call," or I would specifically request to be --
25 I think I used the term on the "no call list

27 (Pages 102 - 105)

Page 106

1 (sic)."
2         My cell phone I try and protect. I'm
3 on the federal Do Not Call List and every year
4 or so, I re-up that to make sure that I don't
5 get calls on my cell phone.
6         Just to finish my thought, that's what
7 I would do. I would explain my position. They
8 were in agreement with me. Then I would go
9 "Please, put me on" -- I think relative to the
10 federal thing, I just say the "do not call list"
11 because those are the terms that I know. I
12 don't know if those are the appropriate terms.
13         But that was when I would receive a
14 call. That was the protocol for a call, and I
15 was generally consistent with that protocol. I
16 don't know how many times I repeated that
17 protocol but, in general, that was the
18 conversation.
19    Q.   We'll get back to that. I'm going to
20 show you a document that's been marked as
21 Lawrence_doc 001. I'm marking it as
22 Defendant's Exhibit M.
23         MR. RODAL: This is like a five- or
24    seven-page document.
25         MR. MCCAUGHAN: What's the date?

Page 107

1         MR. HERBERT: April 28, 2014 also in
2    the documents that are in this file.
3         MR. MCCAUGHAN: April 2014?
4         MR. HERBERT: Yes. It's in the front
5    of that behind the summary, I think.
6         (Defendant's M, Letter dated
7 April 28, 2014, was marked for
8 Identification.)
9 BY MR. HERBERT:
10    Q.   I'm just gonna ask you some questions
11 about the first page and then we'll find the
12 entirety of the document. Do you recognize this
13 document?
14    A.   Yes.
15    Q.   Can you tell me what it is?
16    A.   I believe this is a response to a
17 letter that Bayview Loan Servicing wrote to the
18 Nevada Attorney General.
19    Q.   Who's Ms. Ford?
20    A.   She was the one who drafted the letter
21 from Bayview to the attorney general.
22    Q.   At the top of this letter, you have
23 your cell phone listed, right?
24    A.   Yes.
25    Q.   Why did you have your cell phone

Page 108

1 listed?
2    A.   There is no reason. I didn't
3 specific -- this was, this was not a problem.
4 This was written to the attorney general. These
5 are my points to offset her points now to the
6 attorney general. So basically, this was
7 written and cc'd to the Nevada Attorney General.
8         I'm just trying to tell the attorney
9 general that, "Hey, these are the problems" and
10 my phone number in this case has no purpose.
11 I'm not trying to solve a problem. Well, I
12 guess I am indirectly. I'm trying to tell the
13 Nevada Attorney General in this case that what
14 she wrote was incorrect.
15    Q.   So Ms. Ford was the author of the
16 letter to the attorney general, correct?
17    A.   Yes.
18    Q.   There's no reason that you can think
19 of right now why you would have put your number
20 at the top of this letter?
21    A.   In this case, I mean, these are
22 thoughts off the top of my head. I'm not trying
23 to solve an insurance problem in this case, and
24 I'm not trying to solve an accounting problem --
25 I guess indirectly I am.

Page 109

1         I'm trying to notify the attorney
2 general in this case to inform them of the
3 issues that I'm having with Bayview Loan
4 Servicing. I'm trying to articulate,
5 point-for-point where what she's saying was, in
6 my opinion, either incorrect or wrong --
7 incorrect or misleading.
8    Q.   Do you think it would have been
9 unreasonable for Ms. Ford to call you on your
10 cell phone in response to this letter?
11         MR. RODAL: Objection.
12    A.   Yes.
13    Q.   Why?
14    A.   In this case, I'm not trying to solve
15 a problem.
16    Q.   That's interesting, because if you go
17 to the last page of this document --
18    A.   Actually, you're right. I agree with
19 you. Maybe I was trying to solve a problem
20 indirectly and to Ms. Betty Ford. I'm not
21 against -- if there's a problem we're trying to
22 solve.
23         MR. MCCAUGHAN: Let's go off the
24    record for a second.
25         (Discussion off the Record)

28 (Pages 106 - 109)

1 BY MR. HERBERT:
2    Q.   So just for clarification, I've
3 reidentified the entirety of this letter as
4 Defendant's Exhibit M. It's a copy of a letter
5 that we made from the notebook that Mr. Lawrence
6 provided to us at the beginning of the
7 deposition.
8        It's also a letter that was provided
9 by Mr. Lawrence's counsel Bates-stamped
10 Lawrence_docs 1 through -- I guess it's going to
11 be 6 or 7.
12       So we'll go back to my question,
13 Mr. Lawrence, do you think that it would have
14 been unreasonable for Ms. Ford to call you in
15 response to this letter?
16       MR. RODAL: Objection.
17       MR. HERBERT: What's the basis of that
18 objection?
19       MR. RODAL: Speculation. "Is it
20 unreasonable"?
21    A.   Again, if she was a person of
22 knowledge -- difference that I see here is that
23 I'm trying to engage the Nevada Attorney General
24 and at this point, I'm trying to solve the
25 problem and I don't know if Betty, Ms. Ford is

1 the person of knowledge.
2        I'm asking these questions, but these
3 aren't -- these are more questions for the
4 attorney general. These are the points that I'm
5 trying to articulate.
6    Q.   My question for you is, whether you
7 think it would have been unreasonable if
8 Ms. Ford responded to this letter by calling
9 your cell phone? The answer is yes or no.
10   A.   Yes.
11   Q.   In fact, on Page 7, you actually say,
12 "Ms. Ford, thank you very much for your
13 response. It would be prudent to ask you a few
14 questions at this point," and then you list the
15 questions, right?
16   A.   My point would be that I think it
17 would need to be in writing, is what I need from
18 Ms. Ford. At this point, I'm having credibility
19 issues with Bayview and I think it would be
20 appropriate if she wrote me, but I'm not quite
21 sure I feel it would be appropriate if she
22 called me.
23   Q.   Why?
24   A.   I think because we have a third party
25 involved, the Nevada Attorney General, that

1 would be -- I don't know what the right term is,
2 but we need to have all three people. If the
3 Nevada Attorney General were there, that's the
4 only issue I would have.
5    Q.   Do you request anywhere in this letter
6 that Ms. Ford respond to you in writing?
7    A.   No. I don't even know -- she was
8 responding to the Nevada Attorney General, I
9 believe.
10       MR. HERBERT: Can you read the last
11 question back.
12       (Thereupon, the requested portion of
13 the record was re-read by the Court
14 Reporter.)
15 BY MR. HERBERT:
16   Q.   So do you think it would have been
17 improper for Ms. Ford to respond to you in this
18 letter by calling your cell phone?
19       MR. RODAL: Objection.
20   A.   Do I? Yes.
21   Q.   Why?
22   A.   Because the Nevada Attorney General, I
23 think, should be on the phone if she were to
24 contact me directly, because the letter was
25 directed to the Nevada Attorney General.

1        My sense is it would be appropriate
2 for all three of us to be on the phone and not
3 her and I.
4    Q.   Is that just your opinion or do you
5 base that --
6    A.   That's just my opinion.
7    Q.   What about if she had e-mailed you at
8 Burbank18@aol.com?
9        MR. RODAL: Objection.
10   A.   That would be written and, therefore,
11 verifiable. I would forward that to the Nevada
12 Attorney General, and I think that would be more
13 appropriate. I mean, I just think, because the
14 Nevada Attorney General was involved that that
15 would be appropriate.
16   Q.   Why did you provide the
17 Burbank18@aol.com e-mail on this letter?
18   A.   I think it's just there because I had
19 it on a previous letter. It's not there --
20 there's no purpose to that.
21       (Defendant's N, Letter containing
22 Mortgage Interest Statement of 2013, was
23 marked for Identification.)
24 BY MR. HERBERT:
25   Q.   So I'm going to show you a document

Page 114

1 that's been previously Bates-stamped as Bayview
2 000717. Have you seen this document?
3   A.   Yes.  This is right out -- 14 January,
4 2014, so I was at that point, working to solve
5 the accounting problem, and the IRS was part of
6 the accounting problem.
7   Q.   What do you mean by "the IRS is part
8 of the accounting problem"?
9   A.   Because they did something with an
10 escrow account and by doing that, "they," being
11 Bayview, messed up IRS tracking.  So they -- I'm
12 trying to solve, which has never been solved an
13 IRS mortgage interest problem that they
14 generated with the escrow account that they
15 generated and it's still to this day incorrect,
16 so I'm trying to solve -- I consider that an
17 accounting problem, an accounting problem here.
18   Q.   So why did you write this letter to
19 Bayview?
20   A.   To solve an accounting problem.
21   Q.   The letter was sent to Bayview Loan
22 Servicing, correct?
23   A.   Yes.
24   Q.   It was not sent to an accounting
25 department, correct?

Page 115

1   A.   Similar to our discussion, previously,
2 I assumed that by sending it to the address to
3 the back of the statement that would send this
4 to the accounting department and solve the
5 accounting problem.
6   Q.   Do you know that the name of the
7 proper department within Bayview to resolve this
8 problem was the accounting department?
9     MR. RODAL:  Objection.
10   A.   I assume that would be -- to me, it's
11 an accounting problem.  It could be a tax
12 reporting problem.  To me, they would be in the
13 same department or related departments.
14   Q.   But you don't actually know that to be
15 true?
16   A.   I did not look up the company outline
17 of Bayview Loan Servicing, no.
18   Q.   So you do not know that the name of
19 the department to handle or respond to this
20 issue was the accounting department?
21   A.   Ask me that -- you used two no's.  I
22 thought that this would go to the accounting
23 department, yes.
24   Q.   But you don't know if the accounting
25 department even exists; do you?

Page 116

1   A.   No.  That's true.
2   Q.   So then you're asking Bayview
3 generally to send this to the department that
4 handles accounting issues, correct?
5   A.   That's correct.  I'm calling that,
6 what I assume to be an accounting department,
7 yes.  I assume Bayview has the capability to
8 send this to a person of knowledge.
9   Q.   To a person who can resolve the
10 issues, correct?
11   A.   Yes.
12   Q.   Your cell phone's on the top of this
13 document, correct?
14   A.   Yes.
15   Q.   Why?
16   A.   In this case, a person of knowledge
17 who wanted to solve this specific problem, I
18 would have -- if they wanted additional
19 information, they contact me to get additional
20 information.
21   Q.   So you agree with me that you included
22 your cell phone here because you wanted somebody
23 from Bayview to contact you?
24   A.   Somebody with knowledge, yes.
25   Q.   Somebody who could help you resolve

Page 117

1 the issue that you outline in this letter,
2 correct?
3   A.   Somebody with knowledge of this issue
4 to solve this problem, yes.
5   Q.   To you, it would not matter who at
6 Bayview that was as long as they could help you,
7 correct?
8   A.   Somebody with knowledge of this issue
9 who could solve this problem with the IRS.
10   Q.   You keep saying, "someone with
11 knowledge," so we can get more specific if we
12 have to.  What knowledge would the person have
13 to have in your view to help resolve the issue
14 that you explain in this letter?
15   A.   To get the correct mortgage interest
16 statement.
17   Q.   So when you say "a person with
18 knowledge" you mean somebody who could help you
19 get the correct mortgage interest statement?
20   A.   Somebody in the accounting department
21 or the IRS department -- I'm sorry -- or the tax
22 reporting department within Bayview with
23 knowledge to solve this problem.
24   Q.   Okay.  I'm gonna try to -- we might be
25 saying the same thing but I want to try to lock

30 (Pages 114 - 117)

Page 118

1  down what you mean here.
2      Are you saying that you would have
3  been happy or that you wanted somebody within
4  Bayview who was able to resolve the problem that
5  you explain in this letter?
6      A.   Somebody who could, from the
7  accounting department or whatever department
8  Bayview has to correct the mortgage interest
9  statement was the purpose of this letter. They
10  -- somebody with that knowledge, if they need
11  additional information to get a hold of me for
12  that information, for that knowledge. I'm
13  trying so solve in this letter, in this case --
14  I'm trying to do my taxes. So I'm trying get to
15  the correct mortgage interest statement.
16      Q.   So what if somebody from Bayview
17  contacted you on your cell phone in response to
18  this letter to say, "Mr. Lawrence, good news, we
19  resolved your problem;" would you think that's
20  inappropriate?
21      A.   If it came from this department and
22  solved this problem, I'm perfectly happy with
23  this representative from that department calling
24  me and saying, you know, "we've solved this
25  problem, this specific problem."

Page 119

1      Q.   So you would agree with me then that
2  you providing your cell phone number it was not
3  just for somebody to contact you if they needed
4  more information from you?
5      A.   No, actually, it was for more
6  information, otherwise there's no purpose to the
7  call. If they needed more information was, you
8  know, is the purpose of the letter, you know,
9  you don't -- so the purpose of that is, if they
10  needed more information, they can -- I'd be
11  happy to give them more information.
12      So, I mean, that's the -- all of these
13  letters from what we've discussed are somebody
14  with knowledge to call me or get additional
15  information so that we can solve a problem. In
16  this case, it was mortgage interest.
17      Q.   So is it your testimony that the only
18  reason that somebody would be able to use your
19  cell phone in response to all these letters is
20  if they needed more information from you?
21      A.   Yes.
22      Q.   But you'd agree with me that none of
23  these letters specifically say that, right?
24      A.   It's implied.
25      Q.   That's not my question.

Page 120

1      A.   I don't specifically say that. It's
2  implied that if it's an accounting problem, you
3  know, we need accounting information. If it's a
4  tax problem, we need tax information. It's
5  implied to me.
6      (Defendant's O, Letter dated
7  January 24, 2014, was marked for
8  Identification.)
9  BY MR. HERBERT:
10      Q.   I'm going to show you a document
11  previously identified as Bayview 000778. Do you
12  recognize this document?
13      A.   I recognize Mitchell Beck and the time
14  period is 24 January, 2014. I wrote -- this
15  letter is from me.
16      Q.   Your cell phone's at the top of the
17  document, right?
18      A.   Yes.
19      Q.   Why?
20      A.   This is to Mitchell Beck, so this is
21  to solve an accounting problem.
22      Q.   Why did you provide your cell phone?
23      A.   To solve the accounting problem, if
24  Mitchell Beck were to need additional
25  information to solve the accounting problem, I

Page 121

1  was there to provide it.
2      Q.   Is that the only basis you contend you
3  were giving him the authority to contact you on
4  your cell phone?
5      A.   I think that would be a reason to
6  contact me is for additional information, yes.
7      Q.   Is that the only reason?
8      A.   I can't think of any other reason.
9      Q.   If you go down to the third-to-last
10  paragraph, starting with the words "in order,"
11  can you read that?
12      A.   Yes. "In order to correct the
13  problem, I believe it would be best not to
14  accept a refunded $2,276.76. This way the IRS
15  will have a clear understanding of the mortgage
16  interest paid in 2013.
17      "I would like to either void the check
18  or return the check signed over to Bayview; what
19  do you propose?"
20      Q.   You just testified that the only basis
21  for him to contact you on your cell phone was to
22  request more information from you, correct?
23      A.   I didn't read this. I mean, that
24  would be appropriate. I agree with you, for him
25  in this case, to discuss whether or not we

31 (Pages 118 - 121)

Page 122

1  would -- so it's more information -- and that is
2  more information.
3        I didn't know what to do with a check
4  and I'm asking him -- again, trying to solve an
5  accounting problem.
6     Q.   Okay.  But it's not only providing
7  your phone number for the purpose of requesting
8  information from you; do you agree?
9     A.   I do agree, yes.  But, again, when I
10 answered that question, I didn't know -- I
11 didn't read the whole letter.
12    Q.   Now, it also says here that it was
13 faxed to (305)265-2517; do you see that?
14    A.   Yes.
15    Q.   Is that your handwriting?
16    A.   At the top, yes.
17    Q.   Then underneath it there's another box
18 that says -- it looks like it says, "faxed two
19 times to make sure"?
20    A.   Yes.
21    Q.   Whose fax number is that?
22    A.   That's Mitchell Beck's.
23    Q.   Why did you fax it to him?
24    A.   He asked for it.  I don't know -- he
25 asked for it.  When we had a conversation, he

Page 123

1  gave me his fax number, and he requested several
2  documents.  So I believe this is one of the
3  documents that he requested.  This might have
4  been a little bit later, but he gave me his fax
5  number and requested a whole bunch of
6  information.
7        That's how I received his fax number.
8  I would send him the information that I thought
9  he needed.
10    Q.   Do you think it would have been
11 unreasonable if somebody else from Bayview had
12 reached out to you in response to this letter,
13 if they had knowledge of the situation and the
14 problem?
15    A.   Again, I'm trying to solve an
16 accounting problem, so if somebody who could
17 solve an accounting problem, I think that would
18 be perfectly reasonable.
19        (Defendant's P, Letter mailed on
20 January 27, 2014, was marked for
21 Identification.)
22 BY MR. HERBERT:
23    Q.   I'm going to show you a document
24 that's been marked as Exhibit P, and previously
25 Bates-stamped as Bayview 00720.  I'm going to

Page 124

1  show it you and tell me if you recognize it.
2     A.   This appears to be January of 2014 --
3  oh, this is the -- yes, I do recognize this
4  letter, and this is part of the accounting
5  problem, but it's more to what we discussed
6  earlier, the IRS side.
7     Q.   This letter was sent to Bayview at
8  P.O. Box 331409 in Miami, right?
9     A.   Yes.
10    Q.   Where did you get that?
11    A.   I believe I received that one from the
12 IRS documents that came.  So the 1099 form that
13 was incorrect, I believe I received the address
14 off of that form.  Because this address appears
15 to be different than the other addresses.
16    Q.   Your cell phone's on this document,
17 right?
18    A.   Yes.
19    Q.   Why?
20    A.   If somebody in this department,
21 somebody with knowledge with this issue were to
22 need additional information, and I actually sent
23 the correspondence from Mitchell Beck as well.
24 If they were to need any other proof or
25 information, I'd be perfectly willing to provide

Page 125

1  it.
2     Q.   You sent this to Bayview, generally,
3  right?
4     A.   As before, that's sloppiness on my
5  part, I'm sorry.  Generally, I would put the
6  appropriate header.  There's no different intent
7  between Bayview, Bayview Loan Servicing or
8  Bayview Loan Servicing, LLC, when I put that.
9     Q.   It's all the same, right?
10    A.   Bayview -- yes, sir.  Bayview, Bayview
11 Loan Servicing and Bayview Loan Servicing, LLC;
12 there's no different meaning between the three.
13    Q.   The second-to-last paragraph says,
14 "I've taken the time to notify Bayview's
15 accounting department that the mortgage interest
16 statement which was issued was incorrect; do you
17 see that?
18    A.   Yes.
19    Q.   Who did you speak to at --
20    A.   I didn't.  I think I sent a letter.
21 So I probably -- I don't know for sure, but I
22 probably sent it to the other two addresses, is
23 my guess, in addition to the new address and I
24 think that's what that statement means.
25    Q.   So when you sent that letter that's

32 (Pages 122 - 125)

Page 126

1 referenced in this letter, was it sent directly
2 to or labeled to the accounting department?
3    A.   I don't know. I'm speculating.
4       MR. RODAL:  Objection.
5    A.   I don't know that.
6    Q.   Do you have any letters in your
7 possession that you ever sent directly to
8 Bayview's accounting department specifically?
9    A.   No.
10   Q.   How about the tax department?
11   A.   No. You have every letter I have.
12      (Whereupon, Mr. Herbert left the
13      deposition.)
14      MR. MCCAUGHAN:  You don't have a
15   problem with me sitting in?
16      MR. RODAL:  No. Just for the record,
17   the deposition was not concluded. I'm just
18   asking this because we've agreed to continue
19   it. I just wanted to ask these questions
20   while the information is still fresh my mind
21   and Mr. Lawrence's mind.
22         CROSS-EXAMINATION
23 BY MR. RODAL:
24   Q.   A few hours ago, you said that you
25 spoke to the Nevada attorney general, the

Page 127

1 Florida attorney general and various departments
2 about the allegations in this case. Do you
3 remember saying that?
4    A.   Yes.
5    Q.   When you talked to these varius
6 government departments, were you talking about
7 your accounting issues and your insurance issues
8 or were you talking about your allegations in
9 the TCPA complaint?
10   A.   No. It was just the accounting issues
11 and the insurance issues.
12   Q.   Did any of those communications
13 involve any of the allegations in the TCPA
14 complaint that we're here about today?
15   A.   No.
16   Q.   Did you talk to your girlfriend Leona
17 Tilden about the TCPA allegations?
18   A.   I discussed this case with her.
19   Q.   It's clear in the vast majority if not
20 every one of these documents that are attached
21 to this exhibit, you've provided your cell phone
22 number on these documents; you'd agree with me
23 on that?
24   A.   Yes.
25   Q.   You keep saying you wanted somebody to

Page 128

1 call you back with knowledge. Is it true that
2 you wanted someone from Bayview to call you back
3 that had knowledge about your specific issues?
4    A.   I would have preferred it in writing,
5 but if somebody had knowledge and could solve
6 the problem, I would have no problem with them
7 calling me back.
8    Q.   When you provided your phone number on
9 any of these documents that are attached as this
10 exhibit or any other document you provided to
11 Bayview, did you at any point in time consider
12 or think that you wanted Bayview to call you
13 using an automatic telephone dialing system to
14 call your cell phone?
15   A.   No. Ask me the question one more time?
16   Q.   Is there any point in time, when you
17 provided your telephone number to Bayview in the
18 documents that are exhibits to this deposition
19 or any other document that you provided your
20 cell phone number?
21      When you provided the phone number,
22 did you at any point in time, ever consider or
23 want Bayview to call your cell phone using an
24 automatic telephone dialing system?
25   A.   No. I did not want them to call me,

Page 129

1 autodial me.
2    Q.   You said you wanted someone to call
3 you back with knowledge. So what's the
4 difference of someone calling you back with
5 knowledge and someone calling you back with an
6 autodialing system?
7    A.   There's absolutely no -- there's no
8 information to be given. There's nothing to be
9 gained. They're nonproductive, a waste of time.
10 They use up my battery. They use up -- it was
11 just a waste of time and effort.
12   Q.   Do you recall saying on any of the
13 statements that Bayview sent to you a specific
14 address to send certain qualified written
15 request or requests for information?
16   A.   No. They never told me to write to a
17 certain department.
18      MR. RODAL:  That's all I have for
19   right now.
20      MR. MCCAUGHAN:  Do you mind if I ask
21   two or three questions on what you just
22   asked?
23      MR. RODAL:  Again, I'm not finished
24   wit cross. I just wanted to get that out
25   today.

