1          UNITED STATES DISTRICT COURT
2          SOUTHERN DISTRICT OF FLORIDA
3                MIAMI DIVISION
4          CASE NO. 14-CV-22991-KMW
5
6
                                    )
7    ROBERT M. LAWRENCE,            )
                                    )
8              Plaintiff,           )
                                    )
9          vs.                      )
                                    )
10   BAYVIEW LOAN SERVICING, LLC,   )
                                    )
11             Defendant.           )
                                    )
12                                  )
13
14        DEPOSITION OF ROBERT M. LAWRENCE
15             San Mateo, California
16            Friday, October 9, 2015
17                   Volume 2
18
19
20
21   Reported by:
     LARRY BOSTOW
22   CSR NO. 5941
23   Job No. 2154887;
24
25   Pages 157 - 243

Page 158

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF FLORIDA
 3                   MIAMI DIVISION
 4            CASE NO. 14-CV-22991-KMW
 5
 6                          )
    ROBERT M. LAWRENCE,     )
 7                          )
             Plaintiff,     )
 8                          )
        vs.                 )
 9                          )
    BAYVIEW LOAN SERVICING, LLC, )
10                          )
             Defendant.     )
11                          )
                            )
12
13
14       Deposition of ROBERT M. LAWRENCE, Volume 2,
15  taken on behalf of the Defendant, at 951 Mariners Island
16  Boulevard, Suite 300, San Mateo, California, beginning
17  at 9:31 a.m., and ending at 11:48 a.m., on Friday,
18  October 9, 2015, before Larry Bostow, Certified
19  Shorthand Reporter No. 5941.
20
21
22
23
24
25
```

Page 159

```
 1  APPEARANCES:
 2
 3  For Plaintiff:
 4    LOAN LAWYERS, LLC
      BY: YECHEZKEL RODAL, ESQ., (Telephonic appearance)
 5    2150 S. Andrews Avenue, 2nd Floor
      Fort Lauderdale, Florida 33316-3432
 6    954.523.4357
      chezky@floridaloanlawyers.com
 7
 8  For Defendant:
 9    AKERMAN, LLP
      BY: BRENDAN HERBERT, ESQ., (Telephonic appearance)
10    One Southeast Third Avenue, 25th Floor
      Miami, Florida 33131-1714
11    305.374.5600
      brendan.herbert@akerman.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 160

```
 1                       INDEX
 2  WITNESS                        EXAMINATION
 3  ROBERT M. LAWRENCE                    PAGE
    Volume 2
 4
 5
 6          BY MR. HERBERT:         162
 7
 8  NUMBER       DESCRIPTION              PAGE
 9  Exhibit R  Letter from Robert Lawrence to Bayview, 169
               dated 2/26/14, Bates No. BAYVIEW-000782
10
    Exhibit S  Letter from Robert Lawrence to Elaine  172
11             Mitchell, Bayview Loan Servicing, LLC,
               dated 3/10/14, Bates No. BAYVIEW-000734
12
    Exhibit T  Letter from Robert Lawrence to Mitchell 189
13             Beck, Bayview, dated 1/13/14, Bates No.
               BAYVIEW-000774
14
    Exhibit U  Letter from Robert Lawrence to Federal  196
15             Trade Commission, dated 5/17/11, Bates
               No. Lawrence_Docs_022
16
    Exhibit V  Letter from Robert Lawrence to Consumer 206
17             Financial Protection Bureau, dated
               3/10/14, Bates No. BAYVIEW-000798
18
    Exhibit W  Group of payment statements submitted  211
19             to Bayview Loan Servicing by Robert
               Lawrence, Bates Nos. Lawrence RFP_0508
20             through 520, though not in numerical
               order
21
    Exhibit X  Letter from Robert Lawrence to Consumer 217
22             Financial Protection Bureau, dated
               4/4/14, Bates No. BAYVIEW-000791
23
    Exhibit Y  Letter from Robert Lawrence to Consumer 221
24             Financial Protection Bureau, dated
               3/10/14, Bates No. Lawrence RFP_0526
25
```

Page 161

```
 1  Exhibit Z  Letter from Robert Lawrence to Consumer 222
               Financial Protection Bureau, dated
 2             4/4/14, Bates No. Lawrence RFP_0539
 3  Exhibit AA  Letter from Robert Lawrence to Florida  222
               Attorney General's Office, Florida
 4             Office of Financial Regulation, Florida
               Department of Financial Services, dated
 5             4/4/14, Bates No. Lawrence RFP_0540
 6  Exhibit BB  Letter from Robert Lawrence to          232
               Catherine Cortez Masto, Nevada
 7             Attorney General, dated 5/5/14, Bates
               No. Lawrence RFP_0523
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 158 - 161)

1    San Mateo, California, Friday, October 9, 2015
2         9:31 a.m.
3
4         ROBERT M. LAWRENCE,
5    having been administered an oath, was examined and
6    testified as follows:
7
8              EXAMINATION
9    BY MR. HERBERT:
10   Q   Good afternoon, Mr. Lawrence.
11   A   Good afternoon.
12   Q   Or I guess good morning where you are.
13       This is Brendan Herbert.  We've met before at
14   Day 1 of your deposition.
15       We're here today, as you know, in a case that
16   is pending in the Southern District of Florida, in which
17   you are suing my client, Bayview Loan Servicing, LLC.
18       You understand you are here to have your
19   deposition taken this morning; correct?
20   A   Yes.
21   Q   Okay.  Before we get started, I know that we
22   went over the ground rules of the deposition last time.
23       I suspect that you remember those ground rules
24   and instructions; correct?
25   A   Yes.

1    Q   Before I start asking you any questions I do
2    have to ask you, are you currently under the influence
3    of any medications that would affect your ability to
4    testify truthfully today?
5    A   No.
6    Q   And are you currently experiencing any medical
7    issues or symptoms that would affect your ability to
8    hear the questions I'm asking you or to answer the
9    questions I'm asking you truthfully?
10   A   No.
11   Q   Have you had any alcoholic beverages within the
12   last eight hours?
13   A   No.
14   Q   And are you currently under any medications
15   that would affect your ability to understand the
16   questions that I ask you today?
17   A   No.
18   Q   Great.  I understand that we're here taking
19   this deposition telephonically.  If for some reason you
20   don't hear a question that I ask you, by all means
21   please tell me and I'll be happy to rephrase that
22   question or reask the question.  Okay?
23   A   Okay.
24   Q   Thank you.  All right.
25       So we have some exhibits that we're going to go

1    over but, while we're waiting for them to get printed
2    out, I want to ask you some questions that are not going
3    to be reliant upon documents that you have to look at.
4         Can you tell me right now who your cellar
5    provider is.
6    A   AT&T.
7    Q   And how long has AT&T been your provider?
8    A   A very long time.
9    Q   More than five years?
10   A   Yes.
11   Q   And has AT&T -- and just to clarify, AT&T has
12   been your cellar telephone provider for at least five
13   years; correct?
14   A   Correct.
15   Q   So, would you agree with me that AT&T has been
16   your cellar provider since Bayview began servicing this
17   loan?
18   A   I agree.
19   Q   And the phone number that is the subject of
20   this lawsuit, that ends in 3295, is that the only cellar
21   telephone number that you've had with AT&T since Bayview
22   began servicing this loan?
23   A   Yes.
24   Q   Do you know what kind of monthly telephone plan
25   you have?

1    A   It's -- It varies.  There's a limit on the
2    number of telephone calls, or time, I believe, and the
3    data is unlimited.  So, after a certain period of time,
4    with the phone call -- after a certain period of time
5    they charge me extra for phone service.
6    Q   Do you know how many minutes you have on a
7    monthly basis?
8         MR. RODAL:  Objection to form.
9         THE WITNESS:  It varies.  I generally -- I
10   don't know.
11   BY MR. HERBERT:
12   Q   I'm going to ask you that question differently.
13       Right now would you agree with me that you pay
14   AT&T -- Strike that.
15       Do you pay AT&T on a monthly basis for your
16   cellar telephone plan?
17   A   Yes.
18   Q   And what type of plan, currently, do you pay
19   them for?
20   A   A plan that has a given number of minutes, or
21   time.
22   Q   And right now what is that given number of
23   minutes or time?
24       MR. RODAL:  Objection.
25       THE WITNESS:  I am unsure.  I do not know.

Page 166

1 BY MR. HERBERT:
2    Q   Do you know whether your monthly plan, with
3 respect to the limit of minutes or time you just
4 referred to, has changed since 2011?
5    A   It has.
6    Q   How do you know that?
7    A   Every certain period of time I review the plan.
8    Q   How often do you review the plan?
9    A   It's non -- it's just -- there's no period
10 of -- no consistent period. It's random.
11    Q   When was the last time you reviewed your plan?
12    A   I don't know.
13    Q   When was the last time you changed your plan?
14    A   I don't know.
15    Q   So, as you sit there today is it your testimony
16 that you don't know -- All right. Let's backtrack.
17       You don't know the last time you checked your
18 plan; correct?
19    A   That's correct.
20    Q   You don't know the last time you changed your
21 plan; correct?
22    A   That's correct.
23    Q   As you sit there today do you know what kind of
24 plan you had in 2012?
25    A   No.

Page 167

1    Q   How about 2013?
2    A   No. It's the --
3    Q   How about 2014?
4    A   It's the same plan, but the period, the amount
5 of time, AT&T changes the plan and I will
6 review it, randomly, but I cannot remember the last time
7 I did that. I would -- I can't remember.
8    Q   Does AT&T change the plan or do you change the
9 plan?
10    A   I change the plan. But AT&T, over a period of
11 time, I believe, has changed their billing -- their
12 billings, the way they manage their plan.
13    Q   Have you ever had rollover minutes?
14    A   Yes.
15    Q   When?
16    A   I don't understand the question.
17    Q   I just asked you if you have ever had rollover
18 minutes as part of your telephone plan.
19    A   Right.
20    Q   And you said "yes"; correct?
21    A   Yes.
22    Q   What years did you have rollover minutes?
23    A   I don't know.
24    Q   How would you find out?
25    A   I could call AT&T.

Page 168

1    Q   Have you called AT&T to speak with them about
2 the plans that you had in 2012?
3       MR. RODAL: Objection.
4       THE WITNESS: I don't recall.
5 BY MR. HERBERT:
6    Q   How about 2013?
7    A   I don't recall.
8    Q   How about 2014?
9       MR. RODAL: Objection.
10       THE WITNESS: I don't recall.
11 BY MR. HERBERT:
12    Q   Do you remember the last time that you went
13 over your allowable monthly minutes in your plan?
14       MR. RODAL: I'm just going to object to this
15 line of questioning.
16       THE WITNESS: I don't recall when, I just
17 recall that I have. I just -- I don't recall when I
18 went over my minutes. I know I have in certain billing
19 cycles.
20 BY MR. HERBERT:
21    Q   Is it your position that you went over your
22 monthly allowable minutes because of any calls that my
23 client made to your cell phone?
24    A   I don't know.
25       MR. RODAL: Objection.

Page 169

1 BY MR. HERBERT:
2    Q   You can answer the question.
3    A   I don't -- State the question, please.
4       MR. HERBERT: Mr. Court Reporter, can you read
5 the question back.
6       (Record read.)
7       THE WITNESS: I don't know.
8       MR. HERBERT: Mr. Court Reporter, have the
9 exhibits come through yet?
10       THE COURT REPORTER: Let me go check.
11       (Off the record.)
12       MR. HERBERT: Back on the record.
13       So, Mr. Court Reporter, I would like you to
14 look at the document Bates stamped Bayview 000782.
15       And, to the extent it's necessary, remark that
16 as Exhibit R, if it did not come in clear.
17       (Exhibit R was marked for identification and is
18 attached hereto.)
19 BY MR. HERBERT:
20    Q   Mr. Lawrence, have you ever seen this document?
21    A   I don't recall this document, but --
22    Q   Do you see a signature about two-thirds of the
23 way down the page?
24    A   Yes.
25    Q   Does that appear to be your signature?

4 (Pages 166 - 169)

Page 170

1    A  Yes.
2    Q  And the handwriting on the top-right-hand
3  corner, does that appear to be your handwriting?
4    A  Yes.
5    Q  And it's your testimony that you don't recall
6  ever seeing this document?
7    A  I just don't recall the document.  I'm reading
8  it.
9       This is my document.
10   Q  Okay.  Why don't you read the document and then
11  let me know when you finish.
12   A  I've read the document.
13   Q  Does that refresh your recollection, in terms
14  of your drafting or sending of this document to Bayview?
15   A  It appears that Bayview had processed a payment
16  and then issued a late payment notice after the payment
17  was processed, with my note showing "Terry," a female.
18   Q  Do you remember speaking to Terry?
19   A  I do not.
20   Q  Do you remember why you sent this letter to
21  Bayview?
22   A  I do not.
23   Q  But you would agree with me that you did send
24  the letter to Bayview?
25   A  Yes.

Page 171

1    Q  Can you speculate as to why you would have sent
2  this letter to Bayview?
3       MR. RODAL:  Objection.
4       THE WITNESS:  Like it says in the letter, that
5  Bayview issued a late payment notice after they
6  processed a payment.  And it appears that, when speaking
7  with Terry, that she understood the problem.
8  BY MR. HERBERT:
9    Q  Do you know whether or not this issue was ever
10  corrected or addressed by Bayview?
11   A  No issues appear to ever have been corrected by
12  Bayview.
13   Q  Do you remember ever speaking to anybody from
14  Bayview regarding the late payment notice that you refer
15  to in your letter?
16   A  No, I don't.  I don't recall what this regards
17  and, therefore, I would not have a comment, as far as
18  speaking to somebody about this.
19   Q  When you say you wouldn't have a comment, what
20  do you mean?
21   A  I don't remember this issue.
22       MR. HERBERT:  Okay.  All right.
23       Mr. Court Reporter, you can turn to the next
24  document, Bates stamped Bayview 000734, which I've
25  marked as Exhibit S.

Page 172

1       To the extent that you need to remark that, you
2  can do so and, once you do, please hand it to the
3  deponent.
4       (Exhibit S was marked for identification and is
5  attached hereto.)
6  BY MR. HERBERT:
7    Q  Mr. Lawrence, have you ever seen this document
8  before?
9    A  I wrote this document.
10   Q  Do you know who Elaine Mitchell is?
11   A  I do not.
12   Q  Do you recall writing this document?
13   A  Yes.
14   Q  Why did you write this document?
15   A  This document was written to correct, I
16  believe, the mortgage interest.
17   Q  Okay.
18   A  And I'm responding to her letter about the
19  mortgage interest for, I believe, 2013.
20   Q  Do you remember what her letter said?
21   A  I do not.
22   Q  See, at the top of the document, you have your
23  name and address?
24   A  Yes.
25   Q  And your cell phone number; correct?

Page 173

1    A  Correct.
2    Q  Why did you put your cell phone number on this
3  letter?
4    A  The cell phone on this letter was --
5       Ms. Mitchell was a person of knowledge, it
6  appears, with mortgage interest.  And if she would like
7  to correct the problem, she could contact me.
8    Q  So that was an invitation to Ms. Mitchell to
9  contact you in response to your letter?
10   A  I wouldn't have an issue with Ms. Mitchell
11  calling me at this point.
12   Q  What if somebody else, that Ms. Mitchell worked
13  with, called you, that could address the issues in this
14  letter?
15   A  A person of knowledge with mortgage interest,
16  as we discussed previously, would be acceptable to me.
17   Q  Do you know who, within Bayview, would have
18  knowledge of your mortgage interest?
19   A  I assume --
20       MR. RODAL:  Objection.
21       THE WITNESS:  I assume somebody at the
22  accounting department.
23  BY MR. HERBERT:
24   Q  But you would -- Strike that.
25       I'm sorry.  You assume somebody at what

5 (Pages 170 - 173)

Page 174

1  department?
2     A  The accounting department.
3     Q  So you believe that the only person or people
4  that could resolve this issue for you worked at
5  Bayview's accounting department?
6     A  No.
7        MR. RODAL:  Objection.
8        THE WITNESS:  I assume somebody from the
9  accounting department or -- I assume this is an
10 accounting issue.
11 BY MR. HERBERT:
12    Q  What if I told you that the accounting
13 department within Bayview does not deal with mortgage
14 insurance issues?
15       MR. RODAL:  Objection.
16       THE WITNESS:  I would assume they had a
17 competent mortgage interest department within the
18 accounting department.
19 BY MR. HERBERT:
20    Q  But you don't know whether or not that
21 department exists; correct?
22       MR. RODAL:  Objection.
23       THE WITNESS:  I do not know the structure of
24 Bayview Loan Servicing.
25 BY MR. HERBERT:

Page 175

1     Q  Would you agree with me that you would have
2  been okay with anybody from Bayview Loan Servicing
3  calling you who could have addressed your mortgage
4  interest dispute?
5        MR. RODAL:  Objection.
6        THE WITNESS:  Somebody with knowledge, within
7  Bayview, who could correct the problem, would be
8  acceptable to me.
9        MR. HERBERT:  Okay.  Mr. Court Reporter, I'm
10 going to have you read that question back.
11       And, Mr. Lawrence, that's a "yes" or "no"
12 question, and so I would like you to respond
13 accordingly.
14       (Record read.)
15       MR. RODAL:  Same objection.
16       THE WITNESS:  State that one more time, please.
17       (Record read.)
18       MR. RODAL:  Same objection.
19       THE WITNESS:  Yes.
20       MR. HERBERT:  Thank you.
21       MR. RODAL:  Mr. Court Reporter, do you have my
22 objection noted on that question?
23       THE COURT REPORTER:  Yes, after I read it I
24 heard you say "Same objection."
25       MR. RODAL:  Okay.  Thank you.

Page 176

1  BY MR. HERBERT:
2     Q  Mr. Lawrence, do you know whether Ms. Mitchell
3  ever tried to call you back?
4     A  She did not, to the best of my knowledge.
5     Q  How do you know that?
6     A  Because I review every -- every phone call from
7  Bayview Loan Servicing, to the best of my knowledge.
8     Q  Do you answer every phone call from Bayview
9  Loan Servicing?
10    A  I do not.
11    Q  When you would get calls from Bayview to your
12 cell phone, and you would not answer them, would you not
13 answer them intentionally because you knew that they
14 were from Bayview?
15    A  I would not answer them because they were
16 either robocalls or collection calls.  They were non-
17 productive calls.
18    Q  How do you know they were, as you just called
19 them, robocalls?
20    A  A robot would leave a message periodically.
21       And the messages would be scrambled at times.
22       And every -- And, in this case, Elaine Mitchell
23 never -- as far as my knowledge is concerned, did not
24 identify herself.  I've listened to every message.
25    Q  Did Bayview leave a message on your cell phone

Page 177

1  every time they called you?
2     A  No.
3     Q  So if there were calls that were made to your
4  cell phone where no voicemail was left, how do you know
5  that all of those calls were robocalls, as you just
6  referred to them?
7     A  I don't know that they were all robocalls.  I
8  assume some of them were robocalls.
9     Q  How often -- Strike that.
10       Do you know how many times you did answer a
11 call and speak to somebody from Bayview?
12    A  I do not.
13    Q  More than ten?
14    A  A call from Bayview?  I'd say right in that
15 ballpark.
16    Q  Around ten?
17    A  Yes.
18    Q  When you say that some of the calls you
19 received were scrambled, what do you mean?
20    A  On some of the calls Bayview would play music.
21 On some of the calls Bayview would -- they would just be
22 garbled.  On some of the calls they would leave
23 seductive messages.  And on some of the calls they would
24 leave their name, phone number and a message.
25       Generally the calls came from a grouping of ten

6 (Pages 174 - 177)

1 numbers or so, so I knew they were from Bayview.
2   Q  How did you know that all, say, ten of those
3 numbers were from Bayview?
4   A  Because of the repetitive cycle of calls.
5   Q  So you just came to know, after they called you
6 a number of times, that certain phone numbers were
7 identified with Bayview?
8   A  Yes.
9   Q  And would you intentionally not answer those
10 calls?
11   A  They were -- The volume was such that I would
12 need a secretary to answer all of the nuisance calls.
13   Q  How many calls a day would you get -- Or, I'm
14 sorry, strike that.
15     What were the most amount of calls you received
16 in one day from Bayview, to your recollection.
17   A  I believe, in a 30-day period, I received 60
18 calls.
19   Q  That's not my question though.
20     My question is, in one day what was the most
21 number of calls you received from Bayview?
22   A  I would say -- I don't know. I would -- In
23 general, two. I mean, just breaking it out, I would say
24 two.
25   Q  How many phone calls do you receive on a daily

1 basis?
2     MR. RODAL: Objection.
3 BY MR. HERBERT:
4   Q  From anybody.
5   A  It varies.
6     MR. RODAL: Objection.
7 BY MR. HERBERT:
8   Q  On a daily basis -- Strike that.
9     So it's your testimony that you would need a
10 secretary to answer two calls a day from Bayview?