33 (Pages 126 - 129)

Page 130

1    MR. MCCAUGHAN: So we keep
2    everything --
3         REDIRECT EXAMINATION
4    BY MR. MCCAUGHAN:
5    Q.   When you said that the autodialing
6    numbers -- autodialed phone calls were
7    nonproductive, did you ever listen to any of the
8    autodialed calls all the way through, from
9    beginning to end?
10    MR. RODAL: Objection.
11    A.   I don't -- an autodialed call, yes, I
12    think.
13    Q.   So when they'd call you and obviously
14    the point of this lawsuit and what you're here
15    for are the number of calls that were made to
16    your cell phone, correct, there were a couple
17    hundred?
18    A.   Yes.
19    Q.   They were from this autodialing
20    system?
21    A.   Right.
22    Q.   When you would pick up, do you
23    remember how those calls went?
24    A.   Generally, it was a click and then
25    somebody would come on, and they would -- it was

Page 131

1    remarkable. They would have very little
2    information. They would almost sound
3    disoriented. Some of them would not even know
4    my name. You could tell they were stumbling
5    with my name.
6         Then I would go into -- they would
7    start to discuss and I would do, as I previously
8    talked about, go "hey, you know, I paid the
9    bill, I did this, I did that."
10        By the end of the telephone call, by
11    and large, from all I can remember, they agreed
12    with me. They were almost sympathetic as to why
13    they called. Like I said before, then the
14    termination, I would ask them to be placed on
15    the do not call list. So that's generally how
16    the robocalls would go.
17    Q.   When your talked to those people, did
18    you ever ask them to transfer you to another
19    person or department?
20    A.   They called me. You know, they were
21    calling me. I actually have calls where they
22    were calling on the 2nd to remind me to make the
23    payment on the 1st. The calls were ridiculous.
24    Q.   You can --
25    A.   That was the call, you know, that's

Page 132

1    what I mean when I say they were completely
2    nonproductive.
3    Q.   My question was, did you ever ask to
4    be transferred --
5    A.   No, because they were calling me.
6    They were calling me. I didn't have any --
7    Q.   I understand they're calling you, but
8    you've had correspondence and you've talk to
9    other people in Bayview's department, Mitchell
10    Beck, we talked about a number of people. In
11    any of these calls, did you ever ask them to
12    transfer to someone that you'd spoken to at
13    Bayview about your account prior?
14    A.   I don't believe so. If needed that, I
15    would call them directly. That's when I would
16    call them, you know, the 50 calls that we
17    discussed earlier.
18    Q.   Did you ever discuss these autodialed
19    calls with Mitchell Beck or anyone over the
20    phone when you spoke with them over the phone?
21    A.   No.
22    Q.   Did you ever mention it in any of your
23    letters or correspondence to Bayview?
24    A.   No.
25    Q.   Prior to filing the complaint, did you

Page 133

1    ever provide anything in writing to Bayview
2    concerning all of these autodialed calls?
3    A.   Not in writing. It was just verbally,
4    you know, and those were just when they would
5    autodial me. I'd just go, "Please, stop."
6    After about a hundred of them, I'm -- sometimes
7    I wasn't as nice as I probably could have been,
8    but please understand --
9    Q.   I'm not here to judge you about
10    that --
11    A.   I'm generally very nice.
12    Q.   You seem very nice.
13    A.   But that's, you know, if I was not as
14    polite as I could have been, it was just because
15    of the quantity.
16    Q.   Let me ask you, you said that it would
17    be a click and then you'd talk to someone. Did
18    you ever have any calls where they were instead
19    of a person talking it was some automated
20    message or anything like that?
21    A.   There were a few of those. I think
22    they said to call back.
23    Q.   Did you ever -- I'm sorry. Go ahead.
24    A.   I think one of the, you know, just off
25    the top of my head, one of them would say to

34 (Pages 130 - 133)

Page 134

1  call back. I can't quite remember.
2     Q.   So you would receive them as
3  voicemails or did you ever pick them up --
4     A.   I can't remember, but off the top of
5  my head, I just remember hearing something --
6  that said "call back."
7     Q.   Did you ever, when you picked up the
8  phone, did you ever have an automated message
9  that you listened to the whole way through or
10 would you hang up the minute you heard some
11 automated voice?
12    A.   I do both. Sometimes, I can't really
13 remember. I can't remember really, you know,
14 but --
15    Q.   Did you ever remember --
16    A.   Sometimes, they wouldn't click as
17 well, you know, but generally -- I'm an
18 engineer, so I think I correlate it this way
19 but, it might not even be appropriate.
20       When I would hear a click, my sense
21 was disorientation, that's the first word that
22 come into -- the first thought that would come
23 into my -- because my sense was that that meant
24 on the other side that they were not ready, you
25 know, that's what it meant to me,

Page 135

1  disorientation.
2     Q.   I said it was only a couple and I want
3  to leave it, but there's one last question, your
4  attorney asked you if you ever saw any specific
5  addresses on any of the mailings for different
6  departments at Bayview other than the general
7  addresses and P.O. boxes, which you've discussed
8  today and you said "no," correct, you'd never
9  seen any specific address for different
10 departments?
11    A.   I think -- at least I understood the
12 question, did Bayview send any documents to me
13 that told me to write to a specific department?
14    Q.   You said, "no"?
15    A.   No. I receive the addresses by
16 correspondence from Bayview from either the
17 statement or from what I believe the IRS
18 reporting -- that's the one address that was
19 different, was because I probably received that
20 address off of the mortgage interest statement
21 form.
22    Q.   I just wanted to confirm that you
23 hadn't seen any. My question, I think it's a
24 yes or no question, did you ever at any time
25 request the address or fax number for any

Page 136

1  specific department at Bayview?
2     A.   No, I never did.
3        MR. MCCAUGHAN: I don't have anything
4  else.
5        MR. RODAL: The rest we'll pick up.
6        (Thereupon, the deposition was
7  concluded at 3:45 p.m.)

Page 137

1  THE STATE OF FLORIDA,)
2  COUNTY OF BROWARD.)
3
4
5        I, the undersigned authority, certify
6  that ROBERT LAWRENCE personally appeared before
7  me and was duly sworn.
8
9        WITNESS my hand and official seal this
10 26th day of September, 2015.
11
12
13
14    Joy Reich, Court Reporter
      Notary Public - State of Florida
15    My Commission No. FF224023
      Expires on August 16, 2019
16
17
18
19
20
21
22
23
24
25

35 (Pages 134 - 137)

Page 138

```
 1        C E R T I F I C A T E
 2
     THE STATE OF FLORIDA,)
 3   SS
     COUNTY OF BROWARD)
 4
 5        I, Joy Reich, Court Reporter and
     Notary Public in and for the State of Florida at
 6   large, do hereby certify that the aforementioned
     witness was by me first duly sworn to testify
 7   the whole truth; that I was authorized to and
     did report said deposition in stenotype; and
 8   that the foregoing pages, numbered from 1 to
     138, inclusive, are a true and correct
 9   transcription of my shorthand notes of said
     deposition.
10
          I further certify that said deposition
11   was taken at the time and place hereinabove set
     forth and that the taking of said deposition was
12   commenced and completed as hereinabove set out.
13        I further certify that I am not an
     attorney or counsel of any of the parties, nor
14   am I a relative or employee of any attorney or
     counsel of party connected with the action, nor
15   am I financially interested in the action.
16        The foregoing certification of this
     transcript does not apply to any reproduction of
17   the same by any means unless under the direct
     control and/or direction of the certifying
18   reporter.
19        IN WITNESS WHEREOF, I have hereunto
     set my hand and seal this 22nd day of September,
20   2015.
21
22   _____
23        Joy Reich, Notary Public
          In and for the State of Florida
24        My Commission No. FF224023
          Expires on August 16, 2019
25
```

36 (Page 138)

Veritext Legal Solutions

800-726-7007                                                    305-376-8800

**[000707 - acknowledgment]**

**0**

**000707**  77:5
**000717**  114:2
**000759**  54:23
**000760**  70:14
**000761**  75:13
**000768**  83:10
**000772**  94:3
**000774**  96:11
**000778**  120:11
**000811**  91:19
**001**  106:21
**001353**  25:25
**00720**  123:25
**015**  50:9
**09**  3:9 26:2

**1**

**1**  3:9,14,15 26:2
  27:17 75:7 77:1,12
  110:10 138:8
**100**  67:4
**107**  3:21
**1099**  124:12
**10:00**  1:14
**11**  79:10
**11181**  8:1
**113**  3:22
**12**  79:11
**123**  3:25
**126**  3:5
**13**  3:20 96:7
**130**  3:4
**138**  138:8
**14**  1:3 4:14 114:3
**15**  8:8 78:2
**16**  137:15 138:24
**17**  1:14
**18**  8:18 11:19
**1963**  21:5
**1997**  11:20
**1st**  131:23

**2**

**2,276.76.**  121:14
**20**  9:24 10:1,3 32:21
**2009**  27:17
**2011**  31:7 32:13,23
**2012**  3:10,11,12 50:4
  54:19 55:9 58:18,21
  61:21 62:8,14 70:9
  72:5,14 74:22 75:2
**201270**  3:13
**2013**  3:14,15,18 40:8
  42:6,13,22 44:10
  48:6 75:4,5,7 77:1,12
  83:6 86:20 89:18,23
  91:13 93:6 94:13
  113:22 121:16
**201383**  3:16
**2014**  3:19,21,25 32:1
  46:10 93:24 96:7
  107:1,3,7 114:4
  120:7,14 123:20
  124:2
**2014120**  3:23
**201496**  3:20
**2015**  1:14 32:13,23
  137:10 138:20
**2019**  137:15 138:24
**21**  3:18 44:15 91:13
**2150**  2:6
**22991**  1:3 4:14
**22nd**  138:19
**23**  3:8 46:10
**24**  3:23 42:22 44:10
  96:22 120:7,14
**24th**  94:13
**25**  3:10,11 50:4 54:19
  55:9 58:18,21
**25th**  2:12
**26**  3:9,16 83:6 89:18
  89:23
**265-2517**  122:13
**26th**  137:10
**27**  3:25 123:20

**28**  3:21 107:1,7
**29**  48:6
**29th**  75:4
**2nd**  131:22

**3**

**3**  3:19 93:24
**30**  3:12 48:9 61:9,21
  62:8,14 65:1
**305**  122:13
**3295**  24:20 27:2
**33131**  1:13 2:12
**331409**  124:8
**33316**  2:7
**3:45**  1:14 136:7
**3rd**  95:6

**4**

**4**  3:4
**4000151**  23:22

**5**

**5**  21:5
**50**  3:10 33:3 41:16,18
  43:16 132:16
**54**  3:11
**5933**  56:13,18,21

**6**

**6**  110:11
**60**  23:1
**62**  3:12
**65**  23:2

**7**

**7**  110:11 111:11
**715-3295**  9:19 57:5
**75**  3:14 14:11,14,21
  15:13,16,24 16:11
**76**  3:15
**775**  92:23

**8**

**8**  3:13 70:9
**891**  7:17
**89451**  7:18

**9**

**91**  3:18
**916**  9:19 57:5
**93**  3:19

**a**

**a.m.**  1:14
**a01**  64:22
**ability**  6:14,18 7:1,6
  82:5 86:10 91:10
**able**  118:4 119:18
**absolutely**  129:7
**acceleration**  44:18
**accept**  121:14
**acceptable**  5:24
  95:20
**accommodate**  6:3
**account**  79:21 80:12
  80:17,18,19,19 81:23
  82:13 114:10,14
  132:13
**accounted**  42:15,16
**accounting**  40:3,4,9
  40:11 41:7,8 42:2,4,8
  42:9,19,21,25 43:20
  44:1 46:12,17,19
  48:10 69:6,15 80:24
  81:2,3,6,8,10,11,13
  81:14,16,20 82:1,2,4
  82:9,15,17,23 91:2,4
  94:15 95:1,9 96:22
  99:1,2,18,18 100:24
  101:15,16 108:24
  114:5,6,8,17,17,20
  114:24 115:4,5,8,11
  115:20,22,24 116:4,6
  117:20 118:7 120:2,3
  120:21,23,25 122:5
  123:16,17 124:4
  125:15 126:2,8 127:7
  127:10
**acknowledged**  42:12
  45:12
**acknowledgment**
  89:15

acquaintances 20:11
acronyms 103:20
act 78:5
action 45:19,20
  138:14,15
actual 36:25 57:23
  71:5
added 93:11
addition 125:23
additional 45:13,15
  45:21 51:11 52:4,6
  63:14 71:15 95:14
  116:18,19 118:11
  119:14 120:24 121:6
  124:22
additionally 56:24
  66:3
address 7:25 20:17
  24:14 53:20,24 54:15
  54:16,17 55:19 56:4
  56:20 64:10,18 65:3
  65:4 67:17 76:3,4,10
  76:11 84:20 99:8
  101:19 115:2 124:13
  124:14 125:23
  129:14 135:9,18,20
  135:25
addresses 54:1,2,4,5
  54:6 62:21,23,24
  64:5,7 75:18,20,21
  76:5 88:3 101:21
  102:1,4,6,9 103:2
  124:15 125:22 135:5
  135:7,15
adequate 56:25 82:1
  82:3 88:12 89:8
adequately 67:22
adjective 69:25 70:2
adjectives 69:4 93:18
  104:23
affect 6:14,18 7:1,5
afford 23:5
aforementioned
  138:6

age 23:1
agency 18:22
ago 8:14 11:3,17 18:5
  35:14,18 78:3 126:24
agree 26:8 28:3 30:20
  47:18 50:22 52:7
  53:17 56:12 73:7
  74:23 90:22 109:18
  116:21 119:1,22
  121:24 122:8,9
  127:22
agreed 126:18
  131:11
agreement 105:17
  106:8
ahead 5:18 12:12
  45:9 133:23
airlines 8:11 22:24
akerman 2:11 4:10
akerman.com 2:13
alcoholic 6:22
allegations 17:23
  18:12 127:2,8,13,17
alleged 60:7
allow 5:16 39:8
alludes 78:4
alluding 96:2
alpen 25:12,16
andrea 46:8,9,11,13
  46:21,22,22,23,25
  47:9,12,14,19
andrews 2:6
annoying 69:8,13,14
answer 5:1,4,9,18,19
  5:25 6:6 12:8,13
  13:11 36:2 48:3
  58:25 60:12,21 65:17
  65:23 66:8,9 67:25
  68:1 70:3,3 71:23
  93:8 102:24 111:9
answer's 98:11
answered 34:12
  122:10
answering 99:20,21

anticipation 14:17,22
  15:15 34:2,13
anybody 9:9 17:18
  17:22 22:16 31:19
  40:16 52:17 58:17
  63:12 64:1 89:21
aol.com 113:8,17
appeal 60:14
appealed 59:19
appear 26:13
appearances 2:2
appeared 88:11
  137:6
appears 25:1 26:11
  27:10 28:7 55:17
  124:2,14
applied 23:8 61:1
  70:1
apply 22:22 23:4
  69:3 93:17 138:16
applying 22:19 79:13
appreciate 70:5
appropriate 58:9,11
  68:4,9 73:23,24
  76:14 82:21,22 84:5
  85:15 87:8,18 88:2
  99:4,25 100:10,23
  101:18 102:10,22
  103:3,5 106:12
  111:20,21 113:1,13
  113:15 121:24 125:6
  134:19
approximate 10:4
approximately 8:3
  8:13,19,25 12:18
  15:13,16 18:5 31:7
  32:1 41:18 43:23
april 3:14,21 75:7
  107:1,3,7
area 20:21 27:1
arguably 36:16
arrives 82:19
articulate 109:4
  111:5

asked 5:4,10,19
  11:16 34:25 38:9,12
  49:12,17 93:14
  122:24,25 129:22
  135:4
asking 39:11 45:25
  48:21 88:9 98:22
  99:13 100:18 101:1
  101:13 111:2 116:2
  122:4 126:18
asks 24:13 79:20
assist 90:5
assistance 98:22
assisted 80:15 95:16
assume 28:20 39:21
  51:8 55:5 56:5,23,24
  58:7 64:1,13 66:19
  66:21 73:21 75:24
  76:12 80:24 81:1,6,8
  83:17 84:23,25 86:7
  86:13 87:15 91:1
  92:1 98:10,25 99:1,2
  115:10 116:6,7
assumed 30:14 65:24
  66:24 73:18,24 80:20
  82:19 86:9,9 87:25
  88:1,2 91:9 99:25
  100:10,12,22 101:19
  102:16 115:2
assuming 97:12
assumption 82:16
attached 127:20
  128:9
attempt 48:16 76:13
attention 53:11,12,18
attn 53:8
attorney 4:9,22 5:15
  13:19,22 16:22 17:19
  17:23 18:2,4,13 34:9
  36:15,16 59:9 97:3
  107:18,21 108:4,6,7
  108:8,13,16 109:1
  110:23 111:4,25
  112:3,8,22,25 113:12
  113:14 126:25 127:1

[attorney - call]                                                                 Page 141