11     THE WITNESS: The volume of calls -- I mean,
12 I'm doing other things. To answer calls from Bayview on
13 a daily basis was extreme, yes.
14 BY MR. HERBERT:
15
16   Q  You spent a lot of time writing the letters
17 that you wrote to Bayview, didn't you?
18   A  Yes.
19   Q  And you documented your correspondence, over
20 several years, meticulously, didn't you?
21   A  I documented the correspondence as best I
22 could.
23   Q  And you were frustrated with Bayview, weren't
24 you?
25     MR. RODAL: Objection.

1 BY MR. HERBERT:
2   Q  You can answer.
3   A  I'm sorry. Say again.
4   Q  You got very frustrated with Bayview, didn't
5 you, during this process?
6     MR. RODAL: Objection.
7     THE WITNESS: I think Bayview could have solved
8 the problem.
9 BY MR. HERBERT:
10   Q  That's not my question, or that's not an answer
11 to my question.
12   A  Okay.
13   Q  My question is whether or not you got very
14 frustrated with Bayview during this process.
15   A  I don't know how to answer the question.
16   Q  Well, it would be "Yes," "No" or "I don't
17 know."
18   A  I don't know if "frustrated" is the right word.
19   Q  Do you know what the right word would be?
20   A  I think Bayview could have done a better job.
21   Q  When you just testified that Bayview left you
22 seductive messages, can you explain to me what that
23 means.
24   A  There was a message -- I -- This is off the top
25 of my head, but it was from somebody named Katie, I

1 believe. And the message went "Hi, Robert" -- I
2 believe -- "this is Katie." And I forgot how it was
3 left, but it was in such a way that it could have been
4 interpreted poorly by a spouse or otherwise.
5     There was no mention of Bayview, however it was
6 from the Bayview telephone number.
7   Q  Do you know when that call took place?
8   A  I can't recall. I've got it documented.
9   Q  Where is it documented?
10   A  It should be in the note to the FTC.
11   Q  Okay. Well, we'll look at that in a minute.
12     What's your definition of "seductive"?
13   A  It was just left in a manner that could be
14 interpreted as Katie was a person of interest.
15   Q  A person of interest? You mean, like a lover
16 of yours?
17   A  A person of interest, that's correct.
18   Q  Well, I don't know what a person of interest
19 is.
20   A  A girlfriend, extramarital person or
21 involvement.
22   Q  So there was that one call, that you allege was
23 made by Katie, that was seductive; correct?
24   A  That's correct.
25   Q  And when you say that some of the calls were

7 (Pages 178 - 181)

Page 182

1 garbled, can you tell me what "garbled" means.
2    A   Like it was coming from an area where there
3 were multiple people in the background.  And they didn't
4 speak even to me, it was just spoken, garbled, in the
5 background, there was no audible message.
6    Q   So like what?  So something similar to what you
7 would hear if somebody pocket-dialed you?
8    A   It would be -- you could hear them speaking in
9 the background, that's correct.  Just, there would be a
10 call, that was a call from Bayview, however there was no
11 message.  You could just hear talking, or partial
12 talking.  I mean, we're talking -- we're speaking in
13 general terms, but that's what I mean by "garbled."
14    Q   Do you remember the date and time of that call?
15    A   I think there were more than one, and I do not.
16    Q   How many do you think there were?
17        MR. RODAL:  Objection.
18        THE WITNESS:  I don't recall.  More than one.
19 BY MR. HERBERT:
20    Q   More than five?
21    A   I don't recall.
22    Q   Do you remember if there were more than ten?
23    A   I don't recall.
24    Q   Do you remember if there were more than 100?
25    A   I would say, in general, they -- the garbled

Page 183

1 calls were more than the seductive calls, but not in the
2 range of 100.
3    Q   Well, you testified there was one, how you
4 phrased it, seductive call that was made; right?
5    A   That one -- That one I remember because of the
6 nature of the call, that's correct.
7    Q   I'm sorry.  Can you repeat that.
8    A   I just remember that one specifically because
9 it really -- it is in my memory.  So I remember that
10 one, it was notable.
11    Q   You testified that there were certain times
12 when you would get a call and somebody would leave their
13 name and phone number; is that correct?
14    A   Yes.
15    Q   How many times did that happen?
16    A   I don't recall.
17    Q   Did you record or write down the names and
18 phone numbers of the people that left messages on your
19 cell phone?
20    A   I did not record.
21    Q   Did you call any of them back?
22    A   I called Bayview several times.
23    Q   But in terms of the people that left their name
24 and telephone number in voicemail messages, did you call
25 them back?

Page 184

1    A   Several I did, I believe.  I initiated calls on
2 several occasions.
3    Q   But do you know for certain, as you sit there
4 today, whether or not you returned any of the voicemails
5 during which a Bayview representative left their name
6 and telephone number for you to call them?
7    A   Say that one more time.
8        MR. HERBERT:  Mr. Court Reporter, can you read
9 that back.
10        (Record read.)
11        THE WITNESS:  I believe -- I do not know for
12 certain.
13 BY MR. HERBERT:
14    Q   So, going back to Exhibit S, for the sake of
15 argument, if one of those people that had left a message
16 on your voicemail, with their name and telephone number,
17 were calling in response to this letter that you sent
18 in, or any other letter that you sent into Bayview, you
19 would have been okay with that; right?
20        MR. RODAL:  Objection.
21        THE WITNESS:  I would have been okay with
22 somebody from the accounting department in this case, or
23 somebody with knowledge of this letter.
24 BY MR. HERBERT:
25    Q   Well, that's not what you testified previously

Page 185

1 though, because my understanding was that previously you
2 said that you would have been happy if somebody from
3 Bayview, anybody from Bayview, could have -- had called
4 you back that could have helped you fix the problem you
5 were expressing in this letter to Ms. Mitchell.
6    A   No, I understand.  But somebody with
7 knowledge -- I mean, that's what I'm telling you,
8 somebody with knowledge of this information, not anybody
9 from Bayview.
10    Q   I know that you keep saying "somebody with
11 knowledge," and I just want to understand.
12        Will you agree with me that somebody with
13 knowledge, as you keep saying, is the same thing as
14 somebody that could assist you, resolve your problem?
15    A   If somebody could assist me with the accounting
16 problem.
17    Q   So that's a "yes"?
18    A   If somebody could assist me with the accounting
19 problem.
20    Q   So, to clarify, as long as that person could
21 assist you with the accounting problem, you really
22 didn't care who called you from Bayview; correct?
23    A   In general I -- in this case I would like
24 Elaine Mitchell to call me.
25    Q   Well, does it say anywhere in this letter that

8 (Pages 182 - 185)

Page 186

1 you want Elaine Mitchell to call you specifically?
2       MR. RODAL: Objection.
3       THE WITNESS: No, it does not. But Elaine
4 Mitchell was the point of contact. She was the one who
5 wrote the letter, and I was responding, in this case, to
6 Elaine Mitchell.
7 BY MR. HERBERT:
8    Q  Do you know what department Elaine Mitchell
9 worked in?
10      MR. RODAL: Objection.
11      THE WITNESS: I do not.
12 BY MR. HERBERT:
13   Q  Would you agree with me that if somebody else
14 from Elaine Mitchell's department had contacted you,
15 with the ability to assist in resolving your problem,
16 you would have been okay with that?
17      MR. RODAL: Objection.
18 BY MR. HERBERT:
19   Q  You can answer.
20   A  In this case I would have -- I was dealing with
21 Elaine Mitchell, so Elaine Mitchell would be my point of
22 contact with Bayview in this case.
23   Q  That was not what I asked.
24   A  Well, that's -- that's how I view this. The
25 volume of calls -- I wanted Elaine Mitchell to solve

Page 187

1 this problem.
2       Actually, to be honest, or quite frank, I would
3 have -- I wanted it in writing from Elaine Mitchell,
4 because --
5    Q  Is that why you provided her with your mailing
6 address and your e-mail address?
7    A  Yes, I would like -- I wanted everything in
8 writing. And that's because -- I think I made quite a
9 few phone calls to Bayview Loan Servicing and everyone
10 -- or the representatives would promise a correction and
11 the correction would never take place.
12   Q  Okay.
13   A  Therefore, a phone call from Bayview Loan
14 Servicing was never productive.
15   Q  So it's your testimony that you wanted Elaine
16 Mitchell to respond to this letter in writing; correct?
17   A  That would be preferable, yes.
18   Q  And is that why you provided her with your
19 mailing address and e-mail address?
20   A  Yes.
21   Q  But it doesn't say in the letter here that you
22 wanted her to respond to you in writing; correct?
23   A  She had responded to me in writing previously,
24 so --
25   Q  But, for purposes of this letter, it doesn't

Page 188

1 say anywhere in this letter that you want her to respond
2 to you in writing; correct?
3    A  It's assumed.
4    Q  Why?
5    A  Because I sent the letter, she sent a letter, I
6 sent a letter back, I would gather it would be assumed
7 that the correspondence was by mail.
8    Q  So, based on the course of conduct that you had
9 with Ms. Mitchell, you just assumed that any further
10 communication would be in writing?
11   A  I'd prefer that, yes.
12   Q  And do you think that the -- by you putting
13 your address and your e-mail address in this letter,
14 that it's implied that she can contact you via writing
15 at that address or at that e-mail address?
16   A  She had done that previously, yes.
17   Q  So then you would agree with me, then, that
18 it's also implied that she could contact you on your
19 cell phone; correct?
20      MR. RODAL: Objection.
21 BY MR. HERBERT:
22   Q  You can answer.
23   A  She could. I would accept a call from her as
24 well.
25   Q  And is it your testimony now that you would not

Page 189

1 accept a call from anybody else from Bayview Loan
2 Servicing, in response to this letter, on your cell
3 phone?
4    A  I would prefer a phone call from Elaine
5 Mitchell, or somebody who would identify themselves who
6 could solve this problem.
7    Q  So somebody that could assist you in resolving
8 the problem; correct?
9    A  Yes.
10      MR. HERBERT: We're going to take a quick
11 two-minute break.
12      We'll go off the record, Mr. Court Reporter.
13      (Off the record.)
14      MR. HERBERT: So we're going to go back on.
15      So we're going to take a look at Exhibit T,
16 which has been Bates stamped Bayview 000774.
17      (Exhibit T was marked for identification and is
18 attached hereto.)
19 BY MR. HERBERT:
20   Q  Mr. Lawrence, have you ever seen this document?
21   A  Yes.
22   Q  What is it?
23   A  It's a letter to Mitchell Beck.
24   Q  Why did you send this letter to Mr. Beck?
25   A  After the insurance problem he was supposed to

9 (Pages 186 - 189)

Page 190

1  fix the accounting issues and the other issues
2  associated with getting the account back up to proper
3  status.
4      Q   How did you come across Mr. Beck?  How were you
5  introduced to him?
6      A   I called Bayview Loan Servicing.
7      Q   And how were you connected to Mr. Beck?
8      A   There was a representative who answered the
9  phone and he switched me over, either directly or
10  indirectly, to Mitchell Beck.
11     Q   Do you recall which department Mr. Beck worked
12  in?
13     A   I recall he was a manager.
14     Q   In what department?
15     A   I don't recall.  He appeared to be accounting,
16  as he would specify that the computer would have to run
17  an accounting routine.
18     Q   But you don't know whether or not, as you sit
19  there today, he was in fact a manager in the accounting
20  department at Bayview Loan Servicing; correct?
21     A   I only assume he was a manager at the
22  accounting department at Bayview Loan Servicing.
23     Q   So you do not know; correct?
24     A   He did not tell me he was an accounting manager
25  at Bayview Loan Servicing, no.

Page 191

1      Q   Well, my question is, you do not know whether
2  he worked in the accounting department at Bayview;
3  correct?
4      A   I do not know the title of Mitchell Beck.
5      Q   Not my question.  My question is, you do not
6  know whether Mr. Beck worked in the accounting
7  department at Bayview, do you?
8      A   I do not.
9      Q   Thank you.
10        And you spoke to Mr. Beck over the phone;
11  correct --
12     A   Yes.
13     Q   -- at one point?
14        How many times did you speak to him?
15     A   One time, for a very long period.  And then, I
16  can't recall why I -- that might have been -- maybe one
17  other time.
18     Q   And what did you expect to happen after you
19  sent this letter to Mr. Beck?
20     A   At this point I was documenting, with my
21  letters, so I expected him to correct the problem.  But
22  what I would do is document our phone call, or
23  conversation, in the letter, so he would have what we
24  discussed as well in the letter.
25     Q   When you were documenting all of these

Page 192

1  communications, were you doing so with the intention of
2  suing Bayview?
3      A   No.
4      MR. RODAL:  Objection.
5      THE WITNESS:  No.
6  BY MR. HERBERT:
7      Q   Did Mr. Beck respond to this letter?
8      A   I can't recall.  I recall him promising to
9  respond and correct, and I recall nothing being
10  corrected.
11     Q   Do you know whether he ever tried to contact
12  you?
13     A   I believe he did not.
14     Q   Do you know for sure?
15     A   Yes, there was no message from Mitchell Beck.
16     Q   Do you know whether there were messages from
17  any other employees at Bayview who could have assisted
18  you in resolving these issues?
19     A   At this point I wanted Mitchell Beck.  And I
20  called Mitchell Beck, I would estimate, a dozen times.
21     MR. HERBERT:  Mr. Court Reporter, can you
22  please read my question back.
23        (Record read.)
24     THE WITNESS:  None were identified, so I don't
25  know.

Page 193

1  BY MR. HERBERT:
2      Q   Do you see, at the top of this letter, where
3  you list your cell phone number?
4      A   Yes.
5      Q   Why did you put your cell phone number on this
6  letter?
7      A   As all -- With Mitchell Beck, he was a person
8  of knowledge.  I would not -- I would -- I would -- I
9  was trying to correct the accounting problem in this
10  case.
11     Q   So were you giving Mr. Beck permission to
12  contact you on your cell phone?
13     A   I would have accepted a phone call from
14  Mitchell Beck.
15     Q   Were you consenting to him calling you on your
16  cell phone or no?
17     MR. RODAL:  Objection.
18  BY MR. HERBERT:
19     Q   You can answer the question.
20     A   Yes, I would have accepted a phone call from
21  Mitchell Beck.
22        (Off the record.)
23  BY MR. HERBERT:
24     Q   Mr. Lawrence, would you agree with me that you
25  would have accepted a phone call from anybody at Bayview

10 (Pages 190 - 193)

1 that could have addressed or assisted in resolving the
2 issues that you outline in this letter to Mr. Beck?
3     A   I would say I wanted Mitchell Beck to call me,
4 and not anyone from Bayview, because nobody -- because I
5 was dealing with Mitchell Beck.
6     Q   Hypothetically, what if Mr. Beck had an
7 assistant, or another person who worked with him, who he
8 asked to call you to -- Strike that.
9         Okay.  Let me ask you this.  If you look at the
10 fourth paragraph down in this letter, that begins with
11 "However, I received" --
12        Do you see that?
13    A   Yes.
14    Q   See the last sentence, it says, "I must ask,
15 Mitchell, did you receive my fax and are you attempting
16 to correct this problem with Bayview's credit-reporting
17 department"?
18    A   Yes.
19    Q   Did I read that correctly?
20    A   Yes.
21    Q   What was the issue that you had with Bayview's
22 credit-reporting department?
23    A   Everything was paid properly, and he was --
24 that's what I talked about previously.  He was
25 correcting the accounting from the insurance problem

1 and, in correcting the accounting, he was to correct the
2 incorrect credit reporting.
3     Q   So it's your position that there was a problem
4 with your credit reporting that could have been resolved
5 by Bayview's credit-reporting department; is that
6 accurate?
7     A   It was going to be resolved by Mitchell Beck,
8 and it was his job to take care of the credit-reporting
9 problem.
10    Q   Says who?
11    A   Says him.
12    Q   Did he work for the credit-reporting
13 department?
14    A   He said he was going to interact with the
15 credit-reporting department directly.
16    Q   And if somebody from the credit-reporting
17 department from Bayview called you, to assist you in
18 resolving the credit-reporting department's issues, you
19 would have been fine with that; correct?
20        MR. RODAL:  Objection.
21        THE WITNESS:  I wanted Mitchell Beck.  This was
22 to Mitchell Beck.
23        The whole problem is everything gets -- I
24 wanted Mitchell Beck.
25 BY MR. HERBERT:

1     Q   Do you have any correspondence in your
2 possession, that you sent to Mitchell Beck, saying "I do
3 not want to hear from anybody but you"?
4     A   No.
5         MR. HERBERT:  All right.  We're going to go to
6 Exhibit U.
7         (Exhibit U was marked for identification and is
8 attached hereto.)
9 BY MR. HERBERT:
10    Q   Have you ever seen this document?
11    A   Yes.
12    Q   At the top of the document, you see that you
13 left your address; correct?
14    A   Yes.
15    Q   And your cell phone number?
16    A   Yes.
17    Q   And your e-mail address?
18    A   Yes.
19    Q   Who did you send this letter to?
20    A   It appears the Federal Trade Commission.
21    Q   And why did you list your cell phone number at
22 the top of this document?
23    A   In this case, this is just a standard -- with
24 most of these I just copy a template, so this is part of
25 a template.  I just used a template and printed out this

1 letter.
2     Q   Let me ask you this.  A lot of the letters that
3 you sent have the emblem on top with the wings; correct?
4     A   Correct.
5     Q   What is that emblem?
6     A   That's an emblem of a military pilot in the
7 Navy.
8     Q   And is that something that is on the paper that
9 you used to draft these letters or is that generated by
10 a computer?
11    A   That's just a Word document.
12    Q   So you intentionally, on every document that
13 you print out from your computer, put this emblem on it,
14 at the top; right?
15    A   On some letters I do do that, that's correct.
16    Q   Not all letters?
17    A   No, not all.
18    Q   And with your address and your cell phone
19 number and your e-mail address at the top, is that also
20 something that you put on all letters that you sent or
21 just some?
22    A   It's a template, so I -- you know, a lot of
23 times I'll just go from one -- I just grab from one
24 letter and put it on the next letter, and then I just --
25 I relabel the document.

Page 198

1   Q  Do you ever send a letter where you use the
2  same template but take out your e-mail address or cell
3  phone number?
4      A  Sometimes.  There's no -- when I send this,
5  there's no implication, at least in my mind, that I want
6  them to call me.  So, you know, I write -- when I write
7  letters, they come out in various forms.
8      Sometimes, if there's not enough space, I'll
9  remove different --
10    Q  Under what other circumstances would you remove
11  your cell phone or your e-mail address?
12    A  You know, in this case it's a nonevent, I don't
13  even think of it.  I would remove it for space
14  considerations.
15    Q  So is it your testimony that the only time that
16  you would ever remove that from one of your letters is
17  for space considerations?
18    A  No.  If it popped up somehow some other way or
19  -- it's just a non -- I don't think about it.  It's just
20  part of a template, just to get things started.
21      It's not -- in this case it's not an
22  invitation, you know, to call.
23    Q  It's not an invitation, under any
24  circumstances, to call you?
25    A  No, it's just -- I just -- it's part of a

Page 199

1  template.  I'm not -- I put very little thought into it.
2  And that's why, if I were to need some space, I would
3  delete it without -- with very little thought.
4      Q  Do you receive letters in the mail from other
5  people or creditors?
6      MR. RODAL:  Objection.
7      you can answer.
8      THE WITNESS:  Yes.
9  BY MR. HERBERT:
10    Q  Do you receive letters in the mail from your
11  electric company or water company?
12    A  Yes.
13      MR. RODAL:  Objection.
14  BY MR. HERBERT:
15    Q  When you need or desire to contact them, to
16  respond to the letter, do you look at the letterhead to
17  get contact information to figure out where you should
18  call or write them?
19      MR. RODAL:  Objection.
20      THE WITNESS:  Normally there's a way to contact
21  them, that's correct.
22  BY MR. HERBERT:
23    Q  Do you think it would be unreasonable, if you
24  received one of those letters and saw a phone number and
25  mailing address at the top of the letter that was sent

Page 200

1  to you -- Strike that.
2      If you saw -- If you received a letter with a
3  mailing address and telephone number, do you think that
4  it would be unreasonable to believe the recipient of
5  that letter could respond by contacting you at that
6  information?
7      MR. RODAL:  Objection.
8      THE WITNESS:  They could respond in this case.
9  BY MR. HERBERT:
10    Q  Did the FTC respond to you in this case?
11    A  No.
12    Q  Now, this letter was sent in May of 2011;
13  right?
14    A  Yes.
15    Q  Shortly after the servicing transfer from Saxon
16  to Bayview?