135:4 138:13,14
**august**  11:20 137:15
  138:24
**author**  108:15
**authority**  121:3
  137:5
**authorized**  138:7
**autodial**  129:1 133:5
**autodialed**  130:6,8
  130:11 132:18 133:2
**autodialing**  129:6
  130:5,19
**automated**  133:19
  134:8,11
**automatic**  128:13,24
**avenue**  1:13 2:6,11

b

**b**  3:9 7:14 25:25 26:1
**bachelor**  21:9
**back**  13:1 15:5 20:18
  47:9,15,21 49:5
  62:21 70:6 75:25
  84:3 86:1 88:9,19
  92:9 93:16 95:13,17
  103:22 104:8 106:19
  110:12 112:11 115:3
  128:1,2,7 129:3,4,5
  133:22 134:1,6
**background**  21:8
**balance**  79:22 80:12
  82:14
**ballpark**  32:12
**bankrupt**  22:25
**base**  113:5
**basically**  105:11
  108:6
**basis**  79:21 80:1,11
  81:22 82:13 110:17
  121:2,20
**bates**  23:22 25:24
  50:9 54:23 70:13
  75:13 77:5 83:10
  91:18 94:3 96:11
  110:9 114:1 123:25

**battery**  129:10
**bay**  20:21
**bayview**  1:8 4:10
  14:24 16:1,2,3,5,7,10
  17:4,5 23:22 25:25
  30:14,17,21 31:10,13
  31:17,18,20 32:14
  33:1,4,9,9,14 36:3,4
  36:6,8,11 38:15
  39:12,20 40:7,8 41:3
  41:17,20,24 42:12
  43:11,17 44:4,23
  45:4,6,18,21 46:4,7
  47:24 49:15,17 50:18
  51:4,25 52:17,19,24
  53:8,11,12,14,18,24
  54:11,13,23 55:17
  56:5,8,12,18 57:25
  58:3,7,13,15,20 59:2
  62:17,19,22 63:7,14
  64:3,7,11,13,19,21
  65:14,20 66:11,14,21
  66:22,25 67:7,11,15
  67:21,22 68:3,7,10
  68:19 69:1 70:13
  71:6,10,14,18 72:3
  72:10,13,18 73:5,9
  73:14,21 74:8,11,15
  74:17 75:13,19 76:3
  76:14 77:5 78:6,12
  78:15,17 79:25 80:10
  80:15,18 81:4,7,9,15
  81:17,21 82:5,9,18
  82:20,20 83:10 84:2
  84:21,24 85:3,12,16
  86:6,16,24 87:3,4,9
  87:11 88:15,20,24
  89:2,22,25 90:18
  91:19,25 92:10,17,17
  92:18 94:3,16 96:11
  97:21 98:7,13,16,22
  99:3,7,12,12,24
  100:8,13,18,18,22
  101:1,4,14,17,24
  102:11,12,14,14,16

102:21 103:4,5,25
  104:8,10,11,15,20,24
  105:4,5,12 107:17,21
  109:3 111:19 114:1
  114:11,19,21 115:7
  115:17 116:2,7,23
  117:6,22 118:4,8,16
  120:11 121:18
  123:11,25 124:7
  125:2,7,7,8,10,10,10
  125:11 128:2,11,12
  128:17,23 129:13
  132:13,23 133:1
  135:6,12,16 136:1
**bayview's**  63:17
  93:10 125:14 126:8
  132:9
**beck**  31:23,25 32:3
  33:8 39:14 40:15,20
  46:5 47:13 94:6,11
  94:16 95:2,10 96:14
  96:19,20,24 97:13
  120:13,20,24 124:23
  132:10,19
**beck's**  122:22
**began**  30:21
**beginning**  71:9 74:14
  110:6 130:9
**behalf**  1:20
**believe**  37:19 52:21
  53:5 55:6 56:16 59:1
  60:2 65:6 75:2 84:1
  85:25 107:16 112:9
  121:13 123:2 124:11
  124:13 132:14
  135:17
**believed**  85:11
**bender**  35:17
**best**  5:13 20:5 33:4
  49:19 50:6 85:7 87:4
  105:21 121:13
**better**  43:11 68:18,25
**betty**  109:20 110:25
**beverage**  6:22

**bill**  101:22 131:9
**billing**  71:3,4 81:23
  81:25 102:2
**binder**  15:17 16:17
  16:20 17:11,13 35:7
  35:22 37:5
**birth**  21:4
**bit**  69:22,23 123:4
**blue**  25:22
**board**  20:1
**bob**  26:22
**body**  50:22
**borrower**  81:16
**bottom**  24:9 26:21
  28:12 29:11 50:15
  62:25 63:11 70:17
  77:9
**box**  24:12,16 56:1,13
  56:18,21 64:10,18
  122:17 124:8
**boxes**  135:7
**branch**  8:22
**break**  6:2,7 20:24
  59:8 96:4
**brendan**  2:10 4:9
**broken**  47:7
**broward**  137:2 138:3
**bunch**  123:5
**burbank18**  113:8,17
**business**  19:12,13

c

**c**  3:10 7:15 50:2,3,10
  53:7 138:1,1
**c.e.o.**  73:23 74:3
**california**  21:11,22
  21:23
**call**  10:11,13,16
  19:12 31:16,18 32:2
  32:2,7,14 33:1,4
  39:22,22 40:16 41:3
  44:12,13,23 46:6,16
  46:21,25 47:2,8,21
  47:23 48:13,18,20
  49:8,25 51:17,20

[call - control]

52:9 59:4 65:1 66:10
66:16 86:24 88:9
95:13 105:12,23,24
105:25 106:3,10,14
106:14 109:9 110:14
119:7,14 128:1,2,12
128:14,23,25 129:2
130:11,13 131:10,15
131:25 132:15,16
133:22 134:1,6
**called** 4:3 32:3,5 33:9
39:23,23 41:16,24
44:4 87:10 88:19
89:2,17,21 91:5
94:14 95:17 97:13
105:13 111:22
131:13,20
**calling** 10:14 47:9,15
111:8 112:18 116:5
118:23 128:7 129:4,5
131:21,22 132:5,6,7
**calls** 9:15 11:5 13:18
36:10,12 41:18,19
43:16,24,25 50:7
103:12 105:3 106:5
130:6,8,15,23 131:21
131:23 132:11,16,19
133:2,18
**capability** 73:21
82:20 116:7
**capable** 58:7 64:13
65:25 68:3,8,11
73:19
**car** 16:15
**card** 10:14
**care** 58:3 80:22
**careful** 101:20,24
**case** 1:3 4:13,16 15:1
15:4 16:21 17:14
28:14,21,23 29:12,14
29:24 34:25 36:22
39:25 55:20 57:2,24
80:24 90:20 92:4,19
95:12 108:10,13,21
108:23 109:2,14

116:16 118:13
119:16 121:25 127:2
127:18
**castleman** 8:1
**cause** 1:23 28:8
35:10 78:17
**caused** 95:22
**cc'd** 108:7
**cell** 9:16,18,25 10:2,3
10:17 11:8 24:16,23
25:4,7,9 27:5 32:7,9
32:13,25 33:6 40:17
43:16 57:8 58:17
62:2 63:1 70:23
71:11 80:4,7 94:7,23
95:12 96:15,25 97:13
105:5 106:2,5 107:23
107:25 109:10 111:9
112:18 116:12,22
118:17 119:2,19
120:16,22 121:4,21
124:16 127:21
128:14,20,23 130:16
**cellular** 9:20,22 10:5
10:8 13:7 41:17 44:4
46:7 47:24 51:1
**certain** 66:18 129:14
129:17
**certification** 138:16
**certify** 137:5 138:6
138:10,13
**certifying** 138:17
**cetera** 24:14
**charged** 73:9
**cheaper** 10:16
**check** 121:17,18
122:3
**chezky** 2:7
**chicago** 76:10
**christmas** 44:17
**chronological** 38:6
**circle** 7:17 8:1
**claim** 104:1,14
**clarification** 34:24
110:2

**clarified** 17:2
**clarify** 15:9 16:25
17:11 25:2 28:15
51:22 89:9 90:3
**clarifying** 33:24
**class** 79:6
**clear** 78:8 121:15
127:19
**click** 130:24 133:17
134:16,20
**client** 13:19 34:9
36:22
**clue** 94:19
**coffee** 6:7
**collection** 56:24
**com** 70:6
**combined** 23:2
**come** 38:24 69:20
87:16 130:25 134:22
134:22
**comes** 74:3
**commenced** 138:12
**commission** 137:15
138:24
**communicate** 65:7
**communicated** 66:20
**communicating** 66:1
**communication**
11:24 12:4 45:18
66:19 77:23 78:11
84:8 85:23 86:2 89:7
**communications**
36:10,12 127:12
**company** 22:5,11
64:15,25 67:24 68:9
73:23 74:3 80:21
100:22 102:21
104:11 115:16
**compilations** 15:6
**complaint** 25:10 34:7
45:11 59:14,22 60:8
60:17 61:10,14,15,15
127:9,14 132:25
**complaints** 81:16

**completed** 138:12
**completely** 5:24
132:1
**composite** 37:18
**concept** 84:3
**concern** 28:9 92:14
**concerned** 17:8
**concerning** 133:2
**concerns** 99:8
**concluded** 126:17
136:7
**condition** 7:1
**conditions** 7:5
**confirm** 44:10
135:22
**connected** 138:14
**consider** 114:16
128:11,22
**considerable** 93:11
**consistent** 106:15
**consistently** 73:1
**constitutes** 29:5
**consumer** 19:25
**contact** 27:15 51:20
51:24 52:1,3,17 53:1
53:2,2,4 57:5,14
58:17,21 63:14,18
64:2 73:3 74:4 82:2
82:10 86:10,15 88:13
89:12 112:24 116:19
116:23 119:3 121:3,6
121:21
**contacted** 46:6 52:19
52:24 66:13 83:3
88:24 97:22 118:17
**contacting** 105:5
**containing** 3:22
113:21
**contains** 17:12
**contend** 121:2
**contents** 38:23
**context** 46:16
**continue** 126:18
**control** 138:17

controlling 45:24
conversation 45:8
  47:11,19 48:14,16
  49:16 67:11 75:1
  94:12 95:2,3,4,7
  105:19 106:18
  122:25
conversations 64:9
  77:16
copies 76:8
copy 37:17 38:23
  39:3,9 76:9 110:4
coral 75:23 76:4
corporate 81:15
  101:18
correct 7:19 9:2,21
  10:25 11:9 14:16
  15:15,17 17:14 23:20
  24:14,21 25:10 26:13
  27:2,5 39:20 40:9
  41:14 43:1 49:12
  50:19,24 51:2,14,17
  55:10 56:14 58:15
  64:4 67:16 69:25
  70:2 71:4 72:6 73:10
  80:5 94:21 97:12
  99:14 101:2,7 102:2
  102:6,13,19 103:6,7
  108:16 114:22,25
  116:4,5,10,13 117:2
  117:7,15,19 118:8,15
  121:12,22 130:16
  135:8 138:8
correctly 76:17
correlate 134:18
correlation 93:5
correspondence
  67:20 68:4 76:3
  88:12 124:23 132:8
  132:23 135:16
cost 44:19
counsel 38:15 110:9
  138:13,14
counsel's 39:8

county 137:2 138:3
couple 130:16 135:2
coupon 76:10
court 1:1,21 5:2,7
  112:13 137:14 138:5
cover 102:9,15
coverage 72:14
covered 101:20
created 35:17
credibility 111:18
credit 95:16,25 96:2
critical 59:22
cross 3:2 126:22
  129:24
curiosity 103:8
current 22:3 25:7
  63:22
currently 4:12 6:13
  6:17 7:4 21:15
cuts 22:25
cv 1:3 4:14
cynthia 42:23 44:6,7
  44:9,11,22 45:12,14
  45:16,16,22 46:5
  94:12

**d**

d 3:1,11 54:18,24
  59:13
darias 39:19,25 40:2
  40:13,15,18,20 46:5
date 21:4 61:20 62:4
  62:12 106:25
dated 3:9,10,11,12
  3:13,14,15,16,17,19
  3:20,21,23 26:1 50:3
  54:18 55:9 62:7,14
  70:8 75:6 76:25
  77:12 89:18 91:12
  93:23 96:6 107:6
  120:6
day 114:15 137:10
  138:19
days 61:9

december 40:8 42:6
  42:13,22 44:10 94:13
  96:22
decreases 79:11
deem 71:16
defendant 1:9,20 2:9
  4:10 17:9 59:13
defendant's 3:7
  23:23 25:25 26:1
  50:3,10 54:18 62:7
  63:1 70:8 75:6,14
  76:25 83:6,11 91:12
  91:17 93:23 96:6
  106:22 107:6 110:4
  113:21 120:6 123:19
degree 79:8
degrees 21:13
deliberate 77:23 78:5
delivered 57:19
department 18:17
  19:4,5,11,12 38:22
  49:14 52:3,9 53:13
  53:15 54:8,11 57:20
  57:25 58:4,9,11,11
  59:5 63:13,17 64:2
  64:11,18,21 65:14,20
  66:12,15,22,23,25
  67:21 68:9 71:18,19
  73:14,15,18,22 76:14
  79:24 80:25 81:4,7,9
  81:21 82:1,5,9,17,17
  82:22,24,25 83:3,18
  84:18,21,24 85:3
  86:7,12,16 87:1,8,12
  87:17,18,22,23 88:1
  88:2,4 90:20,23,24
  92:5,11,14 94:17
  98:7,23 99:1,2,4,7
  100:11,24 102:25
  114:25 115:4,7,8,13
  115:19,20,23,25
  116:3,6 117:20,21,22
  118:7,7,21,23 124:20
  125:15 126:2,8,10
  129:17 131:19 132:9

135:13 136:1
departments 68:5
  79:25 86:4 98:13,16
  100:1,3,5,7 101:17
  102:19,22 115:13
  127:1,6 135:6,10
depending 103:23
depo 20:23
deposition 1:17,23
  4:16,18 5:15 6:10
  13:17,24 14:18,23
  15:15,25 16:23 17:20
  33:12 35:13 45:24,25
  110:7 126:13,17
  128:18 136:6 138:7,9
  138:10,11
describe 56:6
described 41:21
  82:24
desire 57:23 76:17
desired 48:22
determine 87:21
  98:15
dialing 128:13,24
difference 42:3 81:18
  103:18 110:22 129:4
differences 103:17
different 43:23 45:17
  54:1 75:21 81:12
  98:13 102:5 124:15
  125:6,12 135:5,9,19
differently 60:6
difficult 69:23 78:7
  78:15
difficulties 95:22
digits 24:20
dina 33:10,10 39:15
  83:15,16,23 84:1,8
  84:10,12,13,14,20,23
  85:1,2,14,20,25 86:1
  88:6,9,20 92:2,8
dina's 88:14 91:21
direct 3:2 4:6 102:18
  138:17

[directed - family]

**directed** 112:25
**direction** 79:19
  138:17
**directly** 40:16 43:17
  44:4,17 49:14 54:10
  55:23 64:25 67:3,6
  83:22 87:11 94:20
  96:18 112:24 126:1,7
  132:15
**disability** 8:10 12:6
  12:17 13:13,14
**disappear** 85:23,24
  86:4
**disappeared** 92:2
**disclosed** 36:23 40:10
**disclosure** 36:18,19
  36:24
**disclosures** 34:11
**disconnected** 47:8,16
  47:20
**discovery** 34:7,16,19
  37:13
**discuss** 36:1 121:25
  131:7 132:18
**discussed** 20:7,10
  41:12 78:2 92:3
  93:16 100:20 119:13
  124:5 127:18 132:17
  135:7
**discussing** 40:12
**discussion** 16:18 17:1
  33:17 36:16 38:8
  75:10 109:25 115:1
**disorganization**
  77:24 78:11,21
**disorientation**
  134:21 135:1
**disoriented** 131:3
**dispute** 34:16,20
  37:13 72:4,8,9,12
  87:24 90:17
**disputes** 64:19 73:4
  95:16
**disrespect** 46:3

**distribute** 67:23
  82:21 100:23 101:25
**distributes** 99:3
**distributing** 58:8
  64:14 68:4,8
**district** 1:1,1 4:13
**division** 1:2 18:23
**divisions** 18:24
**doc** 106:21
**docs** 50:9 110:10
**document** 23:21 24:1
  24:2,5,7,24 25:3,15
  25:19,23 26:5,7
  38:22 44:16 50:8,11
  50:22 54:22,24 61:18
  61:18 62:11,15,16,25
  63:6,25 70:12,14,16
  75:12,14 77:4,6,7
  83:9,12,13,14 85:9
  91:17,20,20,22 94:2
  94:8 96:10,13,15
  106:20,24 107:12,13
  109:17 113:25 114:2
  116:13 120:10,12,17
  123:23 124:16
  128:10,19
**documentation** 44:15
**documented** 36:7,9
  89:16
**documents** 17:3
  33:25 34:3,5 35:6
  36:25 37:4 38:6,10
  38:12,14 39:2 52:6
  57:22,24 63:21,22,25
  66:6,18 67:3,6 68:8
  69:1 107:2 123:2,3
  124:12 127:20,22
  128:9,18 135:12
**doing** 37:11 56:6
  114:10
**door** 38:14
**draft** 55:2
**drafted** 107:20
**duces** 34:21

**due** 45:23 78:21
**duly** 4:3 137:7 138:6
**dyer** 7:17

**e**

**e** 2:7,13 3:1,12 7:14
  7:15,15,15 55:17,19
  55:23 56:5 62:7,13
  63:1 64:23 65:4,9
  67:10 113:7,17 138:1
  138:1
**earlier** 124:6 132:17
**early** 103:12
**easier** 5:7 49:25
**education** 21:7
**educational** 21:7
**effort** 37:12 129:11
**efiling** 59:14
**eight** 6:23
**either** 53:3 64:9
  105:23 109:6 121:17
  135:16
**elizabeth** 19:21
**embarrassments**
  95:23
**employed** 8:9 11:22
**employee** 39:20
  64:22 138:14
**employer** 22:24
**enable** 23:11
**enclosed** 71:3 76:9
**ended** 14:19 48:21
  49:9
**engage** 84:8 110:23
**engineer** 21:20
  134:18
**ensure** 54:8
**entire** 103:24
**entirety** 107:12 110:3
**entity** 100:14
**equivalent** 19:3,6
**escrow** 79:21 80:11
  80:17,17,19,19 81:23
  114:10,14

**esq** 2:5,10,10
**establish** 4:25
**estimate** 8:8 11:2
  32:25 33:3 41:15
  48:9
**et** 24:14
**eve** 44:18
**exact** 49:21
**examination** 4:6
  126:22 130:3
**examined** 4:4
**exhibit** 3:8,9,10,11
  3:12,13,14,15,16,17
  3:19,20,21,22,23,24
  24:2 25:4,25 37:18
  50:2,10 53:7 54:24
  62:13 70:7 93:22
  106:22 110:4 123:24
  127:21 128:10
**exhibits** 3:6 62:1
  128:18
**exists** 115:25
**expected** 6:1 81:20
  81:22
**expires** 137:15
  138:24
**explain** 16:8 28:25
  29:4 42:3 43:4 74:18
  105:13,14,15,20
  106:7 117:14 118:5
**expound** 27:12
**extent** 38:19