17    A  Yes.
18    Q  And at this point you were already annoyed with
19  Bayview, weren't you?
20    A  I wrote a letter to the FTC about several calls
21  in a short period of time.
22    Q  You thought that Bayview's behavior was
23  irrational, didn't you?
24    A  I don't know why they called me 60 times in a
25  30 day period.

Page 201

1      Q  Did you think that their behavior was
2  irrational?
3      A  Irrational?  I don't know why they did that.
4  That's --
5      Q  Well, my question is, do you think their
6  behavior was irrational?
7      A  I think that their behavior -- I don't
8  understand why I was receiving collection calls.
9      Q  My question is -- and we can sit here all day,
10  Mr. Lawrence.
11      My question is, do you believe their behavior
12  was irrational?
13      A  I don't know if "irrational" is the right word.
14      You know, I don't know why collection calls
15  were sent.
16      Q  Okay.  I'm going to direct you to the third
17  paragraph of the letter that's sitting in front of you
18  right now, and it says "This irrational behavior has now
19  become a social experiment."
20      A  Oh, okay.  Well, irrational, that's fine.
21  Okay.
22      Q  Okay.  So then, at least back in 2011, you
23  believed that Bayview's -- Excuse me.
24      At least back in 2011 it appears that you
25  thought that Bayview's behavior was, quote, irrational;

12 (Pages 198 - 201)

1 correct?
2        MR. RODAL:  Objection.
3        THE WITNESS:  It's in the letter.  Like I said
4 before, I don't know why they called me for 60
5 collection calls when the check was mailed.
6 BY MR. HERBERT:
7    Q   And, in fact, in this letter to the FTC you
8 made an analogy of Bayview to a dog, didn't you?
9    A   I was interested to know when they would stop,
10 that's correct.  I didn't understand why they would make
11 60 phone calls.
12    Q   Say that again.
13    A   I did not know why they were making 60 phone
14 calls.  I mean, that's correct.
15    Q   That's not my question though.
16        My question is, you thought that Bayview was
17 acting like your dog Pongo; right?
18    A   I had a dog named Pongo who would eat until --
19 as much as you would put in front of the dog.
20    Q   And you were basically, in this letter, telling
21 the FTC that Bayview was like your dog?
22    A   I was saying that the behavior of a dog that
23 wouldn't stop eating was similar to the behavior of a
24 company that would not stop calling.
25    Q   So all the way back to 2011, you were really

1 annoyed with Bayview; right?
2        MR. RODAL:  Objection.
3        THE WITNESS:  Like I say, I did not understand
4 the behavior.
5 BY MR. HERBERT:
6    Q   Well, then, did you think that the letter to
7 the FTC, making an analogy referring to your childhood
8 dog, was just funny then?
9    A   It was a -- I mean, it was acknowledgment that
10 I did not understand why, if you made a payment, you
11 would receive 60 collection calls.
12    Q   Why did you feel the need to include this
13 analogy in this letter?
14    A   I don't remember why.
15    Q   If somebody made an analogy and -- if somebody
16 made an analogy and referred to you as a dog, would that
17 annoy you?
18    A   No.
19    Q   Would you be insulted by that?
20    A   No.  I didn't call them any names or -- I just
21 was saying that it's similar to 60 collection calls.
22    Q   Now, of the 60 calls here, you break it down,
23 and you say that 22 of the calls, or 36.7 percent, were
24 proper voicemail messages.
25        What do you mean by that?

1    A   Where they would identify themselves, leave a
2 name, a business, and a proper message.
3    Q   What would those messages say?
4    A   I can't recall.
5    Q   So, is it your testimony that a voicemail that
6 leaves a name and a phone number is a proper message?
7        MR. RODAL:  Objection.
8        THE WITNESS:  Where they, I believe, identify
9 themselves and who they are and where they're calling
10 from.
11 BY MR. HERBERT:
12    Q   Did you call any of those people back?
13    A   I did not.
14    Q   Why not?
15    A   I wrote a letter.
16    Q   It says there were eight calls that went to
17 voicemail where no message was provided.
18        Did you save any of these voicemails?
19    A   I tried to.  Over time they -- I don't know how
20 to save them.
21    Q   Do you have -- On your cell phone right now, do
22 you have any voicemails, that are saved, that you
23 received from Bayview?
24    A   No.
25    Q   Not one?

1    A   It's been too long.  If you upgrade your phone
2 you lose -- I don't know how to save them.  I wish I --
3 I wish I did.
4    Q   It says 27 of the calls, or 45 percent, were
5 recorded missed calls with no message.
6        Do you see that?
7    A   Yes.
8    Q   And how do you know that all 27 of those calls
9 were from Bayview?
10    A   Because of the recalled number.
11    Q   Did you check specifically to make sure that
12 all of these calls were -- had come from Bayview?
13    A   There's a -- I have a list of, I think, like I
14 said before, about ten phone numbers from Bayview.
15    Q   The last one, it says, "One call went to
16        voicemail where the message, 'Hello, this
17        message is for Robert Lawrence, this is
18        Katie,' was provided.  The tone of the
19        message seemingly intended to attempt to
20        cause a problem with a spouse."
21    A   Yes, that's what we spoke about before.  That
22 one I remember.
23    Q   Did you have any of your friends or family
24 listen to that message?
25    A   I did not.

13 (Pages 202 - 205)

Page 206

1   Q   And you didn't keep that message; right?
2   A   No.  I wish I would have.
3   Q   Why did you write this letter to the FTC?
4   A   Because I felt what Bayview did was
5   inappropriate.
6   Q   Did you hope to get a response from the FTC?
7   A   I wanted to document that Bayview acted
8   inappropriately.
9   Q   But were you hoping to get a response from the
10   FTC?
11   A   I don't -- I don't recall.
12       MR. HERBERT:  All right.  Could we go to
13   Exhibit V.
14       (Exhibit V was marked for identification and is
15   attached hereto.)
16   BY MR. HERBERT:
17   Q   Do you recognize this document?
18   A   Yes.
19   Q   Who is this sent to?
20   A   The Consumer Financial Protection Bureau.
21   Q   Why did you send this letter to them?
22   A   I have a problem with Bayview Loan Servicing.
23   Bayview Loan Servicing is trying to drive my mortgage
24   into foreclosure for profit.  I have --
25   Q   Why did you feel like they were trying to drive

Page 207

1   your mortgage into foreclosure for profit?
2   A   That there's several -- that's just what
3   appeared to be happening with Bayview Loan Servicing,
4   the force-placed insurance, the lack of willingness to
5   correct the accounting problem, the payments were made
6   on time and yet I was still receiving delinquency and
7   default notices, Mitchell Beck refusing to correct the
8   accounting problem.
9   Q   So all of those things combined led you to
10   believe that Bayview was purposely trying to drive your
11   mortgage into foreclosure for profit; correct?
12   A   I believe that, yes.
13   Q   Do you still believe that?
14   A   I do.
15   Q   Out of curiosity, do you know whether Bayview
16   would profit at all if your home was foreclosed on?
17       MR. RODAL:  Objection.
18       You can answer.
19       THE WITNESS:  I believe so.
20   BY MR. HERBERT:
21   Q   You don't know for sure; right?
22   A   I'm not in the mortgage business, I don't know
23   for sure, but I believe so.
24   Q   So the answer is no, you do not know for sure;
25   correct?

Page 208

1   A   I do not know for sure.
2   Q   At the top of this letter you provided your
3   cell phone number; correct?
4   A   Yes.
5   Q   Why did you provide it?
6   A   It was part of the template.  I was sending a
7   letter to the consumer -- the protection bureau, and it
8   was just part of the template.
9   Q   Did you want the Consumer Financial Protection
10   Bureau to respond to this letter?
11   A   Yes.
12   Q   Did you want the Consumer Financial Protection
13   Bureau to either write, e-mail or call you in response
14   to this letter?
15   A   I wanted them to write me in response to this
16   letter.  I wrote them, I think, more than once.  I've
17   written them more than once.
18   Q   Did you ever ask them specifically to only
19   respond to your letter in writing?
20   A   No, I assumed they would respond in writing.
21   Q   Why did you assume?
22   A   I just -- That's what I assumed.
23   Q   And if they had called you on your cell phone,
24   would you have been okay with that?
25   A   I would have answered the call, yes.

Page 209

1   Q   And you would have been happy with that;
2   correct?
3       MR. RODAL:  Objection.
4   BY MR. HERBERT:
5   Q   You can answer.
6   A   I would have been okay with the Consumer
7   Financial Protection Board calling me.
8   Q   Who, from the Consumer Financial Protection
9   Bureau, would you have been okay with calling you on
10   your cell phone?
11       MR. RODAL:  Objection.
12       THE WITNESS:  A person of knowledge from the
13   Consumer Financial Protection Board.
14   BY MR. HERBERT:
15   Q   A person of knowledge of what?
16   A   With this issue of the problem with Bayview
17   Loan Servicing.
18   Q   Well, it says a little bit further down in this
19   letter, that "I would like to file a complaint against:"
20   And then you have Bayview Loan Servicing and their
21   contact information.
22       Do you see that?
23   A   Yes.
24   Q   So, the way that I would read that, and you can
25   tell me if I'm wrong, I would read that -- Strike that.

14 (Pages 206 - 209)

Page 210

1    So, would you have been okay with anybody from
2  the Consumer Financial Protection Bureau contacting you
3  on your cell phone who could assist you with filing a
4  complaint against Bayview?
5    A  I already filed a complaint.
6    Q  Well, you say here, "I would like to file a
7  complaint against: Bayview."
8    A  Right.
9    Q  Okay.  Do you know whether that, in and of
10  itself, is enough to file a complaint with the Consumer
11  Financial Protection Bureau?
12   A  I did.
13   Q  It what?
14   A  It did.
15   Q  It did; right?
16   A  Yes.
17   Q  And so, if the Consumer Financial Protection
18  Bureau needed more information from you, to pursue your
19  complaint against Bayview, you would have been okay with
20  somebody from the Consumer Financial Protection Bureau
21  calling you on your cell phone; right?
22   A  I would expect something in writing from the
23  Consumer --
24   Q  Why?
25   A  I just would expect something in writing.

Page 211

1    Q  Do you know how the Consumer Financial
2  Protection Bureau operates internally?
3    A  I do not.
4    Q  So then why would you have expected something
5  in writing?
6    A  I would just -- I would expect something in
7  writing.
8    Q  Okay.  But, if you received a phone call,
9  though, my question is whether or not you would have
10  been okay with that phone call?
11   A  I would answer the phone call and provide
12  information if they called me.
13   Q  So you would have been okay with them calling
14  you; correct?
15   A  Yes, I would have.
16      MR. HERBERT:  Okay.  We're going to go to the
17  next exhibit.
18      Mr. Court Reporter, this is a composite Exhibit
19  W, and it's got -- it starts with Lawrence RFP 510 on
20  the top, and goes -- the last page is 511.  So it's out
21  of order.
22      (Exhibit W was marked for identification and is
23  attached hereto.)
24  BY MR. HERBERT:
25   Q  Mr. Lawrence, I'd like you to look through

Page 212

1  these letters that have been marked as composite Exhibit
2  W.
3    Do you recognize these letters?
4    A  Yes.
5    Q  Okay.  What are they?
6    A  There was -- they -- Bayview did not correct
7  the accounting, therefore I just made my own statements.
8    Q  The first five letters, Bates-stamped 510, 509,
9  508, 520 and 519, do you see those?
10   A  Yes.
11   Q  At the bottom of each one of these pages
12  there's your signature; correct?
13   A  Yes.
14   Q  And then there's also your name, typed, with
15  your address and with your cell phone number; correct?
16   A  Yes.
17   Q  Why did you list your cell phone number on
18  these five letters?
19   A  There's no reason.
20   Q  There's no reason whatsoever?
21   A  None whatsoever.
22   Q  When did you file this lawsuit against Bayview?
23   A  I believe in August of 2014.
24   Q  Okay.  And you understood, or had knowledge of
25  the fact, that you were suing Bayview for making phone

Page 213

1  calls to your cellar telephone; correct?
2    A  Yes.
3    Q  And so the first letter here, that's
4  Bates-stamped Lawrence RFP 510, is dated 29th of
5  August 2014.
6    Do you see that?
7    A  Yes.
8      MR. HERBERT:  Hold on one second, please.
9    Q  Okay.  So this lawsuit was filed on
10  August 14th, 2014.  This letter is dated fifteen days
11  after that; correct?
12   A  Yes.
13   Q  Okay.  Knowing that you were suing Bayview for
14  calling your cell phone number, can you explain to me
15  why would you provide your cell phone number in a letter
16  that you sent to Bayview?
17   A  Like I say, there's no reason.  It's just part
18  of the letter.
19   Q  Did you want Bayview to continue calling you on
20  your cell phone?
21   A  No.
22      MR. RODAL:  Objection.
23  BY MR. HERBERT:
24   Q  You did not?
25   A  No.

15 (Pages 210 - 213)

Page 214

1   Q   And then, again, on October 1, 2014, you did it
2   again; right?
3   A   Yes.
4   Q   You sent another letter with your signature and
5   with your cell phone number to Bayview?
6   A   All I would do is change the date, change the
7   month, and -- it was just -- I didn't have a statement,
8   so it was a statement.
9   Q   I'm sorry?
10   A   I would just update it, like I said before.  It
11   was a template.
12   Q   So when was the first time you created this
13   template?
14   A   Well, it appears in August.
15   Q   After you filed the lawsuit against Bayview?
16   A   Well, there's no correlation.  I just did this
17   because the statements were incorrect.
18       There's no correlation between the lawsuit and
19   the timing of this statement.
20   Q   Did you want Bayview to contact you on your
21   cell phone?
22   A   No, I did not.
23   Q   And you sued them because of that, because you
24   didn't want them to; right?
25   A   Yes.

Page 215

1   Q   Did you continue to send them letters listing
2   your cell phone?
3   A   It just goes to -- I mean, I did not want them
4   to call me?
5   Q   So why did you do it?
6       MR. RODAL:  Objection.
7       THE WITNESS:  It's part of the template.
8   BY MR. HERBERT:
9   Q   When did you create this template for the first
10   time?
11   A   I don't recall.  I would assume the first --
12   first document.
13   Q   Which was August 29, 2014?
14   A   I don't recall.  This is the first one I have
15   here.
16   Q   Do you recall sending any other letters,
17   similar to this, attaching payments, before this
18   August 29, 2014, letter?
19   A   I don't.  I do not.
20   Q   So you sent five of these letters then, right,
21   right up through January 1 of 2015, where you list your
22   cell phone number?
23   A   Okay.
24   Q   Right?
25   A   Yes.

Page 216

1   Q   And then, if you look at the next document in
2   this composite exhibit, that's Bates-stamped Lawrence
3   RFP 518, and then at the seven letters after that, the
4   template changes; right?
5   A   I just put the note for counsel at the bottom
6   so, if they had any questions, to call them.
7       Is that -- That's what you're asking?
8   Q   Yes.
9   A   Yes.
10   Q   What prompted you to start putting that note at
11   the bottom of each letter that you sent to them?
12   A   I don't recall.  I just -- one day I just
13   looked at it and did it.
14   Q   Why?
15   A   I don't recall.  I figured -- I thought it
16   appropriate.
17   Q   Why?
18   A   If they wanted to contact somebody in this case
19   it would be appropriate for them to contact counsel.
20   Q   So you provided them with your counsel's
21   mailing and telephone -- mailing information and
22   telephone number; right?
23   A   Yes.
24   Q   Why did you continue to list your cell phone
25   number?

Page 217

1   A   Like I say, there's no reason for it.
2       MR. HERBERT:  Okay.  We're going to go to
3   Exhibit X.
4       (Exhibit X was marked for identification and is
5   attached hereto.)
6   BY MR. HERBERT:
7   Q   Do you recognize this letter?
8   A   It looks similar to the previous letter.  I
9   don't -- It looks similar to the previous letter.
10   Q   To the previous what?
11   A   Letter to the Consumer Financial Protection
12   Board.
13   Q   Is it the same letter or does it just look
14   similar?
15   A   It looks similar.  I don't recall the date of
16   the other letter.
17   Q   So it's another letter that you sent to the
18   CFPB?
19   A   It appears so.
20   Q   Did you ever receive any written correspondence
21   from the CFPB?
22   A   Yes.
23   Q   How many pieces of written correspondence?
24   A   I don't recall.
25   Q   More than three?

16 (Pages 214 - 217)

Page 218

1    A  I would say -- I don't know.  I know one came
2  back saying they'd started an investigation, that's all
3  I remember.
4    Q  Did you ever call the CFPB?
5    A  No.
6    Q  Did you ever receive a phone call from the
7  CFPB?
8    A  No.
9    Q  Are you aware of whether you ever received a
10  phone call from the CFPB that you just didn't answer?
11    A  I did not receive a phone call from the CFPB.
12    Q  How did you know?
13    A  Because I would know the phone call.
14    Q  Do you know what the CFPB's phone number is?
15    A  I mean, it's listed on this letter from -- I
16  think it's Oklahoma City.
17    Q  Is that the only cell phone -- or is that the
18  only telephone number that the CFPB has, to your
19  knowledge?
20    A  I would recognize -- I mean, I would recognize
21  a message or a phone call from the CFPB, I believe.
22    Q  How?
23    A  By the area code.
24    Q  By the 855 area code?
25    A  I'm quite certain I did not receive a call from

Page 219

1  the CFPB.
2    Q  You don't know for sure, though; right?
3    A  I would say a high degree of probability.
4    Q  Do you know whether the only phone numbers that
5  the CFPB has start with 855?
6      MR. RODAL:  Objection.
7      THE WITNESS:  I don't know the numbers for the
8  CFPB.
9  BY MR. HERBERT:
10    Q  So then you wouldn't recognize -- or you can't
11  really testify that you'd recognize any phone call that
12  you received from the CFPB; correct?
13    A  I would.  Number one, they would leave a
14  message if I didn't --
15    Q  How do you know that?
16    A  I would assume they would leave a message if
17  they were calling.  And number two --
18    Q  But you don't know -- I'm sorry.
19      Go ahead, sir.
20    A  And then, you would just know the phone number
21  that came up on your telephone.
22    Q  Would it say on your telephone "This is the
23  CFPB calling"?
24    A  No, but you just -- generally, I'll research it
25  and find out, if I have time.

Page 220

1      And I do not receive -- I'm on the Federal Do
2  Not Call List, so I do not receive a large volume of
3  calls from people other than my contacts.  This would
4  stand out, is what I'm trying to say.
5      I'm quite certain I did not receive a call from
6  the CFPB.
7    Q  If you had received a call from the CFPB in
8  response to this letter, would you have been okay with
9  that?
10      MR. RODAL:  Objection.
11  BY MR. HERBERT:
12    Q  You can answer.
13    A  With somebody of knowledge, who could deal with
14  this issue, I would be comfortable with.
15    Q  If somebody with knowledge called you, you
16  would be comfortable with that, is that what you said?
17    A  I would.
18    Q  And by that you mean somebody that could assist
19  you with your inquiry or complaint; correct?
20    A  Yes, somebody with knowledge of this complaint.
21    Q  What does it mean to you to be a person with
22  knowledge?
23    A  A person who could deal -- or has the
24  responsibility of dealing with the issue at hand.
25    Q  And by dealing with the issue at hand, what do

Page 221

1  you mean?
2    A  In this case, the complaint against Bayview
3  Loan Servicing.
4    Q  You sent in a lot of letters to Bayview; right?
5    A  I sent in several letters to Bayview, yes.
6    Q  Well, several -- at least twenty letters;
7  right?
8    A  I don't recall the number.
9    Q  And today, and the last time we were together,
10  when I asked you whether or not you would be okay with
11  somebody calling you in response to your letters on your
12  cell phone, you've consistently said that you would be
13  okay if a person with knowledge called you; correct?
14    A  I believe a person with knowledge of the issue,
15  to solve the issue, that's correct.
16    Q  And so, just so we don't have to keep coming
17  back to this -- Strike that.
18      All right.  We're going to go to Exhibit Y.
19      (Exhibit Y was marked for identification and is
20  attached hereto.)
21  BY MR. HERBERT:
22    Q  Did you write this document, Mr. Lawrence?
23    A  It appears so.
24    Q  Do you have any reason to believe that you did
25  not write this document?

17 (Pages 218 - 221)

Page 222

1    A  No.
2    Q  So then the answer to my question is yes, you
3  wrote this document; right?
4    A  I don't recall the document, but it is -- it's
5  got my signature on it.
6    Q  You don't recall preparing this document?
7    A  No.
8        MR. HERBERT:  We're going to go to Exhibit Z.
9        (Exhibit Z was marked for identification and is
10  attached hereto.)
11  BY MR. HERBERT:
12    Q  Did you write this document?
13    A  It appears so.
14        MR. HERBERT:  We're going to go to Exhibit AA.
15        (Exhibit AA was marked for identification and
16  is attached hereto.)