**f**

**f** 3:13 70:7,8 138:1
**faa** 22:2 60:8,17 61:1
**facility** 56:24
**fact** 60:4 66:11 68:10
  111:11
**facts** 36:21 79:5
**failed** 92:8
**failure** 78:9 79:15
**fallen** 23:9
**family** 20:8

far  17:7,15
fax  25:19 65:6,8,9,10
  65:13,19 66:3,11,17
  66:21,24 67:6 122:21
  122:23 123:1,4,7
  135:25
faxed  66:19 122:13
  122:18
fcc  103:16
federal  59:14,19,25
  61:16 106:3,10
feel  57:4 60:23 61:2
  61:12 64:15 66:2,6
  68:7,10 69:5 111:21
felt  67:22
ff224023  137:15
  138:24
figured  67:4,4
file  60:8,17 61:10
  103:25 104:14 105:1
  105:2 107:2
filed  4:12 25:9 35:20
filing  36:22 132:25
fill  24:7
financial  3:8 18:17
  18:23,24 19:4,11,25
  23:23
financially  138:15
find  85:9 101:18
  102:23 104:4 107:11
fine  21:2 74:12 89:19
  97:14
finish  5:22 6:5 45:8
  106:6
finished  129:23
firm  38:22
first  10:2 30:24 31:8
  31:16 32:5 33:25
  35:12 44:24 45:10
  87:16,21 103:8
  107:11 134:21,22
  138:6
five  32:16 105:10
  106:23

fix  32:6 46:23,23
  82:2 83:3 84:14
  96:21
fixed  76:18
floor  2:6,12
florida  1:1,13,22 2:7
  2:12 4:13 7:24 18:13
  18:17,22 75:23 127:1
  137:1,14 138:2,5,23
floridaloanlawyers....
  2:7
flying  21:25 60:6
folder  38:17,20,24
follows  4:5 59:22
followup  95:6
force  40:9,11 42:14
  42:20 43:3 44:14
ford  107:19 108:15
  109:9,20 110:14,25
  111:8,12,18 112:6,17
foregoing  138:8,16
forget  78:3
form  10:18 12:7,10
  12:22 13:2 59:21
  64:12 124:12,14
  135:21
format  55:15
fort  2:7
forth  13:1 138:11
forward  42:18
  113:11
found  30:24 35:12
  45:22 66:10 102:22
four  24:20 25:6,8
  27:1,4
francisco  20:21
free  57:5
fresh  126:20
friday  95:5,5,7
friends  20:11
front  39:7,10 107:4
frustrated  45:1,2
  68:16,23 93:15
frustrating  69:2,24
  101:9,11 104:22

ftc  103:16
full  7:13 61:8
fully  65:25
further  4:25 28:19
  138:10,13

g

g  3:14 75:6,14
gables  75:23 76:4
gained  129:9
garbage  101:23
general  18:2,4,13
  31:3 62:22 99:13,19
  106:17 107:18,21
  108:4,6,7,9,13,16
  109:2 110:23 111:4
  111:25 112:3,8,22,25
  113:12,14 126:25
  127:1 135:6
generally  54:2 91:24
  102:15 106:15 116:3
  125:2,5 130:24
  131:15 133:11
  134:17
generated  80:18
  114:14,15
girlfriend  20:12
  127:16
girlfriend's  20:13
give  4:16 5:2,9,22
  37:10 49:13 61:3
  119:11
given  4:18 15:7 30:8
  32:24 34:17 37:21
  41:15 44:14 45:21
  64:6 129:8
giving  6:5 121:3
glow  25:12,16
go  4:25 5:18 12:12
  15:5 27:23 37:2
  38:21 39:3 40:22
  45:9 57:24 59:6
  106:8 109:16,23
  110:12 115:22 121:9
  131:6,8,16 133:5,23

goal  54:8 57:17,18
  60:13 61:5 73:25
  80:16
goes  84:3
going  5:2,21 13:1
  23:21 25:14 31:3
  38:19 40:21 44:20,23
  59:25 60:7,14,17
  61:17 62:5 83:9 91:2
  91:16 96:12 106:19
  110:10 113:25
  120:10 123:23,25
gonna  12:10,11
  20:22 25:21,22 35:13
  37:8,10 70:12 77:4
  86:10 93:21 107:10
  117:24
good  4:8 11:2 76:17
  118:18
goodbye  47:5
government  127:6
graduate  21:13
ground  4:24 6:10
group  62:1
guaranty  17:16
guess  5:23 21:1 52:23
  91:3 108:12,25
  110:10 125:23

h

h  3:15 7:15 76:25
half  8:13 12:5,17,21
  13:6 77:21
halfway  57:3
hand  24:12 137:9
  138:19
handing  24:1 38:5
handle  73:25 115:19
handles  64:19 116:4
handwriting  24:4
  26:13 122:15
handwritten  15:18
  17:6
hang  47:6 134:10

**happen** 85:21
**happened** 36:21
  44:12
**happens** 79:10
**happily** 88:25
**happy** 6:3 89:24
  118:3,22 119:11
**hard** 78:19
**harry** 19:17
**hate** 104:22
**head** 5:5 108:22
  133:25 134:5
**header** 92:12 125:6
**hear** 6:15 7:2 134:20
**heard** 5:10 22:8
  134:10
**hearing** 134:5
**help** 60:15 74:5
  98:23 99:13,24
  100:14,18 101:1,5
  103:6 116:25 117:6
  117:13,18
**helped** 71:19 74:9
  88:21 89:3,22 97:21
**helping** 85:11
**herbert** 2:10 3:4 4:7
  4:9 10:19 12:3,15
  13:10,20 15:3,11
  16:16,19 17:10 20:22
  21:2,3 23:25 25:23
  26:4 29:22 33:16,18
  34:23 35:4,25 36:13
  37:1,15 38:3,7,9 39:3
  39:5 48:2 50:1 54:21
  58:24 60:11,20 61:17
  61:21 62:5,10 65:16
  65:22 70:11 71:22
  75:9,11 77:3 83:8
  91:15 93:21 94:1
  96:4,9 98:6,20 107:1
  107:4,9 110:1,17
  112:10,15 113:24
  120:9 123:22 126:12
**hereinabove** 138:11
  138:12

**hereunto** 138:19
**hey** 108:9 131:8
**high** 79:8
**highest** 21:6
**hold** 21:15 71:15
  118:11
**home** 8:4 10:11,14,16
  10:21 92:24
**homeowner's** 71:5
**honest** 30:9 80:16
  93:3
**honestly** 79:5 104:23
**hour** 95:4
**hours** 6:23 126:24
**humanly** 104:20
  105:1
**hundred** 130:17
  133:6

## i

**idea** 25:13 88:16,18
**identification** 23:24
  26:3 50:5 54:20 62:9
  70:7,10 75:8 77:2
  83:7 91:14 93:25
  96:8 107:8 113:23
  120:8 123:21
**identified** 64:22
  120:11
**immediately** 45:12
**implied** 52:11 53:16
  55:21 63:19,24 82:11
  92:15 119:24 120:2,5
**imply** 93:20
**improper** 112:17
**inappropriate**
  118:20
**incentive** 61:4
**inch** 15:16
**incline** 7:17 8:7
  10:24
**include** 14:12 94:23
  96:25
**included** 88:7 116:21

**including** 88:8
**inclusive** 138:8
**income** 23:3
**inconveniences**
  95:23
**incorrect** 108:14
  109:6,7 114:15
  124:13 125:16
**incorrectly** 57:4
**increased** 23:1
**increases** 79:12
**index** 61:22 62:3
**indirectly** 108:12,25
  109:20
**individual** 57:1
  81:16 87:14
**individual's** 18:6
**individuals** 33:13
  44:3 45:5
**industry** 19:12,13
**inform** 109:2
**information** 20:23
  28:18,19 29:9,16,25
  36:3,5 45:14,15
  47:17 49:14 51:9,11
  51:19 52:1 54:9
  63:15 64:14,25 65:5
  65:8 66:4 67:23
  71:15 82:21,25 84:4
  89:6 90:5 95:14
  100:23 103:15 104:9
  104:10 116:19,20
  118:11,12 119:4,6,7
  119:10,11,15,20
  120:3,4,25 121:6,22
  122:1,2,8 123:6,8
  124:22,25 126:20
  129:8,15 131:2
**initial** 34:11 36:18,24
**initiate** 48:18
**initiated** 40:16
**instruct** 12:10
**instructions** 6:9
**insurance** 40:6,7,10
  40:12 41:9,11,20,25

42:1,4,5,6,7,13,14,20
42:24 43:2,3,6,10,13
43:13,14,18,25 44:14
44:15 45:13,14,16,22
48:11,12,15,17,23
49:13,14 50:19 51:5
51:13,21 52:2,3,5,6,9
52:20,25 53:6,12,14
54:11 57:2,17,19,20
57:21,22,24 58:3
59:4 60:14,15 63:8
63:13,17,21,24 64:2
64:11,19,21,24 65:14
65:20 66:2,6,12,15
66:22,22,25 67:21
68:19 69:1,6,15,19
71:5,17,25 72:2,3,5
72:10,13 73:6,9,14
73:18,19,22 74:1,2,7
74:9,12,20,22 78:15
78:19 79:16 83:18
84:1,5,10,16,18,21
84:24 85:3 86:7,11
86:11,15,15,25 87:7
87:9,12,15,17,22,23
88:1,4 89:1,16 90:1
90:20,21,23 91:3
92:4,11,14 94:13
96:23 98:25 99:1,16
99:17 100:24 101:12
101:13 108:23 127:7
127:11
**insurances** 63:23
**insured** 49:19 69:21
  72:11 73:12
**intended** 46:3
**intent** 88:25 92:12
  101:25 125:6
**intentional** 68:14
  78:18,22 79:16
**interaction** 16:3,4,9
**interactions** 16:7
**interest** 3:22 113:22
  114:13 117:15,19
  118:8,15 119:16

[interest - letter]                                                    Page 147

121:16 125:15
135:20
**interested** 138:15
**interesting** 109:16
**internally** 68:5 78:11
78:17,18 81:14
**internet** 104:7
**interrogatories** 34:10
35:2
**interrogatory** 49:24
**involve** 127:13
**involved** 9:3 111:25
113:14
**irs** 114:5,7,11,13
117:9,21 121:14
124:6,12 135:17
**issue** 28:15 41:9,11
41:21,25 42:1,2,4,4,5
42:7,8,9,21,25,25
43:2,7,10,14,19,20
43:25 44:1 46:20
48:11,11,12 50:19
52:2,20,25 60:25
61:11 70:23 71:20,25
72:2,3 73:16 74:22
87:23 88:22 89:3,23
112:4 115:20 117:1,3
117:8,13 124:21
**issued** 22:1 125:16
**issues** 43:23 69:7,16
88:21 97:18,22
100:19 101:6 109:3
111:19 116:4,10
127:7,7,10,11 128:3

**j**

**j** 3:17 91:12,17,17
**jacksonville** 7:24
**january** 3:19,20,23
3:25 32:1 46:10
93:24 94:14 95:6
96:7 114:3 120:7,14
123:20 124:2
**job** 8:15

**johnny** 48:4,5,8,21
48:24 49:15,17,19
64:21,25 65:2,4,11
65:24 66:1,4 67:12
75:1 77:16 86:19,22
**johnny's** 64:23
**joy** 1:20 137:14
138:5,23
**judge** 133:9
**june** 3:12 61:21 62:8
62:14

**k**

**k** 3:19 93:22,23
**keep** 25:21,22 57:15
90:2,10 117:10
127:25 130:1
**kept** 67:10,15
**kind** 35:2 36:5 39:7,8
81:11 103:19
**kmw** 1:3 4:14
**knew** 87:7 103:19,20
**know** 4:21 5:21,24
6:3 15:7 17:15 20:19
22:5 24:19 25:18,20
27:19 32:12 34:6,8
34:15,18,19 35:10
37:8,20 41:1,22
43:17 44:8 47:4,10
47:14,17 48:7 49:20
49:21 51:8 52:23,23
53:20 54:6 55:14
56:21 64:17,20,21
65:2 68:11,12,14,15
68:15 69:24,24 70:2
71:17 73:13,20,20,25
76:11 78:4,10,14,16
78:18,23 79:1,24
81:3,12,18 82:4,7
85:20 86:8,10 88:17
90:11,13,23 91:1,1
92:20 93:3,4,7,17,17
93:18 94:17 95:3
98:2,7,11,12,23 99:6
99:16,17,19,23 100:2

100:4,6 101:9,16
102:15,23 103:17,21
105:9,11,18,18,23
106:11,12,16 110:25
112:1,7 115:6,14,18
115:24 118:24 119:8
119:8 120:3 122:3,10
122:24 125:21 126:3
126:5 131:3,8,20,25
132:16 133:4,13,24
134:13,17,25
**knowing** 68:11
**knowledge** 20:5
22:10 28:14,16,23
29:1,3,5,6,14,19
49:19 50:6 51:19,25
56:25 57:13,16 63:13
66:5 71:13 73:3 80:9
85:7 87:3,5 88:10,23
89:25 90:3,4,10,11
90:16,17,19 95:1,8
95:19 96:21 97:1,3
97:10,11,25 99:15
101:9 103:22,23
110:22 111:1 116:8
116:16,24 117:3,8,11
117:12,18,23 118:10
118:12 119:14
123:13 124:21 128:1
128:3,5 129:3,5
**knows** 90:14

**l**

**l** 3:20 7:15 96:6
**labeled** 75:13 126:2
**lack** 43:11 77:22
78:10
**land** 10:23 11:4,6,7
92:25 93:2
**large** 1:22 131:11
138:6
**late** 81:24 105:14
**latest** 66:17
**lauderdale** 2:7

**lawrence** 1:4,17 3:3
4:2,8 7:15 15:12 17:1
26:22 37:4 38:16,19
38:21 39:6 50:9
75:15 91:5 106:21
110:5,10,13 118:18
137:6
**lawrence's** 110:9
126:21
**lawsuit** 4:11 9:7,15
17:24 18:12 20:7,10
22:14 25:5 32:10
35:19 51:2 57:9
70:24 130:14
**lawsuits** 9:4
**lawyer** 104:4,13,17
**lawyers** 2:5
**layout** 102:21
**lead** 97:7
**leading** 36:21
**learn** 103:9
**leave** 38:18,21 63:10
135:3
**leaving** 71:11
**left** 24:12 39:11
44:20 126:12
**legal** 45:19,20 61:15
90:12
**lender** 73:9
**leona** 20:14 127:16
**letter** 3:9,10,11,12,13
3:14,15,16,17,19,20
3:21,22,23,24 26:1,9
26:15,18,19,21 27:7
27:9,20,23 28:3,15
28:20,24 29:2 30:8
30:12 31:1,2 50:3,13
51:4,6,9,10,19,24
52:1,7,12,16,21 53:5
53:5,16,21 54:18
55:2,7,9,12,13,14,18
55:21,24 56:2,3,6,7,8
56:12,17 57:1,3,12
57:18,21 58:1,2,8,8
58:12,14,18,22 59:12

[letter - mitchell]

59:17,18 62:7,14,23
63:7,16,19 64:1,5
70:8 71:12 72:23
73:22 74:19 75:6,16
76:1,8,13,15,25
79:20 80:4 81:19
82:9,11,19 83:20,22
83:24 84:12,13 85:1
85:2,7,19 88:6,7,8,11
89:18,23 91:12 92:7
92:9,10,16,22 93:23
94:4,5,20,24 96:6,18
96:24 97:18 107:6,17
107:20,22 108:16,20
109:10 110:3,4,8,15
111:8 112:5,18,24
113:17,19,21 114:18
114:21 117:1,14
118:5,9,13,18 119:8
120:6,15 122:11
123:12,19 124:4,7
125:20,25 126:1,11
**letterhead**  76:22,23
**letters**  13:4 17:4 30:2
30:6 53:23 54:10,16
59:2 62:1,4 67:10
72:17,20 73:5 74:17
76:22 84:19,20 93:19
98:21 99:12,23 100:7
100:17,20 101:6
102:11,13,18 119:13
119:19,23 126:6
132:23
**level**  21:6
**license**  21:21,25 22:3
**licenses**  21:16,24
**life**  45:11 93:12
**line**  10:23 11:4,6,7
13:8 50:21 92:25
93:2
**list**  20:6 49:24 73:1
105:25 106:3,10
111:14 131:15
**listed**  28:21 33:14
72:23 96:16 107:23

108:1
**listen**  36:13 91:5
130:7
**listened**  134:9
**lists**  92:23
**litigation**  33:23 34:13
**little**  12:1 13:25
37:14 69:22,23
103:22 123:4 131:1
**live**  7:16 11:6 20:15
20:20
**llc**  1:8 2:5 92:17
100:13 125:8,11
**llp**  2:11
**loan**  1:8 2:5 4:11
22:11,13,13,19,22
23:12,18 24:13 26:9
27:10,14,16,22 29:6
29:10,15,19,25 30:3
30:7,14,18,22,25
31:4 54:11,13 56:13
56:18 58:3,10,13,15
64:3 67:7,15 68:19
75:19 80:10 92:17
98:16 100:13 102:12
102:14,16 104:11
107:17 109:3 114:21
115:17 125:7,8,11,11
**loans**  81:17
**lock**  117:25
**long**  8:2,6,17,24 9:22
10:4 26:6 35:8,8
46:13 48:7 93:4
95:18 101:5,8 117:6
**longer**  23:5
**look**  15:6 24:12 27:7
27:20 37:16 38:4,9
39:17 50:11 54:24
77:18 91:19 115:16
**looked**  35:2,10,11
102:20
**looking**  39:16 42:19
53:7 62:13 92:1
104:13,17

**looks**  25:19 122:18
**lot**  69:10 72:17 76:21
**lunch**  96:4

## m

**m**  1:4 3:21 7:15
106:22 107:6 110:4
**ma'am**  4:4
**madam**  5:7
**mail**  2:7,13 53:2
55:17,19,23 56:5,17
56:20,23 64:23 65:4
65:9 67:10 113:17
**mailed**  3:24 113:7
123:19
**mailings**  135:5
**major**  95:22
**majority**  127:19
**making**  23:9,14
37:17 82:16
**manager**  39:24,25
73:20 83:17 88:17
**march**  3:10 50:4
**mark**  50:1 61:17 62:5
70:7 93:21
**marked**  23:24 24:1
25:4 26:2 50:4,8
54:19,22 59:12 62:8
62:11 63:1 70:9 75:7
75:12 77:1 83:7,10
83:11 91:13 93:24
96:7 106:20 107:7
113:23 120:7 123:20
123:24
**marking**  25:23 37:18
50:10 91:17 106:21
**married**  7:8,10
**matter**  61:9 74:8
76:17 80:14 83:1,2
93:11 101:4 117:5
**mccaughan**  2:10 3:4
15:5 61:24 106:25
107:3 109:23 126:14
129:20 130:1,4 136:3

**mcdonald's**  100:16
**mean**  10:14 15:9 22:7
28:17,25 29:4,20,23
33:20 34:23 38:15
40:5 41:9,11 42:17
53:1,11 55:25 74:15
78:1,8 87:6 90:8,14
95:24 108:21 113:13
114:7 117:18 118:1
119:12 121:23 132:1
**meaning**  89:14
125:12
**means**  78:7 92:4
125:24 138:17
**meant**  103:21 134:23
134:25
**medical**  7:5
**medications**  6:14,17
**meed**  6:2
**members**  20:8
**mental**  7:1
**mentally**  69:11,20
**mention**  132:22
**message**  133:20
134:8
**messed**  114:11
**met**  34:5
**methods**  66:20
**miami**  1:2,13 2:12
124:8
**michigan**  56:1,14
75:22 76:4
**middle**  6:5 47:19
**military**  8:21
**mind**  95:7 126:20,21
129:20
**minute**  59:7 65:1
134:10
**minutes**  11:16 48:9
78:3
**misleading**  109:7
**missed**  79:7
**mistake**  79:9,11 93:7
**mitchell**  31:23 32:3
39:14 40:15 46:5

[mitchell - page]

Page 149

47:13 94:6,11,16,17
94:21 95:2,10,12
96:14,19,20 120:13
120:20,24 122:22
124:23 132:9,19
**modification** 22:20
22:23 23:4,8,18
27:11,14,16,22 29:7
29:10,15,19,25 30:3
**modified** 27:24 28:5
**modify** 23:11
**month** 35:14
**monthly** 23:3,5
**months** 12:23 13:6
44:15
**montieth** 7:14
**morning** 4:8
**mortgage** 3:22 22:5,8
23:6 76:9 113:22
114:13 117:15,19
118:8,15 119:16
121:15 125:15
135:20
**move** 70:6 79:18
**multiple** 16:7 44:16
54:2 62:20,24 64:7
69:4,20 74:17 102:4