17  BY MR. HERBERT:
18    Q  Do you recognize this document?
19    A  It appears to be from me.
20    Q  Do you recall writing it?
21    A  I do not.
22    Q  Do you recall a time when you sent a letter to
23  the Florida Attorney General's Office, the Florida
24  Office of Financial Regulation and to the Florida
25  Department of Financial Services?

Page 223

1    A  I do.
2    Q  Do you know who Kimberly D'Amico is?
3    A  I believe she's with the Florida Attorney
4  General's Office.
5    Q  Did you ever speak with her on the phone?
6    A  I don't recall.
7    Q  Do you remember why you sent this letter to all
8  three, the AG's office, the Office of Financial
9  Regulation and the Department of Financial Services?
10    A  I believe it's from her direction.
11    Q  When you said that Bayview Loan Servicing needs
12  to be investigated, what did you mean?
13    A  I believe their actions were intentional.
14    Q  And what was your intent of writing this
15  letter?
16    A  To get them investigated.
17    Q  Because you were angry with them?
18    A  I believe their actions are intentional.
19    Q  Were you angry with them?
20    A  Angry is --
21        MR. RODAL:  Objection.
22        THE WITNESS:  I believe their actions are
23  intentional and therefore they need to be investigated.
24  I believe that to this day.
25  BY MR. HERBERT:

Page 224

1    Q  Well, I asked you if you were angry with
2  Bayview, so I think that's really a "yes," "no" or "I
3  don't know" question.
4        So, were you angry with Bayview when you wrote
5  this letter?
6    A  I try not to use the word "angry."
7        It -- Yeah, I believe they needed to be
8  investigated.
9    Q  So is your answer "I don't know"?
10    A  I don't believe "angry" is the right word.  I
11  don't know.
12    Q  So your answer is no?
13    A  "No."
14    Q  Do you know what the right word is?
15    A  I believe they should be investigated.  I think
16  it's a factual -- you know, I just believe they should
17  be investigated.
18    Q  Do you have any feeling that you feel that you
19  can associate with Bayview?  Angry, sad, mad,
20  frustrated, anything?
21    A  They -- the emotion -- I don't know the right
22  word.  It's hurtful.
23    Q  Why do you feel hurt?
24    A  The ability to pay your mortgage properly and
25  have a company able to foreclose or nearly foreclose

Page 225

1  or attempt to foreclose on your home.
2    Q  Did Bayview ever file a foreclosure complaint
3  against you?
4    A  They filed an acceleration notice against my --
5    Q  They filed it with who?
6    A  They gave it to me.  I received an acceleration
7  notice.
8    Q  So they sent you a Notice of Acceleration;
9  correct?
10    A  Yes.
11    Q  Is that the only thing that you can think of
12  that would support your statement you just made, that
13  they attempted to foreclose on you?
14    A  I look at that as an attempt to foreclose on my
15  loan.
16    Q  Let me ask you this.  Have you made every
17  payment, monthly mortgage payment, on time?
18    A  Yes.
19        MR. RODAL:  Objection.
20  BY MR. HERBERT:
21    Q  You have?  Every payment?
22    A  Yes.
23    Q  Since Bayview started servicing this loan?
24    A  Yes.
25    Q  Is it your testimony that you've never made a

18 (Pages 222 - 225)

Page 226

1 late payment?
2     A  Yes.
3     Q  And you're under oath.
4     A  Yes.
5     Q  You understand that?
6     A  Yes.
7     Q  Have you made every payment by the 1st of the
8  month?
9     A  I'd say yes, you know, plus or minus maybe a
10  day.  But I believe, every month, it's like clockwork, I
11  make a loan payment, I make the check.
12        The only issue would be, say, the first of the
13  year, when the 1st is a holiday.  Generally, I will
14  either pay it early or put it in the Post Office on the
15  1st, even though I realize it wouldn't go out until the
16  2nd.
17     Q  Do you know when your monthly mortgage payment
18  is due?
19     A  I just pay it on the 1st.  I know it is -- the
20  17th is when there's a fee associated with the mortgage,
21  so I assume paying it on the 1st is plenty of time
22  before the 17th.
23     Q  Have you ever read the promissory note which
24  governs your loan?
25     A  I've scanned through it.  I haven't done more

Page 227

1  than that.
2     Q  Have you read the deed of trust that governs
3  your loan?
4     A  I have not.
5        MR. RODAL:  Objection.
6        THE WITNESS:  Or I might have read it.  I mean,
7  I can't recall what it says.
8        MR. HERBERT:  Okay.  We're going to look at --
9  actually, I want you to stay on Exhibit AA for a second.
10     Q  You include your cell phone number on this
11  letter; right?
12     A  Yes.
13     Q  Did you ever receive a call on your cell phone
14  from the Florida Attorney General's Office?
15     A  I do not believe so.
16     Q  How about the Florida Office of Financial
17  Regulation?
18     A  I do not believe so.
19     Q  How about Florida Department of Financial
20  Services, Division of Consumer Services?
21     A  I do not believe so.
22     Q  Would it have been unreasonable for any of
23  those to call you on your cell phone?
24        MR. RODAL:  Objection.
25  BY MR. HERBERT:

Page 228

1     Q  You can answer.
2     A  A person of knowledge, I would have accepted a
3  phone call.
4     Q  So somebody that was responding to your letter,
5  you would have been okay if they had called you on your
6  cell phone?
7     A  A person with knowledge, yes.
8     Q  Well, but what if -- If somebody's going to
9  respond to your letter, they would have knowledge of
10  your letter; correct?
11     A  That's correct.
12     Q  Okay.  So then, if somebody called you from one
13  of those divisions, or offices, in response to your
14  letter, you would have been okay with that?
15     A  That's correct, a person of knowledge from one
16  of those departments.
17        MR. HERBERT:  Mr. Court Reporter, I'm going to
18  have you read that question back, because I believe
19  that's a "yes," "No" or "I don't know" answer.
20        And, Mr. Lawrence, I would like you to answer
21  accordingly, without qualifying your answer.
22        (Record read.)
23        THE WITNESS:  The answer is, as long as the
24  somebody has knowledge.  And you've assumed -- you've
25  told me to assume that a person would have knowledge so,

Page 229

1  with that assumption, yes.
2  BY MR. HERBERT:
3     Q  No, you are mischaracterizing what I asked you.
4        I asked you, if somebody responded to your
5  letter, from one of those offices, by calling you on
6  your cell phone, would you have been okay with that?
7        MR. RODAL:  Objection.
8        THE WITNESS:  Not just somebody, so the answer
9  is no.  It would be somebody with knowledge.
10  BY MR. HERBERT:
11     Q  Well, you previously testified that if somebody
12  was calling you in response to the letter that you sent,
13  they would have knowledge or they would be aware of the
14  letter that you sent to them; correct?
15     A  That's correct.
16     Q  So then, if somebody from one of those offices
17  called you on your cell phone in response to your letter
18  you would have been okay with that?
19     A  Well, I just don't want this to be taken out of
20  context.  So, as long as we assume that that somebody
21  has knowledge, so -- But you won't put that in your
22  question.
23     Q  Okay.  You tell me then.  Who would be a person
24  with knowledge from one of these three organizations
25  that you wrote this letter to?

19 (Pages 226 - 229)

Page 230

1    MR. RODAL: Objection.
2    THE WITNESS: A person --
3 BY MR. HERBERT:
4    Q  It's your term, not mine, so you tell me who
5 you believe a person of knowledge would be.
6    A  It would be somebody from the complaint
7 department at the Attorney General's Office.
8    Q  So only somebody from the complaint department
9 from the Attorney General's Office would have your
10 consent to call your cell phone?
11   A  The point is, not somebody from the collections
12 department from the Florida Attorney General's Office.
13   Q  Would you have been okay if a secretary from
14 the complaint department, assuming one exists, within
15 the Attorney General's Office called you on your cell
16 phone?
17   A  No.
18   Q  Why?
19   A  Because she can't solve the problem. It's not
20 an appropriate call.
21   Q  So then you want who? The Attorney General
22 himself?
23   A  No, somebody who has knowledge. Somebody who
24 deals with the problem. The secretary doesn't deal with
25 the problem.

Page 231

1    Q  How do you know that?
2    A  Because she's the secretary.
3    Q  So you know the secretary's job description at
4 the Florida Attorney General's Office?
5    MR. RODAL: Objection.
6 BY MR. HERBERT:
7    Q  Is that correct?
8    MR. RODAL: Objection.
9    THE WITNESS: The point is somebody of
10 knowledge. If she's the one who solves the problem, if
11 that's what you're saying, the secretary, she's the
12 person of knowledge. We're just getting into a title
13 discussion here.
14    If she's the person who solves the problem,
15 she's the person of knowledge in my description.
16 BY MR. HERBERT:
17   Q  So, again, if somebody can help you solve your
18 problem, you believe they have knowledge; correct?
19   A  That would be the person of knowledge, yes.
20   Q  Would you agree with me that it's possible, or
21 even likely, that there is more than one person, really,
22 in any organization, that can resolve a problem, not
23 just one?
24    MR. RODAL: Objection.
25    THE WITNESS: Yes.

Page 232

1    MR. HERBERT: We're going to take a look at
2 Exhibit BB.
3    (Exhibit BB was marked for identification and
4 is attached hereto.)
5 BY MR. HERBERT:
6    Q  Do you recognize this letter, Mr. Lawrence?
7    A  I wrote this letter.
8    Q  Why did you write this letter?
9    A  It's to the Nevada Attorney General, because I
10 believe -- this is in May of 2014 -- I believe Bayview
11 is committing fraud.
12   Q  What kind of fraud?
13   A  I believe they used an insurance problem and
14 then refused to correct the accounting problem from that
15 issue for financial gain.
16   Q  How did they financially gain from what you
17 believe they did or have done?
18   A  Number one, would be a force-placed insurance
19 attempt, fees, and the purchase of my note, I believe,
20 after this.
21   Q  Do you believe that they made money on
22 purchasing your note?
23   A  I do.
24   Q  How?
25    MR. RODAL: Objection.

Page 233

1    THE WITNESS: They purchased the note, I
2 believe, one month prior to this letter. And I believe
3 they purchased the note inexpensively.
4 BY MR. HERBERT:
5    Q  And that constitutes fraud?
6    A  Yes.
7    MR. RODAL: Objection.
8 BY MR. HERBERT:
9    Q  How does that constitute fraud?
10   A  I believe they intentionally refused to correct
11 the accounting.
12   Q  Why did you include your cell phone number on
13 this letter to the Nevada Attorney General?
14   A  It's part of the letterhead. And I would be --
15    It's part of the letterhead.
16   Q  This letterhead, do you remember the first time
17 that you created this letterhead?
18   A  I do not.
19   Q  Do you know how long you've had it for?
20   A  I just have a generic Word document.
21   Q  Who created the letterhead?
22   A  It's a Word document. It's -- I mean, it's
23 been created by me.
24   Q  So the first time that you created this you
25 intentionally put your name, your mailing address, your

20 (Pages 230 - 233)

Page 234

1 cell phone number and your e-mail address on the
2 letterhead; correct?
3    A  It changes all the time.  It's not a specific
4 letterhead.  It's just a letter, and then I just copy
5 the letter and then save it as another document.
6    Q  But you would agree with me, though, that
7 whatever the first letter was that you wrote this on,
8 you were the one that typed that information into the
9 Word document; right?
10    A  Yes.
11    Q  Why did you include all of that information?
12    A  I just put it up there.  As far as letterhead,
13 that's just what I did.
14    Q  Do you use that letterhead to send letters in
15 other matters that are unrelated to your loan?
16    A  Yes.
17    Q  Like what kind of letters do you write?
18    A  I don't write -- to be honest with you, I don't
19 write that many letters.
20    Q  When is the last time you've written a letter
21 that was unrelated to this loan?
22       MR. RODAL:  Objection.
23       THE WITNESS:  I don't recall.
24 BY MR. HERBERT:
25    Q  Within the last six months?

Page 235

1    A  No, I don't recall in the last six months.
2    Q  Have you ever written a letter to anybody,
3 regarding this loan, where you have changed any of the
4 information in that letterhead or in that template?
5    A  Like I said, I'll delete it to make it fit one
6 page.  I typically try to fit it on one page, so --
7    Q  So, what kinds of information do you delete?
8    A  Generally, the phone number and the e-mail
9 address will go quickly, just to make it fit on the
10 page.
11    Q  Have you ever put a different phone number in
12 that letterhead, other than your cell phone?
13    A  I don't recall.  The only phone number I have
14 is my cell phone number.
15    Q  So, as you sit there today, under oath, it's
16 your testimony that you don't recall whether you've ever
17 put a different cell phone -- or put a different
18 telephone number in that letterhead; correct?
19    A  I would say, you know, it's the only phone
20 number I have.  Previously, perhaps.  I had a landline
21 five years ago, I believe, so perhaps that number would
22 be --
23    Q  So, when you first created that letterhead, why
24 did you include your phone number in it?
25    A  Like I said, I just did.  I don't -- There was

Page 236

1 no intent, I just did it.
2    Q  You weren't thinking?
3    A  I just did it.  I don't know why.
4    Q  Do you think it's unreasonable, if somebody
5 receives a letter from you with contact information, for
6 them to use that contact information to contact you?
7       MR. RODAL:  Objection.
8 BY MR. HERBERT:
9    Q  You can answer.
10    A  No, I don't -- I believe it would be -- the
11 more I think about it, the more I should not -- You
12 know, I believe it would be appropriate if I put the
13 number there.
14    Q  Thank you.
15       All right.  So you're suing my client in this
16 case.  As you sit there today, do you know what you are
17 asking my client for, or what you're seeking in terms of
18 damages?
19    A  I -- Not specifically.
20    Q  What do you want to get out of this lawsuit?
21       MR. RODAL:  Objection.
22 BY MR. HERBERT:
23    Q  You can answer.
24    A  I would like Bayview to be held accountable.
25    Q  How?

Page 237

1    A  In any -- I just believe they should be held
2 accountable.
3    Q  You want money from Bayview; right?
4    A  Their -- If that's appropriate.  I believe, you
5 know, if they broke the law, then they should be held
6 accountable.
7    Q  So you personally want to recover money from
8 Bayview in this lawsuit; right?
9    A  That's part of this lawsuit.
10    Q  So yes?
11    A  Yes.
12    Q  How much money are you looking to recover?
13    A  I do not know.
14    Q  Do you have any idea?
15    A  I believe there's 300 calls.
16    Q  And how much do you think you're entitled to
17 for each one of those calls?
18       MR. RODAL:  Objection.
19       THE WITNESS:  I do not know.
20 BY MR. HERBERT:
21    Q  Do you know how much if TCPA allows you to
22 recover for each phone call?
23    A  I believe it varies between $500 per call and
24 $1500 per call.
25    Q  And you know how much you are seeking per call

21 (Pages 234 - 237)

1 in this case?

2    A  I don't know the exact number of calls.  I

3 would -- I don't know.

4    Q  No.  But per call, are you seeking 500 or 1500

5 per call?

6    A  I don't know.  I do not know.

7    Q  You don't know?

8    A  Well, it depends if the calls were intentional.

9    Q  You know what the statute says; right?

10    A  It's between 500 and 1500, depending if it's

11 intentional.

12    Q  And do you believe that the phone calls made by

13 my client to you were intentional?

14    A  I do.

15    Q  Why?

16    A  Because it was a collection-call event.  All of

17 these calls were, I believe, done by people without

18 knowledge, and the intent was to collect, or make

19 collect calls for a loan that was not delinquent.

20       All of these calls are -- as far as -- these

21 calls were made -- these were collect calls.

22    Q  They were collect calls?

23    A  Yes.

24    Q  Or collection calls?

25    A  Collection calls.  I'm sorry.

1    Q  And do you believe that those collection calls

2 were inappropriate?

3    A  Yes.  They were made by people who had no

4 knowledge of the event I'm trying to solve.  They were

5 just trying to make collection calls.

6       I actually received a call that was from

7 somebody asking me to make a mortgage payment when it

8 wasn't even late.  I don't know why they were calling.

9    Q  Because it's your testimony that you've never

10 made a late payment on your mortgage; right?

11    A  That's correct.

12    Q  Ever?

13    A  No, not with Bayview.  Bayview -- Every payment

14 with Bayview has been on time.

15    Q  And so you think that Bayview intentionally

16 called you hundreds of times; right?

17       MR. RODAL:  Objection.

18       THE WITNESS:  I believe they called me hundreds

19 of times.

20 BY MR. HERBERT:

21    Q  Intentionally; right?

22    A  Well, I don't know how you would call

23 otherwise.

24       I don't know what you mean.

25    Q  What else are you looking for in this lawsuit?

1    A  I don't understand.

2    Q  Well, are you seeking anything else, than

3 money, from this lawsuit?

4    A  I believe Bayview should be held accountable,

5 so --

6    Q  By paying you and your lawyer; right?

7    A  In a court of law or a -- in front of a jury of

8 peers.

9    Q  Right.

10    A  For the whole world to see.

11    Q  By paying you money; right?

12    A  Well, I'd like it to be documented that Bayview

13 behaved in this manner.

14    Q  So then it's an ethical or a moral issue for

15 you then; right?

16    A  I believe there's a moral and ethical

17 component, yes.

18    Q  So then it would make you happy if there was a

19 judgment against Bayview saying that what they did here

20 was wrong; correct?

21    A  Bayview would be held accountable, that's my

22 point.

23    Q  But how would they be held accountable?

24    A  Because a jury of peers would say that they

25 behaved improperly.

1    Q  And they would do that by paying you money;

2 right?

3    A  Well, in a written document that says Bayview

4 behaved improperly.

5    Q  And "Mr. Lawrence is entitled to a bunch of

6 money"; right?

7    A  That's -- That's part of a lawsuit.

8       MR. HERBERT:  I don't think I have any further

9 questions at this point.

10       Mr. Rodal, do you have any questions?

11       MR. RODAL:  One second here.

12       I have nothing further.

13       We'll read.

14

15       (TIME NOTED 11:48 a.m.)

16

17

18

19

20

21

22

23

24

25

Page 242

```
 1
 2          Penalty of Perjury
 3
 4
 5
 6
 7
 8
 9      I, ROBERT M. LAWRENCE, do hereby declare under
10  penalty of perjury that I have read the foregoing
11  transcript; that I have made any corrections as appear
12  noted, in ink, initialed by me, or attached hereto; that
13  my testimony as contained herein, as corrected,
14  is true and correct.
15          EXECUTED THIS_____day of _____,
16  2015, at _____, _____.
17      (City)      (State)
18
19
20          ------------------
21          ROBERT M. LAWRENCE
22
23
24
25
```

Page 243

```
 1      I, the undersigned, a Certified Shorthand
 2  Reporter of the State of California, do hereby certify:
 3          That the foregoing proceedings were taken
 4  before me at the time and place herein set forth; that
 5  any witnesses in the foregoing proceedings, prior to
 6  testifying, were administered an oath; that a record of
 7  the proceedings was made by me using machine shorthand
 8  which was thereafter transcribed under my direction;
 9  that the foregoing transcript is a true record of the
10  testimony given.
11          Further, that if the foregoing pertains to the
12  original transcript of a deposition in a Federal Case,
13  before completion of the proceedings, review of the
14  transcript [x] was [ ] was not requested.
15          I further certify I am neither financially
16  interested in the action nor a relative or employee of
17  any attorney or any party to this action.
18          IN WITNESS WHEREOF, I have this date
19  subscribed my name.