**n**

**n** 3:1,22 7:15,15
113:21
**name** 4:8 7:13 18:7
20:13 24:13 39:18
41:1 70:22 79:24
83:15 84:2 91:21
99:7 115:6,18 131:4
131:5
**named** 39:15
**names** 31:19,22
33:12 39:12 44:2
98:12,16 100:3,4,6
**navy** 8:23,24 9:1
**necessary** 66:3,7
**need** 28:19 71:7,14
74:16 111:17,17

112:2 118:10 120:3,4
120:24 124:22,24
**needed** 49:18 52:6
63:14 86:14 95:13
119:3,7,10,20 123:9
132:14
**nevada** 7:18 10:24
18:2,3 19:3,10 21:22
26:10 107:18 108:7
108:13 110:23
111:25 112:3,8,22,25
113:11,14 126:25
**never** 80:17 114:12
129:16 135:8 136:2
**new** 27:24 28:4
125:23
**news** 118:18
**nice** 133:7,11,12
**night** 34:1,4,14 35:1
**nine** 79:10
**no's** 115:21
**nodding** 5:5
**nonproductive** 129:9
130:7 132:2
**nonthreatening**
59:24
**norma** 39:19,25
40:13,15,18
**notary** 1:21 137:14
138:5,23
**note** 103:13
**notebook** 110:5
**notes** 13:25 14:1,3,5
14:8,12,14,18,21,24
14:25 15:10,14,20,24
16:1,11,12 17:2,6,7
17:13 33:11,14 35:16
36:20 39:7,9,17
47:12,13 50:7 61:19
85:5 138:9
**notice** 1:23 44:18
**noticed** 75:24
**notification** 61:16
**notify** 59:25 87:13
109:1 125:14

**november** 3:9,13,18
26:2 27:17 70:9 72:5
72:14 74:22 91:13,23
**number** 4:13 9:18,23
9:25 10:2,3,11,13,21
11:14,14 24:13,17
25:2 28:12,21 29:11
33:5 50:24 51:1,17
57:8 63:10,24 65:13
65:19 66:11,17,21,25
70:22,23 71:12 72:23
73:2 80:5,8 83:19
88:7,8,25 92:23,24
94:7,24 97:14 108:10
108:19 119:2 122:7
122:21 123:1,5,7
127:22 128:8,17,20
128:21 130:15
132:10 135:25
**numbered** 138:8
**numbers** 10:6,9 25:6
25:8 27:1,4 46:19
62:2 130:6

**o**

**o** 3:23 7:14,15 120:6
**oath** 5:25
**object** 5:16 13:8
64:12
**objecting** 38:16
**objection** 5:17 10:18
12:2,7,22 13:18
14:10 24:25 27:18
28:6 29:21 33:2
35:24 36:1 37:9,14
38:11 48:1 58:23
60:10,19 65:15 67:13
69:9 71:21 73:17
78:13 79:17 80:2
81:5 84:22 85:13
91:8 97:23 98:5,9,19
100:9 103:10 104:2,6
109:11 110:16,18
112:19 113:9 115:9
126:4 130:10

**objectionable** 33:19
**obviously** 21:25
74:21 78:16 130:13
**occasions** 41:23
87:10
**occurred** 31:6 42:21
**october** 3:15,16 21:5
77:1,12 83:6 89:18
89:23
**office** 11:11,13 55:22
55:25 56:1,13,18,21
**official** 137:9
**offset** 108:5
**oh** 103:12 124:3
**okay** 28:11 37:16
89:4 91:7 97:24
117:24 122:6
**old** 92:24
**once** 47:15 48:17
68:5 79:7 85:10
**ones** 25:22
**open** 14:19
**opinion** 36:18 78:24
79:2 87:16 109:6
113:4,6
**opportunity** 39:16
**opposite** 79:12
**order** 38:6 121:10,12
**original** 38:20
**outline** 115:16 117:1
**outlined** 97:18 101:6
**outlining** 100:19
**overseas** 10:10,16
**overwhelming** 69:22
**owned** 8:2,6 10:8
11:13

**p**

**p** 3:24 123:19,24
**p.m.** 1:14 136:7
**p.o.** 64:10,18 124:8
135:7
**package** 23:19
**page** 3:7 17:13 24:10
28:13 29:12 50:16

[page - problems]

77:10 106:24 107:11
109:17 111:11
pages  14:8,11,14,21
15:8,14,16,24 16:11
138:8
paid  105:14,15
121:16 131:8
paperwork  63:23
99:3
paragraph  59:16
76:7 77:18 93:9
121:10 125:13
paragraphs  59:18
part  92:21 114:5,7
124:4 125:5
parties  138:13
party  9:6 111:24
138:14
pattern  85:21
pay  22:25
paying  101:22
payment  76:10
101:22 131:23
payments  13:13 23:6
23:9,11,14 105:15,16
pending  4:12 36:1
people  39:12 86:5
103:5 112:2 131:17
132:9,10
percent  67:4
perfectly  68:7 82:3
118:22 123:18
124:25
period  32:22 120:14
permanent  13:14
person  29:5 32:4
40:24 51:23 84:5,23
85:15,22,24 86:3
94:25 95:8 96:20
97:1,3,10,11,25 98:2
98:8 99:17,18,19
101:8,12,15,22
105:13 110:21 111:1
116:8,9,16 117:12,17
131:19 133:19

personal  14:3 20:11
97:9
personally  9:10
137:6
pflc.com  56:5
phone  9:16,18,25
10:2,3,17,21 11:8
22:17 23:16,17 24:17
24:23 25:4,7,9 27:5
28:12 31:16,18 32:7
32:9,13,25 33:6
40:17 41:17,18 43:17
47:2,8,20 53:1,4,4
57:8 58:18 59:4 62:2
63:2 70:23 71:11
72:23 73:2 80:5,7
83:19 92:24 94:7,23
95:12 96:25 97:13
103:12 105:6,12
106:2,5 107:23,25
108:10 109:10 111:9
112:18,23 113:2
116:22 118:17 119:2
119:19 120:22 121:4
121:21 122:7 127:21
128:8,14,20,21,23
130:6,16 132:20,20
134:8
phone's  96:16 116:12
120:16 124:16
phonetic  39:19
physical  6:25 7:4
physically  51:24
56:17
pick  130:22 134:3
136:5
picked  134:7
pilot  8:16,17,18 9:1
23:1
pilot's  21:25
pilots  22:25
place  95:4 138:11
placed  40:9,11 41:20
42:14,20 43:3 44:14
47:24 73:9 131:14

plaintiff  1:5 2:4
plastic  25:12,17
please  5:12,22 6:3
7:12 16:8 42:11 57:4
69:12 71:7 76:16,16
79:20 106:9 133:5,8
point  6:2 27:16 30:21
40:8 42:6,13,18
44:17,19 45:2,11
53:6 56:23 72:1 89:5
89:11 97:14 103:19
109:5,5 110:24
111:14,16,18 114:4
128:11,16,22 130:14
points  108:5,5 111:4
policy  43:3 57:23
63:24 71:5
polite  133:14
polytechnic  21:11
portion  112:12
position  11:21 68:13
88:14 95:11,18 106:7
possession  126:7
possible  104:20,21
105:1
possibly  48:22 71:14
85:14
post  55:22,25 56:1,13
56:18,21
preferred  128:4
premium  40:12
42:14,20 44:19
preparation  34:25
prepare  13:16,23
16:23 33:12 89:7
present  32:23
presently  6:25 9:3
presumed  5:9
previous  84:3 88:12
91:22 92:9 113:19
previously  25:24
39:9 41:13 70:13
75:13 77:5 78:4
83:10 91:18 93:14
94:2 96:11 114:1

115:1 120:11 123:24
131:7
primarily  13:3
primary  11:9
principle  34:20
prior  132:13,25
privilege  13:19 34:9
probabilities  79:6
probability  79:8,11
79:18
probably  75:20
92:19 103:22 125:21
125:22 133:7 135:19
problem  32:6 40:3,5
40:6,7 41:7,8 45:4
46:12,17,22,23,24
48:17 51:5 52:5
57:18,20 60:14,15
61:3,4,6 63:9 67:5,8
71:10 73:19 74:1,7
74:10,12,14,22 78:9
78:19 79:15 80:10,15
80:21,25 81:2 82:15
82:22 83:4,5 84:6,11
84:15,16 85:15 86:14
87:7,13,18 88:5 89:1
90:1,6,21 91:3,10,11
94:14,15 95:2,9,19
96:3,22,23 98:1
99:17,18 100:25
101:13,16 104:19,24
104:25 108:3,11,23
108:24 109:15,19,21
110:25 114:5,6,8,13
114:17,17,20 115:5,8
115:11,12 116:17
117:4,9,23 118:4,19
118:22,25,25 119:15
120:2,4,21,23,25
121:13 122:5 123:14
123:16,17 124:5
126:15 128:6,6
problems  87:9 99:14
108:9

[proceed - relationship]                                        Page 151

**proceed** 5:19
**process** 68:16,24
  69:5,14,14,19
**produce** 17:16
**produced** 14:25 15:4
  17:8,14,17 34:21
  37:5,6,11 39:2 62:13
**product** 33:21 37:10
  38:1
**production** 34:8 37:3
  37:25 38:12
**professional** 21:15
  21:19
**promised** 46:23
**proof** 45:13,14,16,21
  66:1 72:9 74:20
  78:19 124:24
**proper** 40:10 42:12
  43:12,13 54:8 57:1
  82:25 87:22 88:4
  100:14 101:19 115:7
**properly** 49:18 66:20
  69:21 70:1 73:11
  80:20
**properties** 7:21,23
**property** 7:19 8:2,6
  10:24 24:13 26:10
  40:6 41:25 42:12
  43:12,13 49:18 69:21
  72:10,14 73:11
**propose** 121:19
**propounded** 37:3
**protect** 106:2
**protection** 19:25
**protocol** 106:14,15
  106:17
**prove** 68:19 78:15
**provide** 36:25 69:1
  79:21,25 80:7,11
  81:22 82:13,25
  113:16 120:22 121:1
  124:25 133:1
**provided** 17:4 24:23
  25:3 38:10,17 44:17
  45:15 51:11 57:22

64:6 67:18 80:4
  95:12 110:6,8 127:21
  128:8,10,17,19,21
**provides** 50:24
**providing** 67:3 119:2
  122:6
**prudent** 111:13
**public** 1:21 137:14
  138:5,23
**purportedly** 9:16
**purpose** 49:12 92:7
  108:10 113:20 118:9
  119:6,8,9 122:7
**pursuant** 1:22
**put** 14:1,5,8 15:13
  28:12 29:11 34:20
  47:11 57:1,11 106:9
  108:19 125:5,8

**q**

**qualified** 129:14
**quantity** 133:15
**question** 5:1,10,11,14
  5:16,18,19,20,21 6:5
  6:6 9:8 11:2 12:8,13
  12:14 14:13,19,20
  16:6 28:24 30:16
  34:2 36:14,15 43:5
  45:22 46:1 51:12
  56:10 65:17,18,23
  69:12 70:3,4 73:13
  78:3 87:20 93:8 99:5
  99:5,20,22,22 110:12
  111:6 112:11 119:25
  122:10 128:15 132:3
  135:3,12,23,24
**questioning** 13:9
**questions** 5:8 6:15,19
  7:2 45:25 50:23 51:7
  51:16 107:10 111:2,3
  111:14,15 126:19
  129:21
**quick** 38:3
**quite** 111:20 134:1

**r**

**r** 7:14,14,15 138:1
**raised** 73:4,4
**reached** 123:12
**read** 57:4 71:1
  112:10,13 121:11,23
  122:11
**reading** 56:3
**ready** 45:3 134:24
**realized** 66:14,16
**really** 34:15 35:1,10
  68:16 74:3 98:22
  99:23 101:24 102:23
  103:14,21 134:12,13
**reason** 4:23 55:6
  56:16 85:9 108:2,18
  119:18 121:5,7,8
**reasonable** 47:21
  71:16 123:18
**reasoning** 79:13
**recall** 22:12,18 26:7
  30:9,11,12 31:16
  32:4 48:7 50:13
  55:15 65:8 70:15
  76:2 77:7 83:13 85:4
  85:6,25 92:6 129:12
**receive** 11:5 58:12
  59:3 65:7 83:25
  105:12 106:13 134:2
  135:15
**received** 27:24 28:4
  44:18 51:23,24 54:3
  54:9 62:22 68:5 85:7
  86:1 103:11 123:7
  124:11,13 135:19
**receives** 51:18
**receiving** 58:8
**recess** 39:4 96:5
**recognize** 26:20
  54:25 91:20,21 94:3
  94:5,6 96:13 107:12
  120:12,13 124:1,3
**recollection** 27:8,21
  33:5 87:4

**record** 7:12 12:9
  16:17,18 17:1 33:16
  33:17 35:15 38:7,8
  59:6 75:9,10 109:24
  109:25 112:13
  126:16
**redacted** 24:19,20
  27:1
**redirect** 130:3
**reduced** 23:2
**refer** 43:6,19,20
**reference** 16:13 26:9
  40:4
**referenced** 16:10
  17:12 39:10 42:24
  126:1
**references** 74:16
**referring** 17:3 43:9
**refresh** 27:7
**refreshes** 27:21
**refunded** 121:14
**regard** 17:19
**regarding** 14:24
  15:14 16:1,21 17:23
  18:12 27:15 36:20,20
  41:20 48:10 50:18
  52:20,25 53:6
**registered** 21:19
**regulator** 60:15
  61:16
**regulators** 59:15,20
  59:25
**reich** 1:21 137:14
  138:5,23
**reid** 19:17
**reidentified** 110:3
**reimburse** 42:18
**relate** 60:5
**related** 27:10 43:18
  43:20,24 44:1 115:13
**relates** 27:22 29:2
  36:4,5
**relating** 28:18 29:9
**relationship** 76:18

[relative - saying]

**relative** 29:25 36:7
  48:22 51:12,20 106:9
  138:14
**relevance** 37:10
**relieved** 85:10
**remarkable** 105:16
  131:1
**remember** 18:6 19:5
  22:19 23:13 26:15
  28:8,11 30:1,5,13,17
  30:19,24 31:2,5,8,12
  31:19,23,24 32:20
  39:17 40:1,14 41:5
  41:23 44:2 45:5
  46:14 47:1 48:24
  56:2 75:16,17 83:15
  83:16 88:14 93:5
  102:8 127:3 130:23
  131:11 134:1,4,5,13
  134:13,15
**remind** 131:22
**rental** 8:5
**repeat** 65:18
**repeated** 106:16
**rephrase** 5:13 9:8
  10:20 14:7,13
**report** 138:7
**reporter** 1:21 5:3,7
  112:14 137:14 138:5
  138:18
**reporting** 95:16,25
  96:3 115:12 117:22
  135:18
**represent** 4:10
**representative** 32:5
  39:24 48:15 49:13
  66:5 67:2,6 94:16
  105:21 118:23
**representatives**
  65:25 105:17
**reproduction** 138:16
**request** 37:2 63:16
  67:1 71:16 86:25
  105:22,24 112:5
  121:22 129:15

135:25
**requested** 23:10
  63:12 65:3 83:1 89:6
  112:12 123:1,3,5
**requesting** 122:7
**requests** 50:23 51:7
  51:12,16 63:15
  129:15
**required** 11:5,6
  29:15,24 36:24 51:10
  64:16 66:1
**requirement** 93:18
**research** 97:6 101:17
  103:11,15 104:7
**researched** 98:15
**resistance** 93:10
**resolve** 69:6,15 71:19
  76:16 78:9 79:15
  86:14 87:18,23 88:21
  89:22 91:6 93:10
  97:17,21 99:14
  100:19 101:6 115:7
  116:9,25 117:13
  118:4
**resolved** 42:20 46:20
  73:15 74:23 90:24
  118:19
**resolving** 80:15 90:5
**respect** 26:10 33:19
  36:10,21 45:23 72:4
  79:15 105:3
**respectfully** 46:2
**respond** 5:6 85:22,24
  86:3 92:8 103:5
  112:6,17 115:19
**responded** 4:4 85:8
  86:5 101:5 111:8
**responding** 112:8
**response** 5:23 37:6
  37:25 53:6 55:16,18
  56:4 81:20 83:25
  84:7,13,18 89:7,17
  107:16 109:10
  110:15 111:13
  118:17 119:19

123:12
**responses** 34:7 49:24
**responsible** 87:15
**rest** 136:5
**restate** 30:16 58:20
**retirement** 23:1
**return** 121:18
**review** 33:25 34:1,4,5
  34:11 35:1 38:14
**reviewed** 14:1,15,22
  15:14,24 16:11 33:11
  34:3,12,14 35:6
**reviewing** 16:20
**rid** 11:4 93:2,6
**rides** 69:11
**ridiculous** 131:23
**right** 9:16 10:15,24
  12:17 13:21 14:18
  23:19 24:24 25:5,14
  26:19,22,25 27:25
  28:22 29:13 30:22
  39:6,13 41:17 43:10
  45:1 52:10,14 53:9
  53:18 54:22 58:14
  59:15 60:24 63:2
  66:13 67:12 68:6,17
  70:24 72:1 74:5,23
  75:2,3 76:16,19,23
  77:13 79:22 80:12,23
  82:18 83:2,20 84:8
  84:12 86:20 89:19
  90:25 91:7,16,25
  92:14,18 94:8 96:12
  96:16 98:24 99:24
  100:8,14 101:10,11
  102:3,3 104:22
  107:23 108:19
  109:18 111:15 112:1
  114:3 119:23 120:17
  124:8,17 125:3,9
  129:19 130:21
**robert** 1:4,17 3:3 4:2
  7:14 137:6
**robocalls** 131:16

**rodal** 2:5 3:5 10:18
  12:2,7,9,22 13:2,8,18
  14:10 15:9 16:14,25
  20:25 24:25 25:21
  27:18 28:6 29:21
  33:2,20 35:24 36:23
  37:8,19 38:5,11 39:1
  48:1 49:23 58:23
  60:10,19 61:20,22
  62:3 64:12 65:15,21
  67:13 69:9 71:21
  73:17 78:13 79:17
  80:2 81:5 84:22
  85:13 91:8 97:23
  98:5,9,19 100:9
  103:10 104:2,6
  106:23 109:11
  110:16,19 112:19
  113:9 115:9 126:4,16
  126:23 129:18,23
  130:10 136:5
**rodriguez** 83:15,16
  83:23 84:2
**room** 38:13
**rough** 32:24 41:15
  59:21
**roughly** 33:3 43:16
  65:1
**rules** 4:24 6:10
**run** 81:14

**s**

**s** 2:6
**san** 20:21
**satisfied** 40:7
**save** 37:12
**saw** 135:4
**saxon** 22:5,8,12,13
  22:17,20,23 23:10,12
  23:13 24:24 26:9
  27:9,15 28:4 29:8,10
  29:15 30:2,6,9,15
**saying** 5:6 40:19
  51:12 57:15 61:25,25
  79:14 90:3,4,10

[saying - specific]

109:5 117:10,25
118:2,24 127:3,25
129:12
**says**  24:16 27:23 28:2
50:23 51:6 53:8,8,17
55:23 56:3,11,12
57:4 59:21 63:21
74:13 76:8,15 77:21
93:10 95:21 122:12
122:18,18 125:13
**scale**  103:23
**science**  21:9
**seal**  137:9 138:19
**searched**  104:8
**second**  2:6 19:10
32:4 76:7 93:9
109:24 125:13
**see**  24:16 27:20 37:4
57:5 61:5,6 71:9 73:7
74:14 77:24 101:17
102:12 110:22
122:13 125:17
**seen**  16:16 24:2 26:5
26:18,18 50:12 62:15
70:14 75:14,21,22
77:6 83:11 114:2
135:9,23
**select**  103:4
**senator**  19:17,21
**send**  13:3 54:3,10
55:4,7,12 56:8 58:1
59:2 62:17,19,22
63:7 64:25 65:5
67:19 76:1,8 83:22
94:10 96:18 100:15
102:25 115:3 116:3,8
123:8 129:14 135:12
**sending**  53:23,25,25
67:10,15 100:17
115:2
**sense**  65:9 78:6 92:6
92:8 113:1 134:20,23
**senseless**  34:16
**sent**  25:20 31:1 52:16
53:21 54:13,16 55:16