20
21  Dated:
22
23
24          LARRY BOSTOW
25          CSR No. 5941
```

[000734 - answer]                                                      Page 244

**0**

000734   160:11
171:24
000774   160:13
189:16
000782   160:9 169:14
000791   160:22
000798   160:17
022   160:15
0508   160:19
0523   161:7
0526   160:24
0539   161:2
0540   161:5

**1**

1   162:14 214:1
215:21
1/13/14   160:13
100   182:24 183:2
11:48   158:17 241:15
14   157:4 158:4
14th   213:10
1500   237:24 238:4,10
157   157:25
162   160:6
169   160:9
172   160:10
17th   226:20,22
189   160:12
196   160:14
1st   226:7,13,15,19,21

**2**

2   157:17 158:14
160:3
2/26/14   160:9
2011   166:4 200:12
201:22,24 202:25
2012   166:24 168:2
2013   167:1 168:6
172:19
2014   167:3 168:8
212:23 213:5,10
214:1 215:13,18

232:10
2015   157:16 158:18
162:1 215:21 242:16
206   160:16
211   160:18
2150   159:5
2154887   157:23
217   160:21
22   203:23
221   160:23
222   161:1,3
22991   157:4 158:4
232   161:6
243   157:25
25th   159:10
27   205:4,8
29   215:13,18
29th   213:4
2nd   159:5 226:16

**3**

3/10/14   160:11,17,24
30   178:17 200:25
300   158:16 237:15
305.374.5600   159:11
3295   164:20
33131-1714   159:10
33316-3432   159:5
36.7   203:23

**4**

4/4/14   160:22 161:2,5
45   205:4

**5**

5/17/11   160:15
5/5/14   161:7
500   237:23 238:4,10
508   212:9
509   212:8
510   211:19 212:8
213:4
511   211:20
518   216:3
519   212:9

520   160:20 212:9
5941   157:22 158:19
243:25

**6**

60   178:17 200:24
202:4,11,13 203:11
203:21,22

**8**

855   218:24 219:5

**9**

9   157:16 158:18
162:1
951   158:15
954.523.4357   159:6
9:31   158:17 162:2

**a**

a.m.   158:17,17 162:2
241:15
aa   161:3 222:14,15
227:9
ability   163:3,7,15
186:15 224:24
able   224:25
acceleration   225:4,6
225:8
accept   188:23 189:1
acceptable   173:16
175:8
accepted   193:13,20
193:25 228:2
account   190:2
accountable   236:24
237:2,6 240:4,21,23
accounting   173:22
174:2,5,9,10,12,18
184:22 185:15,18,21
190:1,15,17,19,22,24
191:2,6 193:9 194:25
195:1 207:5,8 212:7
232:14 233:11
accurate   195:6
acknowledgment
203:9

acted   206:7
acting   202:17
action   243:16,17
actions   223:13,18,22
address   172:23
173:13 187:6,6,19,19
188:13,13,15,15
196:13,17 197:18,19
198:2,11 199:25
200:3 212:15 233:25
234:1 235:9
addressed   171:10
175:3 194:1
administered   162:5
243:6
affect   163:3,7,15
afternoon   162:10,11
ag's   223:8
ago   235:21
agree   164:15,18
165:13 170:23 175:1
185:12 186:13
188:17 193:24
231:20 234:6
ahead   219:19
akerman   159:9
akerman.com   159:11
alcoholic   163:11
allege   181:22
allowable   168:13,22
allows   237:21
amount   167:4 178:15
analogy   202:8 203:7
203:13,15,16
andrews   159:5
angry   223:17,19,20
224:1,4,6,10,19
annoy   203:17
annoyed   200:18
203:1
answer   163:8 169:2
176:8,12,13,15
177:10 178:9,12
179:10,13 180:2,10
180:15 186:19

[answer - board]                                                                                                Page 245

188:22 193:19 199:7
207:18,24 209:5
211:11 218:10
220:12 222:2 224:9
224:12 228:1,19,20
228:21,23 229:8
236:9,23
**answered** 190:8
208:25
**anybody** 171:13
175:2 179:4 185:3,8
189:1 193:25 196:3
210:1 235:2
**appear** 169:25 170:3
171:11 242:11
**appearance** 159:4,9
**appearances** 159:1
**appeared** 190:15
207:3
**appears** 170:55
171:6 173:6 196:20
201:24 214:14
217:19 221:23
222:13,19
**appropriate** 216:16
216:19 230:20
236:12 237:4
**area** 182:2 218:23,24
**argument** 184:15
**asked** 167:17 186:23
194:8 221:10 224:1
229:3,4
**asking** 163:1,8,9
216:7 236:17 239:7
**assist** 185:14,15,18
185:21 186:15 189:7
195:17 210:3 220:18
**assistant** 194:7
**assisted** 192:17 194:1
**associate** 224:19
**associated** 190:2
226:20
**assume** 173:19,21,25
174:8,9,16 177:8
190:21 208:21

215:11 219:16
226:21 228:25
229:20
**assumed** 188:3,6,9
208:20,22 228:24
**assuming** 230:14
**assumption** 229:1
**at&t** 164:6,7,11,11
164:15,21 165:14,15
167:5,8,10,25 168:1
**attached** 169:18
172:5 189:18 196:8
206:15 211:23 217:5
221:20 222:10,16
232:4 242:12
**attaching** 215:17
**attempt** 205:19 225:1
225:14 232:19
**attempted** 225:13
**attempting** 194:15
**attorney** 161:3,7
222:23 223:3 227:14
230:7,9,12,15,21
231:4 232:9 233:13
243:17
**audible** 182:5
**august** 212:23 213:5
213:10 214:14
215:13,18
**avenue** 159:5,10
**aware** 218:9 229:13

**b**

**back** 169:5,12 175:10
176:3 183:21,25
184:9,14 185:4 188:6
189:14 190:2 192:22
201:22,24 202:25
204:12 218:2 221:17
228:18
**background** 182:3,5
182:9
**backtrack** 166:16
**ballpark** 177:15

**based** 188:8
**basically** 202:20
**basis** 165:7,15 179:1
179:8,14
**bates** 160:9,11,13,15
160:17,19,22,24
161:2,5,7 169:14
171:24 189:16 212:8
213:4 216:2
**bayview** 157:10
158:9 160:9,9,11,11
160:13,13,17,19,22
162:17 164:16,21
169:14 170:14,15,21
170:24 171:2,5,10,12
171:14,24 173:17
174:13,24 175:2,7
176:7,8,11,14,25
177:11,14,20,21
178:1,3,7,16,21
179:10,13,17,23
180:4,7,14,20,21
181:5,6 182:10
183:22 184:5,18
185:3,3,9,22 186:22
187:9,13 189:1,16
190:6,20,22,25 191:2
191:7 192:2,17
193:25 194:4 195:17
200:16,19 202:8,16
202:21 203:1 204:23
205:9,12,14 206:4,7
206:22,23 207:3,10
207:15 209:16,20
210:4,7,19 212:6,22
212:25 213:13,16,19
214:5,15,20 221:2,4
221:5 223:11 224:2,4
224:19 225:2,23
232:10 236:24 237:3
237:8 239:13,13,14
239:15 240:4,12,19
240:21 241:3
**bayview's** 174:5
194:16,21 195:5

200:22 201:23,25
**bb** 161:6 232:2,3
**beck** 160:13 189:23
189:24 190:4,7,10,11
191:4,6,10,19 192:7
192:15,19,20 193:7
193:11,14,21 194:2,3
194:5,6 195:7,21,22
195:24 196:2 207:7
**began** 164:16,22
**beginning** 158:16
**begins** 194:10
**behalf** 158:15
**behaved** 240:13,25
241:4
**behavior** 200:22
201:1,6,7,11,18,25
202:22,23 203:4
**believe** 165:2 167:11
172:16,19 174:3
178:17 181:1,2 184:1
184:11 192:13 200:4
201:11 204:8 207:10
207:12,13,19,23
212:23 218:21
221:14,24 223:3,10
223:13,18,22,24
224:7,10,15,16
226:10 227:15,18,21
228:18 230:5 231:18
232:10,10,13,17,19
232:21 233:2,2,10
235:21 236:10,12
237:1,4,15,23 238:12
238:17 239:1,18
240:4,16
**believed** 201:23
**best** 176:4,7 179:21
**better** 180:20
**beverages** 163:11
**billing** 167:11 168:18
**billings** 167:12
**bit** 209:18
**board** 209:7,13
217:12

[bostow - consumer]

**bostow**  157:21
  158:18 243:24
**bottom**  212:11 216:5
  216:11
**boulevard**  158:16
**break**  189:11 203:22
**breaking**  178:23
**brendan**  159:9
  162:13
**brendan.herbert**
  159:11
**broke**  237:5
**bunch**  241:5
**bureau**  160:17,22,24
  161:1 206:20 208:7
  208:10,13 209:9
  210:2,11,18,20 211:2
**business**  204:2
  207:22

**c**

**california**  157:15
  158:16 162:1 243:2
**call**  165:4 167:25
  176:3,6,8 177:11,14
  181:7,22 182:10,10
  182:14 183:4,6,12,21
  183:24 184:6 185:24
  186:1 187:13 188:23
  189:1,4 191:22
  193:13,20,25 194:3,8
  198:6,22,24 199:18
  203:20 204:12
  205:15 208:13,25
  211:8,10,11 215:4
  216:6 218:4,6,10,11
  218:13,21,25 219:11
  220:2,5,7 227:13,23
  228:3 230:10,20
  237:22,23,24,25
  238:4,5,16 239:6,22
**called**  168:1 173:13
  176:18 177:1 178:5
  183:22 185:3,22
  190:6 192:20 195:17

**200:24 202:4 208:23**
  211:12 220:15
  221:13 228:5,12
  229:17 230:15
  239:16,18
**calling**  173:11 175:3
  184:17 193:15
  202:24 204:9 209:7,9
  210:21 211:13
  213:14,19 219:17,23
  221:11 229:5,12
  239:8
**calls**  165:2 168:22
  176:11,16,17 177:3,5
  177:18,20,21,22,23
  177:25 178:4,10,12
  178:13,15,18,21,25
  179:10,12,13 181:25
  183:1,1 184:1 186:25
  187:9 200:20 201:8
  201:14 202:5,11,14
  203:11,21,22,23
  204:16 205:4,5,8,12
  213:1 220:3 237:15
  237:17 238:2,8,12,17
  238:19,20,21,21,22
  238:24,25 239:1,5
**care**  185:22 195:8
**case**  157:4 158:4
  162:15 176:22
  184:22 185:23 186:5
  186:20,22 193:10
  196:23 198:12,21
  200:8,10 216:18
  221:2 236:16 238:1
  243:12
**catherine**  161:6
**cause**  205:20
**cell**  168:23 172:25
  173:2,4 176:12,25
  177:4 183:19 188:19
  189:2 193:3,5,12,16
  196:15,21 197:18
  198:2,11 204:21
  208:3,23 209:10

**210:3,21 212:15,17**
  213:14,15,20 214:5
  214:21 215:2,22
  216:24 218:17
  221:12 227:10,13,23
  228:6 229:6,17
  230:10,15 233:12
  234:1 235:12,14,17
**cellar**  164:4,12,16,20
  165:16 213:1
**certain**  165:3,4 166:7
  168:18 178:6 183:11
  184:3,12 218:25
  220:5
**certified**  158:18
  243:1
**certify**  243:2,15
**cfpb**  217:18,21 218:4
  218:7,10,11,18,21
  219:1,5,8,12,23
  220:6,7
**cfpb's**  218:14
**change**  167:8,8,10
  214:6,6
**changed**  166:4,13,20
  167:11 235:3
**changes**  167:5 216:4
  234:3
**charge**  165:5
**check**  169:10 202:5
  205:11 226:11
**checked**  166:17
**chezky**  159:6
**childhood**  203:7
**circumstances**
  198:10,24
**city**  218:16 242:17
**clarify**  164:11 185:20
**clear**  169:16
**client**  162:17 168:23
  236:15,17 238:13
**clockwork**  226:10
**code**  218:23,24
**collect**  238:18,19,21
  238:22

**collection**  176:16
  201:8,14 202:5
  203:11,21 238:16,24
  238:25 239:1,5
**collections**  230:11
**combined**  207:9
**come**  169:9,16 190:4
  198:7 205:12
**comfortable**  220:14
  220:16
**coming**  182:2 221:16
**comment**  171:17,19
**commission**  160:15
  196:20
**committing**  232:11
**communication**
  188:10
**communications**
  192:1
**company**  199:11,11
  202:24 224:25
**competent**  174:17
**complaint**  209:19
  210:4,5,7,10,19
  220:19,20 221:2
  225:2 230:6,8,14
**completion**  243:13
**component**  240:17
**composite**  211:18
  212:1 216:2
**computer**  190:16
  197:10,13
**concerned**  176:23
**conduct**  188:8
**connected**  190:7
**consent**  230:10
**consenting**  193:15
**considerations**
  198:14,17
**consistent**  166:10
**consistently**  221:12
**constitute**  233:9
**constitutes**  233:5
**consumer**  160:16,21
  160:23 161:1 206:20

[consumer - drive]                                                                      Page 247

208:7,9,12 209:6,8
209:13 210:2,10,17
210:20,23 211:1
217:11 227:20
**contact** 173:7,9 186:4
186:22 188:14,18
192:11 193:12
199:15,17,20 209:21
214:20 216:18,19
236:5,6,6
**contacted** 186:14
**contacting** 200:5
210:2
**contacts** 220:3
**contained** 242:13
**context** 229:20
**continue** 213:19
215:1 216:24
**conversation** 191:23
**copy** 196:24 234:4
**corner** 170:3
**correct** 162:19,24
164:13,14 166:18,19
166:21,22 167:20
172:15,25 173:1,7
174:21 175:7 181:17
181:23,24 182:9
183:6,13 185:22
187:16,22 188:2,19
189:8 190:20,23
191:3,11,21 192:9
193:9 194:16 195:1
195:19 196:13 197:3
197:4,15 199:21
202:1,10,14 207:5,7
207:11,25 208:3
209:2 211:14 212:6
212:12,15 213:1,11
219:12 220:19
221:13,15 225:9
228:10,11,15 229:14
229:15 231:7,18
232:14 233:10 234:2
235:18 239:11
240:20 242:14

**corrected** 171:10,11
192:10 242:13
**correcting** 194:25
195:1
**correction** 187:10,11
**corrections** 242:11
**correctly** 194:19
**correlation** 214:16
214:18
**correspondence**
179:19,21 188:7
196:1 217:20,23
**cortez** 161:6
**counsel** 216:5,19
**counsel's** 216:20
**course** 188:8
**court** 157:1 158:1
169:4,8,10,13 171:23
175:9,21,23 184:8
189:12 192:21
211:18 228:17 240:7
**create** 215:9
**created** 214:12
233:17,21,23,24
235:23
**credit** 194:16,22
195:2,4,5,8,12,15,16
195:18
**creditors** 199:5
**csr** 157:22 243:25
**curiosity** 207:15
**currently** 163:2,6,14
165:18
**cv** 157:4 158:4
**cycle** 178:4
**cycles** 168:19

**d**

**d'amico** 223:2
**daily** 178:25 179:8
179:14
**damages** 236:18
**data** 165:3
**date** 182:14 214:6
217:15 243:18

**dated** 160:9,11,13,15
160:17,22,24 161:1,4
161:7 213:4,10
243:21
**day** 162:14 178:13,16
178:17,20 179:10
200:25 201:9 216:12
223:24 226:10
242:15
**days** 213:10
**deal** 174:13 220:13
220:23 230:24
**dealing** 186:20 194:5
220:24,25
**deals** 230:24
**declare** 242:9
**deed** 227:2
**default** 207:7
**defendant** 157:11
158:10,15 159:8
**definition** 181:12
**degree** 219:3
**delete** 199:3 235:5,7
**delinquency** 207:6
**delinquent** 238:19
**department** 161:4
173:22 174:1,2,5,9
174:13,17,18,21
184:22 186:8,14
190:11,14,20,22
191:2,7 194:17,22
195:5,13,15,17
222:25 223:9 227:19
230:7,8,12,14
**department's** 195:18
**departments** 228:16
**depending** 238:10
**depends** 238:8
**deponent** 172:3
**deposition** 157:14
158:14 162:14,19,22
163:19 243:12
**description** 160:8
231:3,15

**desire** 199:15
**dialed** 182:7
**different** 198:9
235:11,17,17
**differently** 165:12
**direct** 201:16
**direction** 223:10
243:8
**directly** 190:9 195:15
**discussed** 173:16
191:24
**discussion** 231:13
**dispute** 175:4
**district** 157:1,2 158:1
158:2 162:16
**division** 157:3 158:3
227:20
**divisions** 228:13
**docs** 160:15
**document** 169:14,20
169:21 170:6,7,9,10
170:12,14 171:24
172:7,9,12,14,15,22
189:20 191:22
196:10,12,22 197:11
197:12,25 206:7,17
215:12 216:1 221:22
221:25 222:3,4,6,12
222:18 233:20,22
234:5,9 241:3
**documented** 179:19
179:21 181:8,9
240:12
**documenting** 191:20
191:25
**documents** 164:3
**dog** 202:8,17,18,19
202:21,22 203:8,16
**doing** 179:13 192:1
**dozen** 192:20
**draft** 197:9
**drafting** 170:14
**drive** 206:23,25
207:10

[due - going]                                                              Page 248

**due**  226:18

**e**

**e**  187:6,19 188:13,15
  196:17 197:19 198:2
  198:11 208:13 234:1
  235:8
**early**  226:14
**eat**  202:18
**eating**  202:23
**eight**  163:12 204:16
**either**  176:16 190:9
  208:13 226:14
**elaine**  160:10 172:10
  176:22 185:24 186:1
  186:3,6,8,14,21,21
  186:25 187:3,15
  189:4
**electric**  199:11
**emblem**  197:3,5,6,13
**emotion**  224:21
**employee**  243:16
**employees**  192:17
**ends**  164:20
**entitled**  237:16 241:5
**esq**  159:4,9
**estimate**  192:20
**ethical**  240:14,16
**event**  238:16 239:4
**exact**  238:2
**examination**  160:2
  162:8
**examined**  162:5
**excuse**  201:23
**executed**  242:15
**exhibit**  160:9,10,12
  160:14,16,18,21,23
  161:1,3,6 169:16,17
  171:25 172:4 184:14
  189:15,17 196:6,7
  206:13,14 211:17,18
  211:22 212:1 216:2
  217:3,4 221:18,19
  222:8,9,14,15 227:9
  232:2,3

**exhibits**  163:25 169:9
**exists**  174:21 230:14
**expect**  191:18 210:22
  210:25 211:6
**expected**  191:21
  211:4
**experiencing**  163:6
**experiment**  201:19
**explain**  180:22
  213:14
**expressing**  185:5
**extent**  169:15 172:1
**extra**  165:5
**extramarital**  181:20
**extreme**  179:14

**f**

**fact**  190:19 202:7
  212:25
**factual**  224:16
**family**  205:23
**far**  171:17 176:23
  234:12 238:20
**fax**  194:15
**federal**  160:14
  196:20 220:1 243:12
**fee**  226:20
**feel**  203:12 206:25
  224:18,23
**feeling**  224:18
**fees**  232:19
**felt**  206:4
**female**  170:17
**fifteen**  213:10
**figure**  199:17
**figured**  216:15
**file**  209:19 210:6,10
  212:22 225:2
**filed**  210:5 213:9
  214:15 225:4,5
**filing**  210:3
**financial**  160:17,22
  160:24 161:1,4,4
  206:20 208:9,12
  209:7,8,13 210:2,11

210:17,20 211:1
  217:11 222:24,25
  223:8,9 227:16,19
  232:15
**financially**  232:16
  243:15
**find**  167:24 219:25
**fine**  195:19 201:20
**finish**  170:11
**first**  212:8 213:3
  214:12 215:9,11,12
  215:14 226:12
  233:16,24 234:7
  235:23
**fit**  235:5,6,9
**five**  164:9,12 182:20
  212:8,18 215:20
  235:21
**fix**  185:4 190:1
**floor**  159:5,10
**florida**  157:2 158:2
  159:5,10 161:3,3,4
  162:16 222:23,23,24
  223:3 227:14,16,19
  230:12 231:4
**floridaloanlawyers....**
  159:6
**follows**  162:6
**force**  207:4 232:18
**foreclose**  224:25,25
  225:1,13,14
**foreclosed**  207:16
**foreclosure**  206:24
  207:1,11 225:2
**foregoing**  242:10
  243:3,5,9,11
**forgot**  181:2
**form**  165:8
**forms**  198:7
**fort**  159:5
**forth**  243:4
**fourth**  194:10
**frank**  187:2
**fraud**  232:11,12
  233:5,9

**friday**  157:16 158:17
  162:1
**friends**  205:23
**front**  201:17 202:19
  240:7
**frustrated**  179:23
  180:4,14,18 224:20
**ftc**  181:10 200:10,20
  202:7,21 203:7 206:3
  206:6,10
**funny**  203:8
**further**  188:9 209:18
  241:8,12 243:11,15

**g**

**gain**  232:15,16
**garbled**  177:22 182:1
  182:1,4,13,25
**gather**  188:6
**general**  161:7 178:23
  182:13,25 185:23
  230:21 232:9 233:13
**general's**  161:3
  222:23 223:4 227:14
  230:7,9,12,15 231:4