55:17,18,21,22,22
56:3 58:14,18,21
61:23 62:3 64:1,3,5
71:6 72:17,21 75:17
75:18 76:2 81:19
84:12,19 88:6 91:24
92:16 94:20 96:24
102:3,5 103:1 114:21
114:24 124:7,22
125:2,20,22,25 126:1
126:7 129:13
**sentence**  50:21 57:11
71:8 74:13 77:21
**sentences**  61:8
**separate**  17:7,7
**september**  1:14
137:10 138:19
**sequence**  92:7
**service**  31:4
**serviced**  26:10
**servicer**  22:13
**services**  18:18,23,24
19:4,11 38:22 81:17
**servicing**  1:8 4:11
22:11 30:2,6,14,18
30:21,25 54:11,14
56:13,18 58:3,10,13
58:15 64:4 67:7,16
68:20 75:19 80:10
92:17 98:17 100:13
102:12,14,16 104:12
107:17 109:4 114:22
115:17 125:7,8,11,11
**set**  103:25 138:11,12
138:19
**seven**  106:24
**shaking**  5:5
**shorthand**  138:9
**show**  23:21 25:14
49:18 69:21 70:12
77:4 81:25 83:9
91:16 96:12 106:20
113:25 120:10
123:23 124:1

**showed**  45:14
**showing**  71:4
**sic**  106:1
**side**  124:6 134:24
**sight**  38:18,21
**sign**  55:13
**signature**  24:9 26:22
26:23 50:15 70:17,18
77:9 91:23 137:13
138:22
**signed**  55:4 121:18
**significant**  103:17
**similar**  70:1 115:1
**similarly**  86:13
**simplify**  5:13
**simply**  77:23
**singular**  73:6
**sir**  44:11,13 46:10
49:20 72:15 125:10
**sit**  43:15 52:22 78:20
**sitting**  126:15
**situation**  29:19 79:14
123:13
**six**  12:23 13:6
**sloppiness**  92:21
125:4
**solution**  95:21
**solve**  45:3 48:16 51:5
52:4 57:17,20 60:13
60:15,25 61:2,4,6,11
63:8 67:5,8 74:1,6,9
74:11,20 78:19 80:10
80:21,25 82:22 83:4
84:5,10,16 85:15
87:9 88:4 90:1,20
91:2,10,11 94:14
95:1,9,19 98:1
100:25 101:12,12,16
104:19,24,25 108:11
108:23,24 109:14,19
109:22 110:24 114:4
114:12,16,20 115:4
116:17 117:4,9,23
118:13 119:15
120:21,23,25 122:4

123:15,17 128:5
**solved**  42:7 80:22,23
83:5 88:25 94:13
96:23 114:12 118:22
118:24
**solving**  73:19
**somebody**  28:14,16
28:18,22,23 29:6,8,9
29:14,18,18,24 31:9
31:13 40:21,22 47:7
51:19,25 52:2,8,24
56:25 57:13,15,19
59:4 60:7,16 63:13
63:17 71:13 73:2
74:4,6 80:9 83:18
85:11 86:25 87:2,3,3
87:11 88:19,23 89:2
89:25 90:4,14,16,17
90:19 91:2,4 92:4
95:15 97:20,25 99:3
99:13,15,16 104:9
116:22,24,25 117:3,8
117:18,20 118:3,6,10
118:16 119:3,13,18
123:11,16 124:20,21
127:25 128:5 130:25
**sorry**  45:9 105:18
117:21 125:5 133:23
**sort**  92:2
**sound**  75:3 131:2
**south**  7:17
**southeast**  1:13 2:11
**southern**  1:1 4:13
**speak**  12:19,24,24
18:3 22:16 31:15
33:9 44:9 46:6,9,11
46:13,17 47:23 48:5
49:22 59:9 86:25
125:19
**speaking**  16:22 31:12
40:14
**specific**  64:10,17
65:3 97:7 98:23 99:7
102:19,25 108:3
116:17 117:11

118:25 128:3 129:13
135:4,9,13 136:1
**specifically**  52:8 58:2
58:2 59:3 63:16
65:10 67:20 82:8
85:18 86:24 87:12
94:10 100:2 102:22
104:14 105:22,24
119:23 120:1 126:8
**speculate**  79:4
**speculating**  126:3
**speculation**  110:19
**speed**  37:14
**spell**  7:12
**spoke**  13:22 31:9,19
31:24 33:13 40:1,15
41:5 42:22 44:3 45:6
48:8 126:25 132:20
**spoken**  4:22 12:20
13:5 17:18,22 18:11
18:16 19:16 39:13
132:12
**square**  92:10
**ss**  138:3
**stamp**  83:10
**stamped**  23:22 25:24
50:9 54:23 62:12
70:13 77:5 91:18
94:3 96:11 110:9
114:1 123:25
**standard**  76:23
**standpoint**  81:15
**start**  131:7
**started**  4:21 30:17
85:17
**starting**  71:1 77:19
121:10
**starts**  79:18
**state**  1:22 12:14
21:11,21 59:14,19,25
69:12 137:1,14 138:2
138:5,23
**statement**  3:8,22
23:24 27:25 28:5
54:3,12 57:21 62:23

64:6 67:18 71:4
75:19,25 76:6,12
81:25 82:2 103:2
113:22 115:3 117:16
117:19 118:9,15
125:16,24 135:17,20
**statements**  54:7
62:21 81:24 102:2
129:13
**states**  1:1
**stating**  60:4
**stenotype**  138:7
**step**  38:13
**stop**  8:12 23:14 105:5
133:5
**stopped**  11:17
**stress**  93:11
**structure**  101:18
**stuff**  33:20,22 35:11
**stumbling**  131:4
**subject**  22:14 25:5
32:9 36:17 51:2 57:9
**submitted**  23:18
**subsequently**  60:1
**sue**  44:21,23
**sued**  9:9,13
**suit**  105:1,2
**summaries**  37:21,22
**summarizes**  34:18
**summary**  33:22
34:17 37:24 107:5
**supervisor**  31:23
33:10
**supposed**  32:6 96:21
**sure**  47:11 54:7 86:8
101:20,21 106:4
111:21 122:19
125:21
**surgery**  25:12,17
**switch**  87:14
**switched**  87:8
**sworn**  4:4 137:7
138:6
**sympathetic**  131:12

**system**  128:13,24
129:6 130:20
**systematic**  74:14
**systemic**  71:9

**t**

**t**  7:14,15,15 138:1,1
**tabbed**  34:22
**take**  5:7 20:24 27:20
37:16 38:3 50:11
59:8 60:18 69:16
74:19 79:6
**taken**  1:20 5:2 14:15
15:21 35:13 39:4
88:22 96:5 125:14
138:11
**takes**  69:10 101:22
**talk**  44:13 48:13
127:16 132:8 133:17
**talked**  127:5 131:8
131:17 132:10
**talking**  17:6 90:15
127:6,8 133:19
**tax**  115:11 117:21
120:4,4 126:10
**taxes**  118:14
**tcpa**  103:9,20,23,25
104:14 127:9,13,17
**team**  56:5
**tecum**  34:21
**telephone**  9:20,23
10:6,9,11,13 11:9,14
12:25 13:3,4,7 18:9
31:9 44:5 46:7 47:25
50:24 51:1 128:13,17
128:24 131:10
**telephonically**  64:9
**tell**  5:12 12:12 13:21
15:23 16:9 21:7
31:22 42:9,11 43:2
44:22 46:1 50:11
54:25 57:3 59:17,23
96:13 97:3 107:15
108:8,12 124:1 131:4

**telling**  51:14,15,18
68:2
**tells**  5:17
**ten**  8:3,25 32:18
79:10
**term**  44:24 90:12
105:25 112:1
**terminated**  47:2 86:2
**termination**  131:14
**terminology**  97:4,7
97:10
**terms**  31:3 106:11,12
**terry**  40:25 41:6
**terry's**  41:1
**testified**  4:5 12:16
15:12 41:13 121:20
**testify**  6:1,18 7:6
138:6
**testimony**  11:22
26:12 119:17
**text**  55:14,16
**thank**  111:12
**thick**  15:17
**thing**  37:23 45:17
64:20 76:16 106:10
117:25
**things**  23:2 34:22
68:18,25
**think**  11:18 19:11
32:24 36:13 37:7,24
60:9 62:20 78:20
79:14 85:19 87:25
93:3 99:21 101:10
102:7 103:19 105:25
106:9 107:5 108:18
109:8 110:13 111:7
111:16,19,24 112:16
112:23 113:12,13,18
118:19 121:5,8
123:10,17 125:20,24
128:12 130:12
133:21,24 134:18
135:11,23
**third**  1:13 2:11 43:25
111:24 121:9

thirds  43:24
thought  34:24 52:5
  68:3 85:14 102:10
  103:2 106:6 115:22
  123:8 134:22
thoughts  108:22
threat  60:3 61:5
threaten  45:20
threatened  45:11,19
  61:2,3
threatening  59:13,23
  60:9,18,24 61:7,13
three  11:2 48:14
  67:11 102:8 112:2
  113:2 125:12 129:21
throws  101:23
thursday  1:14
tilden  20:14 127:17
time  10:4,25 11:1
  22:12 25:9 26:6
  30:13,21 31:8 32:22
  35:6,8,8,12 37:12
  44:24 45:6,10 68:19
  72:5 73:10 92:20
  105:4 120:13 125:14
  128:11,15,16,22
  129:9,11 135:24
  138:11
times  32:12,24 41:16
  44:16 105:8 106:16
  122:19
title  8:15
titled  19:6
today  4:16,23,23 5:3
  6:1,15,20 7:2,6 16:13
  16:23 35:13 43:15
  52:22 78:20 100:21
  127:14 129:25 135:8
today's  13:16,24
  14:17,22 15:15,25
  33:12
told  23:12,13 39:14
  39:15 41:9 60:16
  105:4 129:16 135:13

toll  69:16
top  24:12 25:18 53:8
  56:11 83:19 92:22
  94:7 96:15 107:22
  108:20,22 116:12
  120:16 122:16
  133:25 134:4
topic  73:6,7,8
topics  73:3
touch  28:22 29:12
  49:6 86:22
tracking  114:11
transcript  138:16
transcription  138:9
transfer  131:18
  132:12
transferred  39:24
  86:23 87:2 94:15
  103:13 132:4
traveling  10:10
tried  47:15 102:8
troy  56:1,13
true  43:21 115:15
  116:1 128:1 138:8
trusting  103:4
truth  138:7
truthfully  6:1,19 7:6
try  5:13,13 47:9
  60:25 61:11 102:15
  103:6 106:2 117:24
  117:25
trying  27:15 52:4
  63:8 69:5,15,20 70:3
  70:5 84:4 89:10
  92:10 93:20 95:8
  105:20 108:8,11,12
  108:22,24 109:1,4,14
  109:19,21 110:23,24
  111:5 114:12,16
  118:13,14,14 122:4
  123:15
turned  36:17
twice  79:7
two  8:13 12:5,17,20
  13:6 18:5,23 22:25

23:10 35:9 43:22,24
  62:20 75:21 76:8
  93:5 102:5,8,16
  103:18 115:21
  122:18 125:22
  129:21
typed  15:18
types  81:12
typical  85:21

**u**

uncertain  77:22
underneath  26:25
  122:17
undersigned  137:5
understand  4:15
  5:12 6:11 14:20 16:6
  41:16 43:22 56:10
  69:22 87:20 90:9
  103:14 132:7 133:8
understanding  29:17
  104:11 121:15
understood  5:10 34:2
  46:22 135:11
unfortunately  45:19
united  1:1 8:10,12,15
  8:17,18,20 11:18,19
  11:22,25 12:5,19,20
  22:24
university  21:12
unnecessary  69:3
unreasonable  109:9
  110:14,20 111:7
  123:11
unresolved  61:9
usaa  44:16 48:15
  63:21,22,23,23 65:2
  65:3,24 66:4,20 67:2
  67:5,12 71:3 75:2
  77:16
use  10:17 49:23 97:4
  97:7 104:23 119:18
  129:10,10

**v**

vacation  8:4
various  127:1
varius  127:5
vast  127:19
verbal  89:6,12,15
verbally  133:3
verifiable  113:11
vicinity  41:15
view  117:13
village  7:18 8:7 10:24
voice  134:11
voicemails  134:3
void  121:17
vs  1:7

**w**

w  7:15
waiving  37:9,13
  38:11
want  5:23 13:21
  15:23 16:8 28:15
  34:15 37:1 38:17,20
  45:20 52:8,22 58:20
  59:3 73:2 89:11,13
  101:21 104:25,25
  117:25 128:23,25
  135:2
wanted  28:22 29:12
  51:23 57:13 74:4,6
  76:18 80:23 83:4
  84:7,7,10,14,17
  97:17 101:11,15
  104:8 116:17,18,22
  118:3 126:19 127:25
  128:2,12 129:2,24
  135:22
wants  74:11
warren  19:21
waste  129:9,11
water  6:7
way  48:14 67:11 69:7
  78:24 79:2 105:19
  121:14 130:8 134:9
  134:18

[ways - zero]

**ways** 69:20
**we've** 6:9 75:21,22
　100:20 118:24
　119:13 126:18
**weeks** 35:9
**went** 22:24 34:7,8,10
　51:8 130:23
**whatsoever** 82:3
**when's** 11:1 35:5
**whereof** 138:19
**whetherer** 71:17
**william** 2:10
**william.heller** 2:13
**willing** 124:25
**wings** 76:22
**wit** 129:24
**witness** 3:2 4:3 12:14
　34:24 137:9 138:6,19
**woman** 39:15
**woman's** 39:18
**word** 43:11 69:25
　77:19 101:10 104:22
　134:21
**words** 49:21 121:10
**work** 8:20 11:13
　33:21 37:10 38:1
　69:2,2,3,4,10 78:16
　86:5
**worked** 49:15 88:20
　94:18 98:8
**working** 8:12 11:17
　11:18 114:4
**works** 99:4
**worth** 34:19
**write** 51:4,7 63:6
　74:16 93:19 100:13
　114:18 129:16
　135:13
**writing** 12:25 13:4
　18:10,14,19,25 19:14
　19:18,22 20:2 23:16
　26:7,15,20 28:3
　50:14 64:10 70:15,16
　70:20,21 85:17 88:3
　89:11,13 99:6,11,12

　99:22 100:7 111:17
　112:6 128:4 133:1,3
**written** 33:14 55:16
　55:18 56:4 83:24
　89:6,7 108:4,7
　113:10 129:14
**wrong** 41:14 51:15
　82:23 109:6
**wrote** 27:8 28:24
　30:1,5 50:18 59:17
　62:16 63:4 85:19,20
　98:21 107:17 108:14
　111:20 120:14

|  x  |
| --- |

**x** 3:1

|  y  |
| --- |

**year** 31:5 35:18
　106:3
**years** 8:3,8,13,19,25
　9:24 10:1,3 11:3,19
　12:5,17,21 13:6 14:2
　14:6,9 15:13 18:5
**yechezkel** 2:5

|  z  |
| --- |

**zero** 79:22 80:12
　81:23 82:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

FROM : Alpenglow Plastic Surgery       PHONE NO. : Redacted 5399       Jul. 01 2009 01:48AM P3

# Saxon Mortgage
### Financial Statement

| | | | |
|---|---|---|---|
| Loan Number: | REDACTED 3 8 B 2 | | |
| Homeowner Name: | ROBERT M. LAWRENCE | Co-Homeowner Name: | N/A |
| Property Address: | 891 S. DYER | | |
| Mailing Address: | INCLINE VILLAGE, NV 89451 | | |
| Home Phone Number: | | Home Phone Number: | |
| Cell Phone Number: | REDACTED 3295 | Cell Phone Number: | |
| Employer: | UNITED AIRLINES | Employer: | |
| Employer Phone Number: | REDACTED 0495 | Employer Phone Number: | |
| No. of People in Household: | | | |
| Have you filed bankruptcy? Yes ☐ No ☒ | If Yes: Chpt 7 ☐ Filing Date: Chpt 13 ☐ 02/05/08 | Attorney Name: Attorney Phone Number: | |

| Monthly Borrower Income | | Monthly Co-Borrower Income | |
|---|---|---|---|
| Wages/Take Home | 6568 | Wages/Take Home | |
| Overtime | | Overtime | |
| Commissions/Bonus | | Commissions/Bonus | |
| Unemployment Income | | Unemployment Income | |
| Child Support/Alimony | | Child Support/Alimony | |
| Social Security/Disability | | Social Security/Disability | |
| Other | | Other | |
| Total | 0 | Total | 0 |

| Monthly Expenses | | Assets | | |
|---|---|---|---|---|
| Mortgage | 6788 | Type | | Estimated Value |
| 2nd Mortgage | 408 | Home | | 1,250,000 |
| Rent/Other Mortgage | | Other Real Estate | | |
| HOA/Fees/Dues | | All Checking/Savings Accts. | | 3,000 |
| Alimony/Child Support | | Stocks/Bonds/Mutual Funds | | |
| Child/Dependent/Elderly Care | | IRA/Keogh Accounts | | |
| Entertainment | | Retirement, 401(k)s, etc. | | 200,000 |
| Insurance (auto, health, life) | 400 | Total | | 0 |
| Pet Expenses | | | | |
| Groceries/Toiletries | 950 | | | |
| Car Expenses (gas, maint., etc.) | 100 | | | |
| Automobile Loan(s), List All: | | Please remember to: | | |
| Credit Card 1 | | ✓ 1. Sign and date this form. | | |
| Credit Card 2 | | ✓ 2. Include a copy of the most recent bank statement, | | |
| Doctor/Medical Bills | | your last W-2 and a copy of your last year's Federal Tax | | |
| Student Loans | | Return with all attachments if self employed. | | |
| Personal Loans | | | | |
| **Utilities** | | 3. Include a hardship letter of why you fell behind and | | |
| Cable TV/Satellite | 50 | what you will like to do to get caught up. | | |
| Electricity | 100 | 4. Return COMPLETED and SIGNED | | |
| Natural Gas/Oil | 200 | | | |
| Telephone/Cell Phone | 60 | **Income/Expense Summary** | | |
| Water/Sewer | 80 | Borrower Income | | 0 |
| Internet | 50 | Co-Borrower Income | | 0 |
| Other (please list all examples: Spending money, Lunch money, Tuition, Tithing, etc.) | | Expenses | | 0 |
| Total | 0 | Net | | 0 |

Each of the undersigned by signing below states: I certify that the financial information stated above is a true and accurate statement of my financial condition. I understand and acknowledge that any action taken by the lender with regard to my mortgage loan will be made in strict reliance upon the financial information provided. By signing below, I grant the holder of my mortgage loan or its servicer the authority to obtain a credit report to verify that accuracy of the financial information.

| | | | |
|---|---|---|---|
| _signature_ | 02 MAR 09 | N/A | |
| Signature | Date | Signature | Date |

**DEFENDANT'S EXHIBIT**
A
R 9/17/8
PENGAD 800-631-8989

# Exhibit Separator

2440 wanda master                    01 NOV 09

RE: ROBERT LAWRENCE

Acct #   ████████ 3882

SAXON,

I HAVE NOT RECEIVED THE NEW (MODIFIED) STATEMENT.

I WISH TO MAKE THE PAYMENT FOR 01 NOV 09 PAYMENT ON TIME, AS PROMISED.

THE AMOUNT OF $3,100.⁰⁰ IS ENCLOSED. THIS AMOUNT INCLUDES $2529.91 PAYMENT PLUS ESTIMATED ESCROW PAYMENT OF $570.⁰⁹.

IF AVAILABLE, PLEASE FORWARD THE NECESSARY FORM TO LINK "AUTOPAY" TO MY CHECKING ACCOUNT.

IF AVAILABLE, I WOULD LIKE TO PAY TAXES / INSURANCE INDIVIDUALLY. (REMOVE ESCROW ACCOUNT).