**generally**  165:9
  177:25 219:24
  226:13 235:8
**generated**  197:9
**generic**  233:20
**getting**  190:2 231:12
**girlfriend**  181:20
**given**  165:20,22
  243:10
**giving**  193:11
**go**  163:25 169:10
  189:12,14 196:5
  197:23 206:12
  211:16 217:2 219:19
  221:18 222:8,14
  226:15 235:9
**goes**  211:20 215:3
**going**  163:25 164:2
  165:12 168:14
  175:10 184:14

189:10,14,15 195:7
195:14 196:5 201:16
211:16 217:2 221:18
222:8,14 227:8 228:8
228:17 232:1
**good** 162:10,11,12
**governs** 226:24 227:2
**grab** 197:23
**great** 163:18
**ground** 162:22,23
**group** 160:18
**grouping** 177:25
**guess** 162:12

**h**

**hand** 170:2 172:2
220:24,25
**handwriting** 170:2,3
**happen** 183:15
191:18
**happening** 207:3
**happy** 163:21 185:2
209:1 240:18
**head** 180:25
**hear** 163:8,20 182:7
182:8,11 196:3
**heard** 175:24
**held** 236:24 237:1,5
240:4,21,23
**hello** 205:16
**help** 231:17
**helped** 185:4
**herbert** 159:9 160:6
162:9,13 165:11
166:1 168:5,11,20
169:1,4,8,12,19
171:8,22 172:6
173:23 174:11,19,25
175:9,20 176:1 179:3
179:7,15 180:1,9
182:19 184:8,13,24
186:7,12,18 188:21
189:10,14,19 192:6
192:21 193:1,18,23
195:25 196:5,9 199:9

199:14,22 200:9
202:6 203:5 204:11
206:12,16 207:20
209:4,14 211:16,24
213:8,23 215:8 217:2
217:6 219:9 220:11
221:21 222:8,11,14
222:17 223:25
225:20 227:8,25
228:17 229:2,10
230:3 231:6,16 232:1
232:5 233:4,8 234:24
236:8,22 237:20
239:20 241:8
**hereto** 169:18 172:5
189:18 196:8 206:15
211:23 217:5 221:20
222:10,16 232:4
242:12
**hi** 181:1
**high** 219:3
**hold** 213:8
**holiday** 226:13
**home** 207:16 225:1
**honest** 187:2 234:18
**hope** 206:6
**hoping** 206:9
**hours** 163:12
**hundreds** 239:16,18
**hurt** 224:23
**hurtful** 224:22
**hypothetically** 194:6

**i**

**idea** 237:14
**identification** 169:17
172:4 189:17 196:7
206:14 211:22 217:4
221:19 222:9,15
232:3
**identified** 178:7
192:24
**identify** 176:24 189:5
204:1,8

**implication** 198:5
**implied** 188:14,18
**improperly** 240:25
241:4
**inappropriate** 206:5
239:2
**inappropriately**
206:8
**include** 203:12
227:10 233:12
234:11 235:24
**incorrect** 195:2
214:17
**index** 160:1
**indirectly** 190:10
**inexpensively** 233:3
**influence** 163:2
**information** 185:8
199:17 200:6 209:21
210:18 211:12
216:21 234:8,11
235:4,7 236:5,6
**initialed** 242:12
**initiated** 184:1
**ink** 242:12
**inquiry** 220:19
**instructions** 162:24
**insulted** 203:19
**insurance** 174:14
189:25 194:25 207:4
232:13,18
**intended** 205:19
**intent** 223:14 236:1
238:18
**intention** 192:1
**intentional** 223:13,18
223:23 238:8,11,13
**intentionally** 176:13
178:9 197:12 233:10
233:25 239:15,21
**interact** 195:14
**interest** 172:16,19
173:6,15,18 174:17
175:4 181:14,15,17
181:18

**interested** 202:9
243:16
**internally** 211:2
**interpreted** 181:4,14
**introduced** 190:5
**investigated** 223:12
223:16,23 224:8,15
224:17
**investigation** 218:2
**invitation** 173:8
198:22,23
**involvement** 181:21
**irrational** 200:23
201:2,3,6,12,13,18
201:20,25
**island** 158:15
**issue** 171:9,21 173:10
174:4,10 194:21
209:16 220:14,24,25
221:14,15 226:12
232:15 240:14
**issued** 170:16 171:5
**issues** 163:7 171:11
173:13 174:14 190:1
190:1 192:18 194:2
195:18

**j**

**january** 215:21
**job** 157:23 180:20
195:8 231:3
**judgment** 240:19
**jury** 240:7,24

**k**

**katie** 180:25 181:2
181:14,23 205:18
**keep** 185:10,13 206:1
221:16
**kimberly** 223:2
**kind** 164:24 166:23
232:12 234:17
**kinds** 235:7
**kmw** 157:4 158:4
**knew** 176:13 178:1

[know - making]                                                                 Page 250

**know**  162:15,21
    164:24 165:6,10,25
    166:2,6,12,14,16,17
    166:20,23 167:23
    168:18,24 169:7
    170:11 171:9 172:10
    173:17 174:20,23
    176:2,5,18 177:4,7
    177:10 178:2,5,22
    180:15,17,18,19
    181:7,18 184:3,11
    185:10 186:8 190:18
    190:23 191:1,4,6
    192:11,14,16,25
    197:22 198:6,12,22
    200:24 201:3,13,14
    201:14 202:4,9,13
    204:19 205:2,8
    207:15,21,22,24
    208:1 210:9 211:1
    218:1,1,12,13,14
    219:2,4,7,15,18,20
    223:2 224:3,9,11,14
    224:16,21 226:9,17
    226:19 228:19 231:1
    231:3 233:19 235:19
    236:3,12,16 237:5,13
    237:19,21,25 238:2,3
    238:6,6,7,9 239:8,22
    239:24
**knowing**  213:13
**knowledge**  173:5,15
    173:18 175:6 176:4,7
    176:23 184:23 185:7
    185:8,11,13 193:8
    209:12,15 212:24
    218:19 220:13,15,20
    220:22 221:13,14
    228:2,7,9,15,24,25
    229:9,13,21,24 230:5
    230:23 231:10,12,15
    231:18,19 238:18
    239:4

**l**

**lack**  207:4
**landline**  235:20
**large**  220:2
**larry**  157:21 158:18
    243:24
**late**  170:16 171:5,14
    226:1 239:8,10
**lauderdale**  159:5
**law**  237:5 240:7
**lawrence**  157:7,14
    158:6,14 160:3,9,10
    160:12,14,15,16,19
    160:19,21,23,24
    161:1,2,3,5,6,7 162:4
    162:10 169:20 172:7
    175:11 176:2 189:20
    193:24 201:10
    205:17 211:19,25
    213:4 216:2 221:22
    228:20 232:6 241:5
    242:9,21
**lawsuit**  164:20
    212:22 213:9 214:15
    214:18 236:20 237:8
    237:9 239:25 240:3
    241:7
**lawyer**  240:6
**lawyers**  159:4
**leave**  176:20,25
    177:22,24 183:12
    204:1 219:13,16
**leaves**  204:6
**led**  207:9
**left**  177:4 180:21
    181:3,13 183:18,23
    184:5,15 196:13
**letter**  160:9,10,12,14
    160:16,21,23 161:1,3
    161:6 170:20,24
    171:2,4,15 172:18,20
    173:3,4,9,14 184:17
    184:18,23 185:5,25
    186:5 187:16,21,25

    188:1,5,5,6,13 189:2
    189:23,24 191:19,23
    191:24 192:7 193:2,6
    194:2,10 196:19
    197:1,24,24 198:1
    199:16,25 200:2,5,12
    200:20 201:17 202:3
    202:7,20 203:6,13
    204:15 206:3,21
    208:2,7,10,14,16,19
    209:19 213:3,10,15
    213:18 214:4 215:18
    216:11 217:7,8,9,11
    217:13,16,17 218:15
    220:8 222:22 223:7
    223:15 224:5 227:11
    228:4,9,10,14 229:5
    229:12,14,17,25
    232:6,7,8 233:2,13
    234:4,5,7,20 235:2
    236:5
**letterhead**  199:16
    233:14,15,16,17,21
    234:2,4,12,14 235:4
    235:12,18,23
**letters**  179:16 191:21
    197:2,9,15,16,20
    198:7,16 199:4,10,24
    212:1,3,8,18 215:1
    215:16,20 216:3
    221:4,5,6,11 234:14
    234:17,19
**limit**  165:1 166:3
**line**  168:15
**list**  193:3 196:21
    205:13 212:17
    215:21 216:24 220:2
**listed**  218:15
**listen**  205:24
**listened**  176:24
**listing**  215:1
**little**  199:1,3 209:18
**llc**  157:10 158:9
    159:4 160:11 162:17

**llp**  159:9
**loan**  157:10 158:9
    159:4 160:11,19
    162:17 164:17,22
    174:24 175:2 176:7,9
    187:9,13 189:1 190:6
    190:20,22,25 206:22
    206:23 207:3 209:17
    209:20 221:3 223:11
    225:15,23 226:11,24
    227:3 234:15,21
    235:3 238:19
**long**  164:7,8 185:20
    191:15 205:1 228:23
    229:20 233:19
**look**  164:3 169:14
    181:11 189:15 194:9
    199:16 211:25 216:1
    217:13 225:14 227:8
    232:1
**looked**  216:13
**looking**  237:12
    239:25
**looks**  217:8,9,15
**lose**  205:2
**lot**  179:16 197:2,22
    221:4
**lover**  181:15

**m**

**m**  157:7,14 158:6,14
    160:3 162:4 242:9,21
**machine**  243:7
**mad**  224:19
**mail**  187:6,19 188:7
    188:13,15 196:17
    197:19 198:2,11
    199:4,10 208:13
    234:1 235:8
**mailed**  202:5
**mailing**  187:5,19
    199:25 200:3 216:21
    216:21 233:25
**making**  202:13 203:7
    212:25

manage 167:12
manager 190:13,19
  190:21,24
manner 181:13
  240:13
mariners 158:15
marked 169:17
  171:25 172:4 189:17
  196:7 206:14 211:22
  212:1 217:4 221:19
  222:9,15 232:3
masto 161:6
mateo 157:15 158:16
  162:1
matters 234:15
mean 171:20 177:19
  178:23 179:12
  181:15 182:12,13
  185:7 202:14 203:9
  203:25 215:3 218:15
  218:20 220:18,21
  221:1 223:12 227:6
  233:22 239:24
means 163:20 180:23
  182:1
medical 163:6
medications 163:3,14
memory 183:9
mention 181:5
message 176:20,24
  176:25 177:24
  180:24 181:1 182:5
  182:11 184:15
  192:15 204:2,6,17
  205:5,16,17,19,24
  206:1 218:21 219:14
  219:16
messages 176:21
  177:23 180:22
  183:18,24 192:16
  203:24 204:3
met 162:13
meticulously 179:20
miami 157:3 158:3
  159:10

military 197:6
mind 198:5
mine 230:4
minus 226:9
minute 181:11
  189:11
minutes 165:6,20,23
  166:3 167:13,18,22
  168:13,18,22
mischaracterizing
  229:3
missed 205:5
mitchell 160:11,12
  172:10 173:5,8,10,12
  176:2,22 185:5,24
  186:1,4,6,8,21,21,25
  187:3,16 188:9 189:5
  189:23 190:10 191:4
  192:15,19,20 193:7
  193:14,21 194:3,5,15
  195:7,21,22,24 196:2
  207:7
mitchell's 186:14
money 232:21 237:3
  237:7,12 240:3,11
  241:1,6
month 214:7 226:8
  226:10 233:2
monthly 164:24
  165:7,15 166:2
  168:13,22 225:17
  226:17
months 234:25 235:1
moral 240:14,16
morning 162:12,19
mortgage 172:16,19
  173:6,15,18 174:13
  174:17 175:3 206:23
  207:1,11,22 224:24
  225:17 226:17,20
  239:7,10
multiple 182:3
music 177:20

n

name 172:23 177:24
  183:13,23 184:5,16
  204:2,6 212:14
  233:25 243:19
named 180:25
  202:18
names 183:17 203:20
nature 183:6
navy 197:7
nearly 224:25
necessary 169:22
need 172:1 178:12
  179:9 199:2,15
  203:12 223:23
needed 210:18 224:7
needs 223:11
neither 243:15
nevada 161:6 232:9
  233:13
never 176:23 187:11
  187:14 225:25 239:9
non 166:9 176:16
  198:19
nonevent 198:12
normally 199:20
nos 160:19
notable 183:10
note 170:17 181:10
  216:5,10 226:23
  232:19,22 233:1,3
noted 175:22 241:15
  242:12
notice 170:16 171:5
  171:14 225:4,7,8
notices 207:7
nuisance 178:12
number 160:8
  164:19,21 165:2,20
  165:22 172:25 173:2
  177:24 178:6,21
  181:6 183:13,24
  184:6,16 193:3,5
  196:15,21 197:19

198:3 199:24 200:3
  204:6 205:10 208:3
  212:15,17 213:14,15
  214:5 215:22 216:22
  216:25 218:14,18
  219:13,17,20 221:8
  227:10 232:18
  233:12 234:1 235:8
  235:11,13,14,18,20
  235:21,24 236:13
  238:2
numbers 178:1,3,6
  183:18 205:14 219:4
  219:7
numerical 160:20

o

oath 162:5 226:3
  235:15 243:6
object 168:14
objection 165:8,24
  168:3,9,25 171:3
  173:20 174:7,15,22
  175:5,15,18,22,24
  179:2,6,11,25 180:6
  182:17 184:20 186:2
  186:10,17 188:20
  192:4 193:17 195:20
  199:6,13,19 200:7
  202:2 203:2 204:7
  207:17 209:3,11
  213:22 215:6 219:6
  220:10 223:21
  225:19 227:5,24
  229:7 230:1 231:5,8
  231:24 232:25 233:7
  234:22 236:7,21
  237:18 239:17
occasions 184:2
october 157:16
  158:18 162:1 214:1
office 161:3,4 222:23
  222:24 223:4,8,8
  226:14 227:14,16
  230:7,9,12,15 231:4

[offices - properly]                                                    Page 252

**offices** 228:13 229:5
  229:16
**oh** 201:20
**okay** 162:21 163:22
  163:23 170:10
  171:22 172:17 175:2
  175:9,25 180:12
  181:11 184:19,21
  186:16 187:12 194:9
  201:16,20,21,22
  208:24 209:6,9 210:1
  210:9,19 211:8,10,13
  211:16 212:5,24
  213:9,13 215:23
  217:2 220:8 221:10
  221:13 227:8 228:5
  228:12,14 229:6,18
  229:23 230:13
**oklahoma** 218:16
**once** 172:2 208:16,17
**operates** 211:2
**order** 160:20 211:21
**organization** 231:22
**organizations** 229:24
**original** 243:12
**outline** 194:2

**p**

**page** 160:3,8 169:23
  211:20 235:6,6,10
**pages** 157:25 212:11
**paid** 194:23
**paper** 197:8
**paragraph** 194:10
  201:17
**part** 167:18 196:24
  198:20,25 208:6,8
  213:17 215:7 233:14
  233:15 237:9 241:7
**partial** 182:11
**party** 243:17
**pay** 165:13,15,18
  224:24 226:14,19
**paying** 226:21 240:6
  240:11 241:1

**payment** 160:18
  170:15,16,16 171:5,6
  171:14 203:10
  225:17,17,21 226:1,7
  226:11,17 239:7,10
  239:13
**payments** 207:5
  215:17
**peers** 240:8,24
**penalty** 242:2,10
**pending** 162:16
**people** 174:3 182:3
  183:18,23 184:15
  199:5 204:12 220:3
  238:17 239:3
**percent** 203:23 205:4
**period** 165:3,4 166:7
  166:9,10 167:4,10
  178:17 191:15
  200:21,25
**periodically** 176:20
**perjury** 242:2,10
**permission** 193:11
**person** 173:5,15
  174:3 181:14,15,17
  181:18,20 185:20
  193:7 194:7 209:12
  209:15 220:21,23
  221:13,14 228:2,7,15
  228:25 229:23 230:2
  230:5 231:12,14,15
  231:19,21
**personally** 237:7
**pertains** 243:11
**phone** 164:19 165:4
  165:5 168:23 172:25
  173:2,4 176:6,8,12
  176:25 177:4,24
  178:6,25 183:13,18
  183:19 187:9,13
  188:19 189:3,4 190:9
  191:10,22 193:3,5,12
  193:13,16,20,25
  196:15,21 197:18
  198:3,11 199:24

  202:11,13 204:6,21
  205:1,14 208:3,23
  209:10 210:3,21
  211:8,10,11 212:15
  212:17,25 213:14,15
  213:20 214:5,21
  215:2,22 216:24
  218:6,10,11,13,14,17
  218:21 219:4,11,20
  221:12 223:5 227:10
  227:13,23 228:3,6
  229:6,17 230:10,16
  233:12 234:1 235:8
  235:11,12,13,14,17
  235:19,24 237:22
  238:12
**phrased** 183:4
**pieces** 217:23
**pilot** 197:6
**place** 181:7 187:11
  243:4
**placed** 207:4 232:18
**plaintiff** 157:8 158:7
  159:3
**plan** 164:24 165:16
  165:18,20 166:2,7,8
  166:11,13,18,21,24
  167:4,5,8,9,10,12,18
  168:13
**plans** 168:2
**play** 177:20
**please** 163:21 169:3
  172:2 175:16 192:22
  213:8
**plenty** 226:21
**plus** 226:9
**pocket** 182:7
**point** 173:11 186:4
  186:21 191:13,20
  192:19 200:18
  230:11 231:9 240:22
  241:9
**pongo** 202:17,18
**poorly** 181:4

**popped** 198:18
**position** 168:21
  195:3
**possession** 196:2
**possible** 231:20
**post** 226:14
**prefer** 188:11 189:4
**preferable** 187:17
**preparing** 222:6
**previous** 217:8,9,10
**previously** 173:16
  184:25 185:1 187:23
  188:16 194:24
  229:11 235:20
**print** 197:13
**printed** 164:1 196:25
**prior** 233:2 243:5
**probability** 219:3
**problem** 171:7 173:7
  175:7 180:8 185:4,14
  185:16,19,21 186:15
  187:1 189:6,8,25
  191:21 193:9 194:16
  194:25 195:3,9,23
  205:20 206:22 207:5
  207:8 209:16 230:19
  230:24,25 231:10,14
  231:18,22 232:13,14
**proceedings** 243:3,5
  243:7,13
**process** 180:5,14
**processed** 170:15,17
  171:6
**productive** 176:17
  187:14
**profit** 206:24 207:1
  207:11,16
**promise** 187:10
**promising** 192:8
**promissory** 226:23
**prompted** 216:10
**proper** 190:2 203:24
  204:2,6
**properly** 194:23
  224:24

[protection - returned]                                                                                                            Page 253

**protection** 160:17,22
  160:24 161:1 206:20
  208:7,9,12 209:7,8
  209:13 210:2,11,17
  210:20 211:2 217:11
**provide** 208:5 211:11
  213:15
**provided** 187:5,18
  204:17 205:18 208:2
  216:20
**provider** 164:5,7,12
  164:16
**purchase** 232:19
**purchased** 233:1,3
**purchasing** 232:22
**purposely** 207:10
**purposes** 187:25
**pursue** 210:18
**put** 173:2 193:5
  197:13,20,24 199:1
  202:19 216:5 226:14
  229:21 233:25
  234:12 235:11,17,17
  236:12
**putting** 188:12
  216:10

**q**

**qualifying** 228:21
**question** 163:20,22
  163:22 165:12
  167:16 169:2,3,5
  175:10,12,22 178:19
  178:20 180:10,11,13
  180:15 191:1,5,5
  192:22 193:19 201:5
  201:9,11 202:15,16
  211:9 222:2 224:3
  228:18 229:22
**questioning** 168:15
**questions** 163:1,8,9
  163:16 164:2 216:6
  241:9,10
**quick** 189:10

**quickly** 235:9
**quite** 187:2,8 218:25
  220:5
**quote** 201:25

**r**

**r** 160:9 169:16,17
**random** 166:10
**randomly** 167:6
**range** 183:2
**read** 169:4,6 170:10
  170:12 175:10,14,17
  175:23 184:8,10
  192:22,23 194:19
  209:24,25 226:23
  227:2,6 228:18,22
  241:13 242:10
**reading** 170:7
**realize** 226:15
**really** 183:9 185:21
  202:25 219:11 224:2
  231:21
**reask** 163:22
**reason** 163:19 212:19
  212:20 213:17 217:1
  221:24
**recall** 168:4,7,10,16
  168:17,17 169:21
  170:5,7 171:16
  172:12 181:8 182:18
  182:21,23 183:16
  190:11,13,15 191:16
  192:8,8,9 204:4
  206:11 215:11,14,16
  216:12,15 217:15,24
  221:8 222:4,6,20,22
  223:6 227:7 234:23
  235:1,13,16
**recalled** 205:10
**receive** 178:25
  194:15 199:4,10
  203:11 217:20 218:6
  218:11,25 220:1,2,5
  227:13

**received** 177:19
  178:15,17,21 194:11
  199:24 200:2 204:23
  211:8 218:9 219:12
  220:7 225:6 239:6
**receives** 236:5
**receiving** 201:8
  207:6
**recipient** 200:4
**recognize** 206:17
  212:3 217:7 218:20
  218:20 219:10,11
  222:18 232:6
**recollection** 170:13
  178:16
**record** 169:6,11,12
  175:14,17 183:17,20
  184:10 189:12,13
  192:23 193:22
  228:22 243:6,9
**recorded** 205:5
**recover** 237:7,12,22
**refer** 171:14
**referred** 166:4 177:6
  203:16