THANK YOU!

Bob LAWRENCE

████████ 3295

RECEIVED
NOV 12 2009
CUSTOMER RELATIONS



DEFENDANT'S
EXHIBIT
D
R 9/17/15
PENGAD 800-631-6989

BAYVIEW-001353

 Loan No. ███8882

in the amount of U.S. $ 1,000,000.00           , bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in said Security Instrument and defined therein as the "Property," located at 891 South Dyer Circle, Incline Village, Nevada 89451

the real property described being set forth as follows:
THE LAND REFERRED TO IN THIS COMMITMENT IS SITUATED IN THE COUNTY OF WASHOE, STATE OF NEVADA AND IS DESCRIBED AS FOLLOWS:

LOT 90 OF EDGEWOOD PARK SUBDIVISION, ACCORDING TO THE MAP THEREOF FILED IN THE OFFICE OF THE COUNTY RECORDER OF WASHOE COUNTY, STATE OF NEVADA, ON SEPTEMBER 18, 1962.

In consideration of the agreements herein, and other good and valuable consideration, Saxon, on behalf of and as duly authorized agent of Note Holder, and Borrower hereby agree to modify the terms of the Note and Security Instrument as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1.  **Advances by Saxon Mortgage Services, Inc. ("Saxon").** As of    July 1st, 2009          , Borrower acknowledges that the existing principal balance payable under the Note and Security Instrument is/was $  1,000,000.00      which accrued interest at a yearly rate of 6.875      %.  After application of the accrued but unpaid interest due on the August 1st, 2009 through October 1st, 2009   payments, at the interest rate of  6.875      %, $ 11,965.28           will be added to the indebtedness resulting in a new principal balance of $  1,011,965.28       (the "Unpaid Principal Balance").  The Unpaid Principal Balance will accrue interest initially at the interest rate of  3.000         %.

2.  **Interest Rate.**  The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the Lender.  Interest will be charged on the Unpaid Principal Balance at an annual interest rate, and Borrower will pay monthly payments of principal and interest in U.S. dollars (which does not include any required escrow amounts), in accordance with the following schedule:

| | INTEREST RATE | INTEREST RATE CHANGE DATE | PAYMENT DUE DATE | MONTHLY PAYMENT |
|---|---|---|---|---|
| *prior to recast* | 6.875% | 07/01/2009 | 08/01/2009 | $5,729.17 Interest Only |
| | 3.000% | 10/01/2009 | 11/01/2009 | $2,529.91 Interest Only |
| | 4.000% | 10/01/2014 | 11/01/2014 | $3,373.22 Interest Only |
| | 5.000% | 03/01/2016 | 04/01/2016 | $4,216.52 Interest Only |
| | 5.125% | 06/01/2017 | 07/01/2017 | $7,265.63 Principal & Interest |

THE MONTHLY PRINCIPAL AND INTEREST PAYMENT WILL REMAIN $ 7,265.63 UNTIL THE LOAN IS PAID IN FULL.

---

ACKNOWLEDGMENT (NEVADA)                              Page 2 of 5

BAYVIEW-001354

# Exhibit Separator

25 MAR. 2012

25 MAR 2012

ATTN: BAYVIEW

AS VERIFIED PREVIOUSLY, 891 SOUTH DYER CIRCLE IS AND ALWAYS HAS BEEN INSURED BY USAA INSURANCE FOR AS LONG AS I HAVE OWNED THE PROPERTY. ENCLOSED IS A CURRENT STATEMENT WITH USAA INSURANCE AND THE CORRESPONDING CONTRACT FOR THE PROPERTY. ANY MISSING PAGES WERE DEEMED IRRELEVANT OR BLANK; HOWEVER, IF SO REQUIRED, I WILL PROVIDE THE MISSING PAGES FOR COMPLETENESS. QUESTIONS/REQUESTS; Redacted 3295.

Respectfully Submitted —

Robert Lawrence

Redacted 397



Lawrence_Docs_015

DEFENDANT'S
EXHIBIT
C

# Exhibit Separator



Robert M Lawrence                                                        25 May, 2012
891 South Dyer Circle
Incline Village, Nevada 89451

Bayview Loan Servicing
Post Office Box5933
Troy, MI 48007-5933

Re: Loan Number: ███1397

Dear Bayview:

It appears as though you are not responding to my correspondence.

I have sent a written response to the above address and an email to BayviewTeam@pfic.com.

As stated three times now, "the above property is insured and, for as long as I have owned the property, always has been insured with USAA Insurance."

The written response included a hardcopy of my homeowners insurance with USAA insurance, my policy number and an invitation to contact me if you desired anything further. The email was a reinforcement of the written response. Both letters had a USAA policy number and my personal phone number.

I am always available to provide assistance to you.

Please feel free to contact me at Redacted-3295.

Now, if this nonsense continues, I am preparing a letter to the Nevada Attorney General's Office, the Nevada Division of Insurance and the Federal Trade Commission.

In rough form, the critical complaint will be as follows:

"It appears as though Bayview Loan Servicing is in the business of selling insurance, very expensive insurance. Bayview has ignored or misplaced my correspondence in order to initiate a very expensive $4,000.00 insurance policy on an already insured property; furthermore, Bayview backdated the insurance policy by 6 months, effectively charging an $8,000.00 annual premium for which USAA charges $719.87.

I appeal to the State and Federal regulators to investigate this mortgage servicing entity and determine if this problem with Bayview Loan Servicing is part of a larger trend."

Again, I am here to assist in solving this paperwork problem with Bayview. The property is and always has been insured. However, if Bayview Loan Servicing is trying to sell insurance we might have a problem.

Please assist me in assisting you.

If this matter is unresolved in 30 days, I will file a complaint.

Respectfully Submitted,

Robert M Lawrence



DEFENDANT'S
EXHIBIT
D

BAYVIEW-000759

# Exhibit Separator

30 Jun 2012

Attn Bayview,

It appears Bayview has removed the additional insurance policy, thank you! Enclosed are re-submittal pages which prove insurance continuously utilized by USAA Insurance. If ~~you~~ Bayview requires additional, current documents please advise me and I will forward the paperwork as soon as practical.

Again, USAA insurance policy # 4486974 is current and always has been current for my ownership of this property.

Robert Lawrence

Redacted 3295


DEFENDANT'S
EXHIBIT
E
10/9/17

# Exhibit Separator

mailed

7 8 NOV 2012

BAYVIEW LOAN SERVICING,          → to ADDRESS LAST PAGE          FILE

AS WRITTEN PREVIOUSLY, THIS PROPERTY IS AND ALWAYS HAS BEEN PROPERLY INSURED.

I HAVE PROVIDED THE POLICY, THE POLICY STATEMENT AND A REQUEST that IF FURTHER PROOF IS REQUIRED, SIMPLY ASK ME.

HOWEVER, AGAIN, AFTER PREVIOUSLY RESOLVING THIS problem WITH BAYVIEW LOAN SERVICING, I RECEIVE ANOTHER LENDER PLACED INSURANCE LETTER.

I am SIMPLY UNCERTAIN AS TO HOW TO PROCEED. THIS REALLY SHOULD NOT BE THIS DIFFICULT.

Again, I HAVE ENCLOSED A USAA BILLING STATEMENT SHOWING CORRECT BILLING FOR HOMEOWNERS INSURANCE. THE ACTUAL POLICY HAS ALREADY BEEN SENT TO BAYVIEW LOAN SERVICING PREVIOUSLY. HOWEVER, IF AGAIN NEEDED, PLEASE ASK.

I AM BEGINNING TO SEE A SYSTEMATIC PROBLEM W/ BAYVIEW

Robert LAWRENCE          Redacted 3295

BAYVIEW-000760

DEFENDANT'S EXHIBIT

# Exhibit Separator



Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted3295

01 April, 2013

Bayview Loan Servicing, LLC
4425 Ponce De Leon Blvd., 5th Floor
Coral Gables, FL 33146

Re: ███ 1397

Dear Bayview Loan Servicing, LLC,

Presumably, this escrow matter stems from homeowners insurance for the Dyer Circle property.

I was under the impression that this problem was solved.

Again, I will state, the property does have, did have and ever since purchase, has had homeowners insurance through USAA. I have always insured the property. I have sent everything that I believe necessary, including insurance statements, to Bayview in an attempt to clarify this matter.

Further, if it would assist Bayview, I will request a letter from USAA stating continuous coverage.

However, I would like this matter solved permanently.

The Wall Street Journal ran a front-page article detailing this type of behavior by loan servicing companies, http://online.wsj.com/article/SB10001424127887323466204578382603826452198.html
The March 26th article clearly explains the "forced" insurance practice. Quite clearly, I can prove insurance.

.The property was continuously insured; therefore, if, as I suspect, the exorbitant amount of money demanded in the escrow account is being charged to me for insurance, I desire the charges removed. Please
. place the charges into a disputed, separate status while Bayview reviews this matter. I will make normal mortgage payments.

I will send two copies of this letter. One copy will be enclosed with the mortgage payment coupon to a Chicago address. One copy will be sent to the Florida address shown above.

Please do the right thing; please solve this matter correctly. I desire a good relationship.

Respectfully Submitted,

Robert M Lawrence

DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989

3

# Exhibit Separator



Robert M Lawrence                                                01 October, 2013
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted295

Bayview Loan Servicing, LLC
4425 Ponce De Leon Blvd., 5th Floor
Coral Gables, FL  33146

Re: ████1397

Dear Bayview Loan Servicing, LLC,

I dispute the escrow charges and any associated late fees.

I have paid all property taxes on this property since 30 June of 1999.  This information has been provided
to Bayview.

I have paid USAA, a property insurance company, to properly insure this property since 30 June of 1999.
This information has been provided to Bayview.  I have provided USAA contracts, USAA billing
statements and a USAA company representative in an effort to solve this matter.

I desire a resolution to this matter.

However, billing statements from Bayview are late, causing me to provide makeshift statements to include
with proper payment; billing statements from Bayview are incorrect, as in this months' statement
demanding a double monthly payment; and, I am uncertain as to whether this lack of communication is
deliberate or simply disorganization.

Please provide a basis for this escrow account not having a zero balance.

I will send two copies of this letter.  One copy will be enclosed with the mortgage payment coupon to a
Chicago address.  One copy will be sent to the Florida address shown above.

I desire a good relationship.

Respectfully Submitted,

Robert M Lawrence

DEFENDANT'S
EXHIBIT
H

# Exhibit Separator



Robert M Lawrence                                          26 October, 2013
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 3295

Encl:
      A.  USAA to Bayview Conversation Notes.
      B.  Washoe County property tax statement.

Dina Rodriguez
Bayview
4425 Ponce de Leon Blvd
Cora Gables, FL 33146

Dear Dina,

Thank you very much for your response.

Hopefully, you will remain my point of contact and we can work together to conclusively resolve this matter.

Dina, in order to attempt to solve this problem, I have written over six letters, sent numerous USAA statements, USAA insurance policy packets and on 5/29/2013 I even coordinated a USAA representative to directly provide information to a Bayview employee named Johnny ( employee number given: A01 ).

When concluding our conversation with Johnny, both the USAA representative and myself asked Johnny if he was satisfied with the proof on insurance provided by the USAA representative. Johnny responded "yes." Please see the attached exhibit 1, page 1, conversation notes.

Dina, if you desire to do this process again, personally, with a USAA representative or if you desire some other, specific document, I will again provide the information, this time to you.

As the transaction activity provided begins in April of 2013, I have reviewed my payment schedule from this point: A regular mortgage payment of $2,529.63 has been made on the 1st of each month for the entire transaction activity period. Each of these payments was made well before the 17th of each month; a date specified by Bayview determining a late payment date. All mortgage payments were paid properly.

The property taxes are paid current and always have been paid current. As exhibit 2, page 1 shows, every year shown has a zero balance. Washoe County pays property tax in four installments, the first two installments have been paid properly, there are two more installments remaining ( The next two installments are: 01/06/2014 and 03/03/2014). All property taxes have been paid properly.

Very Respectfully Submitted,


Robert M Lawrence



# Exhibit Separator



Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 5843

21 November, 13

Bayview
4425 Ponce de Leon Blvd
Coral Gables, FL 33146

Enclosure:  Robert Lawrence's 26 October 13 Response to Dina's 23 October 13 Letter.  5 pages.

Dear Dina or whomever it may concern,

Thank you very much for this notice.

I have been working to resolve this matter for months.  I have sent numerous letters, sent numerous statements, sent numerous documents of proof and even coordinated a group conversation with my insurance company and Johnny of Bayview in order to resolve this matter.

I will go through the process again with you if it will resolve this matter once and for all.

This delinquency letter is incorrect.  As I have demonstrated to Dina, my mortgage payments were timely, my insurance payments were timely and, since subsequently questioned about my property taxes, my property taxes have been shown to be timely.

Bayview's resistance to resolve this matter has added considerable stress to my life.

I have enclosed the previous correspondence to and from Dina in order to demonstrate the extent to which I have attempted to resolve this situation.

Very Respectfully Submitted,

Robert M Lawrence



BAYVIEW-000811

# Exhibit Separator



FAXED TO Redacted - 2517 @ 1:30 pt · 5 JAN 14



Mitchell to OBTAIN @ BEGIN
WORK DAY @ 9:00 EST MON!

* FOLLOW-UP Message @ 9:15, 6 JAN !
* FOLLOW-U@ Message @ 11:00, 6 JAN !!
* RE-FAX 2010B, 6 JAN 14
     03 January, 2014

* FOLLOW-UP Message @ 8:12 7 JAY
* FOLLOW UP Message @ 12:53 7JA
* FOLLOW-UP Message @ 8:37 8JO

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted-3295
Redacted@aol.com

Loan Number: ████1397

Mitchell Beck
Bayview
Phone: Redacted-0299, Ext: 5773
Fax:   Redacted5-2517  ✓ Con firmed

Encl:   1.  Equifax Credit Report.
        2.  Experian Credit Report.
        3.  Transunion Credit Report.
        4.  October/November Correspondence Letters to Bayview.

Mitchell,

Thank you very much for your assistance Friday.

I have enclosed my October and November letters to Bayview.  It appears that I have been working this assumedly simple problem of proving Homeowners Insurance since 25Mar13.  Even after a three-way conversation with a Bayview employee, a USAA insurance representative, and myself on May 26th 2013 the problem would not resolve.

The resolution difficulties have now caused some major inconveniences and embarrassments:

1.  Credit Card was denied at the grocery store.  MasterCard reduced my credit line from $16,000 to $3,700, the current balance, which caused the grocery store to deny the transaction.  When contacting MasterCard for an explanation, they were extremely unpleasant and unwilling to correct the problem.  On every credit card I own, I carry a zero balance, the monthly balance is always paid in full.  And, this was MasterCard's reaction.
2.  MasterCard is used to pay recurrent monthly expenses.  As the credit card has been effectively stopped, any monthly expenses will need to be re-coordinated.
3.  I assume that any other Credit Card Company will respond similarly to MasterCard's response.
4.  This was an avoidable, needless waste of time, energy and nerves.

As requested, I contacted the three credit reporting agencies and Bayview's negative reporting on my credit profile is the source of the problem.  I was only able to obtain three individual reports.  A merged report was not an option.  The credit reports are very long.  Thus, I have provided the credit report pages that appear to be of concern.  If another section is desired, please advise; I will obtain and provide any additional information.

Please correct the credit-reporting problem in the most expedient manner.

If possible, a Bayview letter to me claiming responsibility for this negative credit reporting would be beneficial.  This letter may be used, in the near term, to potentially solve any forthcoming credit problems.

Respectfully Submitted,

Robert M Lawrence

THIS PACKAGE
WAS FAXED

5 JAN 2014    14
BAYVIEW-000772

DEFENDANT'S
EXHIBIT

9/17/15

# Exhibit Separator



FAXED Documents to [Redacted] - 2517 on
Sunday 12 JAN 2014 @ ~ 3:45 P.T.

# Follow-up 4:00 PT/ 11:00 OT 13JAN !!

Robert M Lawrence                                    13 January 2014
891 South Dyer Circle
Incline Village, Nevada 89451
[Redacted]295
BuroshR18@aol.com

Loan Number: [Redacted]397

Mitchell Beck
Bayview
Phone: [Redacted]-0299, Ext: 5773
Fax:   [Redacted]-2517

Encl:   1. Equifax Dispute Summary.
        2. Bayview Mortgage Interest Statement.

Mitchell,

Thank you very much for your assistance on Friday 03 January 2014.

I faxed the documents that you requested on 05 January 2014. Then, I faxed the same documents again on
the 6th of January. I have attempted to contact you three times subsequent to the last fax in order to ensure
that the credit-reporting problem was being corrected in the most expedient manner.

When contacting the credit reporting agencies, there was an option to dispute the negative report from Bayview,
which I took the time to accomplish. As I was operating under the assumption that you were working with
Bayview's credit-reporting department to fix the problem on your side, I did not provide all of my supporting
documentation to the credit-reporting agencies. Instead, I simply stated that Bayview had made an accounting
error, that Bayview was aware of the error and that Bayview was correcting the problem. This was the conclusion
that I had made when we ended our conversation on Friday.

However, I received an investigative conclusion from Equifax that does not reflect a correction from Bayview. I
have attached a copy of the Equifax report to this letter. I must ask, Mitchell, did you receive my fax and are you
attempting to correct this problem with Bayview's credit-reporting department?

Because of this problem, the Mortgage Interest Statement from Bayview is wrong. As I have made the mortgage
payment on the first of every month for the past year, the Mortgage Interest Statement for the year should show a
box 1 amount of $30,357.12. The incorrect form 1098 sent by Bayview has reported a box 1 amount of $20,491.06.

From our conversation, you begin work on Mondays at 09:00. I am three hours behind on the west coast. I will
attempt to contact you between 10:00 and 11:00 tomorrow.

Thank you,

Robert M Lawrence

page (1/2)



DEFENDANT'S
EXHIBIT
L
ML 9/17/15

BAYVIEW-000774

# Exhibit Separator

① MAIL RESPONSE TO BAYVIEW IN
14 BUSINESS DAYS FROM DOC DATE
② SUPPORTING LETTER SUPPLEMENTS
WILL NOT BE SENT TO BAYVIEW

Robert M Lawrence                                              28 April 2014
891 South Dyer Circle
Incline Village, Nevada 89451
Phone: Redacted-3295
Redacted@aol.com

Bayview Loan Servicing, LLC
4425 Ponce de Leon Blvd., 5th Floor
Coral Gables, FL  33146

Enclosures:
1.  Correspondence from Bayview Dated 16 April 2014.
2.  Correspondence from Lawrence Dated 04 April 2014.
3.  Better Business Bureau Report on Bayview Loan Servicing, LLC.

Dear Mrs. Forde,

Thank you very much for your correspondence.

You make some very specific points.  Thus, it would be productive to discuss this matter further.

For organization, I will separate and identify the problems as "Insurance" and "Accounting."

## First, I would like to address the Forced-Placed Insurance.

You state that Bayview force-placed insurance as "we did not have evidence of insurance" and then you provide a copy of the "warning notices" from Bayview.  The first warning notice was sent on 15 March 2012.

However, Mrs. Forde:

You fail to mention that I responded to the first Bayview letter on 25 March 2012 with proof of insurance.

You fail to mention that I sent at least 12 letters to Bayview in order to prove insurance over the next 21-months.

You fail to mention the conference call with a USAA insurance representative, a Bayview insurance specialist and myself.  USAA provided proof of insurance directly to Bayview's insurance department in May 2013.

You fail to mention Bayview issuing a "Notice Regarding Default of the Above-Referenced Loan" letter and a separate "Notice of Default and Intent to Accelerate" letter in December 2013 for insurance which was proven multiple times during the preceding 21-month period.

You fail to mention that I paid the mortgage properly, the insurance properly and the taxes properly.



Page 1

## **Mrs. Forde, this is what you fail to mention**

**Documented Timeline:**

I send a letter to Bayview on 25 March 2012 with a current USAA Insurance Statement and Policy Packet.