**referring** 203:7
**refresh** 170:13
**refused** 232:14
  233:10
**refusing** 207:7
**regarding** 171:14
  235:3
**regards** 171:16
**regulation** 161:4
  222:24 223:9 227:17
**relabel** 197:25
**relative** 243:16
**reliant** 164:3
**remark** 169:15 172:1
**remember** 162:23
  167:6,7 168:12
  170:18,20 171:13,21
  172:20 182:14,22,24
  183:5,8,9 203:14
  205:22 218:3 223:7

233:16
**remove** 198:9,10,13
  198:16
**repeat** 183:7
**repetitive** 178:4
**rephrase** 163:21
**reported** 157:21
**reporter** 158:19
  169:4,8,10,13 171:23
  175:9,21,23 184:8
  189:12 192:21
  211:18 228:17 243:2
**reporting** 194:16,22
  195:2,4,5,8,12,15,16
  195:18
**representative** 184:5
  190:8
**representatives**
  187:10
**requested** 243:14
**research** 219:24
**resolve** 174:4 185:14
  231:22
**resolved** 195:4,7
**resolving** 186:15
  189:7 192:18 194:1
  195:18
**respect** 166:3
**respond** 175:12
  187:16,22 188:1
  192:7,9 199:16 200:5
  200:8,10 208:10,19
  208:20 228:9
**responded** 187:23
  229:4
**responding** 172:18
  186:5 228:4
**response** 173:9
  184:17 189:2 206:6,9
  208:13,15 220:8
  221:11 228:13
  229:12,17
**responsibility** 220:24
**returned** 184:4

[review - speak]

**review** 166:7,8 167:6
  176:6 243:13
**reviewed** 166:11
**rfp** 160:19,24 161:2,5
  161:7 211:19 213:4
  216:3
**right** 163:24 164:4
  165:13,22 166:16
  167:19 170:2 171:22
  177:14 180:18,19
  183:4 184:19 196:5
  197:14 200:13
  201:13,18 202:17,21
  203:1 204:21 206:1
  206:12 207:21 210:8
  210:15,21 214:2,24
  215:20,21,24 216:4
  216:22 219:2 221:4,7
  221:18 222:3 224:10
  224:14,21 227:11
  234:9 236:15 237:3,8
  238:9 239:10,16,21
  240:6,9,11,15 241:2
  241:6
**robert** 157:7,14
  158:6,14 160:3,9,10
  160:12,14,16,19,21
  160:23 161:1,3,6
  162:4 181:1 205:17
  242:9,21
**robocalls** 176:16,19
  177:5,7,8
**robot** 176:20
**rodal** 159:4 165:8,24
  168:3,9,14,25 171:3
  173:20 174:7,15,22
  175:5,15,18,21,25
  179:2,6,11,25 180:6
  182:17 184:20 186:2
  186:10,17 188:20
  192:4 193:17 195:20
  199:6,13,19 200:7
  202:2 203:2 204:7
  207:17 209:3,11
  213:22 215:6 219:6

220:10 223:21
  225:19 227:5,24
  229:7 230:1 231:5,8
  231:24 232:25 233:7
  234:22 236:7,21
  237:18 239:17
  241:10,11
**rollover** 167:13,17,22
**routine** 190:17
**rules** 162:22,23
**run** 190:16

**s**

**s** 159:5 160:10
  171:25 172:4 184:14
**sad** 224:19
**sake** 184:14
**san** 157:15 158:16
  162:1
**save** 204:18,20 205:2
  234:5
**saved** 204:22
**saw** 199:24 200:2
**saxon** 200:15
**saying** 185:10,13
  196:2 202:22 203:21
  218:2 231:11 240:19
**says** 171:4 194:14
  195:10,11 201:18
  204:16 205:4,15
  209:18 227:7 238:9
  241:3
**scanned** 226:25
**scrambled** 176:21
  177:19
**second** 213:8 227:9
  241:11
**secretary** 178:12
  179:10 230:13,24
  231:2,11
**secretary's** 231:3
**seductive** 177:23
  180:22 181:12,23
  183:1,4

**see** 169:22 172:22
  193:2 194:12,14
  196:12 205:6 209:22
  212:9 213:6 240:10
**seeing** 170:6
**seeking** 236:17
  237:25 238:4 240:2
**seemingly** 205:19
**seen** 169:20 172:7
  189:20 196:10
**send** 170:23 189:24
  196:19 198:1,4
  206:21 215:1 234:14
**sending** 170:14 208:6
  215:16
**sent** 170:20 171:1
  184:17,18 188:5,5,6
  191:19 196:2 197:3
  197:20 199:25
  200:12 201:15
  206:19 213:16 214:4
  215:20 216:11
  217:17 221:4,5
  222:22 223:7 225:8
  229:12,14
**sentence** 194:14
**service** 165:5
**services** 161:4 222:25
  223:9 227:20,20
**servicing** 157:10
  158:9 160:11,19
  162:17 164:16,22
  174:24 175:2 176:7,9
  187:9,14 189:2 190:6
  190:20,22,25 200:15
  206:22,23 207:3
  209:17,20 221:3
  223:11 225:23
**set** 243:4
**seven** 216:3
**short** 200:21
**shorthand** 158:19
  243:1,7
**shortly** 200:15

**showing** 170:17
**signature** 169:22,25
  212:12 214:4 222:5
  243:23
**similar** 182:6 202:23
  203:21 215:17 217:8
  217:9,14,15
**sir** 219:19
**sit** 166:15,23 184:3
  190:18 201:9 235:15
  236:16
**sitting** 201:17
**six** 234:25 235:1
**social** 201:19
**solve** 186:25 189:6
  221:15 230:19
  231:17 239:4
**solved** 180:7
**solves** 231:10,14
**somebody** 171:18
  173:12,21,25 174:8
  175:6 177:11 180:25
  182:7 183:12 184:22
  184:23 185:2,6,8,10
  185:12,14,15,18
  186:13 189:5,7
  195:16 203:15,15
  210:20 216:18
  220:13,15,18,20
  221:11 228:4,12,24
  229:4,8,9,11,16,20
  230:6,8,11,23,23
  231:9,17 236:4 239:7
**somebody's** 228:8
**sorry** 173:25 178:14
  180:3 183:7 214:9
  219:18 238:25
**southeast** 159:10
**southern** 157:2 158:2
  162:16
**space** 198:8,13,17
  199:2
**speak** 168:1 177:11
  182:4 191:14 223:5

speaking 170:18
171:6,13,18 182:8,12
specific 234:3
specifically 183:8
186:1 205:11 208:18
236:19
specify 190:16
speculate 171:1
spent 179:16
spoke 191:10 205:21
spoken 182:4
spouse 181:4 205:20
stamped 169:14
171:24 189:16 212:8
213:4 216:2
stand 220:4
standard 196:23
start 163:1 216:10
219:5
started 162:21
198:20 218:2 225:23
starts 211:19
state 169:3 175:16
242:17 243:2
statement 214:7,8,19
225:12
statements 160:18
212:7 214:17
states 157:1 158:1
status 190:3
statute 238:9
stay 227:9
stop 202:9,23,24
strike 165:14 173:24
177:9 178:14 179:8
194:8 200:1 209:25
221:17
structure 174:23
subject 164:19
submitted 160:18
subscribed 243:19
sued 214:23
suing 162:17 192:2
212:25 213:13
236:15

suite 158:16
support 225:12
supposed 189:25
sure 192:14 205:11
207:21,23,24 208:1
219:2
suspect 162:23
switched 190:9
symptoms 163:7

**t**

t 160:12 189:15,17
take 187:11 189:10
189:15 195:8 198:2
232:1
taken 158:15 162:19
229:19 243:3
talked 194:24
talking 182:11,12,12
tcpa 237:21
telephone 164:12,21
164:24 165:2,16
167:18 181:6 183:24
184:6,16 200:3 213:1
216:21,22 218:18
219:21,22 235:18
telephonic 159:4,9
telephonically
163:19
tell 163:21 164:4
182:1 190:24 209:25
229:23 230:4
telling 185:7 202:20
template 196:24,25
196:25 197:22 198:2
198:20 199:1 208:6,8
214:11,13 215:7,9
216:4 235:4
ten 177:13,16,25
178:2 182:22 205:14
term 230:4
terms 170:13 182:13
183:23 236:17
terry 170:17,18
171:7

testified 162:6
180:21 183:3,11
184:25 229:11
testify 163:4 219:11
testifying 243:6
testimony 166:15
170:5 179:9 187:15
188:25 198:15 204:5
225:25 235:16 239:9
242:13 243:10
thank 163:24 175:20
175:25 191:9 236:14
thing 185:13 225:11
things 179:13 198:20
207:9
think 180:7,20
182:15,16 187:8
188:12 198:13,19
199:23 200:3 201:1,5
201:7 203:6 205:13
208:16 218:16 224:2
224:15 225:11 236:4
236:11 237:16
239:15 241:8
thinking 236:2
third 159:10 201:16
thirds 169:22
thought 199:1,3
200:22 201:25
202:16 216:15
three 217:25 223:8
229:24
time 162:22 164:8
165:2,3,4,21,23
166:3,7,11,13,17,20
167:5,6,11 168:12
175:16 177:1 179:16
182:14 184:7 191:15
191:17 198:15
200:21 204:19 207:6
214:12 215:10
219:25 221:9 222:22
225:17 226:21
233:16,24 234:3,20
239:14 241:15 243:4

times 176:21 177:10
178:6 183:11,15,22
191:14 192:20
197:23 200:24
239:16,19
timing 214:19
title 191:4 231:12
today 162:15 163:4
163:16 166:15,23
184:4 190:19 221:9
235:15 236:16
told 174:12 228:25
tone 205:18
top 170:2 172:22
180:24 193:2 196:12
196:22 197:3,14,19
199:25 208:2 211:20
trade 160:15 196:20
transcribed 243:8
transcript 242:11
243:9,12,14
transfer 200:15
tried 176:3 192:11
204:19
true 242:14 243:9
trust 227:2
truthfully 163:4,9
try 224:6 235:6
trying 193:9 206:23
206:25 207:10 220:4
239:4,5
turn 171:23
twenty 221:6
two 169:22 178:23,24
179:10 189:11
219:17
type 165:18
typed 212:14 234:8
typically 235:6

**u**

u 160:14 196:6,7
undersigned 243:1
understand 162:18
163:15,18 167:16

185:6,11 201:8
202:10 203:3,10
226:5 240:1
**understanding** 185:1
**understood** 171:7
212:24
**united** 157:1 158:1
**unlimited** 165:3
**unreasonable** 199:23
200:4 227:22 236:4
**unrelated** 234:15,21
**unsure** 165:25
**update** 214:10
**upgrade** 205:1
**use** 198:1 224:6
234:14 236:6

**v**

**v** 160:16 206:13,14
**varies** 165:1,9 167:5
179:5 237:23
**various** 198:7
**view** 186:24
**voicemail** 177:4
183:24 184:16
203:24 204:5,17
205:16
**voicemails** 184:4
204:18,22
**volume** 157:17
158:14 160:3 178:11
179:12 186:25 220:2
**vs** 157:9 158:8

**w**

**w** 160:18 211:19,22
212:2
**waiting** 164:1
**want** 164:2 185:11
186:1 188:1 196:3
198:5 208:9,12
213:19 214:20,24
215:3 227:9 229:19
230:21 236:20 237:3
237:7

**wanted** 186:25 187:3
187:7,15,22 192:19
194:3 195:21,24
206:7 208:15 216:18
**water** 199:11
**way** 167:12 169:23
181:3 198:18 199:20
202:25 209:24
**we've** 162:13
**went** 162:22 168:12
168:18,21 181:1
204:16 205:15
**whatsoever** 212:20
212:21
**whereof** 243:18
**willingness** 207:4
**wings** 197:3
**wish** 205:2,3 206:2
**witness** 160:2 165:9
165:25 168:4,10,16
169:7 171:4 173:21
174:8,16,23 175:6,16
175:19 179:12 180:7
182:18 184:11,21
186:3,11 192:5,24
195:21 199:8,20
200:8 202:3 203:3
204:8 207:19 209:12
215:7 219:7 223:22
227:6 228:23 229:8
230:2 231:9,25 233:1
234:23 237:19
239:18 243:18
**witnesses** 243:5
**word** 180:18,19
197:11 201:13 224:6
224:10,14,22 233:20
233:22 234:9
**work** 195:12
**worked** 173:12 174:4
186:9 190:11 191:2,6
194:7
**world** 240:10
**write** 172:14 183:17
198:6,6 199:18 206:3

208:13,15 221:22,25
222:12 232:8 234:17
234:18,19
**writing** 172:12
179:16 187:3,8,16,22
187:23 188:2,10,14
208:19,20 210:22,25
211:5,7 222:20
223:14
**written** 172:15
208:17 217:20,23
234:20 235:2 241:3
**wrong** 209:25 240:20
**wrote** 172:9 179:17
186:5 200:20 204:15
208:16 222:3 224:4
229:25 232:7 234:7

**x**

**x** 160:21 217:3,4
243:14

**y**

**y** 160:23 221:18,19
**yeah** 224:7
**year** 226:13
**years** 164:9,13
167:22 179:20
235:21
**yechezkel** 159:4

**z**

**z** 161:1 222:8,9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Leita Lawrence-RFR-0540
mailed 04 April 2014



Robert M Lawrence                                                    04 April 2014
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted        -3295
            @aol.com

Florida Attorney General's Office
The Capitol, PL-01
Tallahassee, Florida 32399-1050

Florida Office of Financial Regulation
200 East Gaines Street
Tallahassee, Florida 32399-0370

Florida Department of Financial Services
Division of Consumer Services
200 East Gaines Street
Tallahassee, Florida 32399-0322

Enclosures:
1.  Correspondence from Bayview Loan Servicing, Dated 25 March 2014.
2.  Response to Bayview Letter, Dated 04 April 2014.
3.  Attorney General Pam Bondi 'email correspondence, Dated 24 March 2014.

Kimberly D'Amico,

Thank you very much for your assistance and your referrals to the Office of Financial Regulation and the
Department of Financial Services.

I have received a response from Bayview Loan Servicing.

I have enclosed a copy of Bayview's correspondence and my response to their correspondence.

I stand ready to fully support my position.

Bayview Loan Servicing needs to be investigated.

My signature authorizes the Florida Attorney General's Office to take any action deemed necessary for the purpose
of investigation or enforcement.

Respectfully Submitted,

Signed

Robert M Lawrence

EXHIBIT
AA
LAWRENCE



# Exhibit
# Separator

Lawrence RFP_0523



Robert M Lawrence                                                          05 May 2014
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 715-3295
          aol.com

Catherine Cortez Masto
Nevada Attorney General
100 North Carson Street
Carson City, Nevada 89701

Enclosures:
1. Correspondence Dated 28 April 2014.
2. Correspondence Dated 16 April 2014.
3. Southeast Florida Better Business Bureau Overview.
4. Supporting Letters and Documentation.

Mrs. Masto,

Thank you very much for following this matter.

I believe that Bayview Loan Servicing LLC is committing fraud.

I have enclosed my correspondence to Bayview. The 28 April 2014 letter provides a clear timeline of the events that took place and documents the behavior of Bayview Loan Servicing, LLC.

I fully support my position with three packages of letters broken down into appropriate sequences. The packages are further organized from past to present in order to support the correspondence timeline.

As you know, Bayview has the right to operate in within the State of Nevada under license number 3456, Loan Service Registration, with an issue date of 10/05/09.

The Supporting Letters and Documentation will be provided to the Nevada Attorney General.

I will cc an Executive Summary of this matter (Enclosures 1-3) to the following:
• Senator Harry Reid
• Senator Dean Heller
• Senator Elizabeth Warren
• Nevada Department of Business and Industry

My signature authorizes the Nevada Attorney General to take any action deemed necessary for the purpose of investigation or enforcement.

Respectfully Submitted,

Robert M Lawrence

EXHIBIT
BB
LAWRENCE



# Exhibit Separator

*27 FEB 14 @: 8:52 PT*
*DISCUSSION ABOUT Accounting*
*Problem. SHE Appears to SEE*
*THE PROBLEM*

*POC: TERRY (Female)*

*# REQUESTED Accounting Info*
*SENT to ME.   26 February 2014*

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 295
@aol.com

Loan Number: ███1397

Bayview
4425 Ponce de Leon Blvd., 5th Fl
Cora Gables, FL 33146

Enclosures:
1. Bank Statement Line, Dated 10 February 2014.
2. Bayview Reminder Payment, Dated 12 February 2014.

Bayview,

The regular mortgage payment was made on 01 February 2014.

As shown on the bank statement, Enclosure 1, Bayview had received the mortgage payment and processed the check on 10 February 2014.

Then, as shown on Enclosure 2, Bayview issued a late payment notice on 12 February 2014.

It is remarkable that Bayview issued a late payment notice "after" Bayview had already processed the payment.

Respectfully Submitted,

Robert M Lawrence

EXHIBIT

R



# Exhibit Separator



Robert M Lawrence                                                        10 March 2014
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted715-3295
aol.com

Elaine Mitchell
Bayview Loan Servicing, LLC
4425 Ponce de Leon Blvd., 5th Floor
Coral Gables, FL  33146

Enclosures:
1.   Correspondence Dated 28 February 2014

Dear, Mrs. Mitchell,

Thank you very much for your correspondence.

I disagree with your assessment. Bayview received the January 2014 payment on 07 January 2014. The table
below clearly illustrates 12 payments being made in 2013. The sum of those 12 payments is $30,357.12.

Please correct my IRS Form 1098 to show a 2013 mortgage interest amount of $30,357.12.

| Payment Month | Payment Amount | Payment Date | Check Clearing Date |
|---|---|---|---|
| January | $2,529.76 | 01 Jan 13 | 15 Jan 13 |
| February | $2,529.76 | 01 Feb 13 | 05 Feb 13 |
| March | $2,529.76 | 01 Mar 13 | 04 Mar 13 |
| April | $2,529.76 | 01 Apr 13 | 08 Apr 13 |
| May | $2,529.76 | 01 May 13 | 07 May 13 |
| June | $2,529.76 | 01 Jun 13 | 06 Jun 13 |
| July | $2,529.76 | 01 Jul 13 | 08 Jul 13 |
| August | $2,529.76 | 01 Aug 13 | 05 Aug 13 |
| September | $2,529.76 | 01 Sep 13 | 06 Sep 13 |
| October | $2,529.76 | 01 Oct 13 | 07 Oct 13 |
| November | $2,529.76 | 01 Nov 13 | 12 Nov 13 |
| December | $2,529.76 | 01 Dec 13 | 10 Dec 13 |
| | | | |
| Total Interest Paid | $30,357.12 | | |

Respectfully Submitted,

Robert M Lawrence

BAYVIEW-000734

EXHIBIT
S
LAWRENCE



# Exhibit Separator



FAXED documents to <span style="background:red;color:white">Redacted</span> -2517 on
Sunday 12 JAN 2014 @~ 3:45 P.T.

# Follow-up 4:00 PT/ 11:00 GT 13JAN14

Robert M Lawrence                                          13 January 2014
891 South Dyer Circle
Incline Village, Nevada 89451
<span style="background:red;color:white">Redacted</span>8295
@aol.com

Loan Number: ▓▓▓397

Mitchell Beck
Bayview
Phone: <span style="background:red;color:white">Redacted</span>-0299, Ext: 5773
Fax:   <span style="background:red;color:white">Redacted</span>-2517

Encl:   1.  Equifax Dispute Summary.
        2.  Bayview Mortgage Interest Statement.

Mitchell,

Thank you very much for your assistance on Friday 03 January 2014.

I faxed the documents that you requested on 05 January 2014. Then, I faxed the same documents again on
the 6th of January.  I have attempted to contact you three times subsequent to the last fax in order to ensure
that the credit-reporting problem was being corrected in the most expedient manner.