I email Bayview on 04 May 2012, stating, "If you desire me to fax the homeowners insurance papers… please advise."

I send a letter to Bayview on 25 May 2012, stating, "Please assist me in assisting you."

I send a letter to Bayview on 30 June 2012 with proof of insurance documentation, stating, "If Bayview requires additional, current documents please advise me and I will forward the paperwork as soon as practical."

On 08 November 2012, I was alerted to the problem again and provide additional proof of property insurance. The letter states, "I have provided the policy, the policy statement … if further proof is required, simply ask me."

Bayview's billing becomes erratic on 14 January 2013. I make a note to self, "be patient."

I send a letter to Bayview on 01 April 2013, stating, "If it would assist … I will request a letter from USAA."

I send a letter to Bayview on 30 April 2013, stating, "Please correct the paperwork."

On 29 May 2013, I had had enough. I coordinated a conference call with a Bayview Insurance Specialist, a USAA Insurance Representative, and myself. Whatever Johnny, the Bayview Insurance Specialist desired as proof of insurance, George, the USAA Insurance Representative provided. When concluding the conversation, Johnny stated that he had everything that Bayview needed.

Johnny corrected nothing.

*This was a critical moment; I figured it out; I was caught in a runaround. No amount of insurance documentation was going to satisfy Bayview.*

I continue my attempt to provide proof of insurance to Bayview Loan Servicing, LLC. However, I spend more time on the letters in an attempt to document the runaround.

- 01 September 2013 Letter to Bayview, "provided Insurance documentation… please update the paperwork."
- 01 October 2013 Letter to Bayview, "I have paid USAA… desire a resolution to this matter."
- 26 October 20013 Letter to Bayview, "Dina, if you desire to do this process again… I will."
- 21 November 2013 Letter to Bayview, "I have been working to resolve this matter for months."

On 17 December 2013, Bayview Loan Service, LLC sends a "Notice Regarding Default of the Above-Referenced Loan." Bayview demands $5,745.42 plus $6,516.74 plus $1,100.00 in fees. They desire an additional payment of $13,362.16.

On 17 December 2013, Bayview Loan Service, LLC sends a "Notice of Default and Intent to Accelerate."

On 24 December 2013, Christmas Eve, I call Bayview and threaten legal action. Bayview acknowledges Insurance.

## Insurance Conclusions:

I find it important to differentiate between Negligence and Fraud.

*Wikipedia defines negligence and fraud in the following manner:*

- Negligence (Lat. negligentia, from neglegere, to neglect, literally "not to pick up something") is a failure to exercise the care that a reasonably prudent person would exercise in like circumstances.

- Fraud is a deception deliberately practiced in order to secure unfair or unlawful gain.

Until the 29 May 2013 coordinated conference call, Bayview Loan Servicing, LLC failed to exercise the care that a reasonably prudent company would exercise in like circumstances.  Bayview was negligent.

After the 29 May 2013 coordinated conference call, Bayview's actions were deliberate.  Bayview was intentionally negligent.  The demand letter for $13,362.16 becomes very suspicious at this point.

It is important to realize that Bayview's behavior in this instance is not an isolated event.  As the Southeast Florida Better Business Bureau report states, "There is an alert for this business!"  The BBB further reports "a pattern of complaints."

Perhaps Bayview is profiting from intentional negligence?

If it can be shown that Bayview has operated deceptively deliberately in order to collect fees for profit, then they have committed fraud.

## Secondly, I would like to address the Accounting.

You state, "Once evidence of insurance was received, a full refund was applied." Further, you state, "we have removed all late charges... concerning this matter."

German Mathematician Gottfried Leibniz proved the "Law of Conservation of *Money*."  Leibniz concludes that Money can be transferred from one place to another, but cannot be created or destroyed.  This is very important.

Throughout this entire charade, I have continued to pay the mortgage properly.  For a period of time, however, Bayview chose to remove money from the mortgage payment, then, when forced, return some of the money.

Bayview has accomplished this maneuver by "creating" an escrow account and then attempting to "disburse" the same account.  However, the numbers do not add up.  Bayview states that I am delinquent one mortgage month or $2,529.76 while Bayview attempts to disburse account funds amounting to $2,276.78.  Bayview has violated Leibniz's law.

Where did the missing money go, a fee perhaps?

A pattern is emerging here.  The pattern will become more obvious as we discuss my attempt to correct the accounting.

## **Mrs. Forde, this is what you fail to mention**

**Documented Timeline:**

After a 21-month period, Bayview accepted the fact that the property was insured on 24 December 2013.

On 03 January 2014, I contact Mark, a Bayview representative on the phone. Mark explains that he understands the accounting problem; he then transfers me to Mitchell Beck, a Bayview manager in order to make the corrections.

Mitchell Beck and I discuss the accounting problem and the credit-reporting problems for over an hour. At the conclusion of our conversation, Mr. Beck requests that I send him a letter explaining the credit-reporting problems, credit-reduction problems and auto payment problems. Mr. Beck explains that he will coordinate a correction with Bayview's credit-reporting department, however, in order to expedite the process, he desires a report from all three credit-reporting agencies. Mr. Beck explains that the credit-reporting department will not correct the problem without the reports. Mr. Beck further explains that he understands the accounting problem; however, he needs the accounting system to do an overnight update before making corrections.

On 05 January 2014, I fax the requested letter to Mitchell Beck.

On 12 January 2014, I fax a letter to Mitchell Beck, stating, "Are you attempting to correct this problem?"

On 13 January 2014, I place another follow-up call; however, Mitchell Beck has disappeared.

On 23 January 2014, I contact Andrea, a Bayview representative on the phone. As previously explained by Mark, Andrea similarly reports that she understands the accounting problem; however, this time Andrea provides numbers.

On 24 January 2014, I fax a letter to Mitchell Beck with my notes summarizing the conversation with Andrea. The letter explains the accounting amounts as described by Andrea. In addition, I ask Mr. Beck, "I have contacted Equifax in order to follow-up on our discussion. ... As of ... 23 January 2014, Equifax has not received a correction from Bayview."

Mark, Mitchell and Andrea corrected nothing. On 18 February 2014 I receive another "Delinquent Notice."

*Again a critical moment: Bayview was executing another runaround.*

On 27 February 2014, I contact Terry, a Bayview representative, on the phone. As the other three (3) Bayview representatives, she understands the accounting problem. Terry states that she will have a supervisor correct the problem and send me a letter showing the correction.

Terry corrected nothing; I did not receive a correction letter.

Now, if Bayview's previous pattern of behavior is a predictor, then the "Notice Regarding Default of the Above-Referenced Loan" and "Notice of Default and Intent to Accelerate" letters are not far away.

*I have to change something.*

On 06 March 2014, I call Bayview with a plan to request a manager, and then threaten to file a complaint if the accounting problem is not corrected. I call Bayview and execute my plan; first speaking with Jessica then Norma Darias, the Bayview manager. I slowly and methodically explain the situation to Mrs. Darias. As the four previous Bayview representatives, Norma states that she understands the problem, that she will correct the problem and that she will have the negative credit reporting corrected.

I file a complaint, fearing that another demand letter was forthcoming.

Norma Darias does not correct the accounting.

## Accounting Conclusions:

Mark, Mitchell, Andrea, Terry and Dina promise to correct the accounting; they accomplish nothing.

Until the 23 January 2014 discussion with Andrea, Bayview Loan Servicing, LLC simply failed to exercise the care that a reasonably prudent company would exercise in like circumstances. Bayview was again negligent.

After the 23 January 2014 discussion with Andrea, Bayview's actions were deliberate. Andrea understood the accounting problem and she provided the accounting solution; she provided the numbers.

Mrs. Forde, your statement "we have removed all late charges" is a false statement, a lie.

As Andrea discovered in January and I subsequently conveyed to Mitchell Beck, Terry and Norma Darias, if you add the fee that you are attempting to charge to the amount that you are trying to refund, the sum is the mortgage payment, which you say is missing.

Rest assured, the fee will be returned; however, what is intriguing is the extent to which Bayview will go to collect a fee. Further, where did the fee money go? If the fee money went to Bayview, then the intentional negligence described above was used to secure an unlawful gain.

If it can be shown that Bayview has operated deceptively deliberately in order to collect fees for profit, then they have committed fraud.


## Fear Discussion:

Edmund Burke states, "No passion so effectually robs the mind of all its powers of acting and reasoning as fear."

Bayview Loan Servicing, LLC uses fear as a primary weapon.

As both the 'Insurance' and 'Accounting' Problems demonstrate, Bayview will execute a Runaround Program on a borrower in an attempt to get to the "Default" stage. They then attempt to extract at fee to "make good the deficiency."

Bayview uses the following tools:

- "NOTICE REGARDING DEFAULT OF THE ABOVE-REFERENCED LOAN"
- "NOTICE OF DEFAULT AND INTENT TO ACCELERATE"
- Certified Letters, Letters Attached to the Front Door.
- Collection Calls. I documented 60 collection calls in a 30-day period. I estimate 240 calls in the last year.

Bayview uses the fear of foreclosure to coerce the borrower into paying improper fees and charges.

Bayview executed this program on me.

## Summary:

Why? What happened here?

If something happens once or twice, perhaps it's random; however, when something happens 12 times, it's not random.

Therefore, we must ask ourselves, why did Bayview Loan Servicing LLC purposely ignore the proof of insurance and issue a notice of default?

    a.   Bayview enjoys spending time with customers?
    b.   Bayview desires to subsidize the Post Office?
    c.   Bayview desires a customer to pay an extra fee of $13,362.16?

We need to determine who is the beneficiary if this extra fee is indeed paid. When investigated, if it is determined that Bayview Loan Servicing is achieving a financial gain, then this is fraud.

The accounting problem demonstrates additional intentional negligence; however, the intriguing revelation is the extent to which Bayview Loan Servicing LLC is willing to go in order to collect a fee.

It is important to realize that Bayview's behavior in this instance is not an isolated event.

As the Southeast Florida Better Business Bureau report states, "There is an alert for this business!"

Further, the quantity of complaints at the Southeast Florida Better Business Bureau provides additional evidence that Bayview's behavior is systemic. The BBB reports that the reason for the poor rating is "a pattern of complaints."

Now, it is important to realize that Bayview created this entire event.

I have absolute proof that I paid my mortgage, my property insurance and my property tax.

The evidence would suggest that Bayview created the event in my life simply to extract a fee. It appears as though Bayview has no respect for the law. Bayview does whatever they want to their customers, "Who can stop them?"

I find it striking that Bayview has the ability to falsify enough information in this case to generate a default notice and an acceleration notice.

*Wikipedia Defines Criminal Extortion in the following manner*: Extortion (also called shakedown, outwresting, and exaction) is a criminal offense of obtaining money, property, or services from a person, entity, or institution, through coercion.

Bayview has given false information to all three credit-reporting agencies for months.

Bayview refuses to correctly report mortgage interest to the Federal Government.

The question then becomes, "how does one protect themselves from a company which operates in this manner?" The answer is that you can't. The intentional lack of continuity and disappearing representatives provide Bayview a pathway to the default notice, where a fee is charged. Then, threatening "note acceleration" causes fear; a primary motivation tool Bayview uses to collect the improper fee.

Bayview Loan Servicing operates deceptivle, abusively and unfairly.

Bayview needs to be investigated.

**Response to Mrs. Forde Letter:**

Mrs. Forde,

Thank you very much for your response.

It would be prudent to ask you a few questions at this point:

1. Does it normally take a customer 21-months to provide proof of insurance to Bayview?

2. Does Bayview generally need proof of insurance to be delivered a dozen times?

3. I am curious to know if Bayview profits financially when a customer pays fees in order to "make good the deficiency?"

4. You incorrectly stated, "we have removed all late charges." I am curious to know where the missing money discussed in the accounting problem has gone? Does this missing money benefit Bayview?

5. As the mortgage payment was made on the 1st of the month every month to Bayview, how is it that one becomes late on their mortgage? How is it that one goes into default on their mortgage?

6. It has become apparent that you desire to send a check for the incorrect amount in order to collect a fee; however, as I have addressed in several letters, this procedure incorrectly affects the Internal Revenue Service's Mortgage Interest Statement. Would you please correct the Mortgage Interest Statement?

7. Does Bayview have a good relationship with the Southeast Florida Better Business Bureau?

8. Is the reason for the excessive number of complaints at the Southeast Florida Better Business Bureau that Bayview employs the same runaround tactics on many customers in an attempt to collect a fee?

9. Is the runaround behavior at Bayview systemic?

10. Lastly, Mrs. Forde, I find it remarkable that a USAA Insurance Representative contacted Bayview directly on a conference call in order to provide additional proof of insurance. This was in direct response to your (personal) 07 May 2013 letter. I am interested to know what further proof of insurance was required?

Thank you very much for your time.

Respectfully Submitted,

Robert M Lawrence

Page 7

# Exhibit Separator



Robert M Lawrence                                                                        14 January 2014
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 3295

Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5ᵗʰ Fl
Coral Gables, FL 33146

Bayview,

I have been working recently with Mitchell Beck. Mr. Beck has been correcting the accounting problem associated
with this account. As shown below, the total interest paid on this account was $30,357.12. I have copied the old IRS
form 1098 below in order to assist you in providing a corrected IRS form 1098.   The same information was provided
to Mr. Beck, however, for completeness, I thought it best to inform you directly.  Please feel free to contact me if you
should have any questions.  It is my goal to complete tax filing as soon as practical.  Thank You Very Much!

| Form 1098 | (keep for your records) | ☐ CORRECTED (if checked) | Department of the Treasury - Internal Revenue Service | | |
|---|---|---|---|---|---|
| RECIPIENT'S / LENDER'S  name, address, and telephone number<br>**Bayview Loan Servicing LLC**<br>**Customer Service**<br>**4425 Ponce De Leon Blvd., 5th Fl**<br>**Coral Gables, FL 33146**<br>8 Redacted -5105 | | *Caution: The amount shown may not be fully deductible by you. Limits based on the loan amount and the cost and value of the secured property may apply. Also, you may only deduct interest to the extent it was incurred by you, actually paid by you, and not reimbursed by another person. | OMB No. 1545-0901<br>20**13**<br>Form 1098 | **Mortgage Interest Statement** | |
| | | 1 Mortgage interest received from payer(s)/borrower(s) *<br>$                                        $20,491.06 | | Copy B<br>For Payer/Borrower | |
| RECIPIENT'S  Federal Identification no.   PAYER'S social security number<br>Redacted | | 2 Points paid on purchase of principal residence<br>$                                              $.00 | | The information in boxes 1, 2, 3, and 4 is important tax information and is being furnished to the Internal Revenue | |
| | | 3 Refund of overpaid interest<br>$                                              $.00 | | Service. If you are required to file a return, a negligence penalty or | |
| PAYER'S / BORROWER'S name, street address, city, state, and ZIP code | | 4 Mortgage insurance premiums<br>$                                              $.00 | | other sanction may be imposed on you if the IRS determines that | |
| **ROBERT M LAWRENCE**<br>**891 S DYER CIR**<br>**INCLINE VILLAGE NV   89451-9113** | | 5<br>$ | | an underpayment of tax results because you overstated a deduction for this mortgage interest or for these points or because you did not report this refund of interest on your return. | |
| | | LATE CHARGE PD                              $252.98 | | | |
| | | Account number (see instructions)               Redacted 397 | | | |

| Month | Date Paid | Interest Paid |
|---|---|---|
| 1 | 02 January 2013 | 2,529.76 |
| 2 | 01 February 2013 | 2,529.76 |
| 3 | 01 March 2013 | 2,529.76 |
| 4 | 01 April 2013 | 2,529.76 |
| 5 | 01 May 2013 | 2,529.76 |
| 6 | 01 June 2013 | 2,529.76 |
| 7 | 01 July 2013 | 2,529.76 |
| 8 | 01 August 2013 | 2,529.76 |
| 9 | 01 September 2013 | 2,529.76 |
| 10 | 01 October 2013 | 2,529.76 |
| 11 | 01 November 2013 | 2,529.76 |
| 12 | 01 December 2013 | 2,529.76 |
| | Total Interest Paid in 2013 | 30,357.12 |

Sara Torres
3/3/14

JAN 21 '14 RCVD

Robert M Lawrence

DEFENDANT'S
EXHIBIT
N
9/17/15

BAYVIEW-000717

# Exhibit Separator



11:30 pt  24 JAN 2014

FAXED TO (Redacted) - 2517

24 January 2014

FAXED 2X TO MAKE SURE

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted3295
Redacted@aol.com

Loan Number: Redacted1397

Mitchell Beck
Bayview
Phone: Redacted299, Ext: 5773
Fax: Redacted-2517

* Follow-up phone message @ 1:21 pacific time 24 Jun 2014

Mitchell,

. Thank you very much for your assistance.

It appears as though the Property Insurance charge has been reversed and the Escrow Account was closed.

Yesterday, 23 January 2014, I was able to discuss this matter with Andrea, a Bayview representative.

An Amount of

In my discussion with Andrea, it appears that upon closing the Escrow Account a check for $2,276.76 was refunded to me by check. As this amount appears to be a random number, I asked if there were any fees imposed and Andrea said yes, a late fee of $252.98.

The last accounting step now makes sense. If you add the check amount of $2,276.76 to the fee amount of $252.98 them sum becomes $2,529.76. Mitchell, this is exactly the monthly payment amount. When researching the account, Andrea indicated that there was a missing monthly payment. Part of the missing payment was refunded to me and the other part was somehow incorrectly charged as a fee of $252.98.

Unfortunately, as Andrea was working the accounting issue, the phone connection was lost. However, Andrea understood what was happening and I believe she was in the process of correcting the problem.

I have paid the mortgage payment of $2,529.76 properly on the first of every month in 2013. This is important, because as we have discussed previously, the Mortgage Interest Statement reported to the IRS by Bayview was incorrect. The Mortgage Interest Statement should read $30,357.12.

In order to correct the problem, I believe that it would be best that I not accept the refunded $2,276.76. This way, the IRS will have a clear understanding of the mortgage interest paid in 2013. I would like to either Void the refunded check or return the check signed over to Bayview. What do you propose?

In addition, I have contacted Equifax in order to follow-up on our discussion. Once the accounting was run on this account, you were going to coordinate with your credit-reporting department to correct the negative reporting. As of yesterday, 23 January 2014, Equifax has not received a correction from Bayview.

I will call you later today in order to coordinate this matter.

Respectfully Submitted,

Robert M Lawrence

DEFENDANT'S
EXHIBIT
O
9/17/15

BAYVIEW-000778

# Exhibit
# Separator



MAILED TO ADDRESS SHOWN
27 JANUARY 2014

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 8295
█████@aol.com

Loan Number: ████1397



Bayview
P.O. Box 331409
Miami, FL 33233-1409

Enclosures:
1.  Mitchell Beck Letter, Dated 24 January 2014.
2.  Bayview Check Number 082451, Signed over to Bayview.

Bayview,

In order to ensure that the Internal Revenue Service will have a clear understanding of the mortgage interest paid on this loan in 2013, I am returning this check to Bayview.

I have returned this check to Bayview, signed over to Bayview.

The return address of the envelope was as shown in the header above. The check was mailed to the address shown above by standard mail on 27 January 2014.

I have enclosed a letter written to Mitchell Beck dated 24 January 2014. The letter details what appears to be the final accounting problem of Bayview. In short, this check amount of $2,276.78, when added to an incorrectly applied fee of $252.98, becomes an amount of $2,529.76.

This amount equals a standard mortgage payment of $2,529.76.

In time, it should become apparent to Bayview that this is the mortgage payment that somehow went missing.

I have talked on the phone to my Bayview accounting department that the Mortgage Interest Statement which was filled was incorrect. I was able to provide a payment schedule and supporting documentation. Please coordinate with them to ensure that an updated, corrected, Mortgage Interest Statement is forthcoming.

Thank you very much for your assistance,

Robert M Lawrence

DEFENDANT'S
EXHIBIT

BAYVIEW-000720