When contacting the credit-reporting agencies, there was an option to dispute the negative report from Bayview,
which I took the time to accomplish.  As I was operating under the assumption that you were working with
Bayview's credit-reporting department to fix the problem on your side, I did not provide all of my supporting
documentation to the credit-reporting agencies.  Instead, I simply stated that Bayview had made an accounting
error, that Bayview was aware of the error and that Bayview was correcting the problem.  This was the conclusion
that I had made when we ended our conversation on Friday.

However, I received an investigative conclusion from Equifax that does not reflect a correction from Bayview.  I
have attached a copy of the Equifax report to this letter.  I must ask, Mitchell, did you receive my fax and are you
attempting to correct this problem with Bayview's credit-reporting department?

Because of this problem, the Mortgage Interest Statement from Bayview is wrong.  As I have made the mortgage
payment on the first of every month for the past year, the Mortgage Interest Statement for the year should show a
box 1 amount of $30,357.12.  The incorrect form 1098 sent by Bayview has reported a box 1 amount of $20,491.06.

From our conversation, you begin work on Mondays at 09:00.  I am three hours behind on the west coast.  I will
attempt to contact you between 10:00 and 11:00 tomorrow.

Thank you,

Robert M Lawrence

page ( /8 )



EXHIBIT

LAWRENCE



# Exhibit
# Separator



Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 3295
@aol.com                                                   17 May 2011

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Redacted 2222
.ftc.gov

Federal Trade Commission,

Bayview Loan Servicing, LLC has replaced Saxon Mortgage Servicing, Inc as my loan agent.

The transfer of service occurred on 06 April, 2011.  As usual, I paid the monthly mortgage on the 1st of the month, in this case on 01 April, 2011 to the previous loan servicing agent, Saxon Mortgage Servicing, Inc, in the customarily provided statement envelope.  As one might expect, the two loan servicing companies are not communicating with each other and as of 06 May, 2011, I have received over 60 collections calls.

This irrational behavior has now become a social experiment.

As a third grader, I was interested to know when my little dog "Pongo" would stop eating.  One day, while eating "Cheez-its," I decided to find out.  With the patience of a third grader, I handed a single "Cheez-it" to Pongo the moment her jaws stopped chewing the previous Cheez-it.  After hours of feeding, I determined that Pongo was going to eat until death.  Thankfully, I stopped.

Well, it appears that Bayview Loan Servicing, LLC exhibits behavior similar to Pongo.  They do not know when to stop.  However, legally speaking, they should know better.

Of the 60 calls in the last 30 days:
    * Twenty Two of the calls ( 36.7 % ) were proper voicemail messages.
    * Eight calls went to voicemail where no message was provided.
    * Twenty Seven of the calls ( 45 % ) were recorded missed calls with no message.
    * Two calls went to voicemail where a 55 second song was the message.
    * One call went to voicemail where the message, "Hello, this message is for Robert Lawrence, this is Katie," was provided.  The tone of the message seemingly intended to attempt to cause a problem with a spouse.

Now, this is only the beginning of my relationship with Bayview Loan Servicing, LLC.

If it is determined that Bayview Loan Servicing has violated the law, then I would like to take action.

Respectfully Submitted,

Robert Lawrence

Lawrence_Docs_022





# Exhibit Separator



Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 715-3295
Redacted @aol.com

10 March 2014

Consumer Financial Protection Bureau
Post Office Box 4503
Iowa City, Iowa 52244
Phone: Redacted -2372
Fax: Redacted -2392

Enclosures:
1. Consumer Financial Protection Bureau Overview, 2 Pages.
2. Correspondence, 27 Pages;

Consumer Financial Protection Bureau,

I have a problem with a loan servicing company, Bayview Loan Servicing, LLC.

Bayview Loan Servicing, LLC is purposely trying to drive my mortgage into foreclosure for profit.

I have provided a 2-page overview with 27 pages of correspondence.

I would like to file a complaint against:

Bayview Loan Servicing, LLC
4425 Ponce De Leon Blvd, 5th Floor
Coral Gables, Florida 33146
Redacted -0299
Redacted @aol.com
Bayviewloanservicing.com

My signature authorizes the Consumer Financial Protection Bureau to take any action deemed necessary for the
purpose of investigation or enforcement.

Respectfully Submitted,

Robert M Lawrence

BAYVIEW-000798

EXHIBIT

LAWRENCE



# Exhibit Separator

Lawrence RFP_0510

| U.S. POSTAL SERVICE | CERTIFICATE OF MAILING |
|---|---|

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL, DOES NOT
PROVIDE FOR INSURANCE—POSTMASTER

Affix fee here in stamps
or meter postage and
post mark. Inquire of
Postmaster for current
fee.

Received From:

ROBERT LAWRENCE
891 S. Dyer Circle
Incline Village, NV 89451

One piece of ordinary mail addressed to:

BAYVIEW LOAN SERVICING
62516 Collection Center Dr.
CHICAGO, ILLINOIS 60693-0625

PS Form 3817, January 2001

29 August 2014

To whom it may concern,

Please accept this mortgage payment for the month of SEPTEMBER.

Please Credit to:

Loan Number: Redacted 1397

Property Address:

891 South Dyer Circle
Incline Village, NV 89451

Check Number: 5904

Check Date: 29 September 2014

Mailing Address for Payment:

62516 Collection Center Drive
Chicago, IL 60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 3295



Lawrence RFP_0509

U.S. POSTAL SERVICE       CERTIFICATE OF MAILING

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL. DOES NOT
PROVIDE FOR INSURANCE—POSTMASTER

Received From:

Robert   Lawrence

891   S.   Dyer   Circle

Incline   Village,   NV   89451

One piece of ordinary mail addressed to:

Bayview   Loan   Servicing

62516   Collection   Center   Drive

Chicago,   IL   60693 – 0625

PS Form 3817, January 2001





01 October 2014

To whom it may concern,

Please accept this mortgage payment for the month of OCTOBER.

Please Credit to:

    Loan Number:   Redacted1397

Property Address:

    891 South Dyer Circle
    Incline Village, NV  89451

Check Number:  5907

Check Date:  01 October 2014

Mailing Address for Payment:

    62516 Collection Center Drive
    Chicago, IL  60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted3295

Lawrence RFP_0508

U.S. POSTAL SERVICE        CERTIFICATE OF MAILING

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL, DOES NOT
PROVIDE FOR INSURANCE-POSTMASTER

Received From:

ROBERT   LAWRENCE

891   South   Dyer   Circle

Incline   Village,   NV   89451

One piece of ordinary mail addressed to:

BANNIED   LOAN   SERVICING

62516   Collection   Center   Drive

Chicago,   IL   60693-0625

PS Form 3817, January 2001

01 November 2014

To whom it may concern,

Please accept this mortgage payment for the month of NOVEMBER.

Please Credit to:

    Loan Number:   Redacted1397

Property Address:

    891 South Dyer Circle
    Incline Village, NV 89451

Check Number:  5911

Check Date:  01 November 2014

Mailing Address for Payment:

    62516 Collection Center Drive
    Chicago, IL 60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted3295

Lawrence RFP_0520

```
CERTIFIED MAIL RECEIPT
Domestic Mail Only
For delivery information, visit our website at www.usps.com

OFFICIAL USE
CHICAGO, IL 60693

Postage          $    $0.49          0450    12/4/14
Certified Fee         $3.30          06      Postmark
                                             Here
Return Receipt Fee
(Endorsement Required)  $0.00
                                     12/4/2014
Restricted Delivery Fee $0.00        Delivery
(Endorsement Required)
Total Postage & Fees  $  $3.79       12/01/2014

Sent To
BAYVIEW LOAN SERVICING
Street & Apt. No.,
or PO Box No.  62516 Collection Ctr DR
City, State, ZIP+4
CHICAGO, ILL 60693-0625

PS Form 3800, July 2014          See Reverse for Instructions
```

01 December 2014

To whom it may concern,

Please accept this mortgage payment for the month of DECEMBER.

Please Credit to:

     Loan Number: Redacted91397

Property Address:

     891 South Dyer Circle
     Incline Village, NV 89451

Check Number: 5915

Check Date: 01 December 2014

Mailing Address for Payment:

     62516 Collection Center Drive
     Chicago, IL 60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted3295

Lawrence RFP_0519

CERTIFIED MAIL RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

O F F I C I A L   U S E

CHICAGO, IL 60693

| Postage | $ | $0.49 | 0450 |
| Certified Fee | | $3.30 | 06 |
| Return Receipt Fee (Endorsement Required) | | $0.00 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $3.79 | 12/31/2014 |

Postmark Here

1/3/15 delivery

7014 2120 0004 3502 7718

Sent To  Bayview Loan Servicing
Street & Apt. No., or PO Box No.  62516 Collection Cle Dr
City, State, ZIP+4  Chicago, Il 60693-0625

PS Form 3800, July 2014          See Reverse for Instructions

01 January 2015

To whom it may concern,

Please accept this mortgage payment for the month of JANUARY.

Please Credit to:

    Loan Number:  0 Redacted 1397

Property Address:

    891 South Dyer Circle
    Incline Village, NV 89451

Check Number:  5919

Check Date:  01 January 2015

Mailing Address for Payment:

    62516 Collection Center Drive
    Chicago, IL 60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 3295

Lawrence RFP_0518

**U.S. Postal Service**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*
For delivery information visit our website at www.usps.com®

CHICAGO, IL 60693

| | | |
|---|---|---|
| Postage | $ | $0.49 | 0450 |
| Certified Fee | | $3.30 | 10 |
| Return Receipt Fee (Endorsement Required) | | $0.00 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $3.79 | 01/30/2015 |

Postmark Here

1/31/15 Delivery

Sent To

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

PS Form 3800, August 2006          See Reverse for Instructions

7013 3020 0000 3884 6478

01 February 2015

To whom it may concern,

Please accept this mortgage payment for the month of FEBRUARY.

Please Credit to:

Loan Number:  ▮Redacted▮1397

Property Address:

    891 South Dyer Circle
    Incline Village, NV 89451

Check Number: 5922

Check Date: 01 February 2015

Mailing Address for Payment:

    62516 Collection Center Drive
    Chicago, IL 60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
▮Redacted▮3295

I have filed a complaint against Bayview Loan Servicing, LLC. Please direct any relevant legal correspondence to:
Yechezkel Rodal, Esq., 2150 S. Andrews Ave., 2nd Floor, Ft. Lauderdale, Florida 33316, Telephone: ▮Redacted▮4357.

Lawrence RFP_0517

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com.

| | | |
|---|---|---|
| Postage | $ | $0.49 | 0450 |
| Certified Fee | | $3.30 | 06 |
| Return Receipt Fee (Endorsement Required) | | $0.00 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $3.79 | 02/27/2015 |

Sent To _Bayview Loan_

Street & Apt. No., or PO Box No. _____

City, State, ZIP+4 _____

PS Form 3800, July 2014          See Reverse for Instructions

27 February 2015

To whom it may concern,

Please accept this mortgage payment for the month of MARCH.

Please Credit to:

    Loan Number: <span style="background:red;color:white">Redacted</span>1397

Property Address

    891 South Dyer Circle
    Incline Village, NV  89451

Check Number: 5925

Check Date: 01 March 2015

Mailing Address for Payment

    62516 Collection Center Drive
    Chicago, IL  60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
<span style="background:red;color:white">Redacted</span>3295

I have filed a complaint against Bayview Loan Servicing, LLC.  Please direct any relevant legal correspondence to: Yechezkel Rodal, Esq., 2150 S. Andrews Ave., 2nd Floor, Ft. Lauderdale, Florida  33316, Telephone: <span style="background:red;color:white">Redacted</span>-4357.

Lawrence RFP_0516



01 April 2015

To whom it may concern,

Please accept this mortgage payment for the month of APRIL.

Please Credit to:

Loan Number: Redacted 1397

Property Address:

891 South Dyer Circle
Incline Village, NV 89451

Check Number: 5928

Check Date: 01 April 2015

Mailing Address for Payment:

62516 Collection Center Drive
Chicago, IL 60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 3295

I have filed a complaint against Bayview Loan Servicing, LLC. Please direct any relevant legal correspondence to:
Yechezkel Rodal, Esq., 2150 S. Andrews Ave., 2nd Floor, Ft. Lauderdale, Florida 33316. Telephone: Redacted 4357.

Lawrence RFP_0515

**U.S. Postal Service**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*
For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | | |
|---|---|---|---|
| Postage | $ | $0.49 | 0402 |
| Certified Fee | | $3.30 | 07 |
| Return Receipt Fee (Endorsement Required) | | $0.00 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $3.79 | |

5/4/15 Debury

05/01/2015

Sent To

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

PS Form 3800, August 2006          See Reverse for Instructions

01 May 2015

To whom it may concern,

Please accept this mortgage payment for the month of MAY.

Please Credit to:

    Loan Number:  Redacted 1397

Property Address:

    891 South Dyer Circle
    Incline Village, NV 89451

Check Number:  5933

Check Date:  01 May 2015

Mailing Address for Payment:

    62516 Collection Center Drive
    Chicago, IL  60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted -3295

I have filed a complaint against Bayview Loan Servicing, LLC.  Please direct any relevant legal correspondence to: Yechezkel Rodal, Esq., 2150 S. Andrews Ave., 2nd Floor, Ft. Lauderdale, Florida 33316, Telephone: ███ 0-4357.

Lawrence RFP_0514



01 June 2015

To whom it may concern,

Please accept this mortgage payment for the month of JUNE

Please Credit to:

Loan Number Redacted 1397

Property Address,

891 South Dyer Circle
Incline Village, NV 89451

Check Number  5936

Check Date  01 June 2015

Mailing Address for Payment:

62516 Collection Center Drive
Chicago, IL 60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 8295

I have filed a complaint against Bayview Loan Servicing, LLC   Please direct any relevant legal correspondence to
Yechezkel Rodal, Esq., 2150 S  Andrews Ave  2nd Floor, Ft Lauderdale, Florida  33316, Telephone Redacted 4357

Lawrence RFP_0513

**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Certified Mail Fee     $3.45     0456

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)     $ _____
☐ Return Receipt (electronic)   $ $0.00
☐ Certified Mail Restricted Delivery  $ $0.00     08     Postmark
☐ Adult Signature Required      $ N/A            Here
☐ Adult Signature Restricted Delivery $ N/A

Postage     $0.49     07/01/2015

Total Postage and Fees     $3.94   7/4/15 Delivery

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

01 July 2015

To whom it may concern,

Please accept this mortgage payment for the month of JUNE

Please Credit to:

Loan Number [Redacted]91397

Property Address:

891 South Dyer Circle
Incline Village, NV 89451

Check Number: 5938

Check Date: 01 July 2015

Mailing Address for Payment:

62516 Collection Center Drive
Chicago, IL 60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
[Redacted]3295

I have filed a complaint against Bayview Loan Servicing, LLC. Please direct any relevant legal correspondence to Yechezkel Rodal, Esq., 2150 S Andrews Ave., 2nd Floor, Ft Lauderdale, Florida 33316. Telephone [Redacted]4357

Lawrence RFP_0512

**CERTIFIED MAIL RECEIPT**
*Domestic Mail Only*

For delivery information visit our website at www.usps.com®

| CHICAGO, IL 60693 | U.S.P.S. |
|---|---|

| Certified Mail Fee | $3.45 | 0402 |
| | | 05 |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $0.00 | |
| ☐ Return Receipt (electronic) | $0.00 | Postmark |
| ☐ Certified Mail Restricted Delivery | $0.00 | Here |
| ☐ Adult Signature Required | $0.00 | |
| ☐ Adult Signature Restricted Delivery | $0.00 | |
| Postage | $0.49 | 8/3/15 Deliv |
| Total Postage and Fees | $3.94 | 07/31/2015 |

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7015 0640 0000 2812 7836

01 August 2015

To whom it may concern,

Please accept this mortgage payment for the month of AUGUST

Please Credit to

Loan Number [Redacted]39"

Property Address:

891 South Dyer Circle
Incline Village, NV 89451

Check Number: 5940

Check Date: 31 July 2015

Mailing Address for Payment:

62516 Collection Center Drive
Chicago, Il 60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
[Redacted]3295

I have filed a complaint against Bayview Loan Servicing, LLC. Please direct any relevant legal correspondence to Yechezkel Rodal, Esq., 2150 S. Andrews Ave., 2nd Floor, Ft. Lauderdale, Florida 33316. Telephone, [Redacted]-4357.



Lawrence RFP_0511

01 September 2015

To whom it may concern,

Please accept this mortgage payment for the month of SEPTEMBER.

Please Credit to:

    Loan Number: Redacted 1397

Property Address:

    891 South Dyer Circle
    Incline Village, NV  89451

Check Number:  5946

Check Date:  01 September 2015

Mailing Address for Payment:

    62516 Collection Center Drive
    Chicago, IL  60693-0625

Respectfully Submitted,

Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 3295

I have filed a complaint against Bayview Loan Servicing, LLC.  Please direct any relevant legal correspondence to:
Yechezkel Rodal, Esq., 2150 S. Andrews Ave., 2nd Floor, Ft. Lauderdale, Florida  33316, Telephone: Redacted 3-4357.



# Exhibit Separator



Robert M Lawrence
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted15-3295
Redactedol.com

04 April 2014

Consumer Financial Protection Bureau
Post Office Box 4503
Iowa City, Iowa 52244
Phone: Redacted-2372
Fax:   (Redacted)2392

Enclosures:
1.   Correspondence from Bayview Loan Servicing, Dated 25 March 2014
2.   Response to Bayview Letter, Dated 04 April 2014,
3.   CFPB Email with corresponding case number: 140315-000154

Consumer Financial Protection Bureau,

I have received a response from Bayview Loan Servicing.

I have enclosed a copy of Bayview's correspondence and my response to their correspondence.

I stand ready to fully support my position.

My signature authorizes the Consumer Financial Protection Bureau to take any action deemed necessary for the
purpose of investigation or enforcement.

Respectfully Submitted,

Robert M Lawrence

BAYVIEW-000791

EXHIBIT

X

LAWRENCE



# Exhibit Separator

Lawrence RPP_0528



Robert M Lawrence                                                    10 March 2014
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 715-3295
....ol.com

Consumer Financial Protection Bureau
Post Office Box 4503
Iowa City, Iowa 52244
Phone: (Redacted-2372
Fax:   Redacted-2392

Enclosures:
   1.   Consumer Financial Protection Bureau Overview, 2 Pages.
   2    Correspondence, 27 Pages

Consumer Financial Protection Bureau

I have a problem with a loan servicing company, Bayview Loan Servicing, LLC

Bayview Loan Servicing, LLC is purposely trying to drive my mortgage into foreclosure for profit.

I have provided a 2-page overview with 27 pages of correspondence.

I would like to file a complaint against:

Bayview Loan Servicing, LLC
4425 Ponce De Leon Blvd, 5th Floor
Cora Gables, Florida 33146
(Redacted-0299
Bayviewteam@aplc.com
Bayviewloanservicing.com

My signature authorizes the Consumer Financial Protection Bureau to take any action deemed necessary for the
purpose of investigation or enforcement.

Respectfully Submitted.

Robert M Lawrence





# Exhibit Separator



"Letter Lawrence RFP_0539
04 APR 14"



Robert M Lawrence                                                        04 April 2014
891 South Dyer Circle
Incline Village, Nevada 89451
Redacted 15-3295
ol.com

Consumer Financial Protection Bureau
Post Office Box 4503
Iowa City, Iowa 52244
Phone: (Redacted 1-2372
Fax:   (Redacted 2392

Enclosures:
    1.  Correspondence from Bayview Loan Servicing, Dated 25 March 2014.
    2.  Response to Bayview Letter, Dated 04 April 2014.
    3.  CFPB Email with corresponding case number: 140315-000154.

Consumer Financial Protection Bureau,

I have received a response from Bayview Loan Servicing.

I have enclosed a copy of Bayview's correspondence and my response to their correspondence.

I stand ready to fully support my position.

My signature authorizes the Consumer Financial Protection Bureau to take any action deemed necessary for the purpose of investigation or enforcement.

Respectfully Submitted,

Signed

Robert M Lawrence

EXHIBIT
Z
LAWRENCE